**SO ORDERED.**

**SIGNED this 11th day of February, 2010.**

_____
**LEIF M. CLARK**
**UNITED STATES BANKRUPTCY JUDGE**
_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| **In re:** | § | **CHAPTER 11 CASE** |
| | § | |
| **AGE REFINING, INC.,** | § | **CASE NO. 10-50501** |
| | § | |
| **Debtor.** | § | |

**INTERIM AGREED ORDER AUTHORIZING LIMITED USE OF CASH COLLATERAL, OBTAINING CREDIT SECURED BY SENIOR LIENS, AND GRANTING ADEQUATE PROTECTION TO EXISTING LIENHOLDERS**

    **CAME ON FOR CONSIDERATION** the _Emergency Motion for Interim and Final Orders Pursuant to Sections 105, 361, 362, 363, 364, 503 and 507 of the Bankruptcy Code (I)(A) Authorizing the Debtor to Use Cash Collateral, (B) Authorizing the Debtor to Obtain Postpetition Financing, (C) Granting Security Interests and Superpriority Administrative Expense Status to the Post-Petition Lender, and (D) Granting Adequate Protection to the Pre-Petition Lender; (II) Scheduling a Final Hearing; and (III) Granting Related Relief_ (the "Financing Motion") filed by the above-captioned debtor, as debtor-in-possession (the

"Debtor"), seeking, *inter alia*, pursuant to Sections 105, 361, 362(a), 363(c), 364(c)(1), 364(c)(2), 364(c)(3), and 364(d)(1) of Title 11 of the United States Code (the "Bankruptcy Code"), and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), the following:

(i)     authority for the Debtor to use Cash Collateral (as defined below) of JPMorgan Chase Bank, N.A. ("Chase Bank") in accordance with the terms and conditions set forth herein;

(ii)    authority for AGE Refining, Inc., as borrower, to obtain post-petition loans and other extensions of credit from Chase Bank as Lender and as Administrative Agent (all as defined in the DIP Agreement) in an amount not to exceed $35,000,000 cumulative of any amounts advanced on an interim basis (the "DIP Commitment"), and including, without limitation, principal, other extensions of credit, interest, fees, expenses, and other costs of Chase Bank in this bankruptcy case (the "Case"), in accordance with the terms and conditions set forth herein and in the attached Debtor In Possession Financing Amendment And Second Amendment To Amended And Restated Credit Agreement (the "DIP Agreement"),[1] the Loan Documents (as defined in the DIP Agreement), as

---

[1] A copy of the DIP Agreement is attached hereto as Exhibit "1", and incorporated herein as if set forth *in haec verba*. Any express conflict between the DIP Agreement and this Financing Order shall be governed by the terms and conditions of this Financing Order. Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the DIP Agreement. Debtor, Chase Bank and Chase Capital Corporation ("Chase Capital") are parties to that certain Intercreditor Agreement dated March 23, 2007 (as amended, the "Intercreditor Agreement"). Each of Chase Bank and Chase Capital is a wholly-owned subsidiary of JPMorgan Chase & Co. Consistent with the terms of the Intercreditor Agreement, Chase Bank and Chase Capital have reached an agreement whereby (i) the DIP Commitment is an obligation of Chase Bank, (ii) Chase Capital maintains the substantive economic interest in the extensions of credit by Chase Bank under the DIP Agreement, and (iii) the Chase Business Credit line of business of Chase Bank shall provide administrative and servicing functions relating to the DIP Agreement pursuant to a servicing agreement between the parties. Notwithstanding anything to the contrary herein, the priority of liens as between Chase Bank and Chase Capital shall be governed by the Intercreditor Agreement.

modified by the DIP Agreement, and all related documents (collectively, the "<u>DIP Facility</u>");

(iii)     authority for the Debtor to execute, deliver, and perform under the DIP Facility and Loan Documents related to the DIP Facility, and all other related agreements and documents creating, evidencing, or securing indebtedness of the Debtor to the Lender and Administrative Agent on account of the DIP Facility or granting or perfecting liens or security interests by the Debtor in favor of and for the benefit of Lender and Administrative Agent on account of the DIP Facility, as same now exists or may hereafter be amended, modified, supplemented, ratified, assumed, extended, renewed, restated, or replaced, and any and all of the documents currently executed or to be executed in connection therewith or related thereto, by and among the Debtor and Lender and Administrative Agent, the terms of which are referenced and incorporated herein as if set forth *in haec verba* (collectively, the "<u>DIP Facility Documents</u>");

(iv)     approval of the terms and conditions of the DIP Facility and the DIP Facility Documents as so executed and delivered;

(v)     modification of the automatic stay of Bankruptcy Code § 362 (the "<u>Automatic Stay</u>") to the extent provided herein;

(vi)     granting of first priority liens and adequate protection to Administrative Agent with respect to its interests in the DIP Collateral (as defined below);

(vii)     granting of adequate protection to Chase Bank and Chase Capital with respect to their interests in the Pre-Petition Collateral (as defined below);

(viii)   the conversion of certain pre-petition obligations under the Letters of Credit (as defined below) into post-petition debt under the DIP Facility on the terms set forth herein and in the DIP Facility Documents; and

(ix)   authorizing the indefeasible transfer of Cash Collateral to and for the benefit of Chase Bank as set forth herein.

1.   The Debtor and Chase Bank have represented to this Court that they have agreed in good faith to the terms and conditions of the DIP Agreement and this *Interim Agreed Order Authorizing Limited Use of Cash Collateral, Obtaining Credit Secured by Senior Liens, and Granting Adequate Protection to Existing Lienholder* (this "<u>Financing Order</u>").

2.   The parties hereto have stipulated and agreed as follows, and based upon the pleadings and evidence at the interim hearing before this Court, this Court hereby acknowledges said stipulations, and grants the relief herein, on an interim basis, pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) to prevent immediate and irreparable harm to the Debtor and its estate.  Therefore, consistent with Bankruptcy Code §§ 361, 362, 363, and 364, this Court hereby finds and Orders:

## <u>OPPORTUNITY TO OBJECT</u>

3.   Pursuant to Bankruptcy Rule 4001(d)(2), any objection to the entry of a final order on the Financing Motion must be filed on or before 4:00 p.m. Central Time on February 23, 2010 (the "<u>Objection Date</u>").  A final hearing on the Financing Motion shall take place on February 25, 2010, at 9:30 a.m., before the Honorable Leif M. Clark, United States Bankruptcy Judge, at the United States Bankruptcy Court, (the "<u>Final Hearing</u>").  Objections shall be in writing and shall be filed with the Clerk of the Bankruptcy Court so that any such objections are received on or before the Objection Date.

4.    The Debtor, Chase Bank, and Chase Capital have represented to the Court that they have negotiated at arm's length and have acted in good faith in the negotiation and preparation of this Financing Order, have been represented by counsel, and intend to be and are bound by its terms.  The terms of this Financing Order reflect the Debtor's exercise of prudent business judgment under exigent circumstances and are consistent with its fiduciary duties and are supported by reasonably equivalent value and fair consideration.

## STATEMENT OF JURISDICTION

5.    This Court has jurisdiction over this proceeding and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

## NOTICE

6.    Notice of the Financing Motion and the interim hearing with respect thereto has been given to prevent immediate and irreparable harm pursuant to Bankruptcy Rules 2002, 4001, and 9006 and the Local Rules, and as required by Bankruptcy Code §§ 102, 105, 361, 362, 363, and 364.  Other than the notice provided for herein, no further notice of the relief sought in the Financing Motion is necessary.

## FACTUAL AND PROCEDURAL BACKGROUND

7.    On February 8, 2010 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtor has continued in the management and possession of its business and property as debtor-in-possession pursuant to Bankruptcy Code §§ 1107 and 1108.

8.    On February 11, 2010, the Court conducted the interim hearing on the Financing Motion and pronounced interim approval of the Financing Motion as set forth herein.

9.     An official committee of unsecured creditors (the "Committee") has not been appointed in this Case as of the date hereof.

## The Pre-Petition Claims of Chase Bank and Chase Capital

10.     The Debtor stipulates that, pursuant to the Pre-Petition Claim Documents (as defined below) and applicable law, Chase Bank and Chase Capital each hold valid, enforceable, and allowable claims against the Debtor, as of the Petition Date, in an aggregate amount equal to at least $74,455,481 of non-contingent and contingent amounts and, to the extent applicable, unpaid principal, plus any and all other fees, cost, expenses, charges, other debts or obligations of the Debtor to Chase Bank and Chase Capital under the Pre-Petition Claim Documents (as defined below) and applicable law (the "Pre-Petition Claims").

11.     The Debtor stipulates that the Pre-Petition Claims constitute allowed, legal, valid, binding, enforceable, and non-avoidable obligations of the Debtor, and shall not be subject to any offset, defense, counterclaim, avoidance, recharacterization, or subordination pursuant to the Bankruptcy Code or any other applicable law, and that the Debtor does not possess and shall not assert any claim, counterclaim, setoff, or defense of any kind, nature, or description which would in any way affect the validity, enforceability and non-avoidability of any of the Pre-Petition Claims.

12.     The Debtor stipulates that, as of the Petition Date, pursuant to the Pre-Petition Claim Documents, Chase Bank has issued approximately $34,766,592 of commercial standby letters of credit (the "Letters of Credit").

## The Pre-Petition Claim Documents

13.     The Debtor stipulates that the Pre-Petition Claims are evidenced by certain documents executed and delivered to Chase Bank and Chase Capital by the Debtor, including, without limitation, that certain Amended and Restated Credit Agreement dated as of September

12, 2008, as amended on March 26, 2009 by the First Amendment to Amended and Restated Credit and Security Agreement, Limited Consent and Waiver, by and between the Debtor and Chase Bank (as amended and supplemented from time to time prior to this date, the "Chase Bank Credit Agreement"), and that certain Second Amended and Restated Credit and Security Agreement, dated as of September 12, 2008 (as amended and supplemented from time to time prior to this date, the "Chase Capital Credit Agreement," and together with the Chase Bank Credit Agreement, collectively, the "Credit Agreement").

14.     The Credit Agreement and all notes, security agreements, assignments, pledges, mortgages, deeds of trust, guaranties, forbearance agreements, letters of credit, and other instruments or documents executed in connection therewith or related thereto shall be referred to herein as the "Pre-Petition Claim Documents."  True and correct copies of certain of the Pre-Petition Claim Documents are retained by the Debtor, and will be available to interested parties upon request.

15.     The Debtor stipulates that the Pre-Petition Claim Documents are genuine, valid, existing, and legally enforceable.

**The Pre-Petition Collateral**

16.     The Debtor stipulates that the Pre-Petition Claims evidenced by the Pre-Petition Claim Documents are secured by perfected first priority liens and security interests in, *inter alia*, all working capital and personal property assets of the Debtor as more fully described in the Pre-Petition Claim Documents, including, without limitation, a pledge of all issued and outstanding equity of the Debtor, accounts, chattel paper, copyrights, patents, trademarks, documents, equipment to the extent such equipment is accounting systems and related computer hardware, software, programs, peripherals, and other similar items related thereto, general intangibles, goods excluding equipment to the extent that such equipment is not accounting systems and

related computer hardware, software, programs, peripherals, and other similar items related thereto and fixtures, instruments, inventory, investment property, cash and cash equivalents, letters of credit, letter-of-credit rights and supporting obligations, deposit accounts, commercial tort claims; and accessions to, substitutions for, and replacements, proceeds (including stock rights), insurance proceeds, and products of the foregoing, together with all books and records, customer lists, credit files, computer files, programs, printouts, and other computer materials and records related thereto and any general intangibles at any time evidencing or relating to any of the foregoing (collectively, the "Pre-Petition Collateral").  Chase Bank's and Chase Capital's liens and security interests in the Pre-Petition Collateral were granted pursuant to, *inter alia*, the Pre-Petition Claim Documents.

17.     The Debtor stipulates that Chase Bank has properly perfected its first priority liens and security interests and other liens in the Pre-Petition Collateral, subject to Prior Liens (as defined below), if any, the DIP Facility, and this Financing Order as evidenced by, among other things, the Pre-Petition Claim Documents, documents held in possession of Chase Bank and documents filed with the appropriate state, county, and other offices.

18.     The Debtor stipulates that Chase Capital has properly perfected its first priority liens and security interests and other liens in the Pre-Petition Collateral, subject to Prior Liens (as defined below), if any, the DIP Facility, and this Financing Order as evidenced by, among other things, the Pre-Petition Claim Documents, documents held in possession of Chase Capital and documents filed with the appropriate state, county, and other offices.

## Default by the Debtor

19.     The Debtor stipulates that the Debtor is in default of its debts and obligations to Chase Bank and Chase Capital under the terms and provisions of the Pre-Petition Claim Documents.  The Debtor stipulates that these defaults exist, have not been timely cured, and are

continuing. The Debtor stipulates that the filing of this Case has accelerated the Pre-Petition

Claims for all purposes in this Case and in connection with Chase Bank's and Chase Capital's

enforcement of their rights and remedies under applicable non-bankruptcy law. The Debtor

stipulates that the Pre-Petition Claims remain due and owing to Chase Bank and Chase Capital

without any claim, counterclaim, setoff, or defense of any kind, nature, or description.

### Chase Bank's Interests

20.     The Debtor stipulates that Chase Bank and Chase Capital, subject to the

Intercreditor Agreement, holds, or will hold as a result of this Financing Order (in each case

subject to (a) Prior Liens, if any, and (b) the Carve-Out), enforceable, first priority perfected

liens and security interests in the Pre-Petition Collateral and Cash Collateral (as defined below),

plus any and all other property of the estate, real and personal, to the extent provided under

Bankruptcy Code § 552(b), any other provision of the Bankruptcy Code, this Financing Order, or

applicable law to secure the Pre-Petition Claims and the DIP Facility, plus, without limitation,

any other amounts allowable under the Bankruptcy Code and applicable law (the "Lender's

Interests").

