**SIGNED this 22nd day of February, 2011.**

_____
**LEIF M. CLARK**
**UNITED STATES BANKRUPTCY JUDGE**

_____

# United States Bankruptcy Court
### Western District of Texas
### San Antonio Division

| | |
|---|---|
| In re | Bankr. Case No. |
| Age Refining, Inc. | 10-50501-C |
| *Debtor* | Chapter 11 |

## Memorandum Decision on Trustee's Motion to Approve Contingent Fee Agreement

Came on for hearing the foregoing matter. Eric J. Moeller, the chapter 11 trustee appointed in this case, seeks approval to retain two firms to prosecute certain causes of action owned by the bankruptcy estate against various entities that are or were related either to the debtor or to the debtor's former officers, directors and shareholders. An objection was filed by Glen Gonzalez, who is a shareholder, was an officer of the company until he was displaced by the chapter 11 trustee, continues to hold claims against the estate, and (along with a number of related companies) is the target of a suit by the chapter 11 trustee.

## Background

This case involves a small oil refinery in San Antonio, Texas. It has two processing facilities at the refinery, a tank farm, a tank car loading facility and two transport loading systems. It also has storage tanks in nearby Elmendorf, Texas and subleases a terminal in Redfish Bay, Texas. It employs about 80 people. Despite its relative size, however, it is significant both to the local economy and to its customers, as it holds a contracts to furnish jet fuel to the military, including an important contract to supply JP-8 fuels to three local Air Force bases, one of which, Randolph Air Force Base, is a key flight training base for the Air Force. The contract is not the refinery's only source of revenue, however, as it makes a variety of other products as well, including diesel products, solvents, and specialized fuels for commercial, industrial and government clients. At peak capacity, the refinery had a throughput in excess of 14,000 barrels per day. The company enjoyed strong profitability for a number of years, despite suffering under the impediment of having to rely on trucking to supply crude for feedstock. The oil industry suffered along with many others with the downturn in the economy. Refineries are especially vulnerable to fluctuations in the price of feedstock relative to the prices it can fetch for its product, and when that spread narrows, profitability can suffer. The refinery relies on regular suppliers as its source for feedstock, many of which require letters of credit as a condition to shipping.

The refinery had a lending relationship with JPMorgan Chase Bank, N.A., as agent for the Revolving Lenders and with Chase Capital Corporation, as agent for the Construction Lenders. The Revolving facility was for $50,000,000, and afforded both operating capital and letters of credit. It was secured by all of the debtor's inventory,

accounts receivable, and cash. The Construction loan was in the original amount of $46,000,000, with $29,600,000 outstanding as of the petition date, virtually all representing outstanding (but undrawn) letters of credit. Chase Capital was also agent bank for Junior Lenders, for $10,000,000 in financing. Both the Construction loan and the Junior Lenders loan were secured by first and second liens, respectively, on all the debtor's real property, refining plants, expansion construction contracts, and most of the debtor's equipment.

As the refinery's cash flow began to suffer in 2009, losses began to accumulate, and the debtor sought to restructure its lending relationship with JPMorgan and Chase Capital. Unfortunately, those efforts foundered. When the lenders refused to issue further letters of credit, the debtor was no longer able to maintain its supply of crude (which cost an estimated $1.1 million per day). It thus filed this chapter 11 petition in early 2010, and quickly entered into a post-petition financing arrangement with its lenders, which enabled the debtor to once again obtain letters of credit to secure a continued supply of crude for the refinery.

Not long into the bankruptcy case, it became clear that the lenders were losing confidence in the management team at the refinery. Questions were raised about the refinery's use of a trucking company that was also owned by the Gonzalez family, and about various transactions that may have occurred between the refinery and a number of related companies. In an unfortunate confluence of events, one of the refinery's truck terminals caught on fire in May 2010, dramatically reducing the refinery's ability to receive sufficient crude to run at capacity. By June 2010, it was agreed by all parties,

including the lenders, the Gonzalez entities, and the Committee, that a chapter 11 trustee should be appointed to displace management. Eric Moeller was appointed.

The Creditors Committee, through its counsel, commenced an investigation into suspected wrongful transactions. The trustee supported these efforts, but did not invest substantial resources of his own, preferring instead to focus his efforts on repairing the truck terminal, improving operations, and getting the refinery back up to full capacity, in preparation for the marketing and sale of the refinery. The lenders, who were financing all aspects of the bankruptcy by this time, including the legal fees associated with the investigation, favored this division of labor. By the fall of 2010, the Committee felt it had finally found enough to justify litigation. It approached the trustee, who agreed.

As the trustee was willing to initiate such litigation in his own right, there was no need for the Committee to seek authorization to bring an action in the trustee's stead. However, the trustee felt it appropriate to negotiate a special arrangement for the prosecution of this litigation. The plan was to use both his attorneys, Langley & Banack, and the firm of Martin & Drought, which was already representing the Official Committee of Unsecured Creditors in this case. These two firms were to be retained as special counsel under a special payment arrangement designed exclusively for the pursuit of this litigation. The arrangement consists of payment at an hourly rate charged at 85% of the respective firms' normally hourly rates, plus a 6% contingent fee, to be shared by the two firms. The retention agreement itself identifies the scope of retention as follows:

> ... the Firms will, subject to and conditioned upon court approval, represent the Trustee in prosecuting the causes of action owned by AGE Refining, Inc., ("AGE") and any of its assignees against AGE Transportation, Inc. ("ATI"), Tierra Pipeline, LP ("Tierra Pipeline"), Tierra Pipeline, GP, LLC ("Tierra GP"), Tierra G Squared Land and Properties, L.P. ("TGS"), Tierra G Squared Land and Properties, GP, LLC ("TGP"),

> Glen Gonzalez, Individually ("G. Gonzalez"), Glen Gonzalez Special Trust ("Gonzalez Trust"), and/or Al Gonzalez ("A. Gonzalez"), Sharon Gonzalez ("S. Gonzalez"), and collectively with ATI, Tierra Pipeline, Tierra GP, TGS, TGP, G. Gonzalez, Gonzalez Trust and A. Gonzalez ("the Gonzalez Parties") and/or any subsequent transferee or other individual or entity who may be found to have been involved with the Gonzalez Entities (together with the Gonzalez Parties, the "Gonzalez Entities") in the matters which are the subject of the actions (collectively, the "Litigation").

