**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| IN RE: | § | Chapter 11 |
| | § | |
| AGE REFINING, INC., | § | Case No. 10-50501-LMC |
| | § | |
| Debtor | § | |
| | § | |

**TRUSTEE'S MOTION FOR ENTRY OF ORDER AUTHORIZING
AND APPROVING THE SALE OF CERTAIN OF THE DEBTOR'S ASSETS
FREE AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES
OUTSIDE THE ORDINARY COURSE OF BUSINSES AND TOASSUME AND ASSIGN
CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

TO THE HONORABLE LEIF M. CLARK, UNITED STATES BANKRUPTCY JUDGE:

COMES NOW Eric J. Moeller, the court-appointed Chapter 11 Trustee in the above-referenced bankruptcy case ("Trustee"), and files this his *Motion for Entry of Order Authorizing and Approving the Sale of Certain of the Debtor's Assets Free and Clear of All Liens, Claims and Encumbrances Outside the Ordinary Course of Business and to Assume and Assign Certain Executory Contracts and Unexpired Leases* (the "Sale Motion"). In support of the Sale Motion, the Trustee would respectfully show the Court as follows:

### I.    JURISDICTION AND VENUE

1.    The Court has jurisdiction to consider the Sale Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue of this proceeding and this Sale Motion is proper in this District pursuant to 28 U.S.C. §§1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. §157(b)(2).

2.    The statutory predicate for the relief requested herein is sections 363 and 365 of the Bankruptcy Code.

1

## II.  FACTUAL BACKGROUND

### A.  Debtor's Business and Filing Bankruptcy Petition

3.  Albert "Al" Gonzalez formed the Debtor's predecessor in the early 1990s, when he procured his first government contract to supply jet fuel to the military and acquired the refining plant that is the site of the Debtor's current facilities.  The Debtor emerged in its current structure in the late 1990s after a fire required substantial reconstruction of its facilities.

4.  By 2001, the Debtor had obtained procurement contracts with the Defense Logistics Agency - Energy ("DLA-Energy," formerly known as Defense Energy Support Center or DESC) to supply jet fuel to U.S. Air Force bases near San Antonio and Del Rio, Texas.  The Debtor also began refining and supplying diesel fuel to VIA Metropolitan Transit of San Antonio, the city's local transit service.  The Debtor has also endeavored to refine and market "green" products such as biodiesel and low-emission diesel.

5.  The Debtor qualifies as a Small Business Administration ("SBA") entity.  This advantage has produced a committed outlet for approximately 80% of the Debtor's aggregate jet fuel capacity under military contracts at premium pricing.  The Debtor's headquarters and refinery are located in Historically Underutilized Business Zones ("HUBZone").  The HUBZone status has also assisted the Debtor in procuring military jet fuel contracts.

6.  As a result of its earlier success, the Debtor sought to expand its operations in 2007.  The costs of expansion were funded through a term loan facility provided by Chase Capital Corporation ("Chase Capital"), as the administrative agent under the Chase Capital Credit Agreement.  The costs of the expansion were significantly higher than projected, exceeding $82.0 million compared to an original budget of $40.0 million, and the expansion was delayed repeatedly.  As a result, the Debtor incurred a large amount of secured debt to Chase

Capital. As of the Petition Date (defined below), the total obligations due to Chase Capital were just under $40,000,000, secured by first and second liens on certain of the Debtor's fixed assets. Chase Capital is due amounts greater than this today.

7. In July 2009, the Debtor experienced a significant explosion in its steam turbine generator (the "Generator" or "STG"), causing damages to the Debtor's operation in the approximate amount of $3,000,000, estimated as of the Petition Date. The STG was restarted on August 26, 2010.

8. Additional factors leading to the Debtor's bankruptcy filing include the rising prices for crude oil and the narrowing "crack spread," or profit margins, for the Debtor's refined products. In the months leading up to the Petition Date, refining margins and crack spreads were impacted negatively by the decrease in global demand for refined products resulting from the reduction in industrial activity and the decline in consumer spending characteristic of the general decline of global and domestic economies.

9. Also, in the weeks preceding the Petition Date, JPMorgan Chase Bank, N.A. ("Chase Bank"), one of the Debtor's prepetition lenders, was unwilling to renew or extend letters of credit, which were required by many of the Debtor's crude oil suppliers as a precondition to future shipments. Many of those letters expired by their terms in the weeks immediately preceding the bankruptcy filing, and Chase Bank declined to renew them or provide new letters of credit. Thus, as the letters of credit expired, Debtor's crude suppliers refused to deliver new shipments of crude oil, forcing the Debtor to shut down its operations.

10. On February 8, 2010 (the "Petition Date"), AGE Refining, Inc. ("Debtor") filed for relief under Chapter 11.

**B.      Debtor-in-Possession Financing**

11.      On March 3, 2010, the Bankruptcy Court entered its *Amended Final Agreed Order Authorizing Limited Use of Cash Collateral, Obtaining Credit Secured by Senior Liens, and Granting Adequate Protection to Existing Lienholders* (Docket No.113) (the "DIP Financing Order").   The DIP Financing Order allowed the Debtor to use cash collateral to continue operations.   It also authorized the Debtor to enter into the DIP Agreement, under which Chase Capital and Chase Bank agreed to make letters of credit available for crude suppliers' post-petition deliveries.   The Debtor agreed to pursue its reorganization on an accelerated time line, with confirmation of a plan of reorganization premised upon a sale of the Debtor's assets being confirmed on or before June 30, 2010 (which condition was clearly not fulfilled, but which the Lenders waived).   An explosion and fire occurred at the Debtor's facility in May, 2010.   This resulted in (amongst other things) the delay in the sales process which was on going at the time of the fire and the extension of the bankruptcy proceeding.   The DIP Financing Order has been amended multiple times in order to, *inter alia*, (a) increase the principal loan amount, (b) extend the Postpetition Termination Date, and (c) name the Chapter 11 Trustee as Borrower in place of the Debtor (and thus creating the TIP Financing).   Currently, the TIP Financing Agreement, as it has been amended from time to time, allows the Trustee to borrow up to Sixty Million Dollars ($60,000,000.00), and has a Postpetition Termination Date of July 15, 2011.