## CASH COLLATERAL

### Chase Bank's Cash Collateral

21.     The Debtor stipulates that, to the extent of the Lender's Interests, all cash of the

Debtor's bankruptcy estate, wherever located, and all cash equivalents, whether in the form of

negotiable instruments, documents of title, securities, deposit accounts, investment accounts, or

in any other form, which represent income, proceeds, products, rents, or profits of the Collateral

(as defined below) that were on the Petition Date in the Debtor's possession, custody or control

(or persons in privity with the Debtor), or in which the Debtor will obtain an interest during the

pendency of this Case whether via advances under the DIP Facility or otherwise, or which

represent income, proceeds, products, rents, or profits of the Collateral (collectively, the "Cash Collateral"), shall constitute the cash collateral of Chase Bank and Chase Capital.  The Debtor stipulates that Chase Bank has first priority perfected liens and security interests in the Cash Collateral (and Chase Capital has second priority perfected liens and security interests in the Cash Collateral) pursuant to the applicable provisions of the Pre-Petition Claim Documents, the Intercreditor Agreement, Bankruptcy Code §§ 363(a) and 552(b), and this Financing Order, but subject to Prior Liens and the Carve-Out.

22.     The Debtor shall segregate and account to Chase Bank and Chase Capital for all Cash Collateral that it now possesses, that it has permitted to be transferred into the possession of others (if any), that is being held by those in privity with the Debtor, or that the Debtor might hereafter obtain or have any interest in.  The Debtor shall account to Chase Bank and Chase Capital for the receipt and use, if any, of the Cash Collateral received by the Debtor since the Petition Date and prior to the entry of this Financing Order.  Absent a further order of this Court or the consent of Chase Bank and Chase Capital, the Debtor is strictly prohibited from using the Cash Collateral except as expressly provided for herein.

## Need For and Consent to Limited Use of Cash Collateral

23.     Chase Bank and Chase Capital do not consent to the Debtor's use of Cash Collateral except in strict accordance with the terms and conditions contained in this Financing Order.  The relief hereunder is necessary to avoid immediate and irreparable harm to the estate because, without the use of Cash Collateral, the Debtor will not have the funds necessary to maintain its assets, sell or otherwise liquidate its assets, provide financial information, pay necessary employees, payroll taxes, overhead, and other expenses necessary to maximize the value of the Debtor's assets.  The Debtor requires the use of Cash Collateral as provided herein.

24.     Good, adequate, and sufficient cause has been shown to justify the granting of the relief requested herein.  The use of Cash Collateral will benefit the Debtor and its estate.  The ability of the Debtor to maximize the value of its assets depends upon the Debtor's ability to use the Cash Collateral of Chase Bank and Chase Capital.  Accordingly, the use of Cash Collateral by the Debtor is actual and necessary to preserving its estate.

### Authorization for Limited Use of Cash Collateral

25.     The Debtor is hereby authorized, on a limited basis, to use Cash Collateral only in strict accordance with the terms and conditions provided in this Financing Order.

## DIP FACILITY

### Need for DIP Facility

26.     Without the use of Cash Collateral and the DIP Facility, the Debtor will not have the funds necessary to maintain its assets, sell or otherwise liquidate its assets, provide financial information, pay necessary employees, payroll taxes, overhead, and other expenses necessary to maximize the value of the Debtor's assets.  The use of the Cash Collateral and obtaining the DIP Facility is actual and necessary to preserving the Debtor and its estate.  Chase Bank is willing to provide the DIP Facility to or for the benefit of the Debtor only in accordance with the terms of the DIP Agreement and this Financing Order.

27.     The Debtor has requested that Chase Bank and Chase Capital provide use of Cash Collateral and the DIP Facility in order to provide funds to be used for the purposes set forth in the Budget, and such other purposes as required by this Financing Order and to which Chase Bank and Chase Capital consent in writing.

28.     The Debtor has sought to obtain financing from other sources and is unable to obtain credit allowable under Bankruptcy Code § 503(b)(1), or pursuant to Bankruptcy Code §§ 364(a) and (b), on terms more favorable to the Debtor than the terms of the DIP Facility.

29.     The terms of the DIP Facility and this Financing Order are fair, just, and reasonable under the circumstances, are ordinary and appropriate for secured financing to a debtor-in-possession, reflect the Debtor's exercise of its prudent business judgment consistent with its fiduciary duties, and are supported by reasonably equivalent value and fair consideration. The terms and conditions for the use of cash collateral and of the DIP Facility and this Financing Order have been negotiated in good faith and at arms' length by and among the Debtor, on the one hand, and Chase Bank and Chase Capital, on the other hand, with all parties being represented by counsel.  Any credit extended under, or Cash Collateral consented to be used pursuant to, the terms of this Financing Order and the DIP Facility shall be deemed to have been extended or consented to be used in good faith by Chase Bank and Chase Capital, as the term "good faith" is used in Section 364(e) of the Bankruptcy Code.

## Authorization to Obtain Credit

30.     The Debtor is hereby authorized to obtain credit only in accordance with the DIP Agreement, the DIP Facility, this Financing Order and the Budget (as defined below).

31.     The Debtor is hereby authorized to obtain post-petition loans and other extensions of credit in an amount not to exceed $[35,000,000] on an interim basis pursuant to the terms of this Financing Order and the terms of the DIP Agreement, solely for the purposes set forth in the Budget or otherwise due under the DIP Facility as and when they come due.  The DIP Facility shall be limited to credit extended under the Letters of Credit to the extent of the amount set forth in the Budget (as defined below) unless agreed otherwise in writing by Chase Bank and Chase Capital.

## Superpriority Liens and Administrative Claims

32.     Chase Bank is entitled to and is hereby granted first priority claims, priming liens and the protections of good faith credit providers under Bankruptcy Code §§ 364(c)(1), (c)(2),

and (c)(3), 364(d)(1), and 364(e) to secure the DIP Facility, senior to all other liens and security interests, including adequate protection and replacement liens granted pursuant to the terms of this Financing Order, which liens and security interests shall secure all DIP Facility amounts (and including, without limitation, principal and any other extensions of credit, interest, fees, expenses, and any fees and expenses of Chase Bank and Chase Capital in this Case, however incurred, including the amounts of any funds drawn on the Letters of Credit subsequent to the Petition Date), but subject only to Prior Liens and the Carve-Out (as each term is defined below).

33.    The first priority and priming liens and security interests securing the DIP Facility granted hereby are valid and automatically perfected first priority priming liens and security interests, subject only to Prior Liens, the Intercreditor Agreement, and the Carve-Out, in and upon "DIP Collateral, and hereby attach to any and all of the properties and assets of the Debtor and the Debtor's bankruptcy estate, both real and personal, including, without limitation, all cash, accounts, inventory, equipment, general intangibles, intellectual property of all kinds including patents, trademarks, trade names, service marks and copyrights, securities, instruments, investment property, deposit accounts, chattel paper, warehouse receipts, bills of lading, tax refunds of any nature, insurance proceeds, insurance premium refunds, deposits of any kind, security deposits, utility deposits, bonds and proceeds of same, claims of any kind, causes of action of any kind (whether by contract or tort, common law or statutory, equitable or otherwise but excluding Bankruptcy Code Chapter 5 causes of action), oil and gas interests, leasehold interests in real estate or personal property and customer lists, whether acquired before or after the Petition Date, whether now owned and existing or hereafter acquired, created, or arising, and all products, proceeds, rents, revenues, and profits thereof (including, without limitation, claims of the Debtor against third parties for loss or damage to such property), and all accessions

thereto, substitutions and replacements therefor, and wherever located (collectively with the Lender's Interests, the "Collateral").

34.     Additionally, and subject to the Intercreditor Agreement, on account of the DIP Facility and use of Cash Collateral, Chase Bank and Chase Capital are hereby granted superpriority administrative claims and all other benefits and protections allowable under Bankruptcy Code §§ 507(b) and 503(b)(1), senior in right to all other administrative claims against the estate, except for the Carve-Out.

## Cash Collateral Accounts

35.     The Debtor shall immediately, and shall continue to, segregate, remit, and deposit all Cash Collateral in the Debtor's accounts, possession, custody or control and which the Debtor may receive in the future, in accordance with the applicable cash management orders entered by this Court, and consistent with the Debtor's past and ordinary business practices.  The bank accounts of the Debtor (individually or collectively, the "Cash Collateral Accounts") shall be in the name of the Debtor, but Chase Bank shall have full dominion and control over such accounts.

36.     The Debtor shall be prohibited from withdrawing funds from the Cash Collateral Accounts, except in strict compliance with the terms of this Financing Order and the DIP Facility.

37.     The Debtor may instruct Chase Bank, in writing, or in another manner acceptable to Chase Bank, to stop payment on certain prepetition items that may be presented to Chase Bank for payment.  In the event an item is presented, and regardless of whether the Debtor has not given a stop payment order, and such item is cleared, Chase Bank will have no liability regarding same and the Debtor's sole remedy shall be recovery from the transferee.

38.     As adequate protection of the Lender's Interests in the Collateral and the Cash Collateral, any and all Cash Collateral in the Cash Collateral Accounts shall be transferred on a

daily basis to Chase Bank (and Chase Bank is hereby authorized to effectuate such transfers) and applied against either the Pre-Petition Claims or the DIP Facility, as determined in Chase Bank's sole and absolute discretion, in accordance with the terms of the Pre-Petition Claim Documents, the DIP Facility Documents, and this Financing Order, until such time as the Pre-Petition Claims and the DIP Facility are indefeasibly paid and satisfied in full.

39.     All funds transferred to Chase Bank hereunder constitute Cash Collateral of Chase Bank.  In the event that any funds so transferred are ever determined not to be Cash Collateral, and Chase Bank expressly reserves all rights and remedies in connection with any such determination of same, such funds so transferred shall be subject to the super-priority, adequate protection, and replacement liens of Chase Bank for the DIP Facility, the use of Cash Collateral, and decrease in the value of the Lender's Interests in property of this bankruptcy estate in accordance with the terms of this Financing Order.

## ADEQUATE PROTECTION OF CHASE BANK'S AND CHASE CAPITAL'S INTERESTS

### Budgeted Cash Collateral Usage

40.     As adequate protection of the Lender's Interests in the Collateral and for the Debtor's use of Cash Collateral and only so long as an Event of Default (as defined herein) shall not have occurred, the Debtor is authorized to and shall use the Cash Collateral (including the advances under the DIP Facility) strictly in accordance with the budget attached hereto as Exhibit "2" (the "Budget"), subject to a permitted variance for aggregate cash receipts, disbursements and expenses each not to exceed 5% on a line item by line item basis measured weekly on a rolling four (4) week basis from the commencement of the Petition Date to the date of determination.  Notwithstanding the foregoing, there shall be no variance above the agreed-upon Carve-Out.  Prior to any transfer or use of Cash Collateral by the Debtor, AGE Refining

Inc.'s Chief Restructuring Officer ("CRO")[2] shall review and verify the proposed transfer or use of Cash Collateral for strict compliance with the Budget and DIP Agreement.

41.     Chase Bank's and Chase Capital's consent to use of Cash Collateral and agreement to extend credit extends only to (i) amounts due under the DIP Facility and (ii) amounts actually incurred in accordance with the Budget.  Upon the occurrence of an Event of Default, Chase Bank's and Chase Capital's consent to use of Cash Collateral or agreement to extend credit shall automatically and immediately terminate and any consent for use of Cash Collateral or agreement to extend credit to satisfy projected, budgeted expenditures shall be immediately terminated and deemed withdrawn, except that the Debtor may continue to use Cash Collateral and funds under the DIP Facility to pay Budgeted expenses that were actually incurred prior to an Event of Default, but which remain unpaid at the time of an Event of Default, and in no event will expenses or Budget amounts be considered incurred until the week such expense or Budgeted amount is listed in the Budget.

42.     Except as may specifically be provided in the Budget including, without limitation, for ordinary course payroll, benefits, and expense reimbursements, the Debtor agrees that no transfer of Cash Collateral shall be made to any of the Debtor's insiders, as that term is defined in Bankruptcy Code § 101.  Any Budgeted transfers to insiders shall be so identified in the Budget.

43.     The Budget may be modified in writing only with the prior written consent of the CRO, and Chase Bank.

---

[2] The DIP Agreement provides for the engagement of a CRO for the Debtor.

**Replacement and Adequate Protection Liens; Conversion of Letter of Credit Obligations to Post-Petition Obligations; Superpriority Administrative Claims**

44.     Taking into account all factors in this Case, as adequate protection of the Lender's Interests and for the Debtor's use of Cash Collateral, and subject only to Prior Liens, if any, the Intercreditor Agreement, and the Carve-Out, and the liens relating to the DIP Facility, Chase Bank and Chase Capital are hereby granted, effective as of the Petition Date, valid and automatically perfected first priority replacement liens and security interests in and upon the Collateral and all other property of the Debtor and the Debtor's estate.  In addition, any and all claims of Chase Bank under the Pre-Petition Claim Documents, the Letters of Credit or the DIP Facility shall be deemed post-petition obligations of the Debtor for all purposes and shall be afforded all benefits and protections afforded to the DIP Facility hereunder.  Further, and in addition to all other rights and remedies they may have at law or in equity, Chase Bank and Chase Capital shall have the right of setoff and recoupment as to any estate funds held by Chase Bank on account of the Debtor.

45.     To the extent any adequate protection is insufficient to adequately protect the Lender's Interests Chase Bank and Chase Capital are hereby granted superpriority administrative claims and all of the other benefits and protections allowable under Bankruptcy Code § 507(b), junior only in right to (i) any superpriority administrative claims granted to Chase Bank on account of the DIP Facility, (ii) the Intercreditor Agreement, and (iii) the Carve-Out.