Agreement for Legal Services (attached as an exhibit to the Motion). The agreement adds that "[t]he services described herein are in addition to the roles that the Langley & Banack firm serves as general Chapter 11 counsel to the Trustee and MDPC firm [serves] for the Official Committee of Unsecured Creditors." *Id.* With respect to the contingent fee, the agreement states that it "shall be split between the Firms on a 50/50 basis with each Firm receiving 1/2 of the contingent fee ..." *Id.* The agreement adds that "[t]he Firms do not believe that the general representation of [the Trustee and the Committee] is a conflict with respect to the additional representation proposed herein." *Id.*

An objection to this arrangement was filed by Glen Gonzalez, one of the parties to be sued, but also a party in interest in the bankruptcy case, with claims against the estate. In the objection, Gonzalez asserted that the trustee's proposed retention of counsel for the Creditors' Committee "improperly blurs numerous distinctions." He points out that there is no basis for the Committee's direct prosecution of claims owned by the estate, but that retention of counsel for the Committee would appear to be a back-door effort to permit the Committee to do just that, without having to satisfy the standards set out by the Fifth Circuit in *Matter of Louisiana World Exposition v. Fed. Ins. Co.*, 858 F.2d 233 (5th Cir. 1988). If this motion were construed as *de facto* authority for

the Committee to pursue causes of action as co-plaintiff, then, he argues, it should be denied.

Gonzalez also asserts that there is no need for the trustee to retain any other firm than the counsel he has already retained in this case. He notes that the original retention order for Langley & Banack already authorizes that firm to pursue these very sorts of causes of action. Gonzalez says that there has been no showing that the firm is entitled to be retained on any basis different from the basis on which it was originally retained.

Next, Gonzalez says that, if both firms are to be retained, then the duties of the two firms should be divided. In essence, Gonzalez wants the firms to reveal who is doing what in their interim fee applications (though he does not expressly come out and say this). This sort of fee detail could, of course, reveal a good deal about the plaintiff's trial strategy to the defendants.

Gonzalez also raises a question about who is the true plaintiff in the case, as the retention agreement speaks of the need to consult JPMorgan Chase regarding any settlement proposal. Such an arrangement, it is suggested, intimates that JPMorgan Chase proposed and negotiated the fee arrangement. Says Gonzalez, "customarily counsel would consult with their client regarding a possible resolution of a dispute and file a motion to compromise controversies with the Bankruptcy Court with any party in interest having the right to object and be heard. By Chase inserting itself into a role ordinarily occupied by a client it effectively has greater rights than are typically afforded under Bankruptcy Rule 9019. In addition, if the Fee Agreement has been proposed and negotiated by Chase, did Chase also agree to finance the litigation? If so, are there

potentially two disclosed plaintiffs [sic] and a third undisclosed plaintiff?" Response, at ¶ 10.

A hearing on the motion was held, and all parties had a full opportunity to present relevant evidence and to make their arguments. This decision now resolves the questions presented.

## Analysis

The retention of professionals by a trustee in a bankruptcy case is governed by sections 327 and 328. Section 327, in the parts relevant to the issue before the court, says that

> **(a)** Except as otherwise provided in this section, the trustee, with the court's approval, may employ one or more attorneys ... or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title.
> . . .
> **(c)** In a case under chapter ... 11 of this title, a person is not disqualified for employment under this section solely because of such person's employment by or representation of a creditor, unless there is objection by another creditor or the United States trustee, in which case the court shall disapprove such employment if there is an actual conflict of interest.
> . . .
> **(e)** The trustee, with the court's approval, may employ, for a specified special purpose other than to represent the trustee in conducting the case, an attorney that has represented the debtor, if in the best interest of the estate, and if such attorney does not represent or hold any interest adverse to the debtor or to the estate with respect to the matter on which such attorney is to be employed.

11 U.S.C. § 327(a), (c), (e). This section thus tells us *who* the trustee may hire to represent him in a case.

Section 328 provides, in relevant part, as follows:

> **(a)** The trustee ... with the court's approval, may employ or authorize the employment of a professional person under section 327 ... on any

7

reasonable terms and conditions of employment, including on a retainer, on an hourly basis, on a fixed or percentage fee basis, or on a contingent fee basis. Notwithstanding such terms and conditions, the court may allow compensation different from the compensation provided under such terms and conditions after the conclusion of such employment, if such terms or conditions prove to have been improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions.

. . .

**(c)** Except as provided in section 327(c), [or section] 327(e) ... of this title, the court may deny allowance of compensation for services and reimbursement of expenses of a professional person employed under section 327 ... if, at any time during such professional person's employment under section 327 ... such professional person is not a disinterested person, or represents or holds an interest adverse to the interest of the estate with respect to the matter on which such professional person is employed.