**C.      Appointment of Committee and Trustee**

12.      On March 17, 2010, the United States Trustee appointed an Official Committee of Unsecured Creditors (the "Committee") (Docket No. 138).

13.      On May 25, 2010, the Lenders and the Committee filed their Motion to Appoint a Chapter 11 Trustee (Docket No. 291).   The Debtor, Lender and Committee reached an agreement

resulting in the entry of an Agreed Order Granting the Motion to Appoint a Chapter 11 Trustee on June 16, 2010 (Docket No. 350).

14.     On July 6, 2010, the Court entered its Order Approving the Amended Application of the United States Trustee to Approve Appointment of Eric Moeller as Trustee (Docket No. 410).

**D.     The Sale Process**

15.     On December 21, 2010, the Bankruptcy Court entered its *Order (A) Approving the Procedures for Soliciting Offers for Substantially All of the Estate's Assets; (B) Approving the Form and Manner of Notice; (C) Authorizing the Trustee to Conduct an Auction to Determine the Highest and Best Offer; (D) Approving the Procedures for Determining Cure Amounts for Assumed Contracts and Leases; and (E) Granting Related Relief* (Docket No. 758) (the "Bid Procedures Order").

16.     Pursuant to the Bid Procedures Order, Stalking Horse Bids (as defined in the Bid Procedures Order), were due by 5:00 pm Central Time on February 3, 2011. The Trustee, through his investment banker, Global Hunter Services, received five (5) bids from parties potentially interested in having their bid designated as the Stalking Horse offer.

17.     The Trustee filed a Motion to Extend Time for Determining Stalking Horse Bids. On February 17, 2011, the Court, after considering the Motion determined to extend that deadline to February 17, 2011 (Docket No. 827). Designation of a Stalking Horse Bidder remained in the Trustee's discretion, however, and the Trustee elected not to designate a Stalking Horse Bidder.

18.     On March 2, 2011, the Trustee filed an Emergency Motion to again modify the Bid Procedures Order (Docket No. 847). In this Motion, the Trustee sought additional flexibility

in dealing with a number of proposed purchasers who had expressed different concepts and
structures for the purchase of the Debtor's assets.

19.     On March 15, 2011, the Court entered its *Amended Order (A) Approving the
Procedures for Soliciting Offers for Substantially All of the Estate's Assets; (B) Approving the
Form and Manner of Notice; (C) Authorizing the Trustee to Conduct an Auction to Determine
the Highest and Best Offer; (D) Approving the Procedures for Determining Cure Amounts for
Assumed Contracts and Leases; and (E) Granting Relating Relief* (the "Amended Bid Procedures
Order") (Docket No. 870).

20.     Significant changes to the Bid Procedures were made pursuant to the Amended
Bid Procedures Order included postponing the date of the Auction until April 5-6, 2011, and
authorizing the Trustee to negotiate with an individual potential buyer and to proceed to seek
Bankruptcy Court approval in either a Stand-Alone Sale Hearing or potentially seek a sale
through a Plan of Reorganization or to proceed with a formal Auction[1].

21.     The Trustee and his professionals have had extensive discussions with a number
of proposed purchasers.  Several of the purchasers were willing to participate in the auction
process.  At least one purchaser insisted that they would not participate in an auction process and
one potential purchaser expressed a desire to short circuit the auction process and discussed with
the Trustee its interest in becoming a designated purchaser.

**E.      The Proposed Sale with Designated Purchaser**

22.     After pursuing all alternatives to market the Debtor's assets in a manner that
maximizes the value of the Debtor's estate, the Trustee and his professionals have determined

---

1 Amended Bid Procedures Order, Section 3d.

that it is in the best interests of the Debtor's estate to proceed with a sale to a designated purchaser.

23.     On April 1, 2011, the Trustee reached an agreement in principle with a public company (the "Designated Purchaser") by which the affiliate of the Designated Purchaser will purchase certain of the Debtor's refinery assets, as set forth in the Indicative Offer letter (the "Proposal"), a redacted copy of which is attached hereto as <u>Exhibit A</u>.  The Designated Purchaser's Board of Directors have approved the Proposal.

24.     The Designated Purchaser has requested that it not be identified by name prior to the signing of a definitive Asset Purchase Agreement (the "APA").  The Debtor will file a supplement (the "Supplement") to this Motion once the APA is fully executed with the identity of the Designated Purchaser and the form of sale order to be approved.

25.     The Proposal specifies the terms and conditions of a possible transaction with respect to certain assets and properties of the Debtor (the "Assets"), subject to approval by this Court. The Trustee, in consultation with his professionals, the Committee, and the Lenders, evaluated the terms and benefits of the Proposal, as well as the benefits of other alternatives. The Trustee, in his business judgment, concluded that the Proposal offers the most advantageous terms and greatest economic benefit to the Debtor's estate and its creditors.

26.     The Proposal is the result of extensive, arms-length negotiations.  Pursuant to the Proposal, the Assets are to be sold and transferred to the Designated Purchaser pursuant to section 363 of the Bankruptcy Code, free and clear of all liens, claims, and encumbrances, subject to the approval of this Court (the "Sale").