## Automatic Perfection

46.     This Financing Order, the Pre-Petition Claim Documents, and the DIP Facility Documents shall be sufficient and conclusive evidence of the priority, perfection, attachment, and validity of all of Chase Bank's and Chase Capital's security interests in and liens on the Collateral, and the liens and security interests granted and created by this Financing Order,

constitute valid, automatically perfected and unavoidable security interests, with the priorities granted hereunder and thereunder, without the necessity of creating, filing, recording, or serving any financing statements or other documents that might otherwise be required under federal or state law in any jurisdiction or the taking of any other action to validate or perfect the security interests and liens granted to Chase Bank and Chase Capital by this Financing Order and the DIP Facility Documents.

47.     To the extent that any applicable non-bankruptcy law otherwise would restrict the granting, scope, enforceability, attachment, or perfection of Chase Bank's and Chase Capital's liens and security interests authorized, ratified, or created by this Financing Order or otherwise would impose filing or registration requirements with respect to such liens, such law is hereby pre-empted to the maximum extent permitted by the Bankruptcy Code, applicable federal law, and the judicial power of the United States Bankruptcy Court.

48.     By virtue of the terms of this Financing Order, to the extent that Chase Bank and Chase Capital have filed Uniform Commercial Code financing statements, mortgages, deeds of trust, or other security or perfection documents under the name of the Debtor, such filings shall be deemed to properly perfect its liens and security interests granted under this Financing Order without further action by Chase Bank or Chase Capital.

49.     If Chase Bank or Chase Capital shall, in their respective discretion, elect for any reason to file any Uniform Commercial Code financing statements or other recordable documents to evidence perfection of their respective interests in property of the estate, Chase Bank and Chase Capital or, upon the request of either, the Debtor, is authorized and directed to execute, or cause to be executed, all such financing statements or other documents, and the filing, recording, or service (as the case may be) of such financing statements or similar

documents shall be deemed to have been made at the time of and on the Petition Date, and the signature(s) of any person(s) designated by the Debtor, whether by letter to Chase Bank and Chase Capital or by appearing on any one or more of the agreements or other documents respecting the security interests and liens of Chase Bank and Chase Capital granted hereunder, shall bind the Debtor and its estate.  Chase Bank or Chase Capital may, in their sole and absolute discretion, execute such documents on behalf of the Debtor as the Debtor's attorney-in-fact, or file a certified copy of this Financing Order in any filing or recording office in any county or other jurisdiction in which the Debtor has real or personal property, and, in such event, the subject filing or recording officer is authorized and directed to file or record such documents or certified copy of this Financing Order.

### Authorization to Act

50.     The Debtor is hereby authorized and directed to perform all acts, take any action, and execute and comply with the terms of such other documents, instruments and agreements, as Chase Bank or Chase Capital may reasonably require as evidence of and for the protection of the Collateral, or that may be otherwise reasonably deemed necessary by Chase Bank or Chase Capital to effectuate the terms and conditions of this Financing Order and the DIP Facility.

51.     Until all of the DIP Facility and the Pre-Petition Claims shall have been indefeasibly paid and satisfied in full by their terms, and without further order of the Court: (a) the Debtor shall use the DIP Facility proceeds and all Cash Collateral strictly in accordance with the terms of the Budget requirements and other terms of this Financing Order; (b) the Debtor shall not, without prior written approval from the Court after notice to Chase Bank and Chase Capital, engage in any transaction that is not in the ordinary course of the Debtor's business, and (c) the Debtor shall timely comply with all of the covenants set forth in the DIP

Facility Documents to the extent not rendered impossible or commercially impracticable as a result of existing defaults or the filing of the Case.

## Prior Liens

52.     The security interests and liens of Chase Bank and Chase Capital granted pursuant to the terms of this Financing Order are subject to the Intercreditor Agreement and shall not have priority over: (a) perfected and unavoidable liens and security interests in property of the Debtor's estate as of the Petition Date, provided that (i) such perfected and unavoidable liens and security interests are valid, perfected and senior in priority to Chase Bank's and Chase Capital's liens and security interests in accordance with applicable law (together, the "Prior Liens"), and (ii) the foregoing is without prejudice to the rights of the Debtor or any other party in interest, including Chase Bank and Chase Capital, to object to the validity, priority, or extent of such Prior Liens, or the allowance of such debts secured thereby, or to institute any actions or adversary proceedings with respect thereto; (b) the quarterly fees payable to the United States Trustee pursuant to 28 U.S.C. § 1930; (c) the fees and expenses of the Clerk of this Court; and (d) the Carve-Out.  The post-petition liens granted to Chase Bank and Chase Capital pursuant to this Financing Order shall not at any time be (a) made subject or subordinated to, or made pari passu with any other lien, security interest existing as of the Petition Date, or claim or created under sections 363 or 364(d) of the Bankruptcy Code or otherwise (except with respect to the Permitted Liens), or (b) subject to any lien or security interest that is avoided and preserved for the benefit of the Debtor's estate under section 551 of the Bankruptcy Code.

## No Additional Liens

53.     Until the DIP Facility and the Pre-Petition Claims are fully satisfied by their terms, the Debtor shall not be authorized to obtain credit secured by a lien or security interest in the Pre-Petition Collateral, Cash Collateral, or DIP Collateral, other than the DIP Facility,

without the prior written consent of Chase Bank and Chase Capital or order of the Court upon reasonable notice.

## **No Liability**

54.     From and after the Petition Date, no act committed or action taken by Chase Bank or Chase Capital under this Financing Order, the collection of the Pre-Petition Claims, or the DIP Facility shall be used, construed, or deemed to hold Chase Bank to be in "control" of or participating in the governance, management, or operations of the Debtor for any purpose, without limitation, or to be acting as a "responsible person(s)" or "owner(s) or operator(s)" or a person(s) in "control" with respect to the governance, management, or operation of the Debtor or its business (as such terms, or any similar terms, are used in the Internal Revenue Code, WARN Act, Comprehensive Environmental Response, Compensation and Liability Act, or the Bankruptcy Code, each as may be amended from time to time, or any other federal or state statute, at law, in equity, or otherwise) by virtue of the interests, rights, and remedies granted to or conferred upon Chase Bank and Chase Capital under the Pre-Petition Claim Documents, the DIP Facility Documents, or this Financing Order including, without limitation, such rights and remedies as may be exercisable by Chase Bank or Chase Capital in connection with this Financing Order.

## **Automatic Stay**

55.     The Automatic Stay is hereby vacated and modified to the extent necessary to permit (a) the Debtor, Chase Bank and Chase Capital to commit all acts and take all actions necessary to implement the DIP Facility and this Financing Order and (b) all acts, actions, and transfers contemplated herein, including, without limitation, transfers of Cash Collateral and other funds to Chase Bank by the Debtor as provided herein.

## **Collateral Insurance, Maintenance, Taxes, and Deposits**

56.     The Debtor shall maintain, with financially sound and reputable insurance companies, insurance of the kind covering the Collateral, and in accordance with the Pre-Petition Claim Documents and the DIP Facility Documents (covering such risks in amounts as shall be satisfactory to Chase Bank and shall name Chase Bank as loss payee thereunder), including, without limitation, insurance covering the Collateral and such other collateral of Chase Bank, if any, as Chase Bank may from time to time reasonably request; and, at Chase Bank's request, the Debtor shall deliver to Chase Bank evidence of the maintenance of such insurance.

57.     Upon receipt of notification (written or oral) that an insurance policy issued prior to the Petition Date covering any Collateral will not be renewed by the respective carrier, the Debtor will immediately notify Chase Bank in writing of such occurrence and thereafter provide Chase Bank with the status of all negotiations, if any, regarding such policy on a weekly basis.

58.     To the extent permitted by the Budget, the Debtor shall make any and all payments necessary to keep the Collateral and its other property in good repair and condition and not permit or commit any waste thereof.  The Debtor shall exercise its business judgment and, in so doing shall preserve, maintain, and continue all material patents, licenses, privileges, franchises, certificates and the like necessary for the operation of its business.

59.     To the extent the Debtor has made or make any deposits for the benefit of utility companies or any other entity (and the Debtor shall not make any such deposits which are not included in the Budget without first obtaining consent of Chase Bank), such deposits shall be, and hereby are, upon any return of same to the Debtor, subject to first priority perfected liens and security interests of Chase Bank in respect of the DIP Facility and the Debtor's use of Cash Collateral granted by this Financing Order.

**Reporting Requirements**

60.     The Debtor is authorized and directed to provide to Chase Bank all of the documentation and reports required under the DIP Agreement and the DIP Facility Documents, including the Reports required by the DIP Agreement, borrowing base reports, schedules, assignments, financial statements, insurance policies, and endorsements, unless Chase Bank waives or modifies such requirements in writing (the "Reporting Information").

61.     The Reporting Information shall also include: (a) weekly reports of receipts and budgeted cash usage; (b) copies of all reports filed with the Office of the United States Trustee within two (2) days after such filing; and (c) such additional financial or other information concerning the acts, conduct, property, assets, liabilities, operations, financial condition, and transactions of the Debtor, or concerning any matter that may affect the administration of the estate, as Chase Bank may from time to time reasonably request.  All Reporting Information shall be in accordance with accounting principles and bookkeeping practices consistently applied with past accounting principles and bookkeeping practices and reporting of the Debtor to Chase Bank.

62.     The Debtor shall immediately deliver to Chase Bank any and all documentation that in any way relates to a solicitation, offer, or proposed sale or disposition of a material amount of property of the Debtor's estate, including, but not limited to, letters of inquiry, solicitations, letters of intent, or asset purchase agreements.  Chase Bank shall not disclose such information other than to its attorneys, agents and advisors, and to Chase Capital and its attorneys, agents and advisors, without the prior consent of the Debtor or upon order of the Court entered upon reasonable notice.

63.     Chase Bank, Chase Capital, and their representatives, agents, consultants and other professionals shall be permitted, in coordination with Debtor's counsel, to contact and

communicate with the Debtor and its financial advisors regarding potential transactions for the sale or other disposition of assets of the Debtor's estate. The Debtor shall be responsive and employ its best efforts to cooperate in the coordination of all such contacts and communications, including, without limitation, by conducting update telephone conferences with the Debtor, its investment bankers, and Chase Bank and Chase Capital upon request regarding any potential transactions for the sale or other disposition of the assets of the Debtor's estate. In the event the Debtor shall not be responsive and/or employ its best efforts to cooperate in the coordination of all such contacts and communications, then, upon notice of same by Chase Bank or Chase Capital to the Debtor, the Debtor consents to an expedited hearing upon Chase Bank's or Chase Capital's motion in which Chase Bank, on behalf of its representatives, agents, consultants and other professionals, may seek to be permitted to conduct such contacts and communications without the Debtor.

64. Chase Bank, Chase Capital and their respective agents and advisors shall have full access, upon reasonable notice during normal business hours, to the Debtor's business records, business premises, and to the Collateral to enable Chase Bank, Chase Capital or their agents and advisors to (a) review, appraise, and evaluate the physical condition of the Collateral, (b) inspect and review the financial records and all other records of the Debtor concerning the operation of the Debtor's business, and (c) evaluate the Debtor's overall financial condition and all other records relating to the operations of the Debtor. The Debtor shall fully cooperate with Chase Bank and Chase Capital regarding such reviews, evaluations, and inspections, and shall make its employees and professionals available to Chase Bank, Chase Capital and their professionals and consultants to conduct such reviews, evaluations, and inspections.

**Interest, Fees, Costs and Expenses of Chase Bank and Chase Capital**

65.     During the Case, as additional adequate protection, all interest, fees, costs, and expenses, including attorneys' fees and expenses, due at any time to Chase Bank and Chase Capital under the Pre-Petition Claim Documents and/or the DIP Facility Documents (including the Expenses described in Section 7 of the DIP Agreement), as applicable, or that are incurred as a result of the Debtor's Case (collectively, the "Lender's Costs"), may be charged by Chase Bank and Chase Capital and shall be paid by the Debtor out of the Cash Collateral or out of any DIP Facility advances, on a monthly basis, up to the aggregate amount for such Lender's Costs set forth in the Budget or, if greater than such amount in the Budget and only if approved in writing by Chase Bank, by an over-advance which shall then be deemed to be part of the DIP Facility.  The Debtor is hereby authorized to pay such Lender's Costs without Chase Bank, Chase Capital or their counsel having to file any further application with this Court for approval or payment of such Lender's Costs.  Any such Lender's Costs incurred by professionals retained by Chase Bank or Chase Capital shall be paid within ten (10) calendar days of delivery of a summary invoice to the Debtor, with a copy to the U.S. Trustee and any official committee appointed in this Case; provided, however, that if the Debtor, U.S. Trustee, or any official committee objects to the reasonableness of such fees and expenses and cannot resolve within five (5) business days of service of such invoice(s), the Debtor, U.S. Trustee, or any official committee, as the case may be, shall file and serve upon such professional an objection with the Court (a "Fee Objection") limited to the issue of the reasonableness of the disputed fees and expenses; provided, further, that the Debtor shall timely pay in accordance with this Financing Order the undisputed fees, costs, and expenses reflected on any invoice to which a Fee Objection has been timely filed.  All such unpaid fees, costs, and expenses of Chase Bank or Chase Capital, including, without limitation, all fees referred to in the DIP Facility Documents (including,

without limitation, all attorneys' and other professionals' fees and expenses), shall constitute obligations under the DIP Facility and shall be secured by the Collateral and afforded all priorities and protections afforded to the DIP Facility under this Financing Order and the DIP Facility Documents.

### Hiring of Additional Professionals

66.    The DIP Agreement requires that the Debtor engage the CRO and project manager Muse Stancil & Co.  Such hiring of these professionals shall be the subject of a separate motion and order.