11 U.S.C. § 328(a), (c). This section thus tells us *on what terms* the trustee may hire professional persons to represent him in the case.[1]

One other section has relevance to the issues presented in this case, though it is not one that was referenced by any of the parties in their moving papers. Section 504 states (in relevant part) that

---

[1] Practitioners seem to believe that section 328 is another section under which a professional can be retained, as an alternative to section 327, and argue that, if a person is "retained under section 328," their fees are thus virtually immune from later adjustment by the court. That is a misreading of the statute, however. They have apparently jumped to that conclusion from their reading of Fifth Circuit jurisprudence addressing the extreme limitations that are placed on revisiting some types of compensation arrangements -- especially contingent fee agreements -- by the language in section 328(a), which says that terms and conditions can only be revisited if they "prove to have been improvident in light of developments *not capable of being anticipated at the time of the fixiing of such terms and conditions*." *See Matter of Barron*, 325 F.3d 690, 694 (5th Cir. 2003) (overruling a trial court's reduction of a contingent fee award, noting that settlement of a case without an actual trial was capable of being anticipated when the contingent fee agreement was made); *see also Gibbs & Bruns LLP v. Coho Energy, Inc. (Matter of Coho Energy, Inc.)*, 395 F.3d 198, 205 (5th Cir. 2004) (reducing fees awarded by an arbitration panel as being improvident in light of circumstances not capable of being anticipated, here, the arbitration panel's basing the award on a gross misunderstanding of the facts).

In fact, professionals representing the trustee are *only* retained under section 327. The language of section 328 discussed by the Fifth Circuit is actually language that applies to *all* terms and conditions under which counsel might have been retained. Thus, it is the *nature* of the terms and conditions, and their relationship to what is and is not capable of being anticipated, that is relevant. Some kinds of arrangements attempt to fix compensation in a way that cannot later be altered. *See Donaldson, Lufkin & Jenrette Sec. Corp. v. National Gypsum Co. (Matter of National Gypsum Co.)*, 123 F.3d 861, 862 (5th Cir. 1997). Fixed fee contracts, contingent fee contracts, and contracts with bonus features are all examples of agreements whose nature is such that, once approved at the retention stage, are difficult to revise later in the case, because it is so difficult to show that later developments were not capable of being anticipated. But it is the *nature of the agreement* and not the so-called "basis of retention" that affects a court's ability to revisit fee awards in a case. Hourly fee awards, paid on an interim basis pursuant to section 331, but not actually awarded until the entry of a final award pursuant to section 330, are by their nature capable of being adjusted, because they are not finally awarded until the conclusion of the services, and only then is the court obligated to make a one time determination whether the fee fits the standards set out in section 330(a)(3). All that *Matter of Barron* actually teaches is that some types of fee arrangements are, *by their nature*, immune from later adjustment under section 330(a)(3).

By way of example, a contingent fee agreement is one pursuant to which a professional agrees to be paid only on the condition that the professional prevails, but also agrees that, it if *does* prevail, its fee will be determined not by consulting a reasonable hourly rate times a reasonable amount of time expended, but rather by applying a fixed percentage to the award. Those "terms and conditions" expressly remove that professional from the application of section 330(a)(3). Only if the court were to determine that there were developments not capable of being anticipated that render the contingent fee *arrangement* itself improvident would a court be permitted to later substitute a fee award on some other basis. Thus, it is not the fee award as such but the *fee arrangement* that must later be found to have been improvident as a result of later unanticipated developments.

> **(a)** ... a person receiving compensation or reimbursement under section 503(b)(2) ... of this title may not share or agree to share --
>> **(1)** any such compensation or reimbursement with another person, or
>> **(2)** any compensation or reimbursement received by another person under such sections.

11 U.S.C. § 504(a). The section applies to all persons who receive compensation "under section 503(b)(2)." *See id.* Section 503(b)(2), in turn, permits allowance (and payment) of "allowed administrative expenses ... including -- ... (2) compensation and reimbursement awarded under section 330(a) of this title." 11 U.S.C. § 503(b)(2). Thus, section 504(a), and its prohibition on fee sharing, applies to any compensation awarded under section 330(a).

Section 330(a) is the single vehicle by which *all* professional persons employed under section 327 are paid -- regardless on what basis they are paid. Section 330 of course familiarly applies to (and regulates the allowed amount paid to) professionals who charge on an hourly rate basis. It also, however, applies to professionals who are

paid on some other basis -- contingent fee, flat fee, bonus arrangements, and such -- though *some* of its provisions, such as subsection (a)(3), would not be applicable.[2]

Thus, while section 328 governs the *terms and conditions* under which a professional might be hired, it is section 330 itself that actually governs whether the professional person will get *paid*. For any professional retained under section 327 (and that is all professionals retained by the trustee), the *only* way for any professional to get *paid* -- even professionals who are retained under a fixed fee, contingent fee, or bonus fee contract -- is by court order, on application with notice and an opportunity for a hearing given to other parties in interest in the case pursuant to section 330(a). Cases that hold that the court may not later alter the terms and conditions of a contingent fee

---

[2] Section 330(a), in relevant part, provides:

(a)(1) After notice to the parties in interest ... and a hearing, and subject to sections ... 328 ... the court may award to a ... professional person employed under section 327 ...reasonable compensation for actual, necessary services rendered by the ... professional person or attorney ...; and reimbursement for actual, necessary expenses.
(a)(2) The court may, on its own motion, or on the motion of ... any other party in interest, award compensation that is less than the amount of compensation that is requested.
(a)(3) In determining the amount of reasonable compensation to be awarded to ... a professional person, the court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including --
(A) the time spent on such services;
(B) the rates charged for such services;
(C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case ...
(D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;
(E) with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and
(F) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.
(a)(4)(A) ... the court shall not allow compensation for --
unnecessary duplication of services; or
services that were not --
reasonably likely to benefit the debtor's estate; or
necessary to the administration of the case

11 U.S.C. § 330(a).

contract, based on the language in section 328, do not stand for the proposition that such professionals are "retained" under section 328 (they are not). Nor do they stand for the proposition that such professionals are only "paid" under section 328 (they are not). *See Matter of Barron*, *supra*. It is only pursuant to section 330(a) that any professional retained by the trustee gets paid, regardless on what terms and conditions the professional was retained. *Barron* simply informs us that some of the *rules* regulating payment (to wit, section 330(a)(3)) will not apply to professionals whose retention agreement calls for payment on terms other than hourly rates.[3]