27.     The following briefly summarizes certain provisions of the Proposal and is qualified entirely by reference to the Proposal:

| | |
|---|---|
| Refinery Assets to be Sold | Refining assets including but not limited to: (1) the Debtor's refining assets; (2) the Debtor's truck loading rack with vapor recovery system; (3) railcar loading facility; (4) onsite storage capacity; (5) offsite storage capacity located at Elmendorf Tank Farm; (6) related petrochemical and feedstock inventories; (7) post-petition prepaid expenses, inventory and accounts receivable, and other current assets, net of trade and crude payables |
| Purchase Price (the "Purchase Price") | $41,000,000.00 plus the value of the Debtor's inventory, post-petition prepaid expenses and deposits, and accounts receivable, and other current assets, net of trade and crude payables |
| Escrow Deposit | $1,000,000.00 upon execution of Proposal |
| Proposed Close Date | April 21, 2011 |

## F.     Certain Assets **Not** Being Sold to Designated Purchaser

28.     The Debtor will continue to own certain assets including: (1) cash and cash instruments; (2) related party receivables (including those from ATI, Tierra Transportation and Tierra G Squared Land and Properties; (3) any and all proceeds from litigation claims in any way related to Adversary No. 10-05120-LMC; (4) any other potential causes of action under Chapter 5 of the Bankruptcy Code; (5) all insurance policies and rights, obligations and claims thereunder (including the STG, Truck Rack Property and Truck Rack Business Interruption policies), except to the extent the same relate to any liabilities assumed by the Designated Purchaser; (6) the Debtor's interest in the leased property known as Redfish Bay Terminal; and (7) any other assets not sold to Designated Purchaser.  Please see the Proposal for additional details related to assets not being sold to the Designated Purchaser.

### G.    Asset Purchase Agreement

29.    The parties in interest  are working on a definitive Asset Purchase Agreement APA.  It is expected that the APA will completed and filed with the Court prior to the hearing on the instant Sale Motion.

### H.    Assumed Contracts

30.    The Debtor proposes to assume and assign and Designated Purchaser proposes to assume certain executory contracts by Debtor ("Assumed Contracts").  The Trustee had previously served on the counterparty to each contract a Notice of Cure Claims (Docket No. 776).

31.    At the hearing on this Sale Motion, the Trustee will request the entry of an order authorizing, but not requiring, the assumption of the Assumed Contracts and the assignment of the Assumed Contracts.  The Trustee, however, reserves the right to withdraw the request to assume any and all of the Assumed Contracts at any time before the closing of the sale(s) of the Assets by filing and serving a notice of withdrawal of such request.

### III.    RELIEF REQUESTED

32.    The proposed sale of the Assets is outside the scope of the Debtor's ordinary course of business and must be approved by the Court pursuant to section 363 of the Code.

33.    The proposed sale is free and clear of any pre- or post-petition liens, with any pre- or post-petition liens or priority claims to attach to the proceeds.

34.    Pursuant to 11 U.S.C. § §363 and 365, this Sale and the assumption and assignment of executory contracts and unexpired leases are appropriate..

### IV.    LEGAL ARGUMENT AND AUTHORITY

### A.    Requirements Under Section 363

35.     Section 363(b)(1) of the Bankruptcy Code provides that, "the Trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1); *see also* FED. R. BANKR. P. 6004(f)(1) ("All sales not in the ordinary course of business may be by private sale or by public auction."). *In re Continental Air Lines, Inc.*, 780 F.2d 1223 (5th Cir. 1986)(for a "trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business.").

36.     Courts have broad discretion to authorize a sale or other disposition of assets under section 363(b) of the Bankruptcy Code. *In re Continental Air Lines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986); *Stephen Indus., Inc. v. McClung*, 789 F.2d 386, 388 (6th Cir. 1986) (authorization to sell or dispose of assets reviewed "under an abuse of discretion standard"). Courts in this circuit employ a flexible, case by case approach. *In re Baldwin United Corp.*, 43 B.R. 905 (Bankr. S.D. Ohio 1984). The key consideration is the court's finding that a "sound business purpose dictates such action." *Stephens Indus.*, 789 F.2d at 390.

37.     Courts have also required a debtor to establish the following additional elements to sell property outside the ordinary course of business: (a) adequate and reasonable notice has been provided to interested parties, 11 U.S.C. § 363(b); (b) the sale price is a fair and reasonable price, *Lounds v. Boyd (In re Lounds)*, 1998 U.S. Dist. LEXIS 10925 (W.D. Mi. 1998); *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2nd Cir. 1983); *accord Stephens Indus.*, 789 F.2d at 389-90 (quoting and adopting as persuasive the reasoning of *In re Lionel*); and (c) the sale was negotiated in good faith, *In re Embrace Sys. Corp.*, 178 B.R. 112, 126 (Bankr. W.D. Mi. 1994). *See also 240 N. Brand Partners, Ltd. v. Colony GFP Partners, L.P. (In re 240 N. Brand*

*Partners, Ltd.)*, 200 B.R. 653, 659 (9th Cir. B.A.P. 1996) (considering the three factors above and whether a valid business justification exists for the sale).

38.     As set forth herein, cause exists with respect to a sale of the assets described in this Motion.

### Sound Business Purpose Supports the Sale

39.     On a day to day basis, the Debtor is currently making a profit; this depends in part on spreads which are not predictable, and in part on avoidance of catastrophes which is also unpredictable. The Proposal coupled with the expected sale of the Debtor's interest in the Redfish Bay Terminal may net Debtor sufficient funds to pay Chase Capital/Chase Bank in full, and be able to pay all (or substantially all) administrative claims, with perhaps some small dividend for unsecured creditors.[2]     This is a more favorable treatment (especially for the unsecured creditors) than what was provided in the previously proposed First Amended Chapter 11 Plan of Reorganization (Docket No. 779).     Furthermore, the Trustee believes that a liquidation of the Debtor's assets through a Chapter 7 bankruptcy case would produce a nominal return, or no return at all, for holders of General Unsecured Claims, Chapter 11 Administrative Claims and Interests in the Debtor (as those claims are classified in the proposed First Amended Chapter 11 Plan of Reorganization).     While the Trustee has not obtained a recent appraisal of the Debtor's assets, the exposure to the market of the value of the Debtor's assets, including the refinery and all related real and personal property, indicate that the debt secured by such assets exceeds the aggregate value if such assets were liquidated.     Accordingly, because the proposed sale represents the greatest return to all of the Debtor's creditors, the Sale is supported by the reasonable exercise of the Trustee's business judgment.