### Professional Fees of the Estate

67.    Chase Bank hereby consents to the Debtor's professionals, including the CRO and Muse Stancil & Co. retained in this Case retaining any retainers held as of the Petition Date, provided that such retainers are used first for payment of allowed fees and expenses of such firms holding such retainers.   Chase Bank additionally consents, subject to the terms and conditions set forth in this Financing Order, to a carve out of its Collateral interests for the payment of the allowed professional fees and expenses of those professionals retained pursuant to an order of this Court by the Debtor or Committee (collectively, the "Estate Professionals") to the extent set forth in the Budget and approved by an order of this Court, and only so long as such fees and expenses are incurred and earned prior to the occurrence of an Event of Default; provided that, subsequent to the occurrence of an Event of Default, there shall be an aggregate amount not to exceed $500,000 as additional carve-out funds for the payment of allowed professional fees, subject to any other terms and conditions of the engagement agreements and appurtenant orders for the employment of such Estate Professionals (the "Carve-Out").  So long as no Event of Default shall have occurred and be continuing, the Debtor shall be permitted to

segregate and pay Budgeted compensation and reimbursement of expenses as allowed and payable under 11 U.S.C. §330 and §331, as the same may be due and payable, and the same shall not reduce the Carve-Out.

68.     Other than the Carve-Out set forth above, Chase Bank does not consent to any carve-out of its Collateral interests for payment of any fees and expenses of the Estate Professionals.

69.     Unless the DIP Facility and Pre-Petition Claims have been paid in full, any remaining unapplied retainer funds at the conclusion of an Estate Professional's engagement shall be immediately returned to Chase Bank as Chase Bank's Cash Collateral.  Any and all payments of fees and expenses to any Estate Professionals shall constitute diminution in the value of the Collateral for all purposes.  Notwithstanding any other provision herein, all liens, security interests and claims of Chase Bank shall be subject to the Carve-Out of the Estate Professionals, provided that nothing herein shall waive any right of Chase Bank or Chase Capital to object to any fees or expenses of such professionals as to reasonableness.

70.     Notwithstanding the foregoing, and irrespective of the Carve-Out, in no event shall Cash Collateral, or the proceeds of any loans, advances, or other funds made available by Chase Bank or Chase Capital to or for the benefit of the Debtor, ever be used for the payment or reimbursement of any fees, expenses, costs, or disbursements of any of the professionals incurred in connection with the assertion or joinder in any claim, counter-claim, action, proceeding, application, motion, objection, defense, or contested matter, the purpose of which is to seek any order, judgment, determination, or similar relief (a) invalidating, setting aside, avoiding, or subordinating in whole or part Chase Bank's or Chase Capital's liens and security interests provided by the Pre-Petition Claim Documents or this Financing Order, (b) seeking any

monetary damages or asserting a claim against Chase Bank or Chase Capital or (c) preventing, hindering or delaying, whether directly or indirectly, Chase Bank's or Chase Capital's assertion, enforcement, or realization upon any Collateral.

## No Surcharge

71.     No costs or expenses of administration which have or may at any time be incurred in this Case (or in any successor Chapter 7 case) shall be charged against Chase Bank, or Chase Capital, their respective claims or the Collateral pursuant to Section 506(c) of the Bankruptcy Code without the prior written consent of Chase Bank and Chase Capital, and no such consent shall be implied from any other action, inaction, or acquiescence by Chase Bank or Chase Capital.  Chase Bank and Chase Capital shall not be subject in any way whatsoever to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Collateral.

## EVENTS OF DEFAULT/REMEDIES

## Events of Default

72.     The occurrence of any of the following shall constitute an Event of Default under this Financing Order upon notice to the Debtor by Chase Bank: (a) any default, violation, or breach of any of the terms of this Financing Order, the DIP Agreement or the DIP Facility Documents by the Debtor; (b) the occurrence of the Expiration Date (as defined below), maturity, termination, expiration, or non-renewal of this Financing Order or the DIP Facility as provided for herein or in the DIP Facility Documents; (c) the Debtor shall fail to pay any principal or other extensions of credit of the DIP Facility when the same becomes due and payable; (d) the Debtor shall fail to pay any interest on the DIP Facility or any fee or other amount due with respect to the DIP Facility after such interest, fee, or other amount becomes due and payable; (e) the Debtor shall fail to obtain, on or before March 15, 2010, an order by the Bankruptcy Court approving the DIP Financing on a final basis in form and substance

satisfactory to Chase Bank in its sole and absolute discretion; (f) any representation or warranty made by the Debtor in the DIP Agreement or in any statement or certificate given after the Effective Date (as defined in the DIP Agreement) by the Debtor in writing pursuant to any Loan Document or in connection with any Loan Document shall be false in any material respect on the date as of which made; (g) any of the Debtor's Case shall be dismissed or converted to a case under chapter 7 of the Bankruptcy Code with out the express written consent of Chase Bank; (h) the appointment of a trustee or examiner in any of the Debtor's Case without the express written consent of Chase Bank; (i) any security interest, lien, claim, or encumbrance, excluding the liens permitted pursuant to the DIP Agreement, shall be granted in any of the Collateral which is *pari passu* with or senior to the claims of Chase Bank, including any surcharge of the Collateral pursuant to Bankruptcy Code §506(c) or otherwise without the express written consent of Chase Bank and Chase Capital; (j) the entry of an order granting relief from the Automatic Stay to the holder or holders of any other security interest or lien (other than Chase Bank or Chase Capital) in any Collateral to permit the pursuit of any judicial or non-judicial transfer or other remedy against any of the Collateral without the express written consent of Chase Bank and Chase Capital; (k) any provision of the DIP Facility Documents shall cease to be valid and binding on the Debtor, or the Debtor shall so assert in any pleading filed with any court; (l) the Debtor shall attempt to vacate or modify this Financing Order over the objection of Chase Bank or Chase Capital; (m) the entry of an order pursuant to Section 363 of the Bankruptcy Code approving the sale of a material portion of the Debtor's assets without the prior written consent of Chase Bank and Chase Capital to such sale; (n) the failure to confirm a plan of reorganization in the Debtor's Case acceptable to Chase Bank and Chase Capital on or prior to June 30, 2010; (o) the entry of any order modifying, reversing, revoking, staying, rescinding, vacating, or

amending this Financing Order without the express prior written consent of Chase Bank and Chase Capital; (p) the filing or confirmation of a plan of reorganization that does not provide for payment in full of the DIP Facility; (q) any challenge to the extent, validity, priority, or unavoidability of Chase Bank's liens or Chase Capital's liens securing the Pre-Petition Claim and/or the DIP Facility is commenced by the Debtor or an order is entered sustaining any such challenge commenced by any party other than the Debtor; or (r) the occurrence of any Postpetition Default as defined in the DIP Agreement (any of the foregoing events of default being referred to in this Financing Order, individually, as an "Event of Default", or severally, as "Events of Default").

## Remedies

73.    Immediately upon the occurrence of any Event of Default, and at all times thereafter, and without further act or action by Chase Bank or Chase Capital, or any further notice, hearing, or order of this Court: (a) Chase Bank may declare all or any part of the DIP Facility immediately to be accelerated and due and payable for all purposes, rights, and remedies, (b) Chase Bank's obligations in connection with the DIP Facility shall immediately terminate, and (c) the Debtor's authority to use Cash Collateral and any and all obligations of Chase Bank under this Financing Order and the DIP Agreement shall terminate, except to the extent set forth herein with respect to Budgeted expenses that were actually incurred prior to an Event of Default, but which remain unpaid at the time of an Event of Default.

74.    Furthermore, upon the occurrence of any Event of Default, and after the giving of five (5) business days notice by Chase Bank to the Debtor, the Committee and the United States Trustee, then without further act or action by Chase Bank, or any further notice, hearing or order of this Court, and absent the entry of an order of this Court to the contrary, the automatic stay of Bankruptcy Code § 362 shall be immediately modified and Chase Bank and Chase Capital shall

be and are hereby authorized, in its discretion, to take any and all actions and remedies that Chase Bank or Chase Capital may deem appropriate to proceed against, take possession of, protect, and realize upon the Collateral and any other property of the estate of the Debtor upon which Chase Bank or Chase Capital has been or may hereafter be granted liens and security interests to obtain repayment of the Pre-Petition Claims and the DIP Facility, provided that Chase Bank and Chase Capital shall not be obligated to take title to any of the Collateral in the pursuit of Chase Bank's rights and remedies.

75.     Upon or after the occurrence of any Event of Default, Chase Bank may, in its sole and absolute discretion, advance funds to the Debtor, and all such advances (i) shall not constitute a waiver, limitation, or modification of Chase Bank's rights and remedies pursuant to the Pre-Petition Claim Documents, the DIP Facility Documents, and applicable law and (ii) shall be and hereby are granted all of the protections granted to Chase Bank under this Financing Order in connection with the DIP Facility.

## OTHER TERMS

76.     Other than Prior Liens and the Carve-Out, no priority claims shall be allowed that are or will be prior to or on parity with the superpriority claims or secured claims of Chase Bank or Chase Capital against the Debtor and its estate arising out of the Pre-Petition Claim Documents, the DIP Facility Documents, and this Financing Order.

77.     No obligations incurred or payments or other transfers made by or on behalf of the Debtor on account of the post-petition financing arrangements with Chase Bank shall be avoidable or recoverable from Chase Bank or Chase Capital under any section of the Bankruptcy Code, or any other federal, state, or other applicable law.

78.     Except for the sale of inventory in the ordinary course of Debtor's business and as may be provided for in the Budget and consistent with the terms of the DIP Agreement, the

Debtor shall not sell, transfer, lease, encumber, or otherwise dispose of any of the Collateral, without the prior written consent of Chase Bank and Chase Capital and/or an Order of the Court, after notice and hearing, approving such disposition.

79.     All post-petition advances under the DIP Agreement are made in reliance on this Financing Order and so long as such advances and the Pre-Petition Claims remain unpaid, there shall not at any time be entered in the Debtor's Case any other order that, except as consented to by Chase Bank in writing, (a) authorizes the use of Cash Collateral or the sale, lease, or other disposition of the Collateral unless the cash proceeds will satisfy the obligations under the DIP Facility in full, (b) authorizes the obtaining of credit or the incurring of indebtedness secured by a lien or security interest in property in which Chase Bank holds or asserts liens or security interests, or (c) grants to any claim a priority administrative claim status that is equal or superior to the superpriority status granted to Chase Bank herein.

80.     The terms hereunder and under the DIP Facility Documents, the security interests and liens granted to Chase Bank and Chase Capital under this Financing Order, and the rights of Chase Bank and Chase Capital pursuant to this Financing Order with respect to the Collateral, and treatment of the Pre-Petition Claims shall not be altered, modified, extended, impaired, or affected by any plan of reorganization of the Debtor without the prior written approval of Chase Bank and Chase Capital.

81.     The terms and provisions of this Financing Order and any actions taken pursuant hereto shall survive entry of any order that may be entered converting to chapter 7 or dismissing a Debtor's Case, except for the Debtor's authority to use Cash Collateral and any obligations of Chase Bank under the DIP Facility Documents (all of which shall immediately terminate upon entry of such an order).   The terms and provisions of this Financing Order, as well as the

priorities in payment, liens, and security interests granted pursuant to this Financing Order and the DIP Facility Documents, shall continue in these or any subsequent Chapter 7 of this case, and such priorities in payment, liens, and security interests shall maintain their priority as provided by this Financing Order until the Pre-Petition Claims and the DIP Facility are indefeasibly paid and satisfied in full by their terms and discharged and Chase Bank and Chase Capital shall have no further obligation or financial accommodation to the Debtor.

82.     The provisions of this Financing Order shall inure to the benefit of the Debtor and Chase Bank and Chase Capital, and they shall be binding upon (a) the Debtor and its respective successors and assigns, including any trustees or other fiduciaries hereafter appointed as legal representatives of the Debtor or with respect to property of the estate of the Debtor, whether under chapter 11 of the Bankruptcy Code, any confirmed plan, or any subsequent chapter 7 case, and (b) all creditors of the Debtor and other parties in interest.

83.     If any or all of the provisions of this Financing Order are hereafter modified, vacated, or stayed without the prior written agreement of Chase Bank and Chase Capital, such modification, vacation, or stay shall not affect (a) the validity of any obligation, indebtedness or liability incurred by the Debtor to Chase Bank or Chase Capital before the effective date of such modification, vacation, or stay or (b) the validity or enforceability of any security interest, lien, priority or other protection authorized, created, or confirmed hereby or pursuant to the DIP Facility Documents.   Notwithstanding any such modification, vacation, or stay, any indebtedness, obligations, or liabilities incurred by the Debtor to Chase Bank before the effective date of such modification, vacation, or stay shall be governed in all respects by the original provisions of this Financing Order, and Chase Bank and Chase Capital shall be entitled to all the

rights, remedies, privileges, and benefits granted herein and pursuant to the DIP Facility Documents with respect to all such indebtedness, obligations, or liabilities.

84.     To the extent the terms and conditions of the DIP Agreement are in conflict with the terms and conditions of this Financing Order, the terms and conditions of this Financing Order shall control.

85.     No approval, agreement, or consent requested of Chase Bank by the Debtor pursuant to the terms of this Financing Order or otherwise shall be inferred from any action, inaction, or acquiescence of Chase Bank or Chase Capital other than a writing acceptable to Chase Bank and Chase Capital that is signed by Chase Bank and Chase Capital and expressly shows such approval, agreement or consent, without limitation.  Nothing herein shall in any way affect the rights of Chase Bank or Chase Capital as to any non-Debtor entity, without limitation.

86.     Nothing herein shall be deemed or construed to waive, limit, or modify the rights of Chase Bank and Chase Capital to obtain further adequate protection and other statutory protections for the use of the Collateral and Cash Collateral, or to seek other relief in this Case in accordance with any provision of the Bankruptcy Code or applicable law, and all of the Debtor's rights to contest any such requests are preserved.