Because all professionals retained by the trustee -- including those retained on a fee basis other than an hourly fee -- are compensated "under section 330(a) of this title," their entitlement to payment arises under section 503(b)(2). *See* 11 U.S.C. § 503(b)(2). And because they receive their compensation, if any, "under section 503(b)(2) ... of this title," all such professionals are subject to the restriction on fee sharing in section 504(a)

---

[3] Were a court to apply the section 330(a)(3) standards to a contingent fee contract, for example, the effect would be to "allow compensation different from the compensation provided under [the] terms and conditions" of the contract. *See* 11 U.S.C. § 328(a). As we have already noted, those retention terms and conditions may only be altered if later unanticipated developments arise. Other parts of section 330(a) *do* apply, however, to fixed fee agreements, contingent fee contracts, and the like. For example, section 330 (a)(1) permits an award of "reasonable compensation," subject to section 328. *See* 11 U.S.C. § 330(a)(1) (A). If a professional retained on a contingent fee were to commit malpractice, then it would not be reasonable for that professional to receive an award. *See Matter of Intelogic Trace, Inc.*, 200 F.3d 382, 387 (5th Cir. 2000) (citing *In re Temple Retirement Community* for the proposition that the court "has the independent authority and responsibility to determine the reasonableness of fees," in support of its conclusion that a final order authorizing a fee request is a de facto determination that there is no basis for challenging those fees, including a charge of malpractice or other wrongdoing that would undermine the finding of "reasonableness"). Thus, it is error to assert that section 330 *in toto* does not apply to contingent fee arrangements, as some might be tempted to say. It is only correct to say that some *portions* of section 330 (subsection (a)(3) in particular) can only apply to certain types of payment arrangements (primarily hourly rate arrangements). Other portions of section 330 (such as subsection (a) (1)) apply to regulate the payment of all professionals, regardless the terms and conditions of retention, because, by their nature, their application does not impermissibly alter the terms and conditions of retention. Of course, one could imagine a retention arrangement in which the trustee (or debtor-in-possession) agrees to pay a fee, regardless whether services are rendered, regardless whether the services are reasonable, regardless whether malpractice was committed, regardless whether the estate is damaged by the actions of the professional. Hopefully, however, most courts have the good sense not to approve such an arrangement in the first place.

(1). *See* 11 U.S.C. § 504(a)(1). As the agreement in this case could be construed with respect to each of the firms sought to be retained to be one to "share or agree to share compensation with another person," the court must reach the question whether this agreement in fact does so. *See In re Futuronics Corp.*, 655 F.2d 463 (2nd Cir. 1981) (disallowing fees for failure to disclose fee sharing arrangement); *Quesada v. United States Trustee*, 222 B.R. 193, 198 (D.P.R. 1998) (finding Trustee's failure to disclose fee sharing arrangement violated Rule 2016 and denying compensation); *In re Cupboards, Inc.*, 190 B.R. 969, 971 (Bankr. M.D.Fla. 1996) (requiring disgorgement of compensation of debtor's attorney who violated Rule 2016 by under-reporting and sharing fees with unauthorized advisor); *see also* ALAN RESNICK & HENRY SOMMER, 4 COLLIER ON BANKRUPTCY, ¶ 504.02[7] (noting that "the Bankruptcy Code imposes upon the court a duty to scrutinize the actions of professionals who appear, file claims or provide services in the bankruptcy context").

Section 504 imposes a prohibition against the practice of "fee-splitting," departing from Act practice that had permitted it "except in a case where one of the professionals simply referred or forwarded the bankruptcy case to another professional who thereafter rendered all the services." *In re Matis*, 73 B.R. 228, 230-31 (Bankr. N.D.N.Y. 1987); *see also Goldberg v. Vilt (In re Smith)*, 397 B.R. 810, 816 (Bankr. E.D.Tex. 2008). *Collier* explains that

> Whenever fees or other compensation are shared among two or more professionals, there is incentive to adjust upward the compensation sought in order to offset any diminution to one's share. Consequently, sharing of compensation can inflate the cost of a bankruptcy case to the debtor, and therefore to the creditors. Fee splitting also subjects the professional to outside influences over which the court has no control, which tends to transfer from the court some degree of power over expenditure and allowances. . . . The potential for harm makes such

arrangements reprehensible as a matter of public policy as well as a violation of the attorney's ethical obligations.

ALAN RESNICK & HENRY SOMMER, 4 COLLIER ON BANKRUPTCY (15TH ED.), ¶ 504.01, at p. 504-3 (Matthew Bender 2009). Adds the treatise,

> While the legislative history of section 504 is sparse ... there can be no doubt that section 504(a) is intended to be mandatory and preemptory. The section illustrates a congressional intent to preserve the integrity of the bankruptcy process so that professionals, engaged in bankruptcy cases, attend to their duty as officers of the bankruptcy court, rather than treat their interest in bankruptcy cases as "matters of traffic."

*Id.*, at ¶ 504.02, at p. 504-5. Importantly, the prohibition on fee sharing applies even though such fee sharing (or fee-splitting) might otherwise be authorized under the state bar rules applicable to the professionals. *Id.*, at ¶ 504.02[3]; *see also In re Hepner*, 2007 Bankr. LEXIS 226, at *5 (Bankr. S.D.Tex. Jan. 16, 2007) (noting that the prohibition may be out of step with modern practice, but is nonetheless unambiguous).

But understanding just what constitutes fee sharing is not an easy task. *Collier* notes that, regardless whether attorneys could engage in fee splitting outside bankruptcy (and that practice is common in personal injury actions in Texas, and is specifically authorized under Texas rules of professional conduct),[4] in order for another attorney to obtain its part of the fee, "attorneys not in the same firm but who represent a single entity would thus be required to separately obtain court approval of their retention and fees." *Collier*, ¶ 504.02[3], at p. 504-8.