---

[2]  This also assumes the ability of having a rapid sale of the Redfish Bay Terminal.

*Adequate and Reasonable Notice Has Been Provided*

40.     The Debtor's Assets have been marketed since early 2010. After the truck-rack fire in May 2010, the marketing process was not vigorously pursued. Beginning in December 2010, the Trustee once again began aggressively marketing the Debtor's assets through Global Hunter Securities. As required under the Bid Procedures Order, notice of the Bidding Procedures was served on multiple interested parties. Pursuant to the Amended Bid Procedure's Order, notice of the Amended Bid Procedures (which authorized the Trustee to negotiated directly with any Qualified Bidder to become a designated purchaser and forego the auction procedure), was served on multiple interested parties. Additionally, the Trustee has regularly communicated with the Lenders and the Committee regarding the status of the sales process. The Trustee submits that notice of the Sale has been adequate and proper.

*The Proposed Sale is for a Fair and Reasonable Price*

41.     The Bid Procedures have adequately tested the market to achieve the highest and best price for the Debtor's Assets. Pursuant to the Amended Bid Procedures, the Trustee received five bids from potential Stalking Horse Bidders, although the Trustee ultimately did not select a Stalking Horse Bid. After the deadline for receiving Stalking Horse Bids, the Trustee continued to receive bids from Qualified Bidders who were interested in participating in the auction, including the Designated Purchaser, although the Designated Purchaser desired to avoid the auction process and make a preemptive bid. Pursuant to the Amended Bid Procedures, the Trustee determined, in his business judgment, that the Designated Purchaser's bid represented the highest and best offer, and therefore, negotiated directly with the Designated Purchaser and

decided to forego the Auction. The proposed sale price is the result of extensive arms' length negotiations.

42.     When the Debtor's Assets were initially marketed for a contemplated 2010 sale, the highest offer received was approximately $17 million. The current proposed sale price is nearly 2.5 times that offer. In addition, the Trustee believes there is additional value for the estate in the assets which are *not* being sold to the Designated Purchaser.

43.     The Trustee believes, in his best business judgment, that the proposed sale price is fair and reasonable, based on his assessment of the Assets and the Debtor's potential to generate profits going forward.

### The Proposed Sale was Negotiated in Good Faith

44.     The proposed sale was negotiated and continues to be negotiated in good faith. Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

45.     Although the Bankruptcy Code does not define "good faith purchaser," courts construing section 363(m) of the Bankruptcy Code have stated that "the phrase encompasses one who purchases in 'good faith' and for 'value'." *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 147 (3d. Cir. 1986). To constitute lack of good faith, a court must find "fraud or collusion between the purchaser and the seller or the other bidders, or that the purchaser's actions constituted 'an attempt to take grossly unfair advantage of other bidders." *255 Park Plaza Assocs. Ltd. P'shp. v. Conn. Gen. Life Ins.*, 100 F.3d 1214 (6th Cir. 1996) (citing *In re Onouli-*

*Kona Land Co.*, 846 F.2d 1170, 1173 (9th Cir. 1988)). See also *Miami Ctr. Ltd. P'ship v. Bank of New York*, 838 F.2d 1547 (11th Cir. 1988); *Hoese Corp. v. Vetter Corp. (In re Vetter Corp.)*, 724 F.2d 52, 56 (7th Cir. 1983); *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978); *In re Bedford Springs Hotel, Inc.*, 99 B.R. 302, 305 (Bankr. W.D. Pa. 1989); *Matter of Perona Bros., Inc.*, 186 B.R. 833, 839 (D.N.J. 1995). Due to the absence of a bright-line test for good faith, the determination is based on the facts of each case, concentrating on the "integrity of [an actor's] conduct during the sale proceedings." *In re Pisces Leasing Corp.*, 66 B.R. 671, 673 (E.D.N.Y. 1986) (quoting *Rock Indus. Mach.*, 572 F.2d at 1198).

46.    As required by section 363(m) of the Bankruptcy Code, the Trustee and Designated Purchaser acted in good faith in negotiating the Proposal and will continue to negotiate in good faith the terms of the Asset Purchase Agreement. The Trustee is aware of, and takes very seriously, his fiduciary duty to act in the best interest of the Debtor's estate and all of its creditors.

47.    The Bid Procedures established a process whereby interested parties competed to establish the value of the Assets. The Proposal negotiated between the Trustee and Designated Purchaser represents the highest and best of the offers received through the Bid Procedures to date, and represents market value of the Assets. *See Abbotts Dairies*, 788 F.2d at 149. Accordingly, the Trustee requests that the Court make a finding that Designated Purchaser should be entitled to the protections of section 363(m) of the Bankruptcy Code.

**Sale of the Assets Free and Clear of Liens, Claims and Encumbrances**

48.    The Trustee proposes to sell the Assets pursuant to section 363(b) and (f) of the Bankruptcy Code which, among other things, authorizes a debtor to sell property outside of the ordinary course of business, free and clear of any interest, lien, claim, encumbrance or security

interest of any other party, including, but not limited to, any administrative expense or priority claim asserted in these Chapter 11 Cases (collectively, "Liens"). Specifically, section 363(f) of the Bankruptcy Code states:

> (f)    The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if –
>
>> (1)    applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>>
>> (2)    such entity consents;
>>
>> (3)    such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>>
>> (4)    such interest is in bona fide dispute; or
>>
>> (5)    such entity could be compelled, in a legal or equitable proceeding to accept a money satisfaction of such interest.