87.     Unless expressly and specifically provided otherwise herein, nothing herein shall be deemed or construed to waive, limit, modify or prejudice the claims, rights, protections, privileges and defenses of Chase Bank and Chase Capital afforded pursuant to Title 11 of the United States Code including, without limitation, those claims, rights, protections, privileges and defenses afforded Chase Bank and Chase Capital pursuant to Bankruptcy Code §§ 361, 363, 506, 507, 546, 547, 548, 549, 550, 553, 555, 556, 559, 560, 561 and 562.

88.     This Financing Order, and the findings of fact and conclusions of law contained herein, shall be effective upon signature by the Court, and may be relied upon by Chase Bank, Chase Capital and the Debtor without the necessity of entry into the docket sheet of this Case. To the extent any findings may constitute conclusions, and vice versa, they are hereby deemed as such.

89.     This Court hereby expressly retains jurisdiction over all persons and entities, co-extensive with the powers granted to the United States Bankruptcy Court under the Bankruptcy Code, to enforce the terms of this Financing Order and to adjudicate any and all disputes in connection therewith.

90.     All headings in this Financing Order are descriptive and for reference only, and do not have separate meaning or change any terms therein.

## RESERVATION OF RIGHTS OF PARTIES IN INTEREST/DEADLINE TO ACT

91.     Parties-in-interest (other than the Debtor) shall have ninety (90) days from the date of entry of this Financing Order (or, in the case of the official committee of unsecured creditors of the Debtor, if appointed, seventy-five (75) days from the date of appointment of such committee) to file a motion seeking authority from the Court to file a complaint pursuant to Bankruptcy Rule 7001 asserting a claim or cause of action arising out of the Pre-Petition Claim Documents, or otherwise challenging the extent, priority, validity, perfection, amount, or allowability of Chase Bank's and Chase Capital's claims or security interests, arising out of or related to the Pre-Petition Claim Documents or the transactions related thereto, or to file an objection to the allowability or amount of Chase Bank's and Chase Capital's claims.  Such motion, if filed, shall be set on the Court's docket on an expedited basis, diligently pursued by such party in interest or committee, as applicable, and if granted and not stayed upon appeal, be

followed by the filing of such a complaint under Bankruptcy Rule 7001 within fifteen (15) days of the entry of an order approving such motion.

92.    Otherwise, if no action is commenced or pursued in accordance with the immediately preceding paragraph, all of the Debtor's waivers, releases, stipulations, and affirmations of the priority, extent, and validity of Chase Bank's and Chase Capital's claims and interests, of any nature, as contained in the Pre-Petition Claim Documents or otherwise incorporated or set forth in this Financing Order shall be of full force and effect and forever binding upon the Debtor's bankruptcy estate and all parties-in-interest of this Case. Notwithstanding the foregoing and regardless of the timely commencement of an action as contemplated in paragraph 89, the Debtor's waivers, releases, stipulations, and affirmations of the priority, extent, and validity of Chase Bank's and Chase Capital's claims and interests, of any nature, as contained in the Pre-Petition Claim Documents or otherwise incorporated or set forth in this Financing Order  shall be in full force and effect with respect to any claims or causes of action not timely raised within the deadlines set forth in paragraph 89 above.

## WAIVER OF CLAIMS

93.    THE DEBTOR (IN ITS OWN RIGHT AND, SUBJECT TO THE RESERVATION OF RIGHTS OF PARTIES IN INTEREST/DEADLINE TO ACT SECTION IMMEDIATELY ABOVE, ON BEHALF OF ITS ESTATE, REPRESENTATIVES, DIRECTORS, OFFICERS, EMPLOYEES, INDEPENDENT CONTRACTORS, ATTORNEYS AND AGENTS, AND ITS SUCCESSORS AND ASSIGNS, IN EACH CASE TO THE EXTENT PERMITTED BY APPLICABLE LAW) (COLLECTIVELY, THE "RELEASING PARTIES") HEREBY RELEASES, ACQUITS, FOREVER DISCHARGES AND COVENANTS NOT TO SUE CHASE CAPITAL CORPORATION, CHASE BANK AND CHASE CAPITAL AND CHASE BANK'S REPRESENTATIVES, DIRECTORS, OFFICERS,

EMPLOYEES, INDEPENDENT CONTRACTORS, ATTORNEYS AND AGENTS, AND ITS SUCCESSORS AND ASSIGNS (THE "RELEASED PARTIES") FROM ANY AND ALL ACTS AND OMISSIONS OF THE RELEASED PARTIES, AND FROM ANY AND ALL CLAIMS, CAUSES OF ACTION, AVOIDANCE ACTIONS, COUNTERCLAIMS, DEMANDS, CONTROVERSIES, COSTS, DEBTS, SUMS OF MONEY, ACCOUNTS, RECKONINGS, BONDS, BILLS, DAMAGES, OBLIGATIONS, LIABILITIES, OBJECTIONS, LEGAL PROCEEDINGS, EQUITABLE PROCEEDINGS, AND EXECUTIONS OF ANY NATURE, TYPE, OR DESCRIPTION WHICH THE RELEASING PARTIES HAVE OR MAY COME TO HAVE AGAINST THE RELEASED PARTIES THROUGH THE DATE OF THIS ORDER, TO THE EXTENT SUCH CLAIMS RELATE TO OR ARISE OUT OF THE DIP FACILITY OR THE PRE-PETITION CLAIMS OR THE MATTERS, TRANSACTIONS OR DOCUMENTS RELATED HERETO OR THERETO, AT LAW OR IN EQUITY, BY STATUTE OR COMMON LAW, IN CONTRACT, IN TORT, INCLUDING BANKRUPTCY CODE CHAPTER 5 CAUSES OF ACTION, WHETHER THE LAW OF THE UNITED STATES OR ANY OTHER COUNTRY, UNION, ORGANIZATION OF FOREIGN COUNTRIES OR OTHERWISE, KNOWN OR UNKNOWN, SUSPECTED OR UNSUSPECTED, BUT EXCLUDING OBLIGATIONS UNDER THE DIP FACILITY ARISING AFTER THE DATE OF THIS FINANCING ORDER (COLLECTIVELY, THE "RELEASED CLAIMS").  THE DEBTOR ON BEHALF OF THE RELEASING PARTIES FURTHER COVENANTS NOT TO SUE THE RELEASED PARTIES ON ACCOUNT OF ANY RELEASED CLAIM.  THIS PARAGRAPH IS IN ADDITION TO AND SHALL NOT IN ANY WAY LIMIT ANY OTHER RELEASE, COVENANT NOT TO SUE, OR WAIVER BY THE RELEASING PARTIES IN FAVOR OF THE RELEASED PARTIES.

NOTWITHSTANDING THE RELEASES AND COVENANTS IN FAVOR OF THE RELEASED PARTIES CONTAINED ABOVE IN THIS PARAGRAPH, SUCH RELEASES AND COVENANTS IN FAVOR OF THE RELEASED PARTIES SHALL BE DEEMED ACKNOWLEDGED AND REAFFIRMED BY THE DEBTOR EACH TIME THERE IS AN ADVANCE OF FUNDS UNDER THIS FINANCING ORDER.

94.     Notwithstanding any due diligence period granted to other parties in interest herein, as a result of the Debtor's review of the Pre-Petition Claim Documents and the facts related thereto, the Debtor shall have no right to file a complaint pursuant to Bankruptcy Rule 7001 or otherwise, or any other pleading asserting a claim or cause of action arising out of or related to the Pre-Petition Claim Documents, the DIP Agreement, or any transactions or dealings related to same.

## NOTICE

95.     The Debtor's proposed counsel shall serve this Financing Order on all of the following parties: (a) the Office of the United States Trustee; (b) the attorneys for Chase Bank and Chase Capital; (c) all creditors known to the Debtor who have or may assert liens against any of the Debtor's assets; (d) the United States Internal Revenue Service; (e) the [thirty (30)] largest unsecured creditors of the Debtor; and (f) all parties in interest who have filed a notice of appearance or upon whom service must be effected under the Federal Rules of Bankruptcy Procedure or the Local Rules.

96.     Any notice, report, or other document required to be given hereunder may be given by U.S. mail, overnight courier, hand delivery, facsimile or e-mail addressed as follows:

If to Chase Bank:                        with a copy to:

                                         William L. Wallander
                                         Bradley R. Foxman
                                         Vinson & Elkins L.L.P.

3700 Trammell Crow Center
2001 Ross Avenue
Dallas, TX  75201
Fax:  (214) 220-7716
E-mail: bwallander@velaw.com;
bfoxman@velaw.com

If to Chase Capital:                          With a copy to:


Toby L. Gerber
FULBRIGHT & JAWORSKI L.L.P.
2200 Ross Avenue, Suite 2800
Dallas, Texas 78205
Telephone: (214) 855-8000
Facsimile: (214) 855-8200
Email:  tgerber@fulbright.com


If to the Debtor:                             Mark E. Andrews
Aaron M. Kaufman
Cox Smith Matthews Incorporated
1201 Elm Street, Suite 3300
Dallas, TX  75270
Fax:  (214) 698-7899
E-mail: mandrews@coxsmith.com
E-mail:akaufman@coxsmith.com

and

Carol E. Jendrzey
James M. McDonough
Cox Smith Matthews Incorporated
112 East Pecan Street, Suite 1800
San Antonio, Texas 78205
Fax: (210) 226-8395
E-mail: cjendrzey@coxsmith.com
E-mail:jmcdonough@coxsmith.com

If to the United States Trustee:              United States Trustee
P.O. Box 1539
San Antonio, TX  78294-1539

### **EXPIRATION DATE/MATURITY**

97.    Chase Bank's consent and Debtor's authority to use Cash Collateral and Chase Bank's commitment to provide credit under the DIP Agreement and this Financing Order, subject to the funding and Budget limitations above, shall be effective upon entry of this Financing Order to and including the earlier of: (a) notice of the occurrence of an Event of Default or (b) February 25, 2010, at 4:00 p.m (Central), at which time all of the Debtor's authority to use Cash Collateral and to obtain credit under the DIP Agreement and this Financing Order shall terminate, as shall Chase Bank's obligation to provide the DIP Facility, unless extended by written agreement of the parties hereto, a copy of which shall be promptly filed with this Court by the Debtor (the "Expiration Date").

98.    THIS ORDER IS EFFECTIVE IMMEDIATELY.

### ###

**AGREED TO AND ACCEPTED:**

By: */s/ Mark E. Andrews*
    Mark E. Andrews
    State Bar No. 01253520
    Aaron M. Kaufman
    State Bar No. 24060067
    Cox Smith Matthews Incorporated
    1201 Elm Street, Suite 3300
    Dallas, Texas 75270
    (214) 698-7800
    (214) 698-7899 (Fax)
     -and-
    Carol E. Jendrzey
    State Bar No. 21617500
    Cox Smith Matthews Incorporated
    112 East Pecan Street, Suite 1800
    San Antonio, Texas 78205
    (210) 554-5500
    (210) 226-8395 (Fax)

*PROPOSED ATTORNEYS FOR THE*
*DEBTOR AND DEBTOR-IN-POSSESSION*

By: */s/ Toby L. Gerber*
    Toby L. Gerber
    State Bar No. 07813700
    Steve A. Peirce
    State Bar No. 15731200
    FULBRIGHT & JAWORSKI L.L.P.
    2200 Ross Avenue, Suite 2800
    Dallas, Texas 78205
    Telephone: (214) 855-8000
    Facsimile: (214) 855-8200
    Email: tgerber@fulbright.com

*ATTORNEYS FOR CHASE CAPITAL*

By: */s/ William L. Wallander*
    William L. Wallander, SBT #20780750
    Bradley R. Foxman, SBT #24065243
    Vinson & Elkins L.L.P.
    3700 Trammell Crow Center
    2001 Ross Avenue
    Dallas, TX 75201
    Fax: (214) 220-7716
    E-mail: bwallander@velaw.com;
    bfoxman@velaw.com

*ATTORNEYS FOR CHASE BANK*

# Exhibit "1"

## DEBTOR IN POSSESSION FINANCING AMENDMENT AND
## SECOND AMENDMENT TO
## AMENDED AND RESTATED CREDIT AGREEMENT

THIS DEBTOR IN POSSESSION FINANCING AMENDMENT AND SECOND AMENDMENT TO AMENDED AND RESTATED CREDIT AGREEMENT (this "**Second Amendment**") is dated as of February __, 2010, and entered into among AGE Refining, Inc., a Texas corporation (the "**Borrower**"), JPMorgan Chase Bank, N.A., a national banking association (the "**Lender**") and as Issuing Bank under and as defined in the hereinafter described Credit Agreement, and JPMorgan Chase Bank, N.A., as administrative agent (in such capacity, the "**Administrative Agent**") for itself and any future lenders.

WITNESSETH:

WHEREAS, the Borrower, the Lender and the Administrative Agent are parties to that certain Amended and Restated Credit Agreement dated as of September 12, 2008, as amended by that certain First Amendment to Amended and Restated Credit and Security Agreement, Limited Consent and Waiver dated March 26, 2009 (the "**First Amendment**") (as further amended, restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**");

WHEREAS, pursuant to the terms of the Credit Agreement, the Lender made loans and granted other financial accommodations, including but not limited to the issuance of letters of credit, to the Borrower, which loans and other financial accommodations are secured by a lien upon (i) substantially all of the personal property of the Borrower and (ii) the ownership interests of Albert Gonzalez, Albert Glen Gonzalez, and the Glen Gonzalez Special Trust in the Borrower;

WHEREAS, the Borrower filed a voluntary petition for relief under Chapter 11, Title 11, United States Code, on February 8, 2010, in the United States Bankruptcy Court for the Western District of Texas (the "**Case**");

WHEREAS, the Borrower has insufficient unencumbered cash or liquid assets with which to operate its business;

WHEREAS, the Borrower is unable to obtain credit on an unsecured basis or as an administrative expense pursuant to 11 U.S.C §§ 364(a) and (b), and 503(b)(1);

WHEREAS, an immediate need exists for the Borrower to obtain funds to continue operation of its business;

WHEREAS, the Lender has agreed to extend additional credit to the Borrower up to an amount not to exceed $35,000,000 (the "**DIP Facility**") for Budgeted Expenses (as defined below) from the Second Amendment Effective Date (as defined below) until the earlier of (a) notice of the occurrence of a Postpetition Default (as defined below) or (b) June 30, 2010;

WHEREAS, the Lender has agreed to grant the request of the Borrower to extend such additional credit, but only upon the terms and conditions set forth in this Second Amendment and the Financing Order (as defined below); and

1

WHEREAS, the Borrower has agreed to secure its obligations to the Administrative Agent and the Lender in connection with such additional credit with, among other things, a first priority perfected security interest in substantially all of its existing and future personal property and a second priority perfected security interest in the Term Loan Priority Collateral (as hereinafter defined), as set forth in the Financing Order.