A decisive point seems to be whether the other firm in question is independently retained, as opposed to simply looking to the first firm for its payment. *See id.* For example, in *In re Anderson*, 936 F.2d 199 (5th Cir. 1999), the debtor employed an

---

[4] *See* Texas Disciplinary Rules of Professional Conduct, Rule 1.04(f), (g), State Bar Rules, Art. X, § 9, *reprinted in* Texas Rules of Court - State (West pamphl. ed. 2010).

attorney who in turn hired his son, who was not a member of his firm, and paid his son a retainer. The son's separate employment was not authorized by the court. The son could not be paid by the estate because he had not been retained by the estate, and he could not be paid by his father because that would violate the strictures of section 504 (a). *Id.*, at 203. In *In re Soulisak*, 227 B.R. 77 (Bankr. E.D.Va. 1998), a debt counseling firm offered financial and legal counseling to clients for a fixed fee, then contracted with an attorney to perform all the work prior to the first meeting of creditors. Among other violations, the court found this arrangement violated section 504 of the Code. *Id.*, at 82.

On the other hand, when an attorney retained an out of state attorney to subpoena a witness, the court found the arrangement to be merely a payment for a necessary service, and not fee sharing. *In re Warner*, 141 B.R. 762 (M.D.Fla. 1992). In another case, an attorney's retaining a former officer of the debtor on an hourly basis to assist in collecting receivables for the trustee was found not to violate section 504. *In re Statewide Pools, Inc.*, 79 B.R. 312, 316 (Bankr. S.D.Ohio 1987).

In this case, the trustee has affirmatively represented a desire to hire *two* law firms, each of which is to be separately compensated under a blended scheme consisting of hourly fees billed at 85% of the lawyers' ordinary billing rate, and a contingency fee totalling 6% of the award, one half to go to each firm. While the exact language of the agreement could be read as an agreement to "split" a 6% contingency fee, it functions more like a separate agreement to pay *each* firm a contingency fee of *3%* of any award. From the point of view of the trustee, the total contingency fee to be applied to any award will not exceed 6%, but the obligation to pay the contingency fee is one directly imposed on the trustee. Neither firm is expected to look to the other firm for

15

"it's cut" of the fee. Each firm is sought to be separately retained for this engagement, on the terms and conditions set out in the agreement attached to the motion. Those terms do not entitle either firm to receive any more than *3%* of any award in this case, and to receive that payment from the trustee, upon appropriate application to the court. The agreement does not authorize, or permit, or even contemplate, that either firm would be expected to pay the other firm out of whatever either firm received from the trustee. Thus, in both form and substance, the proposed arrangement is in fact *not* a fee sharing agreement and so does not violate section 504.

Next, the court turns to the objections urged by Glen Gonzalez.[5] A couple of them are easily disposed of. For example, it is broadly suggested that, if the trustee hires the law firm that represents the Creditors' Committee in this case, that means that the Committee is bringing this lawsuit, though it has not sought permission to do so. Yet is is clear from the motion that the client would be the trustee, and only the trustee, with respect to the scope of this retention. The trustee says he was motivated to retain law firm because they have already invested substantial time and effort into ferreting out the facts to support the proposed litigation, and that it makes more sense to "buy" that knowledge by directly retaining the firm than it does to expect that firm to "educate" some other lawyer. What is more, because this particular firm is already a retained professional in the case, were it limited to simply "educating" some other firm, that work would in all likelihood still be billed to the estate, on the theory that the committee's constituency benefits from the trustee's pursuit of this litigation. It is more efficient to just hire the knowledge, maintains the trustee, and this court is inclined to agree with that

---

[5] Gonzalez is listed as a creditor with a small trade claim in the original schedules filed in this case. *See* Doc. # 152, at p. 26. He thus has at least technical standing in this case.

economic argument (without here reaching other issues that this retention raises). It is clear that the law firm would not be representing the Committee in this retention, though the work would appear to be closely aligned with the interests of the Committee and its constituency in augmenting the estate by the pursuit of available causes of action. That the interests are aligned is unremarkable -- it happens in bankruptcy cases all the time.

Nor is the court much concerned that the retention application for the firm of Langley & Banack stated that one of their expected duties might be the pursuit of chapter 5 actions. The trustee has determined that, based on the facts as they have developed in this case, he needs to put together a different kind of legal team to pursue what he now believes to be a significant piece of litigation held by the estate. Like any client, the trustee has the right to reconsider how he wishes to pursue that litigation, and who he wants to hire for the job. Nothing in the Bankruptcy Code strips the trustee of the same rights he would have as a client outside bankruptcy -- to choose professionals as he deems fit to best represent him. The trustee is simply negotiating a new contract, and now seeks its approval. No rule of law prohibits that.

Gonzales also insists that duties should be divided to avoid overlap. The court can hardly disagree with the sentiment, but notes that, regardless whether the firms are attentive to a careful division of labor, the failure to do so carries with it a heavy price. Section 330(a)(4)(A)(i) expressly states that the court shall *not* allow compensation for unnecessary duplication of services.

Gonzales also hauls out the canard that the retention agreement includes a proviso requiring the trustee to notify JPMorgan Chase of any proposed settlement, intimating that this provision shows that JPMorgan Chase is somehow an undisclosed

"client" of the firms. Such a proviso does not, in fact, make Chase a "client." It is beyond dispute, however, that in this case, Chase has a strong vested interest in every aspect of the administration of the estate because Chase, through its post-petition financing agreements, is effectively *funding* everything taking place in this case. As the party footing the legal bill (at least on a cash flow basis), Chase it seems is entitled to a great deal of information about whether reasonable settlements are proposed, and whether it might be asked to provide further funding for continued litigation should a settlement proposal be spurned -- especially if it were spurned without Chase's even knowing it had been made in the first place. The court is certainly not suggesting that any counsel in this case would (or would even have the desire to) run up fees in the case chasing windmills. Chase, however, as the party already on the hook for more money than any other creditor, certainly is entitled to protect itself from not being kept in the loop, and to put that protection in writing.