11 U.S.C. § 363(f); see *In re Elliot*, 94 B.R. 343, 345 (E.D. Pa. 1988) (section 363(f) written in disjunctive; court may approve sale "free and clear" provided at least one of the subsections is met); *In re Shary*, 152 B.R. 724, 725 (Bankr. N.D. Ohio 1993).

49.    To the extent that any Liens, other than the permitted Liens (if any) set forth in the APA, relate to the Assets pursuant to section 363(f) of the Bankruptcy Code, such assets should be sold free and clear of such Liens. Liens on the Assets, if any, are capable of being satisfied by money, and should transfer and attach to the net proceeds of the Sale with the same validity, priority, force and effect that the Liens had on the Assets immediately prior to the Closing, subject to further order of this Court and subject to the rights and defenses, if any, of the Debtors and any other party in interest with respect thereto.

50.    The Sale satisfies the criterion set forth in section 363(f) of the Bankruptcy Code. The Trustee has provided notice of the Sale to all parties who are creditors and therefore all

parties who could potentially assert Liens against the Assets. Any holder of an alleged Lien against the Assets could be compelled, in a legal or equitable proceeding, to accept a monetary satisfaction equal to the amount of their claim, or interests in, such assets.

51.     Accordingly, the Trustee submits that the Sale of the Assets free and clear of any Liens satisfies the statutory prerequisites of section 363(f) of the Bankruptcy Code.

52.     In addition, the retention of the Redfish Bay Terminal lease represents substantial potential additional value for Debtor and its creditors.

**B.      Requirements Under Local Rule 6004**

53.     The name and address of the potential buyer is: Designated Purchaser – to be supplied by the Supplement.

54.     The proposed consideration to be received by the estate, including estimated costs of the sale, including commissions, auctioneer's fees, costs of document preparation and recording and any other customary closing costs is: $41,000,000.00 plus the net value of the Debtor's inventory, accounts receivable post-petition prepaid expenses, and deposits.

55.     It is not believed that there will be estimated or possible tax consequences to the estate.

**C.      Assumption and Assignment of Contracts**

56.     The Trustee seeks authority to assume and assign the Assumed Contracts to Designated Purchaser under section 365 of the Bankruptcy Code. Assumption and assignment or rejection of executory contracts and unexpired leases are an integral part of the proposed Sale and should be approved by the Court.

57.     Section 365(a) of the Bankruptcy Code authorizes the Trustee to assume an executory contract or unexpired lease subject to the Court's approval. Section 365(b) of the

Bankruptcy Code requires the Trustee to satisfy certain requirements at the time of assumption if a default exists under the contract to be assumed.

58.     Section 365 of the Bankruptcy Code states in relevant part:

(a) Except as provided in...subsections (b), (c), and (d) of this section, the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor.

(b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee –

(A)     cures, or provides adequate assurance that the trustee will promptly cure, such default;

(B)     compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

(C)     provides adequate assurance of future performance under such contract or lease.

(f)(1) Except as provided in subsection (c) of this section, notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease under paragraph (2) of this subsection...

(2) The trustee may assign an executory contract or unexpired lease of the debtor only if –

(A) the trustee assumes such contract or lease in accordance with the provisions of this section; and

(B) adequate assurance of future performance by the assignee or such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(a), (b)(1), (f). Accordingly, section 365 of the Bankruptcy Code authorizes the proposed assumption and assignments of the Assumed Contracts, provided that the defaults

under the Assumed Contracts, if any, are cured and adequate assurance of future performance is provided.

59.     Bankruptcy court's generally apply the "business judgment rule" in determining whether an executory contract or unexpired lease should be assumed. *See In re Hurricane Elkhorn Coal Corp. II*, 15 B.R. 987, 989 (Bankr. W.D. Ky. 1981) ("we think the business judgment rule to be the preferable standard"); *see also NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 523 (describing the business judgment test as "traditional"); *Phar-Mor, Inc. v. Strouss Bldg. Assocs.*, 204 B.R. 948, 952 (N.D. Ohio 1997) ("Courts should generally defer to a debtor's decision whether to reject an executory contract.").

60.     Adequate business justifications merit judicial approval to assume the Assumed Contracts. As noted above, the Trustee has determined that it is in the best interest of the estate to sell the Assets. The Assumed Contracts are important assets, which are necessary to operate the Debtor's business; moreover, following the Sale, the Debtor will have no means to perform and complete the contracts. The Assumed Contracts are critical to the transaction and their assignment to Designated Purchaser is a condition to the Sale of the Assets. A prerequisite to the assignment of an executory contract or unexpired lease is its assumption under section 365 of the Bankruptcy Code. Accordingly, based on the foregoing, and the importance of the assignment of the Assumed Contracts, the assumption thereof is a product of a reasonable exercise of the Trustee's business judgment.

61.     In order to assign an executory contract or unexpired lease that has been assumed, the counterparty must be provided with adequate assurance of future performance. See 11 U.S.C. § 365(f). Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property

assigned. *See In re Bygaph, Inc.*, 56 B.R. 596, 605-606 (Bankr. S.D.N.Y. 1986) (adequate assurance is present when assignee has financial resources and has expressed a willingness to devote sufficient funding to business to give it a strong likelihood of succeeding); *In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985).

62.     Pursuant to section 365 of the Bankruptcy Code and in accordance with the APA, each counterparty owed a cure amount for their Assumed Contract will be provided with a cure payment or adequate assurance of such payment.   Moreover, Designated Purchser has the financial capabilities to satisfy any and all obligations it will incur in connection with the contracts and leases to be assumed and assigned to Designated Purchaser under the APA.

## V.     EXEMPTION FROM TRANSFER TAXES

63.     Pursuant to section 1146 of the Bankruptcy Code, the "transfer... or the making or delivery of an instrument of transfer under a plan confirmed under section 1129 of this title, may not be taxed under any law imposing a stamp or similar tax."  11 U.S.C. §1146(c).  This provision has been broadly construed to include sales and transfers which occur outside a chapter 11 plan and before or after plan confirmation, provided that such sales and transfers enable the confirmation and consummation of a chapter 11 plan for the Debtors. *In re Serv. Merch. Co.*, 2000 Bankr. LEXIS 1523 (Bankr. M.D. 2000).