NOW, THEREFORE, for valuable consideration hereby acknowledged, the parties hereto agree as follows:

Section 1    **Definitions**.  Unless specifically defined or redefined below, capitalized terms used herein shall have the meanings ascribed thereto in the Credit Agreement.

Section 2    **Amendments to Credit Agreement**.  Subject to the terms and conditions hereof, the provisions of the Credit Agreement enumerated below are amended as follows:

(a)    Effective as of the date hereof, the following definitions set forth in Section 1.02 of the Credit Agreement are hereby amended to read in full as follows:

"**Collateral**" means any and all property owned, leased or operated by a Person covered by the Collateral Documents, the DIP Collateral and any and all other property of any Loan Party, now existing or hereafter acquired, that may at any time be or become subject to a security interest or Lien in favor of the Administrative Agent, on behalf of itself and the Lenders, to secure the Secured Obligations.

"**Loans**" means each and all of (a) the loans and advances made by the Lenders pursuant to this Agreement, including Protective Advances, and (b) the Postpetition Loans.

(b)    Effective as of the date hereof, the following definitions are hereby added to Section 1.02 of the Credit Agreement:

"**Bankruptcy Code**" means 11 U.S.C. § 101 et seq.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the Western District of Texas or any other court with competent jurisdiction over the Case.

"**Budget**" means the 13-week cash budget detailing the Borrower's anticipated cash receipts and expenditures from the week beginning February 7, 2010, until May 31, 2010, as amended or supplemented from time to time, which budget (and any amendments thereto) shall be in form and substance acceptable to the Administrative Agent and shall be incorporated into the Financing Order and attached hereto as Exhibit D.  Changes to the Budget, including budget information for additional time periods following May 31, 2010, are subject to the prior written approval of the Administrative Agent in its Permitted Discretion.

2

"**Budgeted Expenses**" means expenses permitted to be paid by the Borrower for the purposes set forth in the Budget.

"**Case**" means the Chapter 11 bankruptcy case of the Borrower pending before the Bankruptcy Court entitled "In re AGE Refining, Inc.", Case No. 10-50501, including adversary proceedings or other ancillary proceedings.

"**Cash Collateral**" means cash collateral, as such term is defined in Section 363(a) of the Bankruptcy Code and as defined in the Financing Order, arising from or relating to Collateral granted to the Administrative Agent for the benefit of the Lenders.

"**Cash Collateral Order**" has the meaning specified in Section 3(i) of the Second Amendment.

"**DIP Collateral**" means, subject to the Intercreditor Agreement, any and all of the properties and assets of the Borrower and the Borrower's bankruptcy estate, both real and personal, including, without limitation, all cash, accounts, inventory, equipment, general intangibles, intellectual property of all kinds including patents, trademarks, trade names, service marks and copyrights, securities, instruments, investment property, deposit accounts, chattel paper, warehouse receipts, bills of lading, tax refunds of any nature, insurance proceeds, insurance premium refunds, deposits of any kind, security deposits, utility deposits, bonds and proceeds of same, causes of action (whether by contract or tort, common law or statutory, equitable or otherwise), oil and gas interests, leasehold interests in real estate or personal property and customer lists, whether acquired before or after the Petition Date, whether now owned and existing or hereafter acquired, created, or arising, and all products, proceeds, rents, revenues, and profits thereof (including, without limitation, claims of the Borrower against third parties for loss or damage to such property), and all accessions thereto, substitutions and replacements therefor, and wherever located, in which the Administrative Agent, for the benefit of the Lenders, is granted a lien or security interest to secure the Postpetition Obligations as set forth in the Financing Order.

"**Final Order**" has the meaning specified in Section 3(d) of the Second Amendment.

"**Financing Order**" means the one or more orders of the Bankruptcy Court authorizing and approving, on either an interim or final basis, the financing contemplated by the Second Amendment and use of Cash Collateral, each in form and substance satisfactory to the Lenders.

"**Petition Date**" means February 8, 2010.

"**Postpetition Aggregate Commitments**" means $35,000,000, being the aggregate amount of the Postpetition Commitments of the Lenders on the Second Amendment Effective Date, as the same may be reduced from time to time.

3

"**Postpetition Commitment**" means the commitment of any Lender to make Postpetition Loans and cause the Issuing Bank to issue Postpetition Letters of Credit as set forth in Section 2.01 hereof up to the amount for such Lender set forth on Exhibit B to the Second Amendment.

"**Postpetition Default**" means the occurrence and continuance of any of the following events:

(a)     The Borrower shall fail to pay any principal of the Postpetition Loans when the same becomes due and payable;

(b)     The Borrower shall fail to pay any interest on the Postpetition Loans or any fee or other amount due with respect to the Postpetition Obligations after such interest, fee, or other amount becomes due and payable;

(c)     The Borrower shall fail to obtain the Final Order from the Bankruptcy Court by March 15, 2010;

(d)     Any representation or warranty made by the Borrower in the Second Amendment or in any statement or certificate given after the Second Amendment Effective Date by the Borrower in writing pursuant to any Loan Document or in connection with any Loan Document shall be false in any material respect on the date as of which made;

(e)     The Borrower shall breach or violate any term, covenant or agreement contained in the Second Amendment, Articles V, VI, or VII of this Agreement (other than as set forth on Exhibit C attached to the Second Amendment), or any of the other Loan Documents;

(f)     An Event of Default shall occur under and as defined in the Financing Order;

(g)     The Case shall be dismissed or converted to a case under Chapter 7 of the Bankruptcy Code; or a Chapter 11 trustee or an examiner with expanded power shall be appointed in the Case without the express written consent of the Administrative Agent;

(h)     Any security interest, lien, claim or encumbrance, excluding the Liens permitted pursuant to Section 6.02 hereof, shall be granted in any of the DIP Collateral which is pari passu with or senior to the claims of the Lenders therein, including any surcharge of the DIP Collateral (other than the Term Loan Priority Collateral) pursuant to Bankruptcy Code § 506(c) or otherwise without the express written consent of the Administrative Agent;

4

(i)     The Borrower shall make any payment (whether by way of adequate protection or otherwise) of principal or interest or otherwise on account of any prepetition Indebtedness, except to the Lenders, unless approved by the Administrative Agent in writing or as authorized by the Bankruptcy Court after notice and hearing;

(j)     The Borrower shall declare or make, or agree to pay or make, directly or indirectly, any Restricted Payment;

(k)     The Bankruptcy Court shall enter an order granting relief from the automatic stay to the holder or holders of any other security interest or lien (other than the Lenders) in any DIP Collateral to permit the pursuit of any judicial or non-judicial transfer or other remedy against any assets of the Borrower without the express written consent of the Administrative Agent;

(l)     Any provision of the documents relating to the Postpetition Loans shall cease to be valid and binding on the Borrower, or the Borrower shall so assert in any pleading filed in any court;

(m)     The Borrower shall for any reason fail to remit to the Administrative Agent all net proceeds from the sale, disposition, collection, or other realization upon the Collateral or the DIP Collateral for application in accordance with Section 2.09(h);

(n)     The Borrower shall attempt to vacate or modify either the Financing Order or the Cash Collateral Order over the objection of the Administrative Agent;

(o)     The entry of an order pursuant to Bankruptcy Code § 363 approving the sale of a material portion of the Borrower's assets without the prior written consent of the Administrative Agent and the Lenders to such sale;

(p)     Actual performance shall at any time adversely deviate from the Budget by 5.00% or more calculated on a line item by line item basis and measured weekly on a rolling 4 week basis from the Petition Date;

(q)     The Borrower shall fail to obtain, on or before April 1, 2010, renewals or replacements of all existing contracts with the United States government or a department or agency thereof for the sale of not less than 36 million gallons of jet fuel for the service year beginning April 1, 2010 and ending March 31, 2011;

(r)     The Borrower shall fail to retain Muse Stancil & Co. as the project manager for the replacement of the ULSD steam turbine

5

generator on terms and conditions satisfactory to the Lenders on or before March 10, 2010, nunc pro tunc to the Petition Date;

(s)    The Borrower shall fail to retain Albert Conly as Chief Restructuring Officer on terms and conditions satisfactory to the Lenders on or before March 10, 2010, nunc pro tunc to the Petition Date;

(t)    The Borrower shall terminate Albert Conly as Chief Restructuring Officer without the Administrative Agent's prior written consent.

"**Postpetition Letters of Credit**" means any Letter of Credit issued, renewed or extended by the Issuing Bank for the benefit of the Borrower pursuant to the Postpetition Commitments which together with the Postpetition Loans, are in an aggregate amount not to exceed at any time the Postpetition Aggregate Commitments then in effect.

"**Postpetition Loans**" means advances by the Lenders to the Borrower pursuant to the Postpetition Commitments which together with the Postpetition Letters of Credit, are in an aggregate amount not to exceed at any time the Postpetition Aggregate Commitments then in effect.

"**Postpetition Obligations**" means all present and future obligations, indebtedness and other liabilities of the Borrower arising with respect to the Financing Order, the Postpetition Loans or the Postpetition Letters of Credit, including without limitation the principal amount thereof, and any interest, fees, and charges related thereto or in connection therewith, and any and all renewals, extensions, rearrangements, and refundings of the foregoing.

"**Postpetition Termination Date**" means the earliest of (a) June 30, 2010 at 5:00 p.m. Central Time, (b) the date the Borrower terminates the commitment of the Lenders to make Postpetition Loans and cause the Issuing Bank to issue Postpetition Letters of Credit, (c) the date the Administrative Agent terminates the commitment of the Lenders to make Postpetition Loans and cause the Issuing Bank to issue Postpetition Letters of Credit upon the occurrence of a Postpetition Default, (d) the effective date of a confirmed plan of reorganization for the Borrower, or (e) the date on which the Bankruptcy Court approves the extension of any other credit facilities to the Borrower.

"**Prepetition Obligations**" means all Secured Obligations other than the Postpetition Obligations.

"**Second Amendment**" means that certain Second Amendment to Amended and Restated Credit Agreement dated as of February [__], 2010 among the Borrower, the Administrative Agent and the sole Lender.

"**Second Amendment Effective Date**" means February [__], 2010.

"**Superpriority Claim**" means a claim against the Borrower in the Case which is an administrative expense claim having priority over any and all administrative expenses of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code.

"**Term Loan Priority Collateral**" has the meaning assigned to such term in the Intercreditor Agreement.

(c)     Effective as of the Second Amendment Effective Date, Article 2 of the Credit Agreement is amended to add thereto the following Section 2.21:

SECTION 2.21.     Postpetition Loans.

(a)     Commitment for Postpetition Loans and Postpetition Letters of Credit.  From and after the Petition Date, the Lenders shall have no obligation to make any new Loans or issue, renew or extend any Letters of Credit to the Borrower.  Notwithstanding the foregoing, subject to the terms and conditions contained in this Section 2.21, the Lenders agree to make Postpetition Loans and cause the Issuing Bank to issue Postpetition Letters of Credit for the account of the Borrower from time to time, but not more frequently than once each week, from the Second Amendment Effective Date until the Postpetition Termination Date, in accordance with their Postpetition Commitments and in an aggregate amount not to exceed at any time outstanding the lesser of (a) the Postpetition Aggregate Commitments and (b) the Borrowing Base minus the amount of the Prepetition Obligations. Each Postpetition Loan may be prepaid at any time without premium or penalty and may be borrowed, repaid, and reborrowed subject to the terms and conditions of this Agreement.

(b)     Borrowing Mechanics for Postpetition Loans.  Each Postpetition Loan shall be made on notice given by the Borrower to the Administrative Agent not later than 11:00 a.m. Central Time on the Business Day prior to the date of the proposed Postpetition Loan.  Each such notice (a "**Postpetition Notice of Borrowing**") shall be in substantially the form of Exhibit A to the Second Amendment specifying therein (i) the proposed funding date, (ii) the aggregate amount of such proposed Postpetition Loan, and (iii) that the proposed use of the proceeds thereof is for Budgeted Expenses in compliance with the Budget and no other cash is available to the Borrower to pay such Budgeted Expenses. Administrative Agent may condition the disbursement of Postpetition Loans on receipt of such documentation as it shall require to evidence that the proceeds of such Postpetition Loans shall be used in accordance with the Budget both as to amount of

7

such Postpetition Loans and as to the timing of such Postpetition Loans.

(c)    <u>Borrowing Mechanics for Postpetition Letters of Credit</u>.  Each issuance, amendment, renewal or extension of a Postpetition Letter of Credit shall be made on notice given by the Borrower to the Issuing Bank and the Administrative Agent not later than 11:00 a.m. Central Time at least three Business Days prior to the requested date of the issuance, amendment, renewal or extension of the Postpetition Letter of Credit.  Each such notice (a "**Postpetition Notice of Issuance**") shall specify (i) the proposed date of issuance, amendment, renewal or extension (which shall be a Business Day), (ii) the date on which the proposed Postpetition Letter of Credit is to expire (which shall not be later than the Postpetition Termination Date), (iii) the aggregate amount of such proposed Postpetition Letter of Credit, and (iv) the name and address of the beneficiary thereof and such other information as shall be necessary to prepare, amend, renew or extend such Postpetition Letter of Credit.  If requested by the Issuing Bank, the Borrower shall also submit a letter of credit application on the Issuing Bank's standard form in connection with any request for a Postpetition Letter of Credit.