Gonzalez also suggests that he would be willing to pursue alternate dispute resolution as an alternative to litigation, and that the estate might be better served doing so as well. Perhaps. Then again, mediation is no panacea. Often, a certain amount of discovery in the context of formal litigation is necessary to make the mediation process more substantive. Otherwise, parties may be operating in the dark about both the potential upsides and the possible downsides in their respective positions. The court is not here suggesting that the parties delay pursuing mediation. However, the trustee as a party litigant is certainly free to exercise his business judgment that formally retaining counsel of his choice to pursue formal litigation best serves the interests of the estate.

The court is reluctant to second-guess that business judgment based primarily on the arguments urged by one of the very parties the trustee has sued.

There are more substantive objections to be addressed however, relating to whether this retention arrangement passes muster under the Bankruptcy Code's rules relating to disinterestedness and conflicts of interest. "The Fifth Circuit has long been 'sensitive to preventing conflicts of interest' and requires a 'painstaking analysis of the facts and precise application of precedent' when inquiring into alleged conflicts."  I*n re Contractor Tech.*, Ltd., 2006 U.S. Dist. LEXIS 34466, at *16 (S.D. Tex. May 30, 2006) (quoting *In re West Delta Oil Co., Inc.*, 432 F.3d 347, 355 (5th Cir. 2005)). There is no conflict of interest issue posed by the trustee's desire to employ its general counsel to aid in pursuing this litigation, on special compensation terms that differ from the terms under which the firm works in generally representing the trustee. As has been noted already, any issues regarding duplication of effort are already anticipated by section 330 (a)(4)(A)(i), and it is unnecessary to add special language that simply repeats the directive of the statute.

The trustee's request to employ Martin & Drought is a different matter. In order for the trustee to retain this firm, it must be established that doing so would not run afoul of the proscriptions contained in section 327(a), the section that regulates *who* a trustee may hire as a professional in a case. *See* discussion *supra.* As interpreted by the Fifth Circuit, section 327(a) sets forth a general two-part limiting test: the Trustee may hire only those professionals who 1) do "not hold or represent an interest adverse to the estate," and 2) are "disinterested." *In re Contractor Tech., Ltd.*, 2006 U.S. Dist. LEXIS 34466, at *14 (S.D. Tex. May 30, 2006) (quoting section 327(a) and citing *In re West*

*Delta Oil Co., Inc.*, 432 F.3d 347, 355 (5th Cir. 2005)). Subsection (c) of section 327 further qualifies subsection (a) by providing that a person is "not disqualified for employment under this section solely because of such person's employment by or representation of a creditor, unless there is objection by another creditor or the United States trustee, in which case the court shall disapprove such employment if there is an actual conflict of interest." *Id.* at *15 (quoting § 327(c)). Thus, while subsection (c) does not permit disqualification of Martin & Drought solely because it also represents a creditor of the estate, "subsection (c) 'does not preempt the more basic requirements of subsection (a)'"—the professional must not have or represent an interest adverse to the estate, and must be disinterested. *Id.* (quoting *In re AroChem Corp.*, 176 F.3d 610, 621 (2d Cir. 1999)). We thus turn first to whether Martin & Drought would be disqualified for employment under subsection (a). If so, then we look further at subsection (c) to see whether its safe harbor would apply.

The first prong, whether the professional sought to be hired by the Trustee "has or represents an interest adverse to the estate," have interpreted by analogizing to section 327(e), which uses the same language with respect to the retention of special counsel hired for a limited purpose. Several courts, including the District Court for the Southern District of Texas, have found that a proposed counsel's "adverse interest is relevant only if that interest relates to the matter on which the special counsel is employed." *In re Contractor Tech., Ltd.*, *supra* at *14; *see also Stoubmos v. Kilimnik*, 988 F.2d 949, 964 (9th Cir. 1993) (requiring, under section 327(a), that there be only "no conflict between the trustee and counsel's creditor client with respect to the specific matter itself."); *In re AroChem Corp.*, 176 F.3d 610, 622 (2d Cir. 1999) (stating that the

Second Circuit "'interpret[s] that part of § 327(a) which reads that attorneys for the trustee may 'not hold or represent an interest adverse to the estate' to mean that the attorney must not represent an adverse interest relating to the services which are to be performed by that attorney"). Thus, the relevant inquiry here is whether Martin & Drought holds or represents an interest adverse to that of the estate with respect to the specific causes of action for which the Trustee seeks to hire the firm. The source of conflict, if any in this case, would be Martin & Drought's prior and continuing representation of the Creditor's Committee's "general counsel" in the bankruptcy case.

The Fifth Circuit has adopted the following definition of "represent or hold any interest adverse to the debtor or to the estate":

> (1) to possess or assert any economic interest that would tend to lessen the value of the bankruptcy estate or that would create either an actual or potential dispute in which the estate is a rival claimant; or
> (2) to possess a predisposition under circumstances that render such a bias against the estate.

In re West Delta Oil Co., 432 F.3d 347, 356 (5th Cir. 2005) (citing In re Roberts, 46 B.R. 815, 827 (Bankr. D. Utah 1985)). "The concept of 'adverse interest' has also been articulated in terms of motivation: whether the attorney possesses 'a meaningful incentive to act contrary to the best interests of the estate and its sundry creditors.'" In re Contractor Tech., Ltd., 2006 U.S. Dist. LEXIS 34466, at *19 (quoting In re Martin, 817 F.2d 175, 180 (1st Cir. 1987)). The determination of whether an adverse interest exists is fact-specific, requiring a case-by-case examination. Id. Here, the objecting party has not identified any facts indicating that Martin & Drought "holds" any interest adverse to the estate. It is not a pre-petition creditor of Age. Nor does the firm personally possess any interests or claims against Age.If anything, Martin & Drought (as counsel for the

Committee) has interests that are virtually identical with those of the trustee when it comes to prosecuting this litigation, as it involves maximizing (and monetizing) a cause of action available to the estate, the proceeds of which are likely to defray both the estate's administrative costs and perhaps afford a basis for distributions to unsecured creditors of the estate (assuming the litigation proves to be successful). Both parties seek to maximize the value of the estate for the benefit of creditors.