64.     The Sale of the Assets is essential to the consummation of a plan, and therefore should be deemed to be "under a plan" for purposes of section 1146(c) of the Bankruptcy Code. The Trustee intends to use the net Sale proceeds to satisfy claims asserted against the Debtor. Accordingly, the Trustee submits that the Sale of the Assets falls within the scope of the exemption provided for under section 1146(c) of the Bankruptcy Code.

## VI. THE COURT SHOULD WAIVE OR REDUCE THE FOURTEEN DAY STAY PERIODS REQUIRED BY RULES 6004(g) AND 6006(d) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE

65.     Pursuant to Bankruptcy Rule 6004(g), unless the court orders otherwise, all orders authorizing the sale of property pursuant to section 363 of the Bankruptcy Code are automatically stayed for 14 days after entry of the order. The purpose of Bankruptcy Rule 6004(g) is to provide sufficient time for an objecting party to request a stay pending appeal before the order can be implemented. *See* Advisory Committee Notes to Bankruptcy Rule 6004(g).

66.     Although Bankruptcy Rule 6004(g) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the 14-day stay period, *Collier on Bankruptcy* suggests that the 14 (formerly 10)-day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." 10 *Collier on Bankruptcy* ¶ 6004.09 (15th ed. 1999). Furthermore, *Collier on Bankruptcy* provides that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time necessary to file such appeal. *Id.*

67.     Similarly, Bankruptcy Rule 6006(d) stays all orders authorizing a trustee to assign an executory contract or unexpired lease pursuant to section 365(f) of the Bankruptcy Code for fourteen days, unless the court orders otherwise.

68.     To preserve the value of the Assets and limit the costs of administering and preserving such assets, it is critical that the Trustee close the Sale of the Assets as soon as possible after all closing conditions have been met or waived. Much of the Debtor's business operates on a monthly cycle, *e.g.*, the Debtor "nominates" or reserves a certain amount of crude

oil by the twentieth of the month to meet its needs for the following month. Thus, it is particularly important to close the sale and allow Designated Purchaser to commence operations. Accordingly, the Trustee hereby request that the Court waive the 14 day stay periods under Bankruptcy Rules 6004(g) and 6006(d) or in the alternative, if an objection to the Sale or an assignment of a contract or lease is filed, reduce the stay period to the minimum time needed by the objecting party to file its appeal to allow the Sale to close as provided under the APA.

69. Based upon the foregoing, the Trustee submits that the relief requested herein is necessary and appropriate, is in the best interests of the Debtor and its estate, and should be granted in all respects.

WHEREFORE, PREMISES CONSIDERED, the Trustee requests approval to sell the Assets outside the ordinary course of business and to assume and assign designated executory contracts and unexpired leases under the foregoing contract terms or under such other terms as may be presented and agreed to by the Parties and to authorize distribution of certain of the proceeds of the transaction, and for such other relief as is appropriate.

Dated: April 1, 2011

Respectfully submitted,

LANGLEY & BANACK, INC.
745 E. Mulberry, Suite 900
San Antonio, TX 78216
Telephone: (210) 736-6600
Facsimile: (210) 735-6889

By: _____
DAVID S. GRAGG
State Bar No. 08253300
STEVEN R. BROOK
State Bar No. 3042300
NATALIE F. WILSON
Hawaii Bar No. 8852
*Admitted Pro Hac Vice*

ATTORNEYS FOR ERIC J.
MOELLER, CHAPTER 11 TRUSTEE

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing document was served by first class mail, postage prepaid, upon the parties listed on the attached Limited Service List, and/or by electronic transmission to the attorneys and parties in this case who are enrolled in the ECF system on the ___ day of April, 2011.

_____
DAVID S. GRAGG

# EXHIBIT "A"

*Privileged and Confidential*

[●]

April 1, 2011

Mr. Michael Schmidt
Senior Vice President

Ms. Jenna Wittig
Associate

On behalf of the Chapter 11 Trustee for AGE Refining, Inc.

Global Hunter Securities
400 Poydras Street, Suite 3100
New Orleans, LA 70130

*Via e-mail:*

Re: Indicative Offer – AGE Refining, Inc.

Dear Mr. Schmidt and Ms. Wittig:

[●] (together with its affiliated companies, "[●]") is pleased to submit this Indicative Offer ("**IO**") for pursuing the acquisition of certain assets being sold by the Chapter 11 Trustee ("**Trustee**") for the estate of AGE Refining, Inc. ("**AGE**"), as described in the Confidential Information Memorandum ("**CIM**") prepared by Global Hunter Securities ("**Global Hunter**"). [●], through one or more of its subsidiary operating companies, is interested in the possibility of acquiring the following assets: (i) certain refining assets as described in the CIM, namely: 14,500 barrels per stream day crude unit with 6,000 bpd catalytic reformer, naphtha hydrotreater and distillate hydrotreaters, 1,500 bpd solvent distillation unit, and five (5) MWH steam turbine generator; (ii) truck loading rack with vapor recovery system; (iii) railcar loading facility; (iv) onsite storage capacity of 170,374 barrels; (v) offsite storage capacity located at the Elmendorf Tank Farm and the truck loading and unloading facility located at the Elmendorf Tank Farm; (items (i) (ii), (iii), (iv), and (v), collectively, the "**AGE Refinery Assets**"); (vi) related petrochemical and feedstock inventories ("**AGE Inventory**"); (vii) post-petition prepaid expenses ("**AGE Prepaid Expenses (Post-Petition)**"); (viii) deposits ("**AGE Deposits**"); (ix) accounts receivable ("**AGE Accounts Receivable**"); and (x) any other assets (including real property) as described in the definitive documentation schedules ("**AGE Other Assets**"), (items (i) (ii), (iii), (iv), (v), (vi), (vii), (viii), (ix) and (x), collectively the "**AGE Assets**"). Please note that this IO **excludes** from the AGE Assets the following items: (i) cash and cash instruments; (ii) related party receivables (including those from ATI – Tierra Transportation – and Tierra G Squared Land and Properties LLC); (iii) pending litigation claims (including without limitation, Adversary No. 10-05120 LMC), and the proceeds from any claims under insurance policies or against third parties for casualty loss or business interruption pertaining to