(d)    <u>Conditions Precedent to Each Postpetition Loan or any Postpetition Letter of Credit</u>.  The obligation of the Lenders to make any Postpetition Loan (including the initial Postpetition Loan) or cause any Postpetition Letter of Credit to be issued, amended, renewed or extended shall be subject to the following conditions precedent: (i) the Borrower shall deliver to the Administrative Agent an executed Postpetition Notice of Borrowing or Postpetition Notice of Issuance, as the case may be, pursuant to Section 2.21 hereto, (ii) no event has occurred and is continuing which constitutes a Postpetition Default or which would constitute a Postpetition Default but for the requirement that notice be given or time elapsed or both; (iii) the Borrower shall deliver to the Administrative Agent a certificate of the chief financial officer of the Borrower certifying that (A) all representations and warranties made by the Borrower in the Second Amendment or in any statement or certificate after the Second Amendment Effective Date by the Borrower in writing pursuant to any Loan Document or in connection with any Loan Document shall be true and correct and, (B) with respect to Postpetition Loans, the Borrower shall apply the proceeds of the Postpetition Loan only to Budgeted Expenses; (iv) with respect to the initial Postpetition Loan, the Administrative Agent shall have received such other approvals or documents as the Lenders may reasonably request; (v) no Bankruptcy Court order has been

8

entered authorizing the Borrower to obtain financing or credit pursuant to Section 364 of the Bankruptcy Code from any Person other than the Lenders secured by a security interest or having the priority of an administrative claim unless otherwise consented to by the Administrative Agent in writing; (vi) the Financing Order shall not have been vacated, reversed, modified, or amended and, in the event that such order is the subject of any pending appeal, no performance of any obligation of any party hereto shall have been stayed pending appeal; (vii) the Administrative Agent shall have received payment for all reasonable professional fees incurred by the Administrative Agent and the Lenders with respect to the Postpetition Loans or Postpetition Letters of Credit; (viii) after giving effect to the Postpetition Loan requested or Postpetition Letter of Credit issued, amended, renewed or extended, the total amount of the Postpetition Loans and the Postpetition Letters of Credit shall not exceed the Postpetition Aggregate Commitment; (ix) the Borrower shall have obtained an order approving bidding and sales procedures for a sale of substantially all of the Borrower's assets and for assumption and assignment of executory contracts under 11 U.S.C. §§ 363 and 365 that is acceptable to the Administrative Agent and the Lenders no later than March 8, 2010 and (x) the Borrower shall have proposed a plan of reorganization in the Case that provides for payment in full of the Postpetition Loans no later than March 31, 2010. In no event shall the Lenders be requested to advance any funds or extend any credit other than for Budgeted Expenses actually incurred and payable either at the time of such advance or within one week thereafter.

(e)     Repayment.  The Borrower shall repay the entire unpaid principal amount of the Postpetition Loans, together with all accrued and unpaid interest thereon, and provide cash collateral for any uncaptured Letters of Credit, including Postpetition Letters of Credit, on the earlier of the Postpetition Termination Date or the date on which the Bankruptcy Court approves the extension of any other credit facilities to the Borrower.

(f)     Interest.  The Borrower shall pay interest on the unpaid principal amount of each Postpetition Loan from the date advanced until the principal amount thereof shall have been paid in full at a rate per annum equal at all times to the Adjusted LIBO Rate in effect from time to time plus 5.50%, payable monthly in arrears on the first Business Day of each month, and on the Postpetition Termination Date; provided however that all principal outstanding after the occurrence of a Postpetition Default shall bear interest, from the date of such Postpetition Default until the date on which such amount is due until such amount is paid in

9

full or such Postpetition Default is waived or cured, payable on demand, at the Alternate Base Rate in effect from time to time plus 7.50% per annum.

(g) <u>Commitment Fee</u>. The Borrower agrees to pay to the Administrative Agent for the account of each Lender a commitment fee of .75% on the average daily amount of the unused amount of the Postpetition Commitment of such Lender during the period from and including the date of the Petition Date to but excluding the Postpetition Termination Date. Accrued commitment fees shall be payable in arrears on the first Business Day of each month and on the Postpetition Termination Date, commencing on the first such date to occur after the Petition Date. All commitment fees shall be computed on the basis of a year of 360 days, unless such computation would exceed the Highest Lawful Rate, in which case interest shall be computed on the basis of a year of 365 days (or 366 days in a leap year), and shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

(h) <u>Letter of Credit Fee</u>. The Borrower agrees to pay to the Administrative Agent for the account of each Lender a participation fee with respect to Letters of Credit, at a per annum rate equal to 5.50% payable monthly in arrears on the last day of each month and on the Postpetition Termination Date.

(i) <u>Grant of Security Interest</u>. As security for the prompt payment and performance when due (whether at stated maturity, by acceleration or otherwise) of all the Postpetition Obligations and to induce the Lenders to make the Postpetition Loans in accordance with the terms hereof, the Borrower shall, pursuant to the Financing Order, and does hereby, assign, convey, mortgage, pledge, hypothecate and grant to the Administrative Agent, for the benefit of the Lenders, a first priority perfected security interest in the DIP Collateral, in each case subject to Prior Liens (as defined in the Financing Order) and to agreed upon carve-outs for the Borrower's professionals and the creditor committee's professionals and certain fees and expenses payable to the United States Trustee and the Clerk of the Bankruptcy Court as more fully set forth in the Financing Order. Furthermore, in the event any unapplied remaining retainer funds paid to any of the Borrower's Bankruptcy Court approved professionals are returned to the Borrower, such returned unapplied remaining retainer funds shall be considered Cash Collateral. No cost or surcharge shall be imposed against the DIP Collateral or the Collateral under Section 506(c) of the Code.

(j) <u>Application of Sale Proceeds and Collections</u>. Notwithstanding anything to the contrary contained in this Agreement, from and after the Second Amendment Effective Date and so long as no Postpetition Default has occurred and is continuing, all net proceeds received from the sale, disposition, collection or other realization upon the Collateral or the DIP Collateral (other than the Term Loan Priority Collateral) shall be applied (a) first, to payment of all fees, including attorneys fees, and expenses incurred by the Administrative Agent and the Lenders under the Credit Agreement or the Second Amendment, (b) second, to payment of the Postpetition Obligations plus any fees and accrued interest thereon, and (c) third, to payment of the Prepetition Obligations plus any accrued interest thereon, in accordance with the Intercreditor Agreement, each as determined by the Administrative Agent in its sole and absolute discretion, until such time as all Indebtedness of the Borrower to the Administrative Agent and the Lenders is satisfied in full, and then to the Borrower.

(k) <u>Postpetition Default</u>. Upon the occurrence and during the continuance of any Postpetition Default, the Administrative Agent (at the request of the Lenders) may, by written notice to the Borrower, declare all or any portion of the Postpetition Obligations to be, and the same shall forthwith become, due and payable, together with accrued interest thereon, and the obligation of the Lenders to make any further Postpetition Loans and issue further Postpetition Letters of Credit shall thereupon terminate. After the occurrence and during the continuance of any Postpetition Default, all net proceeds received from the sale, disposition, collection or other realization upon the Collateral or the DIP Collateral (other than Term Loan Priority Collateral) shall be applied to such Prepetition Obligations and Postpetition Obligations as may be determined by the Administrative Agent in its sole and absolute discretion.

(d) Effective as of the date hereof, Article V of the Credit Agreement is hereby amended to add thereto the following sections:

SECTION 5.14. <u>Budget</u>. The Borrower shall operate strictly in accordance with the Budget attached hereto as <u>Exhibit D</u>, shall have cash receipts equaling at least 95% of the cash receipts reflected on the Budget from time to time as measured weekly on a rolling 4-week basis, and shall pay only those actual, ordinary and necessary operating expenses of the Borrower's business in compliance with and not to exceed by more than 5% those expenses on a line item basis listed on the Budget as measured weekly on a rolling 4-week basis, as the Budget may be modified in writing with the prior written consent of the Administrative Agent. On Friday of each week, the Borrower shall deliver an

11

update to the Budget, adding an additional week's budget (covering the week following the last week of the immediately prior 13-week budget) for approval by the Administrative Agent in its sole discretion.

SECTION 5.15.     Reports.  The Borrower shall furnish the following:

(a)     Not later than the close of business on Wednesday of each week, the Borrower will provide the Administrative Agent with a variance report showing (A) actual receipts and expenses for the preceding week as compared to those contemplated by the Budget, and (B) aggregate actual receipts and expenses for the period from the Petition Date through the end of the preceding week as compared to the Budget for the same period.

(b)     No later than 15 days after the Second Amendment Effective Date, the Borrower will provide the Administrative Agent with a report from the CRO setting forth the results of an analysis by the CRO of whether the terms and pricing of the Borrower's existing business arrangement with AGE Transportation, Inc. ("**ATI**") are not less favorable to the Borrower than could be obtained on an arm's-length basis from unrelated third parties.

(c)     On the Second Amendment Effective Date the Borrower will provide the Administrative Agent with an updated detailed budget and project plan for the replacement of the ULSD steam turbine generator (the "**STG Replacement**") showing final completion of the STG Replacement by no later than March 31, 2010, and the Borrower will deliver to the Administrative Agent any additional updated budgets and project plans immediately upon receipt or creation thereof by the Borrower.

(d)     Such other reports that the Administrative Agent or any Lender may request from time to time.

(e)     The Borrower will provide or cause to be provided to the Administrative Agent and the Lenders telephonic and/or written weekly reports (including operating metrics) by the Borrower as may be requested by the Administrative Agent.

(e)     Effective as of the date hereof, Article VI of the Credit Agreement is hereby amended to add thereto the following section:

SECTION 6.15.     Chapter 11 Claims.  The Borrower shall not incur, create, assume, suffer to exist, or permit any claim in the Case (including without limitation any claim under Section 506(c) of the Bankruptcy Code and any deficiency claim remaining after the satisfaction of a Lien that secures a claim) to be on a parity with or senior to the claims of the Administrative Agent for the benefit of the Lenders against the Borrower hereunder, or apply to the Bankruptcy Court for authority to do so.  The Borrower shall not pay fees and expenses to any Bankruptcy Court-approved professional until such Bankruptcy Court-approved

12

professional is authorized to be paid pursuant to any fee procedure approved by the Bankruptcy Court.

Section 3 <u>Conditions Precedent</u>. This Second Amendment shall not be effective until all corporate actions of the Borrower taken in connection herewith and the transactions contemplated hereby shall be satisfactory in form and substance to Administrative Agent, and each of the following conditions precedent shall have been satisfied:

(a) The Administrative Agent shall have received each of the following, in form and substance satisfactory to the Administrative Agent and the Administrative Agent's counsel, in their sole and absolute discretion:

(i) a certificate of a chief financial officer of Borrower certifying that (A) all representations and warranties in this Second Amendment are true and correct in all material respects, and (B) there exists no Postpetition Default after giving effect to this Second Amendment and the borrowings contemplated hereby; and

(ii) such other documents, instruments, and certificates as the Administrative Agent shall deem necessary or appropriate in connection with this Second Amendment and the transactions contemplated hereby.

(b) The Administrative Agent shall have received a counterpart of this Second Amendment duly executed and delivered by a duly authorized officer of the Borrower and the Administrative Agent.

(c) All governmental and third party approvals necessary in connection with the financing contemplated hereby and the continuing operations of the Borrower (including shareholder approvals, if any) shall have been obtained on satisfactory terms and shall be in full force and effect.

(d) The Bankruptcy Court's entry of an interim order (the "**<u>Interim Order</u>**") approving the DIP Facility and other arrangements described herein, in form and substance acceptable to the Administrative Agent, which order may allow funding of only a limited amount pending entry of an order approving the DIP Facility on a final basis, in form and substance acceptable to the Administrative Agent (such final order being referred to herein as the "**<u>Final Order</u>**"), and entry of the Final Order.

(e) The Bankruptcy Court's entry of a cash collateral order (the "**<u>Cash Collateral Order</u>**") in form and substance satisfactory to the Administrative Agent, which order may be included and part of the Interim Order and the Final Order.

(f) The Administrative Agent shall have received the Budget which shall be in a form and substance acceptable to the Administrative Agent.

(g) The Administrative Agent shall have received satisfactory evidence of the Borrower's engagement of an acting Chief Restructuring Officer (the "**<u>CRO</u>**") upon terms and

13

conditions agreed among the Borrower and the CRO, which shall include a grant of authority by the Borrower and its board of directors of such CRO to:

> (i)  develop and implement the Budget, including the review and determination of underlying assumptions, including near term and projected margin outlook, and operating expense (Processing and G&A) and capital budgets;

> (ii)  develop and implement cost reduction plans, including the determination and setting of staffing levels;

> (iii)  identify and implement revenue enhancement opportunities (i.e., gasoline, product mix) and optimal crude supply strategies;

> (iv)  implement the foregoing in a manner consistent with the CRO's reasonable business judgment without prior consultation with the Borrower's board of directors; and

> (v)  communicate directly with the Administrative Agent and deliver to the Administrative Agent all information, reports and presentation materials prepared by the CRO.

(h)  The Administrative Agent shall have received a report from the Borrower describing in detail the Borrower's relationship and business transactions with Tierra Pipeline, LLC, Tierra G Squared Land and Properties GP, LLC, any of Borrower's Affiliates or any Affiliates of any of Borrower's shareholders.

(i)  The Administrative Agent shall be satisfied in its sole discretion that ATI will continue to provide the same services to the Borrower that ATI has historically provided for at least 30 days after the date hereof on written terms and conditions satisfactory to the Lenders.

(j)  The Administrative Agent and the CRO shall have been granted access to inspect the books and records of ATI and each other Affiliate of the Borrower.