In *Stoubmos*, the trustee sought to employ, for the purpose of pursuing a preference action against the former president of the debtor, an attorney who had previously represented a creditor of the estate. *In re Stoubmos*, 988 F.2d at 964. The Ninth Circuit affirmed the bankruptcy court's approval of the attorney's retention, stating that "with respect to the [] preference action, the interests of [the creditor] and the trustee coincide: if money is recovered for the estate, [the creditor's] pro rata recovery will ultimately be greater." *Id*. Similarly, in *In re RPC Corp.*, the court approved the chapter 7 trustee's retention of counsel that also represented the debtor's former CEO and creditor of the estate for the purpose of pursuing a lender liability claim against a bank that had loaned money to the estate. *In re RPC Corp.*, 114 B.R. 116, 119 (M.D.N.C. 1990). The court first noted that, while dual representation of the trustee and a creditor "seems at least suspect"…,

> the naked existence of a potential for conflict of interest does not render the appointment of counsel nugatory, but makes it voidable as the facts may warrant. It is for the court to decide whether the attorney's proposed interest carries with it a sufficient threat of material adversity to warrant prophylactic action.

Ultimately, the court concluded that, inasmuch as the former CEO was also pursuing claims against the bank in connection with his personal guaranty of the loan at issue,

"the estate's proposed suit was identical to [the former CEO's] suit, the firm had undertaken extensive litigation concerning [the former CEO's] claim against the bank and limited retention under the circumstances would 'save the estate the added expense that would be generated by retention of counsel unfamiliar with the facts and proceedings.'" *Id.* (internal quotations and citation omitted).[6] Here too, the trustee seeks to hire the Committee's counsel to pursue certain specific causes of action on behalf of the estate, and for the benefit of the estate and its creditors, including the Committee. Were the trustee intending to hire Martin & Drought as its *general* counsel, adverse interests might be presented, as it is often the case that the trustee and the committee will disagree over various administrative matters.[7] However, recalling that the focus must be placed on whether an adverse interest is created as a result of *this particular retention*, which is narrow in its scope, no adverse interest is presented "relating to the services which are to be performed by that attorney." *See In re AroChem Corp.*, 176 F. 3d 610, 622 (2nd Cir. 1999).

---

[6] *See also AroChem*, 176 F.3d at 627 (approving trustee's retention of creditor's former attorney because of the "identity of interests between the trustee and special counsel's former client with respect to the special matter for which special counsel was retained."); *In re Fondiller*, 15 B.R. 890, 892 (B.A.P. 9th Cir. 1981) (finding that chapter 7 trustee's employment of creditor's counsel was proper under section 327(a) because retention was "limited to the search for, and attempted recovery of, specific assets allegedly concealed, and the investigation of certain alleged fraudulent conveyances" in which the firm's creditor clients were not involved); *In re Contractor Tech., Ltd.*, 2006 U.S. Dist. LEXIS 34466, at *26, 32 (affirming bankruptcy court's approval of trustee's retention law firm that represented 8 of the 400 creditors in the case to pursue certain claims identified by the trustee (not involving any of the firm's creditor clients) because "[t]he creditors and the Trustee [were] generally aligned in regard to the purposes of [the firm's] employment. All want[ed] [the firm] to recover substantial sums for the estate in order to pay creditors' claims in this bankruptcy case").

[7] That has, unsurprisingly, been the case here, as the trustee sought authority to increase the borrowing base so that the trustee could increase throughput at the refinery, while the committee opposed that request because such additional borrowings would potentially place additional administrative costs ahead of the expected payout for unsecured creditors.

Gonzalez expressed concern that even if no present conflict exists between the Trustee and Martin & Drought, one might arise in the future. The mere possibility of a conflict of interest arising at some point in the future, however, is not sufficient grounds for disapproving the proposed Retention Agreement. In *Contractor Technologies*, the court found that "there is at best only a potential conflict of interest between" the trustee and the creditors' counsel (who the trustee sought to employ) "based on the conceivable existence of some claim against [counsel's] clients." 2006 U.S. Dist. LEXIS 34466, at *27-28. The court concluded that the objector's concern was "fundamentally about the 'appearance of a conflict of interest,'" and that "[t]he concern about potential issue conflicts or the 'appearance of a conflict' [was] legally insufficient to warrant disqualification." *Id.* at *29. The court relied, in part, on the Third Circuit's decision in *In re Marvel Entm't. Group., Inc.*, 140 F.3d 463, 476 (3d Cir. 1998). In that case, the Third Circuit articulated a three-part inquiry posed by sections 327(a) and (c):

> [s]ection 327(a), as well as section 327(c), imposes a *per se* disqualification as trustee's counsel of any attorney who has an *actual* conflict of interest; (2) the district court *may* within its discretion—pursuant to § 327(a) and consistent with § 327(c)—disqualify an attorney who has a *potential* conflict of interest and (3) the district court may *not* disqualify an attorney on the *appearance* of conflict alone.

*Id.* (emphasis added). The court concluded that while the potential for a conflict of interest to arise there existed in connection with the trustee's retention of a creditor's former counsel,[8] the possibility was remote and did not justify disapproving the Trustee's proposed Retention Agreement on those grounds. *Id.*

---

[8] In *Marvel Entertainment*, the proposed counsel had previously been counsel for a secured creditor who was a creditor in the case, though it had not represented the creditor in the case *sub judice*. The court found that former representation to be insufficient to warrant a finding of either an actual or a potential conflict of interest. *Id.*, at 477.