AGE's ownership and operation of the AGE Assets prior to the Closing, including, but not limited to, those claims under Chapter 5 of Title 11, United States Code, the business interruption claims related to the May 2010 fire, and the Elmendorf/Tideport claims; (iv) the lease, agreements and assets related to the Redfish Bay terminal and the Shell (STUSCO) contract for the terminal ("**Redfish Bay Lease**"); and (v) all insurance policies and rights, claims and obligations under such policies (including the STG, Truck Rack Property and Truck Rack Business Interruption policies), except to the extent the same relate to any liability assumed by [●]. This IO is subject to, among other things, negotiation and execution of definitive documentation.

[●] hereby consents to the filing of the material terms of this IO, together with a redacted copy of this IO removing references to "[●]" (which redacted copy shall be reviewed and approved by [●] prior to filing), as part of a motion, or supplement thereto, to be filed with the Bankruptcy Court by AGE (i) requesting approval to sell the AGE Assets to a "Designated Purchaser," provided that [●] is not specifically named until a definitive asset purchase agreement is executed by AGE and [●], and (ii) seeking a hearing to approve the sale on or before April 11, 2011. Unless and until [●] and AGE enter into a definitive asset purchase agreement governing the sale of the AGE Assets, [●]'s identity as a possible acquiror of the AGE Assets and the unredacted copy of this IO are strictly confidential and should not be disclosed to any party other than Global Hunter, the Trustee, Chase/J.P. Morgan, and the Official Committee of Unsecured Creditors ("**Committee**") and their professionals; as to the Committee, AGE will use its reasonable best efforts to obtain a confidentiality agreement from the board of the Committee and its counsel. Any disclosure to any other party is subject to such party's entry into a confidentiality agreement on terms acceptable to [●]. Upon the full execution of the asset purchase agreement by AGE and [●], AGE's counsel may thereafter file the executed purchase agreement with the Bankruptcy Court. AGE and [●] will exercise reasonable efforts to negotiate and execute an asset purchase agreement by April 6, 2011.

*1. Introduction:* Based upon the information provided in the CIM and subject to the conditions, approval and assumptions discussed in this IO, we have calculated an estimated value for the AGE Assets.

*2. Valuation:* Subject to the conditions, approvals and assumptions discussed in this letter, we at this time estimate the value of the AGE Assets, on a cash- and debt- free basis (the "[●] **Estimated Total Price**"), as follows:

| | |
|---|---|
| Value of AGE Refinery Assets and AGE Other Assets: | US$ 41,000,000.00 |
| *Plus* Value of AGE Accounts Receivable in Good Standing: | To Be Determined |
| *Plus* Value of Doubtful Accounts Receivable: | To Be Determined |
| *Plus* Value of AGE Inventory: | To Be Determined |
| *Plus* Value of AGE Prepaid Expenses (Post-Petition): | To Be Determined |
| *Plus* Value of AGE Deposits: | To Be Determined |
|     *Less* Value of Uncollectible Accounts | To Be Determined |
|     *Less* Value of AGE Current Payables (Post-Petition): | To Be Determined |
| **[●] Estimated Total Price:** | **US$ 41,000,000.00 + TBD** |

*Privileged and Confidential*

For the purposes of the foregoing, Doubtful Accounts Receivable means: any account receivable invoice that is deemed doubtful due to any or all of the following: (i) is greater than 60 days past due date, (ii) is greater than 90 days past invoice date, (iii) was issued prior to January 1, 2011, (iv) due from a customer currently under a payment plan due to poor payment history, (v) due from a customer that has filed Chapter 11, (vi) already considered an uncollectible invoice by AGE, (vii) due from a customer that has more than fifty percent (50%) of its total aging past 90 days and (viii) any invoice related to off-spec products. Doubtful Accounts Receivable would be determined by good faith agreement of the parties prior to Closing, would exclude Uncollectible Accounts, and would be valued at a to-be-agreed-upon percentage of nominal value. Uncollectible Accounts would be those accounts receivable of AGE that in the good faith opinion of AGE or [●] are unlikely to be collected in the 6 month period following Closing.

For the avoidance of doubt, the AGE Current Payables (Post-Petition) would exclude all professional fees in connection with AGE's Chapter 11 filing, the sale of the AGE Assets and related restructuring/liquidation proceedings.

[●] would value the AGE Inventory by mutual agreement with AGE under a mechanism to be established in the negotiated asset purchase agreement. The value of the AGE Prepaid Expenses (Post-Petition), the AGE Deposits and the AGE Accounts Receivable would be determined as described per the definitive documentation. [●] would assume current post-petition trade and crude payables (but excluding all related taxes payable) of AGE in an amount to be determined as described in the definitive documentation (**"AGE Current Payables (Post-Petition)"**). A reconciliation between estimated and actual working capital would be completed upon availability of the closing date balance sheet and supporting documents within a specified period of time after Closing.

The [●] Estimated Total Price assumes an acquisition of the AGE Assets on a cash- and debt-free basis (other than AGE Current Payables (Post-Petition) and such other liabilities [●] would agree to expressly assume under the terms of the negotiated asset purchase agreement). AGE would make a final stub payment of wages for the period prior to Closing, and [●] would be responsible for the remainder of the pay period occurring on and after the date of Closing. [●] would credit AGE employees [●] determines to hire with their accrued vacation time as of the Closing.