(k)  The Administrative Agent shall have been reimbursed for all reasonable fees and expenses incurred by the Administrative Agent, and the Lender shall have received an upfront fee of 3% of the amount of its Postpetition Commitment.

Section 4   Representations and Warranties; Ratifications.  The Borrower represents and warrants to the Administrative Agent and the Lender that (a) this Second Amendment constitutes its legal, valid, and binding obligations, enforceable in accordance with the terms hereof (subject as to enforcement of remedies to any applicable bankruptcy, reorganization, moratorium, or other laws or principles of equity affecting the enforcement of creditors' rights generally), (b) the Credit Agreement, as amended hereby, and the other Loan Documents remain in full force and effect, and (c) other than as disclosed on Exhibit C, there exists no Event of Default under the Credit Agreement after giving effect to this Second Amendment.  Except as expressly modified by this Second Amendment, the terms and provisions of the Credit Agreement and the other Loan Documents are ratified and confirmed and shall continue in full

14

force and effect.  Except as provided herein, this Second Amendment shall not constitute an amendment or waiver of any terms and provisions of the Credit Agreement and other Loan Documents nor a waiver of the rights of the Administrative Agent and the Lender to insist upon compliance with each term, covenant, condition, or provision of the Credit Agreement and other Loan Documents.

Section 5     Further Assurances.  The Borrower shall execute and deliver such further agreements, documents, instruments, and certificates in form and substance satisfactory to the Administrative Agent, as the Administrative Agent or the Lender may deem necessary or appropriate in connection with this Second Amendment.

Section 6     Counterparts.  This Second Amendment and the other Loan Documents may be executed in any number of counterparts, all of which taken together shall constitute one and the same instrument; in making proof of any such agreement, it shall not be necessary to produce or account for any counterpart other than one signed by the party against which enforcement is sought.  Signatures delivered by fax and pdf (email) shall be binding and effective as originals.

Section 7     Expenses.  The Borrower agrees to pay all costs and expenses of the Administrative Agent including, without limitation, those contemplated under Section 2.11 of the Credit Agreement and any other Loan Document, and expressly including fees, charges and expenses of Vinson & Elkins L.L.P., Fulbright & Jaworski L.L.P. and XRoads Solution Group, LLC or any other consultant for or advisor to the Administrative Agent in connection with the preparation, negotiation, execution, delivery and administration of this Second Amendment and all other instruments or documents provided for herein or delivered or to be delivered hereunder or in connection herewith (all such costs and expenses, the "**Agent's Expenses**").  In addition, the Borrower agrees to save and hold harmless the Administrative Agent and the Lender from all liability for the Agent's Expenses.  All of the Agent's Expenses constitute Postpetition Obligations under the Loan Documents.  Borrower acknowledges that it will receive a summary invoice reflecting only the total amount due and that such summary invoice will not contain any narrative description of the services provided by Vinson & Elkins L.L.P., Fulbright & Jaworski L.L.P., XRoads Solution Group, LLC or any other consultant or advisor to the Administrative Agent.  Borrower agrees that delivery of such summary invoices shall not, in any way constitute a waiver of any right or privilege of the Administrative Agent and the Lender associated with such invoices.  The Administrative Agent is authorized by the Borrower to charge the Borrower's deposit accounts with JPMorgan for any and all of the Agent's Expenses from time to time as determined by the Administrative Agent.  All obligations provided in this Section 7 shall survive any termination of this Second Amendment and the other Loan Documents.  Borrower agrees and intends that each transfer to or for the benefit of the Administrative Agent and the Lender made or to be made under this Section 7 (a) are made according to ordinary business terms between Borrower, the Administrative Agent and the Lender taking into account the Borrower's business and financial affairs and (b) are intended by the Borrower, the Administrative Agent and the Lender to be a contemporaneous exchange for new value given to the Borrower by the Administrative Agent and the Lender as set forth herein.

Section 8     Indemnification.  The Borrower hereby agrees to indemnify the Administrative Agent and the Lender from and against any and all liabilities, obligations, losses,

15

damages, penalties, actions, judgments, suits, costs, expenses, or disbursements of any kind or nature whatsoever which may be imposed on, incurred by or asserted against the Administrative Agent or any Lender in any way relating to or arising out of or any action taken or omitted by the Administrative Agent or any Lender under this Second Amendment or in any way relating to the Postpetition Loans; provided that the Borrower shall not be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses, or disbursements resulting from the Administrative Agent's or any Lender's gross negligence or willful misconduct.

Section 9 **WAIVER OF JURY TRIAL.** **TO THE MAXIMUM EXTENT PERMITTED BY LAW, THE BORROWER HEREBY WAIVES ANY RIGHT THAT IT MAY HAVE TO A TRIAL BY JURY OF ANY DISPUTE (WHETHER A CLAIM IN TORT, CONTRACT, EQUITY, OR OTHERWISE) ARISING UNDER OR RELATING TO THIS SECOND AMENDMENT, THE OTHER LOAN DOCUMENTS, OR ANY RELATED MATTERS, AND AGREES THAT ANY SUCH DISPUTE SHALL BE TRIED BEFORE A JUDGE SITTING WITHOUT A JURY.**

Section 10 **GOVERNING LAW.** **THIS SECOND AMENDMENT AND ALL LOAN DOCUMENTS SHALL BE DEEMED CONTRACTS MADE UNDER THE LAWS OF THE STATE OF TEXAS AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF TEXAS, EXCEPT TO THE EXTENT (1) FEDERAL LAWS GOVERN THE VALIDITY, CONSTRUCTION, ENFORCEMENT, AND INTERPRETATION OF ALL OR ANY PART OF THIS AGREEMENT AND ALL DOMESTIC LOAN DOCUMENTS OR (2) STATE LAW GOVERNS UCC COLLATERAL INTERESTS FOR PROPERTIES OUTSIDE THE STATE OF TEXAS. WITHOUT EXCLUDING ANY OTHER JURISDICTION, THE BORROWER AGREES THAT BOTH THE BANKRUPTCY COURT AND THE COURTS OF TEXAS WILL HAVE JURISDICTION OVER PROCEEDINGS IN CONNECTION HEREWITH.**

Section 11 **RATIFICATION.** **THE BORROWER HEREBY RATIFIES AND CONFIRMS EACH OF THE RELEASES CONTAINED IN SECTION 12 OF THE FIRST AMENDMENT.**

Section 12 **ENTIRE AGREEMENT.** **THIS SECOND AMENDMENT AND THE OTHER LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES. THIS SECOND AMENDMENT SHALL CONSTITUTE A LOAN DOCUMENT.**

[Remainder of page left intentionally blank. Signature pages follow.]

**<u>BORROWER</u>:**                          **AGE REFINING, INC.**


By:   _____
      Name:_____
      Title:_____

Signature Page
SECOND AMENDMENT TO AMENDED AND RESTATED CREDIT AGREEMENT
AGE REFINING, INC.

70783847

<u>**ADMINISTRATIVE AGENT/LENDER:**</u>

**JPMORGAN CHASE BANK, N.A.**, as Administrative Agent, Issuing Bank and sole Lender

By: _____
Name: _____
Title: _____

Signature Page
SECOND AMENDMENT TO AMENDED AND RESTATED CREDIT AGREEMENT
AGE REFINING, INC.

70783847

**EXHIBIT A**
**FORM OF POSTPETITION NOTICE OF BORROWING**


Date:_____


JP Morgan Chase Bank, N.A., as Administrative Agent
2200 Ross Avenue, 9th Floor
Dallas, Texas 75201
Attn: Mr. Courtney J. Jeans


Re:     Request For Postpetition Loan

This Request for Borrowing has been prepared and is being delivered to Administrative Agent pursuant to Section 2.21(b) of that certain Amended and Restated Credit Agreement by and among AGE Refining, Inc. (the "**Borrower**"), the lenders party thereto, as Lenders, and JPMorgan Chase Bank, N.A., as administrative agent ("**Administrative Agent**") for the Lenders, dated as of September 12, 2008 (as modified to date, the "**Credit Agreement**"). Capitalized terms in this document shall have the meanings assigned to them in the Credit Agreement unless otherwise provided herein or the context hereof otherwise requires.

The Borrower hereby (i) requests that Lenders make a Postpetition Loan (i) in the aggregate principal amount of $ _____ on _____, 20__, and (ii) certifies that the proceeds of such Postpetition Loan shall be used for Budgeted Expenses in compliance with the Budget and no other cash is available to the Borrower to pay such Budgeted Expenses.

The undersigned (in his or her representative capacity and not in his or her individual capacity) hereby represents and warrants, to the best of his or her knowledge, to the Administrative Agent and Lenders that all of the representations and warranties contained in Section 4 of the Second Amendment are true and correct in all material respects as of the date hereof, with the same force and effect as if made on the date hereof, and that no Postpetition Default or condition, event or act which with the giving of notice or lapse of time, or both, would constitute a Postpetition Default exists and is continuing on this date, unless noted below (if such a condition, event or act is so noted, there shall also be noted below the nature, period of existence thereof and the action which the Borrower is taking or propose to take with respect thereto).


**AGE REFINING, INC.**



By:      _____
Name:  _____
Title:   _____


A-1

## EXHIBIT B
## POSTPETITION COMMITMENTS

| Lender | Postpetition Commitment | Postpetition Percentage |
|---|---|---|
| JPMorgan Chase Bank, N.A. | $35,000,000 | 100% |

## **EXHIBIT C**
## **DEFAULTS EXISTING ON PETITION DATE**

70784134.6

**<u>EXHIBIT D</u>**
**<u>BUDGET</u>**

[Attached]

D-1

# Exhibit "2"

**AGE Refining, Inc.**
**Weekly Cash Flow Estimate**
**$ in 000's**
Revised: February 4, 2010
Week Ending/Sunday

| | Estimate 24-Jan | Projected 31-Jan | Projected 7-Feb | Projected 14-Feb | Projected 21-Feb | Projected 28-Feb | 1 Projected 7-Mar | 2 Projected 14-Mar | 3 Projected 21-Mar | 4 Projected 28-Mar | 5 Projected 4-Apr | 6 Projected 11-Apr | 7 Projected 18-Apr | 8 Projected 25-Apr | 9 Projected 2-May | 10 Projected 9-May | 11 Projected 16-May | 12 Projected 23-May | 13 Projected 30-May | 14 Projected | 15 Projected | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

**Receipts:**
- Collections of Accounts Receivable
- Other Deposits - Misc.
- Other Deposits - Insurance
- Other Deposits - Transportation
- Other Deposits - [illegible]

**Total Receipts**

**Disbursements:**
- Crude Oil Payments
- Other Production Costs
- Transportation
- Employee Relations & Training
- Employee Benefits
- Payroll Taxes
- Payroll
- Utilities
- Operating and Maintenance
- Chemicals
- Insurance Premiums/Financing Pmts
- Legal & Professional Services
- Rent
- Office Expenses
- Travel & Entertainment
- Interest & Fees
- Principal
- 20?0 Tax Deposit
- Excise Taxes
- Crude Oil & Natural Gas Taxes
- Sales & Use Taxes
- Delivery Fee (tax)
- Other Taxes (Franchise, Property, FIT)
- Capital Expenditures
- Restructuring
- Less: Other Withdrawals (bank fees)
- Other Income

**Total Disbursements**

**Net Cash Activity**

**Operating Account Activity**
- Beginning Cash Balance
- Add: Customer Collections
- Add: Other Deposits
- Less: Disbursements
- Less: Other Withdrawals
- Ending Operating Cash Account Balance

**Collateral Cash Account Activity**
- Beginning Balance
- Restructuring
- Capital Expenditures
- STG
- Other
- Ending Collateral Cash Account Balance

**Ending Total Cash Balance**

**Plus: N/R Receipts**
- Terra Receivable (2/22/10)
- Insurance reimbursement

**Total N/R Receipts**

**Plus: N/R Disbursements**
- Restructuring
- Additional Utilities (deposit, regm, stg)
- STG

**Total N/R Disbursements**

**Total Non-recurring cash activity**

**Net Cash Inflow/(Outflow)**

Recurring cash activity
Interest

CONFIDENTIAL
2/10/2010, 2:58 PM

CONFIDENTIAL 22/10/2010, 2:58 PM

**AGE Refining, Inc.**
**Weekly Cash Flow Estimate**
**$ in 000's**
Revised: February 4, 2010
Week Ending:Sunday

Recurring Operational Cash Activity

**Accounts Receivable - Unreconciled**

Add: Net Sales
- Products
- Product Transportation
- Product Taxes
- Prior
- Other

Less: Collections

**Total Sales**

**Inventory - Estimated Ending Balances**

ISSO/#4 Oil Sales (Volley) 9 day
Reformate Sales 14 day
Government Sales 30 day
Other 30 Day Sales
Product Transportation
Product Taxes
Total Collections
Less: Credits & Allowances & Adjustment

**Ending balance**

**BORROWING BASE**

**Accounts Receivable**
Ending Collateral Balance
Less Ineligible A/R
Total Eligible A/R Collateral
A/R Advance Rate
A/R Borrowing Base Value

**Inventory**
Beginning Collateral Balance
Less Ineligible Inven.- est @ 2.5%
Total Eligible Inventory Collateral
Inventory Advance Rate
Inventory Borrowing Base Value

**Total Inventory**

**Borrowing Base Availability**
Available Borrowing Base
Less Pro-Forma Funds Transfer Adjustment
Less Pro-Forma Crude Payment Adjustment
Less Other Reserves - Various
Other Adjustments

**Estimated Availability Net Borrowed**

**Availability Net Borrowed per Bank**

Metrics (based on budget forecast)
- EBITDA
- Crude Purchases ($ in 000's/month)
- Total Crude Purchase ($ in 000's)
- Average Crude Price per bbl
- Product Sale Volume (bbls/month)
- Total Product Sales ($ in 000's)
- Average Sales Price per bbl