The trustee here seeks to hire Martin & Drought solely for the purpose of prosecuting certain preference and fraudulent conveyance actions in which Martin & Drought's clients are not involved. The potential for conflict here is remote. By the same token, the practical business justifications for the firm's retention for this purpose are strong. The firm has already invested a substantial amount of time and effort into investigating possible causes of action, and in drafting a pleading. Retention of this firm is an efficient and cost-effective strategy for the trustee who wishes to pursue causes of action already developed by this firm. Of course, should an actual conflict of interest arise in the future, the parties are under a continuing obligation to inform the court of such an occurrence. *See In re Roberts*, 75 B.R. 402, 410 (Bankr. D. Utah 1987). Until then, mere speculation about the possibility of a conflict is insufficient grounds to justify disqualification of the firm's retention by the trustee.

The first prong of the inquiry is thus satisfied in this case.

The second prong of section 327(a) provides that any person (or firm) retained by the trustee must also be "disinterested." Section 101(14)(E) of the Bankruptcy Code defines a "disinterested" person as one who "does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor." 11 U.S.C. § 101(14)(E). Furthermore, courts have interpreted this definition to implicate only the personal interests of the professional sought to be retained. *In re Contractor Technology, Ltd.*, 2006 U.S. Dist. 34466, at *22 (citing *AroChem*, 176 F.3d at 629). "Accordingly, to violate the requirements of § 101(14)(E), the professional personally must 'have' the prohibited interest; and the representation of an adverse

interest cannot be imputed to the professional." *Id.*; *see also In re AFI Holding, Inc.*, 530 F.3d 832, 848 (9th Cir. 2008) (concluding that the definition of disinterested "was intended to disqualify only creditors with personal claims and those 'holding' pre-petition adverse interests, not [persons] having claims in a representative capacity").

Neither the trustee, Gonzalez nor the committee has pointed to any facts showing that Martin & Drought personally has any interest adverse to the estate, its creditors or equity holders. Just as Martin & Drought does not "hold" any interest adverse to the estate under the "adverse interest" prong of section 327(a), the firm does not "have" any such interest within the meaning of section 101(14)(E), and so "is not rendered 'interested' on that basis." *AroChem*, 176 F.3d at 629. In sum, Martin & Drought's continuing relationship with the Committee does not, in and of itself, preclude the Trustee's retention of the firm to prosecute certain specific causes of action on behalf of the estate under this prong.

While it is unnecessary to the analysis, given the court's conclusion that this retention arrangement passes muster under both prongs, it is nonetheless worth noting that, were one to construe section 327(c)'s reference to "a creditor" to include representation of a "a creditor's committee,"[9] the firm's representation of the Committee raises no actual conflict of interest with the firm's retention by the trustee for purposes of pursuing this litigation.

It is suggested that the retention arrangement is simply "too rich" for this estate, that the cost of two firms handling this litigation cannot be justified. However, it is only

---

[9] Because the facts of this case do not require the court to reach section 327(c), it is not necessary to here decide whether the subsection's reference to "a creditor" would also apply to "the creditor's committee."

the objecting creditor -- who is also a named defendant -- who raises this concern. On its face, the objection lacks a certain sincerity. However, even taken at face value, the objection is not well taken. As has previously been noted, the trustee desires to take advantage of the sunk costs represented by Martin & Drought's investigative work to date. By the same token, the trustee desires to retain his originally selected firm as well, an acknowledgment of the respect that he has for the skills and abilities of the team that he selected in this case as his general counsel. The trustee will no doubt be attentive to the costs associated with using two law firms, given that he will be using borrowed funds to pay for ongoing costs. The firms themselves are similarly motivated to be cost-effective in their division of labor, given the strictures of section 330(a)(4)(A)(i). The deal that the trustee has negotiated for the estate is a good one -- a reduced hourly rate, in exchange for the opportunity to realize a reward in the form of a 3% contingent fee per firm. The economics of the proposal are frankly compelling.

One final issue merits brief discussion. In approving the Trustee's proposed Retention Agreement, Martin & Drought will find itself representing both the Trustee and the firm's current client—the Committee. This implicates the possibility of a potential waiver of the attorney-client privilege between the firm and the Committee. But this concern can be quickly dispatched. The common interest doctrine provides that counsel for parties having a common interest in current or potential litigation may share information without waiving their respective privileges. *In re Hardwood P-G, Inc.*, 403 B.R. 445, 460 (Bankr. W.D.Tex. 2009). This court previously articulated the common interest doctrine as follows:

> In order to maintain the privilege, 'the common interest must relate to a litigation interest, not merely a common business interest.' Whether the

common interest doctrine applies to a privileged document 'depends upon the reason for disclosure, and not when the document was created.'  The common interest rule is not limited to parties who are perfectly aligned on the same side of a single litigation, rather the party asserting the privilege must simply demonstrate actual cooperation toward a common legal goal with respect to the documents they seek to withhold.   However, this shared interest must be identical, not simply similar.

*Id.* In *Hardwood*, this court concluded that the common interest doctrine protected certain documents exchanged between the debtors, the Committee and the banks providing the DIP financing. *Id.*[10] The court found that "the parties were [] working in concert to recover, through litigation, causes of action of the estate for the benefit of the estate's creditors. The common legal goal of investigating and recovering the debtors' assets existed between the debtors, the Committee and the Banks." *Id.* Similarly, here, counsel for the Committee and counsel for the Trustee seek to jointly pursue litigation on behalf of the estate to their joint benefit. The common interest doctrine would apply to protect privileged information shared in the process of prosecuting estate claims.

### Conclusion

For the reasons stated, the application of the trustee to retain both firms, on the terms specified in the application and the accompanying agreement, is approved. The objections are overruled.

**# # #**

---

[10] It is an irony of bankruptcy that the party in *Hardwood P-G* asserting waiver of the attorney client privilege by virtue of this sharing of documents was represented by the very firm that now seeks to be retained by the trustee in this case -- Martin & Drought.