AGE and [●] would each be responsible for the filing of tax returns and payment of taxes attributable to each such party's period of ownership and operation of the AGE Assets; provided, however, the asset purchase agreement would provide a mechanism to account for any money [●] receives from a customer for taxes on sales of refined product that occurred prior to the Closing and delivering the same to AGE for payment of such taxes.

*3. Assumptions:* Our analysis is based on the CIM provided by Global Hunter and our communications with the Trustee. We have assumed the accuracy and completeness of all information provided to us. Subject to the negotiation and execution of definitive documentation, [●] would agree to acquire the AGE Assets "AS IS".

Pursuant to the Bid Procedure Order, we anticipate that the transaction would be structured as an asset purchase with the standard and customary documentation for a transaction of this

*Privileged and Confidential*

nature, including (but not limited to) an asset purchase agreement, documents of conveyance for personal and real property, permit transfers and reconciliation of product inventories and prepaid expenses pursuant to a mutually agreed upon post-closing adjustment mechanism. Key documents and transfer of monies would be handled via a Court-approved escrow agent after all to-be-agreed-upon terms, conditions, representations, warranties and approvals have been satisfied.

*4. Financing:* Our [●] Estimated Total Price is not conditioned upon the arrangement of financing. We also confirm that upon Closing, there will not be any financing conditions.

[●] is an investment grade rated company with a very strong balance sheet and excellent cash flow coverage ratios. [●] has a US$[●] revolving bank credit facility led by [●], as well as excellent relationships with our banks. You may contact [●], [●]'s Senior Vice President, Chief Financial Officer and Treasurer, at [●] to verify [●]'s availability of funding for this acquisition.

[●] would provide replacement standby letters of credit for the leased platinum catalyst and for the crude and related purchases now supported by Chase or J.P. Morgan standby letters of credit at Closing (defined herein).

*5. Conditions:* The closing of an acquisition by us of the AGE Assets would be subject to approval by our Board of Directors, the receipt of a title commitment for the real property, the receipt of any necessary regulatory approvals and negotiation of mutually agreeable acquisition agreements. All such conditions, other than Board approval, would be met, if at all, on or prior to April 21, 2011, the targeted date of closing ("**Closing**"). Board of Director approval would be obtained, if at all, pursuant to a special meeting held on or before April 1, 2011, and we will advise you in writing following the conclusion of that meeting. If the parties are unable to negotiate and execute definitive documentation and obtain an approval order from the Bankruptcy Court by April 12, 2011, this IO shall expire and have no further force or effect.

We are prepared to consummate the acquisition in accordance with the Bankruptcy Court's desired schedule and to close on the targeted date of Closing. Our executive team will be available for negotiation of contractual matters as needed to expedite closing of this transaction. Please note that the timing to obtain the various regulatory approvals necessary for a transaction of this nature is outside of our control, but we will use reasonable efforts to manage those approvals in a timely fashion.

We would prefer to make offers of employment to all or most of AGE's current employees, pending pre-employment screening satisfactory to [●], in its sole discretion. [●] and AGE would each agree to retain copies of all material books and records for a period of time as provided in the negotiated asset purchase agreement. [●] and AGE (and its trustees and representatives) would further cooperate with each other after Closing to effect a smooth transition and to complete AGE's bankruptcy process.

The provisions of this IO are intended to set forth a framework for further discussions and negotiations between us, Global Hunter and the Trustee with respect to the sale of all or a portion of the AGE Assets and shall not create or constitute any legally binding obligation upon either party to enter into any agreement.

*Privileged and Confidential*

*6. Contracts:* In regards to specifying all executory contracts or unexpired leases that will be assumed by the Trustee and assigned to [●], we reserve the right to complete this requirement as part of the negotiation of the definitive documentation.

*7. Escrow:* Upon execution of this IO, [●] Board approval of this IO, and AGE's written acceptance of this IO (as an expression of intent), we will: (x) submit an executed escrow agreement that is acceptable to both the Trustee and [●], and (y) initially deposit one million dollars ($1,000,000.00) per the wire instructions we received and provide the associated FED reference, which amount would be applied to the purchase price at Closing. At the Closing, [●] would wire an additional two million dollars ($2,000,000.00) under the terms of the escrow agreement, such that the total deposit with the escrow agent would be three million dollars ($3,000,000.00) ("**Escrow Amount**"). The Escrow Amount would be applied to the purchase price at Closing and would further serve as a "holdback" solely for purposes of remitting payment to [●] for any working capital "true up" after Closing. The Escrow Amount would be released to AGE and/or [●], as applicable and as soon as reasonably practicable after Closing, pending completion of the "true up" procedures.

*8. Advisors:* In anticipation of moving forward on this transaction, we reserve the right to engage legal and other professionals as necessary, at our expense.

*9. Contacts:* I will be your primary contact for information specific to the possible transaction. My contact information is set forth below.

[●]
Work Phone:     [●]
Cell Phone:     [●]
Facsimile:      [●]
E-mail:         [●]

[●]'s President and Chief Executive Officer is [●], and its Senior Vice President and General Counsel is [●]. They can be reached as follows:

[●]
Work Phone:     [●]
Cell Phone:     [●]
Facsimile       [●]
Email:          [●]

[●]
Work Phone:     [●]
Cell Phone:     [●]
Facsimile:      [●]
E-mail:         [●]

We greatly appreciate the opportunity to submit this [●] Estimated Total Price. We are confident that we have the resources needed to consummate an acquisition of the AGE Assets on an expedited basis, and we look forward to working with Global Hunter, the Trustee and the AGE Bankruptcy Court towards a successful and mutually beneficial transaction on a time-

*Privileged and Confidential*

sensitive basis, pursuant to a stand-alone sale process as contemplated by the Bid Procedures Order.

Sincerely,

[●]