**SO ORDERED.**

**SIGNED this 14th day of April, 2011.**



_____
**LEIF M. CLARK**
**UNITED STATES BANKRUPTCY JUDGE**

_____

## UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | |
| | § | **CASE NO. 10-50501-LMC** |
| **AGE REFINING, INC.,** | § | |
| | § | **Chapter 11** |
| **DEBTOR.** | § | |
| | § | |

### ORDER (A) AUTHORIZING AND APPROVING THE SALE OF CERTAIN OF THE DEBTOR'S ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES OUTSIDE THE ORDINARY COURSE OF BUSINESS; AND (B) APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES AND APPROVING INTERIM DISTRIBUTION OF CERTAIN SALE PROCEEDS

Upon the Motion of Eric J. Moeller, the Court-appointed chapter 11 trustee for AGE Refining, Inc. (the "Trustee"), for Entry of Order Authorizing and Approving the Sale of Certain of the Debtor's Assets (the "Purchased Assets") Free and Clear of all Liens, Claims, and Encumbrances Outside the Ordinary Course of Business and to Assume and Assign Certain Executory Contracts and Unexpired Leases (the "Sale Motion"); and upon the Supplement to the Sale Motion filed by Trustee, which included an executed copy of the that certain Asset Purchase Agreement dated as of April 11, 2011 by and between NuStar Refining, LLC (the

"Purchaser") and the Trustee ("APA"), such APA being attached hereto as Exhibit A,[1] and incorporated herein and the Court having found that the relief requested in the Sale Motion is in the best interest of the Debtor's estate, its creditors and other parties in interest; and the Trustee having provided appropriate and sufficient notice under the circumstances, and that no other or further notice is required; and the Court having reviewed the Sale Motion and having heard the evidence in support of the relief requested therein at a hearing before the Court (the "Sale Hearing"); and the Court having considered any objections to the Sale Motion, each of which are overruled, resolved, or withdrawn; and the Court having determined that the legal and factual bases set forth in the Sale Motion and at the Sale Hearing establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefore:

**THE COURT HEREBY FINDS THAT:**

A.    **Jurisdiction and Venue**.    This Court has jurisdiction over this bankruptcy case and the Sale Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A) and (M). Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409(a). Findings of fact shall be construed as, and constitute, conclusions of law and conclusions of law shall be construed as, and constitute, findings of fact when appropriate. See Fed. R. Bankr. P. 7052. Statements made by the Court from the bench at the hearing shall constitute additional conclusions of law and findings of fact as appropriate. The Court reserves the right to make additional findings of fact and conclusions of law in support of this Order.

B.    **Statutory Predicates**. The statutory predicates for the relief sought in the Sale Motion are sections 105(a), 363 and 365 of the Bankruptcy Code, Bankruptcy Rules

---

[1]    Capitalized terms not defined in this Order shall have the meaning ascribed to them in the Sale Motion. The schedules and exhibits to the APA are not attached, but copies may be obtained from the Trustee's counsel, and such exhibits and schedules are subject to modification as agreed between Trustee and the Purchaser.

2002, 6004, 6006, 9007 and 9014, and the applicable Local Rules for the United States Bankruptcy Court for the Western District of Texas (the "Local Rules").

C.     **Final Order**.  This order approving the Sale Motion (the "Order") constitutes a final order within the meaning of 28 U.S.C. § 158(a).  Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rules 9014, Rule 54(b) of the Federal Rules of Civil Procedure, made applicable by Bankruptcy Rule 7054, and any other applicable rule or law, the Court expressly finds that there is no just reason for the delay in the implementation of this Order, waives any stay, and expressly directs entry of the order as set forth herein.

D.     **Notice**.  As evidenced by the affidavits of service filed with this Court and based upon the representations of counsel at the Sale Hearing and as approved under the Bid Procedures Order (Docket No. 758, as amended by Docket No. 870): (i) due, proper, timely, adequate and sufficient notice of the Sale Motion, proposed auction, the Sale, and the transactions contemplated by the APA (the "Sale") has been provided; (ii) it appearing that no other or further notice need be provided; (iii) such notice was and is good, sufficient and appropriate under the circumstances of this bankruptcy case; and (iv) no other or further notice of the Sale Motion, the Auction, the Sale Hearing or the Sale is or shall be required. The disclosures made by the Trustee concerning the Sale Motion, Auction, the Sale, the Sale Hearing, and the APA were reasonable, adequate and complete.

E.     **Opportunity to Object**.  A reasonable opportunity to object and to be heard with respect to the proposed Sale, the Sale Motion and the relief requested therein (including the assumption and assignment of the Assumed Contracts) has been given to all interested persons and entities, including, without limitation, the following: (i) all potential purchasers previously identified by Trustee and any additional parties who have expressed an interest in potentially acquiring the Purchased Assets, including those parties that have

submitted formal expressions of interest; (ii) all other potentially interested parties identified by the Trustee in his business judgment as a potential purchaser of assets; (iii) the Office of the United States Trustee; (iv) all applicable federal, state and local regulatory or taxing authorities, recording offices or any governmental entity which have a reasonably known interest in the relief requested in the Sale Motion; and (vii) all parties on the most current master service list.

F.   **Sale Process**.  The sale process described in the Sale Motion afforded a full, fair and reasonable opportunity for any interested party to submit bids to become: (i) a Stalking Horse Bidder; (ii) a Qualified Bidder in the event of an auction or (iii) a designated purchaser in an effort to preempt an auction.  The Trustee spent a significant amount of time negotiating with multiple interested parties and pursuing numerous different asset purchase structures and alternatives.  Ultimately, the Trustee determined that in his business judgment, the Purchaser's bid, as fully described in the APA, constitutes the highest and best offer for the Purchased Assets and will provide a greater recovery for the Debtor's estate than would be provided by any other known available alternative.  The Trustee's determination that the APA constitutes the highest and best offer for the Purchased Assets constitutes a valid and sound exercise of the Trustee's business judgment.

G.   **Arm's-Length Sale**.  The APA was negotiated, proposed and entered into by the Trustee and the Purchaser without collusion, in good faith and from arm's-length bargaining positions.  Neither the Trustee nor the Purchaser, nor any of their respective representatives, have engaged in any conduct that would cause or permit the APA to be avoided under section 363(n) of the Bankruptcy Code.  Specifically, neither Purchaser nor any of its representatives have acted in a collusive manner with any person and the purchase price was not controlled by any agreement among bidders.  The terms and conditions of the APA and the transactions contemplated thereby (including without limitation the

consideration provided in respect thereof) are fair and reasonable and shall not be avoided under section 363(n) of the Bankruptcy Code.

H. **Good Faith Purchaser**. The Purchaser is purchasing the Purchased Assets and is assuming certain liabilities, as further described in the APA, in good faith and is a good faith purchaser of the Purchased Assets within the meaning of section 363(m) of the Bankruptcy Code and is therefore entitled to all of the protections afforded by that provision. The Purchaser and its representatives have proceeded in good faith and without collusion in all respects in connection with the Sale and Sale Hearing. The Purchaser recognized that the Trustee was free to deal with any interested party in selling the Purchased Assets or pursue alternatives to the Sale, complied with the Bid Procedures Order, and disclosed all payments to be made by the Purchaser in connection with the Sale.

I. **Authority**. The Trustee: (i) has full power and authority to execute and deliver the APA and all other documents contemplated thereby; (ii) has all of the power and authority necessary to consummate the transactions contemplated by the APA; and (iii) has taken, or will take, all action necessary to authorize and approve the APA and the consummation of the transactions contemplated thereby. No consents or approvals, other than those expressly provided for in the APA, or those that have been obtained pursuant to applicable provisions of Bankruptcy Code sections 363 and 365, are required for the Trustee to consummate the Sale.

J. **Sale in the Best Interests of the Debtor's Estate and Creditors**. Good and sufficient reasons for approval of the APA and the Sale have been articulated, and the relief requested in the Sale Motion and granted herein is in the best interest of the Debtor, its estate, its creditors and other parties in interest.

K. **Assumed Contracts Should be Assigned to Purchaser**. In addition to the sale of the Purchased Assets, good and sufficient reasons also exist with respect to

approving the assumption by the Trustee of the Assumed Contracts and for the subsequent assignment of the same to the Purchaser, *provided, however*, that any and all contracts to which the United States Government is a counterparty shall be assigned to the Purchaser only upon the consent of the United States Government in compliance with the provisions of the Federal Acquisition Regulation, as applicable. A schedule of all Assumed Contracts is attached hereto as <u>Exhibit B</u> and incorporated herein. All defaults under the Assumed Contracts have been cured, or will be cured on the Closing Date (as defined herein). In addition, the Purchaser has provided adequate assurance of future performance. Moreover, the Assumed Contracts are an integral part of the Sale since they are necessary to operate the Purchased Assets and the Purchaser will not close without the Assumed Contracts.

     L.    **Business Justification**. The Trustee has demonstrated both (i) good, sufficient and sound business purposes and justifications and (ii) compelling circumstances for the Sale outside of the ordinary course of business under section 363(b) of the Bankruptcy Code in that, among other things, the immediate approval by this Court of the Sale to the Purchaser is necessary and appropriate to maximize the value of the Debtor's estate. Entry of an order approving the APA and all of the provisions thereof is a necessary condition precedent to the Purchaser's consummation of the transactions set forth in the APA. The Sale does not constitute a *de facto* plan of reorganization or liquidation, as the Sale does not and will not: (a) impair or restructure existing debt of, or equity interests in, the Debtor; (b) impair or circumvent voting rights with respect to any future plan proposed by the Debtor; (c) circumvent chapter 11 plan safeguards, such as those set forth in sections 1125 and 1129 of the Bankruptcy Code; (d) classify claims or equity interests or extend debt maturities; or (e) modify the provisions of and protections afforded JPMorgan Chase Bank, N.A. and Chase Capital Corporation under the various financing orders entered in this case. Given all the circumstances of this bankruptcy case and the adequacy and fair value of the purchase price

under the APA, the proposed Sale constitutes a reasonable and sound exercise of the Trustee's business judgment and should be approved.

M. **Consideration**. The consideration provided by the Purchaser pursuant to the APA constitutes reasonably equivalent value or fair consideration under the Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, the Bankruptcy Code, and the laws of the United States, any state, territory, possession thereof or the District of Columbia. The APA represents a fair and reasonable offer to purchase the Purchased Assets under the circumstances of this chapter 11 case. Based on the Sale Motion and the record at the Sale Hearing, no other person or entity or group of entities, other than the Purchaser, has offered to purchase the Purchased Assets on terms that would give greater economic value to the Debtor's estate. Approval of the Sale Motion and the APA, and consummation of the transactions contemplated thereby, is in the best interests of the Debtor, its estate, its creditors and all other parties in interest.

N. **Free and Clear**. The Debtor is the sole and lawful owner of the Purchased Assets. Except as otherwise expressly provided herein in Section Q, the transfer of the Purchased Assets to the Purchaser under the APA will be a legal, valid, and effective transfer of the Purchased Assets and vests or will vest the Purchaser with all right, title, and interest of the Trustee and Debtor to the Purchased Assets free and clear of all liens (as defined in section 101(37) of the Bankruptcy Code, whether consensual, statutory, possessory, judicial or otherwise), claims (as defined in section 101(5) of the Bankruptcy Code and including without limitation successor liability claims), or other interests, of any kind or nature whatsoever, whether known or unknown, legal or equitable, matured or unmatured, contingent or non-contingent, liquidated or unliquidated, asserted or unasserted, whether arising prior to or after the Petition Date, and whether imposed by agreement, understanding, law, equity or otherwise, accruing, arising or relating thereto (collectively, the

"Interests"[2]), at any time prior to April 21, 2011, or such other date as the Trustee and Purchaser mutually agree (the "Closing Date"). The Purchased Assets do not include, and affirmatively exclude, the Excluded Assets as provided in the APA, and such Excluded Assets are not sold or subject to this Order, and the Interests of any person with respect to the Excluded Assets are not impaired or affected (or created or enlarged) by this Order.

O. **Free and Clear Findings Needed by Purchaser**. The Purchaser asserts that it would not have entered into the APA and would not consummate the transactions contemplated thereby, thus adversely affecting the Debtor, its estate and its creditors, if the sale of the Purchased Assets to the Purchaser was not free and clear of all Interests of any kind or nature whatsoever, or if the Purchaser would, or in the future could, be liable for any of the Interests.

P. **No Liability Findings Needed by Purchaser**. Purchaser asserts that it will not consummate the transactions contemplated by the APA unless the APA specifically provides, and the Court specifically orders, that none of Purchaser or its affiliates, members or shareholders or the Purchased Assets will have any liability whatsoever with respect to the Sale, or be required to satisfy in any manner, whether at law or in equity, whether by payment, setoff or otherwise, directly or indirectly, any liability, including any Interest.

---

[2]       The term "Interests" as used in this Order includes, without limitation: all encumbrances; obligations; debts; liabilities; demands; guaranties; options; rights; restrictions; contractual commitments, including but not limited to, any license obligations; rights of first refusal or interests; any of the foregoing that purport to give to any party any defense, a defense or right of setoff, or recoupment against or a right or option to effect any forfeiture, modification or termination of the Debtor's interests in the Purchased Assets, or any similar rights; any of the foregoing arising under any mortgages, deeds of trust, security interests, conditional sale or other title retention agreements, pledges, judgments, demands, encumbrances, rights of first refusal or charges of any kind or nature, including, without limitation, any restriction on the use, voting, transfer, receipt of income or other exercise of any attributes of ownership; and any of the foregoing arising in connection with any agreements, acts, or failures to act, of Seller or any of the Seller's predecessors, affiliates, or representatives, including, but not limited to, any of the foregoing arising under any bulk-transfer laws, doctrines of successor liability or similar theories. Notwithstanding the foregoing, "Interests" does not include those certain environmental obligations discussed in Section Q hereof.

regulatory

Q. **Certain Regulatory Obligations Excepted**. Notwithstanding anything to the contrary in the Sale Motion or this Order, nothing in the Sale Motion or this Order is intended to: (i) release or nullify any party's liability to the Texas Commission on Environmental Quality ("TCEQ") and Texas Department of Licensing and Regulation ("TDLR") under statutes or regulations to which any such party would be subject if the contemplated sale had taken place outside of bankruptcy; (ii) modify the obligations of the Purchaser to comply with applicable regulations and statutes concerning the Purchased Assets; or (iii) impair or restrict the TCEQ's or the TDLR's ability to pursue all of its rights and remedies in an administrative proceeding or in state court against any entity which is the owner or operator of the Purchased Assets. Nothing in this provision obligates the Purchaser with respect to the Purchased Assets for the period prior to the date of Closing, provided, however (and as set forth above), the Purchaser is responsible for ownership and operation of the Purchased Assets from and after the Closing, including liability from and after Closing of continuing violations or conditions in existence at or after Closing.

R. **Satisfaction of 363(f) Standards**. The Seller may sell and transfer, and Purchaser may purchase, the Purchased Assets free and clear of any Interests of any kind or nature whatsoever because, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied. Each holder of any Interest against the Debtor, its estate, or any of the Purchased Assets: (i) has, subject to the terms and conditions of this Order, consented to the Sale or is deemed to have consented to the Sale; (ii) could be compelled in a legal or equitable proceeding to accept money satisfaction of such Interest; or (iii) otherwise falls within the provisions of section 363(f) of the Bankruptcy Code, including that such Interests is in bona fide dispute. Those holders of Interests who did not object, or who withdrew their objections, to the Sale Motion and Sale are deemed, subject to the terms of this Order, to have consented pursuant to section 363(f)(2) of the

Bankruptcy Code. All holders of Interests are adequately protected by having their Interests attach to the proceeds ultimately attributable to the Purchased Assets against or in which such Interests are asserted, subject to the terms of such Interests, with the same validity, force and effect, and in the same order of priority, that such Interests had prior to the Sale, subject to any rights, claims and defenses the Trustee, the Debtor or its estates, as applicable, may possess with respect thereto.

S. **Interim Distribution of Proceeds.** Because JPMorgan Chase Bank, N.A. and and Chase Capital Corporation are the sole parties believed to have liens on the Purchased Assets, the proposed Sale will be free and clear of all liens, claims, interests, and encumbrances (as contemplated in the Purchase Agreement), including any liabilities that arose prior to the Closing (except as otherwise provided in the APA), with all such liens, claims, interests, encumbrances and liabilities to transfer and attach to any remaining sale proceeds with the same validity, priority, force, and effect that such liens, claims, interests, encumbrances and liabilities had on the Purchased Assets immediately prior to the Closing. Because JPMorgan Chase Bank, N.A. and Chase Capital Corporation have valid, perfected and unavoidable first priority liens on and security interests in ~~some of~~ the Purchased Assets, interim, partial payments of their claims will be made contemporaneously with the Closing of the transaction from the proceeds. The Trustee submits that the interim, partial payments of the TIP indebtedness, the pre-petition claims of Chase Capital Corporation and any adequate protection obligations due JPMorgan Chase Bank, N.A. and Chase Capital Corporation are is entirely appropriate because (i) such payments were a precondition to the consents of JPMorgan Chase Bank, N.A. and Chase Capital Corporation to the Sale as required by section 363(f)(2) of the Bankruptcy Code, (ii) the Trustee could not otherwise adequately protect the liens of JPMorgan Chase Bank, N.A. and Chase Capital Corporation in the cash proceeds of their collateral, and (iii) it would make no economic sense for the Trustee to

retain the proceeds in escrow and continue to incur the substantial ongoing interest accruals and "negative carry" with respect to the TIP indebtedness or possible claims for interest by Chase Capital Corporation. Moreover, payment of JPMorgan Chase Bank's secured claims from the Sale proceeds is expressly required by the various financing orders in order to avoid a default under the conditions of the TIP loan agreement and the Trustee's right to use cash collateral. The failure to honor these provisions would terminate the Trustee's right to use cash collateral.

T. **No Fraudulent Transfer**. The APA was not entered into for the purpose of hindering, delaying or defrauding creditors of the Debtor. The transactions contemplated by the APA are not fraudulent transfers or fraudulent conveyances under the Bankruptcy Code or under the laws of the United States, any state, territory, possession, or the District of Columbia.

U. **No Successor Liability**. The transfer of the Purchased Assets to the Purchaser under the APA shall not result in the Purchaser, or any of its affiliates, successors or assigns, having any liability or responsibility (i) for any Interest, or any other obligation, of or against the Debtor or its estate, and neither the Purchaser, nor any of its affiliates, successors and assigns, shall, as a result of the Sale or any action taken in connection with the Sale, be deemed to (1) be a successor (or other similarly situated party) to the Debtor or Trustee or (2) have, *de facto* or otherwise, merged with or into the Debtor or the Trustee, or (ii) to the Debtor, Trustee or to third parties except as is expressly set forth in the APA. Without limiting the effect or scope of the foregoing, to the fullest extent permitted by law, the transfer of the Purchased Assets from the Trustee to the Purchaser does not and will not subject the Purchaser, or any of its affiliates, successors or assigns, or any of their respective properties (including the Purchased Assets) to any liability for Interests against the Debtor or Trustee or Interests of the Debtor or Trustee in such Purchased Assets by reason of such

transfer under the laws of the United States or any state, territory or possession thereof, or the District of Columbia, applicable to such transactions, including, without limitation, any bulk-transfer laws, successor liability or similar theories. Except as expressly provided for in the APA or this Order, the Purchaser is not acquiring or assuming any liability, warranty or other obligation of the Debtor or Trustee. The transfer of the Purchased Assets to the Purchaser, will not subject the Purchaser to any liability whatsoever with respect to the operation of the Debtor's businesses prior to the Closing Date, including, without limitation, any liability arising from any of the following: (1) any employment or labor agreements, consulting agreements, severance agreements, change-in-control agreements, or other similar agreements to which the Debtor is or was a party; (2) any pension, welfare, compensation or other employee benefit plans, agreements, practices, and programs, including, without limitation, any pension plan of the Debtor; (3) the cessation of the Debtor's operations, dismissal of employees, or termination of employment or labor agreements or pension, welfare, compensation or other employee benefit plans, agreements, practices and programs, and any obligations with respect thereto that arise from the with respect thereto that arise from the Employee Retirement Income Security Act of 1974, as amended, the Fair Labor Standard Act, Title VII of the Civil rights Act of 1964, the Age Discrimination and Employment Act of 1967, as amended, the Federal Rehabilitation Act of 1973, the National Labor Relations Act, the Consolidated Omnibus Budget Reconciliation Act of 1985 or the Worker Adjustment and Retraining Notification Act, (iv) workers' compensation, occupational disease or unemployment or temporary disability insurance claims, (v) except as specifically assumed in the APA and as discussed in Section Q hereof, environmental liabilities, debts, claims or obligations which may be asserted on any basis, including, without limitation, under the Comprehensive Environmental Response, Compensation and Liability Act or any other Environmental, Health and Safety Requirements, (vi) any bulk sales or

similar law, (vii) any litigation by or against the Debtor and (viii) the laws of the United States, any state, territory or possession thereof, or the District of Columbia, including any statute, rule, regulations, order, decree, administrative or judicial doctrine or other laws based, in whole or in part, directly or indirectly, in any theory of law or equity, including without limitation, any theory of equitable law, including, without limitation, any theory of antitrust or successor or transferee liability. For the avoidance of doubt, the liabilities set forth in this paragraph are included in the defined term "Interests" for all purposes herein.

V. **Compelling Circumstances for an Immediate Sale**. Good and sufficient reasons for approval of the APA and the Sale have been articulated. The relief requested in the Sale Motion is in the best interests of the Debtor, its estate and creditors. The Trustee has demonstrated sufficient and sound business justifications and compelling circumstances for the Sale outside of a plan of reorganization and the immediate consummation of the Sale to the Purchaser on the terms of the APA is necessary and appropriate to maximize the value of the Purchased Assets for the benefit of the Debtor, its estate and creditors. To maximize the value of the Purchased Assets and to maintain and preserve the viability of the businesses to which the Purchased Assets relate, the transaction must be consummated within the time frame set forth in the APA.

NOW, THEREFORE, IT IS ORDERED, JUDGED AND DECREED THAT:

1. **Sale Motion is Granted**. The Sale Motion and the relief requested therein is GRANTED and APPROVED, as set forth herein and on the record of the Sale Hearing, which is incorporated herein in its entirety, and the Sale as contemplated thereby is granted and approved.

2. **Objections Overruled**. Subject to the qualifications and limitations made on the record by the Trustee, any objections to the entry of this Order or the relief granted herein or requested in the Sale Motion that have not been withdrawn, waived, or

settled, or not otherwise resolved pursuant to the terms hereof, if any, hereby are denied and overruled on the merits with prejudice.

3. **Approval of APA**. The APA and all of the terms and conditions thereto are hereby approved. The Trustee is hereby authorized and directed, without further order of the Court, to take any and all actions necessary or appropriate to: (i) assume the Assumed Contracts and assign the same to the Purchaser; (ii) consummate the Sale of the Purchased Assets to the Purchaser pursuant to the terms of the APA; (iii) close the Sale as contemplated by the APA and this Order; (iv) execute and deliver, perform under, consummate, implement, and close fully the APA, together with all additional instruments and documents that may reasonable be necessary or desirable to implement the APA and Sale; and (v) take all other and further actions as may be reasonably necessary or appropriate to implement the transactions contemplated by the APA. Subject to Section 16 below, the Purchaser shall not be required to seek or obtain relief from the automatic stay under section 362 of the Bankruptcy Code to enforce any of its remedies under the APA or any other Sale-related document. The automatic stay imposed by section 362 of the Bankruptcy Code is modified solely to the extent necessary to implement the preceding sentence and the other provisions of this Order.

4. **Free and Clear**. Except as expressly provided for in this Order, pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, as of the Closing Date, the Trustee shall transfer, and the Purchaser shall take title to and possession of, the Purchased Assets free and clear of all Interests, with all such Interests to attach to the proceeds ultimately attributable to the property against or in which such Interests are asserted, subject to the terms of such Interests, with the same validity, force and effect, and in the same order of priority, which such Interests now have against the Purchased Assets or their proceeds, subject to any rights, claims and defenses of the Trustee, the Debtor or its estate, as

applicable, may possess with respect thereto. Upon closing of the Sale (the "Closing"), the Purchaser shall take title to and possession of the Purchased Assets. All persons and entities that are in possession of some or all of the Purchased Assets on the Closing Date are directed to surrender possession of such Purchased Assets to the Purchaser at the Closing. On the Closing Date, each of the Debtor's creditors is authorized and directed to execute such documents and take all other actions as may be reasonably necessary to release its Interests in the Purchased Assets, if any, as such Interests may have been recorded or may otherwise exist. For clarity in any real estate or other public record, the Purchased Assets include the real property described in the APA.

5. **Valid Transfer**. As of the Closing Date, the transactions contemplated by the APA effect a legal, valid, enforceable and effective sale and transfer of the Purchased Assets to Purchaser, and shall vest Purchaser with title to such Purchased Assets free and clear of any Interests of any kind whatsoever; *provided, however*, that the rights and obligations under any contract to which the United States Government is a counterparty shall be transferred to Purchaser only upon the consent of the United States Government and in compliance with applicable provisions of the Federal Acquisition Regulation. The Purchased Assets shall be transferred to the Purchaser "as is, where is" with all faults in accordance with the APA. As of the Closing Date, the APA and the transactions and instruments contemplated thereby shall be specifically performable and enforceable against and binding upon, and not subject to rejection or avoidance by, the Debtor or the Trustee appointed in this bankruptcy case or any successor case.

6. **Injunction**. Except as expressly permitted by this Order, all persons and entities (including, but not limited to, all debt security holders, equity security holders, governmental, tax and regulatory authorities, lenders, trade creditors, litigation claimants and other creditors) holding Interests in or against all or any portion of the Purchased Assets

arising under, out of, or in connection with, or in any way relating to the Trustee, the Debtor, the Purchased Assets, the operation of the Debtor's businesses prior to the Closing Date, or the transfer of the Purchased Assets to the Purchaser, hereby are forever barred, estopped and permanently enjoined from asserting, prosecuting or otherwise pursuing such person's or entity's Interests against the Purchaser, any of its affiliates, successors or assigns, any property of any of the foregoing, or any of the Purchased Assets. On and after the Closing, no holder of any Interest against the Debtor shall interfere with Purchaser's title to or use and enjoyment of the Purchased Assets based on or related to such Interests, and all such Interests, if any, shall attach to the Debtor's interests in the Sale proceeds as provided in this Order in the order of their priority, with the same validity, force and effect which they have against such Purchased Assets immediately before the Closing, subject to any rights, claims and defenses that the Debtor's estate and Debtor or Trustee, as applicable, may possess with respect thereto.

7. **Release of Interests**. Except as otherwise expressly provided in this Order, any person or entity that has filed a statement or other document evidencing an Interest in, to or against the Purchased Assets, shall, remove any and all such Interests on the Purchased Assets. If any of such persons or entities shall not have delivered to the Trustee in proper form, appropriate termination statements, releases and documents in accordance with this paragraph, then the Purchaser is authorized to file, register or otherwise record a certified copy of this Order (and the subject filing or recording officer is authorized and directed to file or record such certified copy of this Order), which, once filed, registered or otherwise recorded, shall constitute evidence of the release of all such Interests in, to or against the Purchased Assets. A certified copy of this Order may be filed with the appropriate clerk and/or recorded with the recorder to act to cancel any of such Interests of record.

8.     **Direction to Release Interests.**  On the Closing Date, each of the Debtor's creditors or Interest holders is authorized and directed to execute such documents and take all other actions as may be reasonably necessary to release its Interests in the Purchased Assets, if any, as such Interests may have been recorded or may otherwise exist.

9.     **No Successor Liability**.   Neither Purchaser nor its affiliates, successors or assigns shall, as a result of the consummation of the transaction contemplated by the APA: (a) be a successor to Seller or the Debtor or its estate or the Trustee; (b) have, *de facto* or otherwise, merged or consolidated with or into Seller, the Trustee or the Debtor or its estates; or (c) be a continuation or substantial continuation of the Seller, the Trustee or the Debtor or any enterprise of the Debtor.  The transfer of the Purchased Assets to Purchaser under the APA shall not result in Purchaser, its affiliates, members, or shareholders, or the Purchased Assets: (i) having any liability or responsibility for any Claim against Seller, the Trustee or the Debtor or against an insider of the Debtor; (ii) having any liability whatsoever with respect to, or be required to satisfy in any manner, whether at law or in equity, whether by payment, setoff or otherwise, directly or indirectly, any Interest; or (iii) having any liability or responsibility to Seller, the Trustee or the Debtor except as is expressly set forth in the APA.  Notwithstanding anything to the contrary in this Order or the APA, no provision of this Order or the APA is intended to or shall be interpreted to contradict, override or otherwise impair obligations and/or liabilities assumed by Purchaser pursuant to any novation agreement entered into by and between the Purchaser, Debtor, the Trustee and the United States Government and/or any agency thereof as part of obtaining the United States Government's consent to the assumption and assignment of contracts to which the United States Government and/or any agency thereof is a counterparty.

10.     **Examples of No Successor Liability**.  Without limiting the effect or scope of the foregoing and except as otherwise expressly provided herein, as a result of the

Closing of the transactions contemplated by the APA, the Purchaser shall have no successor or vicarious liabilities of any kind or character, including, but not limited to, any theory of antitrust, environmental, successor or transferee liability, labor law, alter ego, veil piercing, continuity of enterprise, mere continuation, product line, *de facto* merger or substantial continuity, whether known or unknown, legal or equitable, matured or unmatured, contingent or non-contingent, liquidated or unliquidated, asserted or unasserted, whether arising prior to or subsequent to the commencement of the bankruptcy case, whether imposed by agreement, understanding, law, equity or otherwise with respect to the Seller, the Trustee or the Debtor or any obligations of Seller, the Trustee or the Debtor arising prior to the Closing Date, including, but not limited to, liabilities on account of any taxes arising, accruing or payable under, out of, in connection with, or in any way relating to the operation of the Purchased Assets prior to the Closing Date, except insofar as Purchaser assumes such obligation and/or liability pursuant to any novation agreement entered into by and between the Purchaser, the Debtor, the Trustee and the United States Government and/or any agency thereof as part of obtaining the United States Government's consent to the assumption and assignment of contracts to which the United States Government and/or any agency thereof is a counterparty.

11. **Prohibition of Actions Against Purchaser**. Except as otherwise expressly provided for in this Order or the APA, the Purchaser shall not have any liability or other obligation of the Debtor or the Trustee arising under or relating to the Purchased Assets and shall not be liable for any Claims against the Debtor or the Trustee or any of their predecessors or affiliates, and shall have no successor or vicarious liabilities of any kind, character or nature whatsoever, including under any theory of antitrust, successor or transferee liability, labor law, or *de facto* merger whether known or unknown as of the Closing Date, now existing or hereafter arising, whether fixed or contingent, whether asserted or unasserted, whether legal or equitable, whether liquidated or unliquidated, including but

not limited to, liabilities on account of any taxes arising, accruing or payable under, out of, in connection with, or in any way relating to the Purchased Assets prior to the Closing, except insofar as Purchaser assumes such obligation and/or liability pursuant to any novation agreement entered into by and between the Purchaser, the Debtor, the Trustee and the United States Government and/or any agency thereof as part of obtaining the United States Government's consent to the assumption and assignment of contracts to which the United States Government and/or any agency thereof is a counterparty.

12. **Effect of Order**. On the Closing Date, this Order shall be considered and shall constitute (a) for any and all purposes, a full and complete general assignment, conveyance and transfer of the Debtor's interest in the Purchased Assets to the Purchaser, and (b) other than as expressly provided for in the APA or in this Order, a determination that all Interests of any kind or nature whatsoever existing as to the Purchased Assets prior to the Closing Date shall have been unconditionally released, discharged and terminated as of the Closing Date, and that the Sale described herein have been effected. This Order shall be binding upon and shall govern the acts of all entities, including without limitation all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Purchased Assets, and each of the foregoing is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the APA.

13. **Binding on Successors**. The terms and provisions of the APA and this Order shall be binding in all respects upon the Trustee, the Debtor, its estates, the Purchaser,

all creditors (whether known or unknown) of the Debtor, all holders of Interests against or on all or any portion of the Purchased Assets, any non-debtor counterparties to any of the Debtor's executory contracts or unexpired leases, any holders of equity interests in the Debtor, the Purchaser or their respective affiliates, the Trustee appointed in this bankruptcy case or any successor case, and the successors and assigns of each of the foregoing. This Order, the APA and the other agreements contemplated thereby shall inure to the benefit of the Debtor, its estates, its creditors, the Trustee, the Purchaser, and the successors and assigns of each of the foregoing.

14. **Good Faith**. The transactions contemplated by the APA are undertaken by the Purchaser without collusion and in good faith, as that term is used in section 363(m) of the Bankruptcy Code and, accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale with the Purchaser, unless such authorization is duly stayed pending such appeal prior to the Closing Date. The Purchaser is a good faith purchaser of the Purchased Assets, and is entitled to all of the benefits and protections afforded by section 363(m) of the Bankruptcy Code.

15. **Fair Consideration**. The consideration provided by the Purchaser pursuant to the APA for its purchase of the Purchased Assets constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act and under the laws of the United States, any state, territory, possession or the District of Columbia. The consideration provided by Purchaser for the Purchased Assets under the APA is fair and reasonable and may not be avoided under section 363(n) of the Bankruptcy Code.

16. **Retention of Jurisdiction**. This Court retains jurisdiction, pursuant to its statutory powers under 28 U.S.C. § 157(b)(2), to, among other things, interpret,

implement, and enforce the terms and provisions of this Order, the APA, all amendments thereto and any waivers and consents thereunder and each of the agreements executed in connection therewith to which the Debtor or the Trustee is a party, including, but not limited to, retaining jurisdiction to: (a) compel delivery of the Purchased Assets to the Purchaser; (b) interpret, implement and enforce the provisions of this Order and any related order; (c) protect the Purchaser against any Interests in the Purchased Assets of any kind or nature whatsoever that attached to the proceeds of the Sale; and (d) any disputes related to the APA.

17. **Surrender of Possession**. All entities that are currently, or on the Closing Date may be, in possession of some or all of the Purchased Assets in which the Debtor holds an interest are hereby directed to surrender possession of the Purchased Assets either to (a) the Trustee before the Closing Date, or (b) to Purchaser on the Closing Date.

18. **Fees and Expenses**. Any obligations of the Trustee in favor of the Purchaser (including without limitation any obligation to pay any amounts or deliver documents to the Purchaser in connection with the APA) shall (i) be performed when due in the manner provided in the APA without further order of this Court, and (ii) not be discharged, modified or otherwise affected by any reorganization plan for the Debtor, except by an express agreement with the Purchaser, its successors, or assigns.

19. **Application of Sale Proceeds**. Any and all valid and perfected Interests in Purchased Assets of the Debtor shall attach to any proceeds of such Purchased Assets immediately upon receipt of such proceeds by the Trustee (or any party acting on the Trustee's behalf) in the order of priority, and with the same validity, force and effect which they now have against such Purchased Assets, subject to any rights, claims and defenses the Debtor, its estates or the Trustee, as applicable, may possess with respect thereto. The Trustee is hereby authorized and directed to make the following interim, partial cash

distributions of proceeds of the Sale to JPMorgan Chase Bank, N.A. and Chase Capital Corporation at Closing (collectively, the "Chase Payments"):

A. To JPMorgan Chase Bank, N.A., an amount equal to the sum of the [Net Working Capital Adjustment] and the [Platinum Price] minus $3 million.

B. To Chase Capital Corporation, [$37.5] million dollars.

20. **Non-Material Modifications**. The APA and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto, in a writing signed by such parties, and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtor's estates.

21. **Subsequent Plan Provisions**. Nothing contained in any subsequent order of this Court or any court of competent jurisdiction in this bankruptcy case or any successor case (including, without limitation, any order authorizing the sale of assets pursuant to sections 363, 365 or any other provision of the Bankruptcy Code or any order entered after the conversion of any of the bankruptcy cases to a case under chapter 7 of the Bankruptcy Code), or in any chapter 11 plan confirmed in the bankruptcy case or any order confirming any such plan, shall alter, conflict with, or derogate from, the provisions of the APA or this Order, which provisions shall survive and remain in full force and effect.

22. **Failure to Specify Provisions**. The failure specifically to include any particular provisions of the APA or the other agreements contemplated thereby in this Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Court that the APA and the other agreements contemplated thereby be authorized and approved in their entirety. Likewise, all of the provisions of this Order are nonseverable and mutually dependent.

23.	**No Stay of Order**.  Notwithstanding the provisions of Bankruptcy Rules 6004 and 6006 or any applicable provisions of the Local Rules, this Order shall not be stayed for fourteen (14) days after the entry hereof, but shall be effective and enforceable immediately upon entry.  Time is of the essence in closing the transactions referenced herein, and the Trustee and the Purchaser intend to close the Sale as soon as practicable.  Any party objecting to this Order must exercise due diligence in filing an appeal and pursuing a stay, or risk its appeal being foreclosed as moot.

24.	**Preservation of Certain Records**.  Subject to further order of the Court, the Trustee and Purchaser are hereby ordered (and shall cause their affiliates) to take appropriate measures to maintain and preserve all records held by each relating to the Purchased Assets for a period of three (3) years or such other period as may be required by applicable law; provided, however, that in no event shall the Trustee be required to preserve such records after this bankruptcy case is closed after providing notice and an opportunity to acquire such records to Purchaser.

25.	**Ad Valorem Taxes**.  All ad valorem taxes for 2010, if any (or any, if any, prior years), pertaining to the Purchased Assets shall be paid prior to or at Closing by the Trustee from proceeds of the Sale.  Ad valorem taxes for 2011 pertaining to the Purchased Assets shall be prorated in accordance with the APA and shall become the responsibility of the Purchaser and such lien shall be retained against the Purchased Assets until said taxes are paid in full.

26.	**Failure to Close by the Closing Date**.  In the event that the Sale is not closed on or before the Closing Date, either party may seek modifications of this Order.

27.	**Payment of Closing Costs; Retention of Proceeds**.  The proceeds from the Sale of the Purchased Assets, together with Debtor's cash on hand (which is an Excluded Asset) shall be used to pay reasonable and normal Closing costs, as approved by

the Trustee (including, but not limited to the fees of Global Hunter Securities, LLC as provided by Final Order on the Application for the Approval of Employment of Global Hunter Securities, LLC as Investment Banker for the Debtor (Docket No. 157) related to the transaction evidenced by the APA), to ad valorem taxes pursuant to the APA to the extent of the Seller's liability therefor, to pay cure amounts for Assumed Contracts (not to exceed approximately the amounts shown on Exhibit B), to maintain the Escrow Amount under the Escrow Agreement as provided in the APA, and the subsequent "true-up" for working capital as provided in the APA, for the payment of ordinary course outstanding checks, payroll and taxes, and sales taxes accrued through Closing, for any post-petition ordinary course accounts payable (other than amounts alleged to be owed to SemCrude or other disputed payables) accrued through Closing and not assumed by the Purchaser, and the Chase Payments. The balance of the proceeds of Sale shall be retained by the Trustee, at Chase Bank subject to the liens and Interests of the Lenders (as defined below), and other parties holding Interests, to the extent such liens and other Interests exist at Closing with respect to the Purchased Assets pursuant to Section 4, above, pending further order of this Court.[3] The Lenders shall continue to have a lien and Interests on the Excluded Assets to the extent, if any, the Lenders held such liens or other Interests prior to Closing.

28. **Order Controls**. To the extent that this Order is inconsistent with any prior order or pleading with respect to the Sale Motion in this bankruptcy case, the terms of this Order shall govern. To the extent there are any inconsistencies between the terms of this

---

[3] On February 11, 2010 this Court entered its Interim Order Authorizing Limited Use of Cash Collateral, Obtaining Credit Secured by Senior Liens, and Granting Adequate Protection to Existing Lienholders (Docket No. 39); on February 25, 2010, the Court entered its Final Agreed Order Authorizing Limited Use of Cash Collateral, Obtaining Credit Secured by Senior Liens, and Granting Adequate Protection to Existing Lienholders (Docket No. 96); that Order was amended on March 3, 2010 (Docket No. 113), and such financing has been amended through the 8th amendment. Collectively, such orders are referred to as the "DIP Financing Order." Pursuant to the DIP Financing Order, the Debtor (and subsequently, the Trustee) entered into a financing agreement with JPMorgan Chase Bank, N.A. ("Chase Bank"), as issuing bank and administrative agent for itself and any future lenders, including Chase Capital Corporation ("Chase Capital," and together with Chase Bank, the "Lenders," and each, a "Lender").

Order and the APA (including all ancillary documents executed in connection therewith), the

terms of this Order shall govern.

### 

Submitted by:

**Langley & Banack, Inc.**
**745 E. Mulberry, Suite 900**
**San Antonio, TX 78216**
**Telephone: (210) 736-6600**
**Facsimile: (210) 735-6889**

**David S. Gragg**
**State Bar No. 08253300**
**Steven R. Brook**
**State Bar No. 3042300**
**NATALIE F. WILSON**
**Hawaii Bar No. 8852**
*Admitted Pro Hac Vice*

**ATTORNEYS FOR ERIC J.**
**MOELLER, CHAPTER 11 TRUSTEE**

**Execution Version**

Exhibit A

**ASSET PURCHASE AGREEMENT**

**dated as of April 11, 2011**

**by and between**

**NUSTAR REFINING, LLC**

**"PURCHASER"**

**and**

**ERIC J. MOELLER, CHAPTER 11 TRUSTEE OF AGE REFINING, INC., DEBTOR**

**"SELLER"**

# TABLE OF CONTENTS

**Page**

ASSET PURCHASE AGREEMENT ..................................................................1

**ARTICLE I** PURCHASE AND SALE OF ASSETS ...................................1
  1.1      Purchase and Sale of Purchased Assets ...............................1
  1.2      Assumption of Liabilities .....................................................6
  1.3      Consideration for Purchased Assets ....................................7
  1.4      Further Assurances ...............................................................9
  1.5      Assignment of Business Contracts and Business Licenses ....10
  1.6      Casualty and Condemnation Loss .......................................10

**ARTICLE II** THE CLOSING ..................................................................11
  2.1      Time and Place; Effective Time ..........................................11
  2.2      Closing Deliveries of the Seller ..........................................11
  2.3      Closing Deliveries of Purchaser ..........................................12

**ARTICLE III** REPRESENTATIONS AND WARRANTIES OF THE SELLER ....14
  3.1      Organization .........................................................................14
  3.2      Authority ..............................................................................14
  3.3      No Violation; Third Party Consents ....................................14
  3.4      Government Consents ...........................................................15
  3.5      Equipment and Tangible Property .......................................15
  3.6      Proprietary Rights ...............................................................15
  3.7      Business Contracts ..............................................................15
  3.8      Business Licenses ................................................................16
  3.9      Business Employees .............................................................16
  3.10    Employee Plans and Other Benefit Obligations ..................17
  3.11    Financial Statements ...........................................................18
  3.12    Real Property .......................................................................18
  3.13    Litigation; Governmental Orders ........................................19
  3.14    Compliance with Laws ........................................................19
  3.15    Insurance .............................................................................19
  3.16    Title to Purchased Assets ....................................................19
  3.17    Taxes ...................................................................................20
  3.18    Receivables .........................................................................20
  3.19    Inventory .............................................................................20
  3.20    Environmental Matters ........................................................20
  3.21    Warranties ...........................................................................21
  3.22    Brokers ................................................................................21
  3.23    Affiliated Transactions........................................................22
  3.24    Certificate of Service ..........................................................22
  3.25    Undisclosed Liabilities ........................................................22

i

3.26     Disclosure .................................................................................22
3.27     Trustee's Operation ....................................................................22

**ARTICLE IV** REPRESENTATIONS AND WARRANTIES OF PURCHASER ...................22
4.1      Organization ...............................................................................22
4.2      Authority ....................................................................................22
4.3      No Violation; Third Party Consents ............................................23
4.4      Governmental Consents ..............................................................23
4.5      Litigation ....................................................................................23
4.6      Brokers .......................................................................................23
4.7      Financing ....................................................................................24

**ARTICLE V** COVENANTS AND AGREEMENTS ..........................................24
5.1      Conduct of Business ...................................................................24
5.2      Access and Information ..............................................................24
5.3      Confidentiality ...........................................................................24
5.4      Further Actions ...........................................................................25
5.5      Fulfillment of Conditions by the Seller .....................................25
5.6      Fulfillment of Conditions by Purchaser .....................................26
5.7      Publicity .....................................................................................26
5.8      Transaction Costs .......................................................................26
5.9      Retention of and Access to Records; Employees .......................26
5.10     Insurance ....................................................................................27
5.11     Prorations and Taxes ..................................................................28
5.12     Bankruptcy Court Approval .......................................................29
5.13     Updating Disclosure Schedules .................................................29
5.14     Notice .........................................................................................30
5.15     Corporate Name .........................................................................30
5.16     Data ............................................................................................30
5.17     Employees ..................................................................................30
5.18     Title Matters Relating to Real Property .....................................31
5.19     Existing Letters of Credit ...........................................................31

**ARTICLE VI** CLOSING CONDITIONS .........................................................32
6.1      Conditions to Obligations of Purchaser .....................................32
6.2      Conditions to Obligations of the Seller ......................................34

**ARTICLE VII** AS IS SALE; SURVIVAL ......................................................35
7.1      "AS IS" SALE ............................................................................35
7.2      Survival of Representations and Warranties ...............................36

**ARTICLE VIII** TERMINATION ...................................................................36
8.1      Termination .................................................................................36
8.2      Effect of Termination ..................................................................37
8.3      Good Faith Deposit.....................................................................37

ii

8.4      Notice .......................................................................................................37

**ARTICLE IX** MISCELLANEOUS ...........................................................................37
9.1      Notices ....................................................................................................37
9.2      Assignment .............................................................................................39
9.3      Amendments and Waiver; Exclusive Remedies .....................................39
9.4      Entire Agreement ....................................................................................39
9.5      No Third Party Beneficiary .....................................................................39
9.6      Governing Law; Jurisdiction ...................................................................39
9.7      Neutral Construction ...............................................................................40
9.8      Severability ..............................................................................................40
9.9      Headings; Construction ...........................................................................40
9.10     Patriot Act; Executive Order 13224; Anti-Money Laundering Act .......40
9.11     Extended Meanings ..................................................................................41
9.12     Counterparts; Facsimile Delivery ...........................................................41
9.13     WAIVER OF JURY TRIAL ...................................................................41
9.14     Further Assurances...................................................................................42
9.15     Time of Essence .......................................................................................42

**ARTICLE X** DEFINITIONS.....................................................................................42
10.1     Certain Definitions ..................................................................................42
10.2     Interpretation ...........................................................................................53

## EXHIBITS

| | |
|---|---|
| Exhibit A | Form of Special Warranty Deed |
| Exhibit B-1 | Form of Bill of Sale |
| Exhibit B-2 | Form of Bill of Sale (Inventory) |
| Exhibit C | Form of Assignment and Assumption Agreement |
| Exhibit D | Form of Affidavit of Non-Foreign Status |
| Exhibit E | Escrow Agreement (Executed) |
| Exhibit F | Form of Approval Order |

## SCHEDULES

| | |
|---|---|
| Schedule 1.1(a)(iv) | Owned Real Property |
| Schedule 1.1(a)(v) | Tangible Property |
| Schedule 1.1(a)(vi) | Inventory |
| Schedule 1.1(a)(vii) | Business Licenses |
| Schedule 1.1(a)(viii) | Business Contracts |
| Schedule 1.1(a)(xi) | Intellectual Property |
| Schedule 1.1(a)(xv) | Telephone numbers, websites and URLs |
| Schedule 1.1(b)(x) | Leased Real Property |
| Schedule 1.1(b)(xi) | Other Excluded Assets |
| Schedule 1.3(c)(iii) | Product Inventory Valuation |
| Schedule 3.6 | Proprietary Rights |
| Schedule 3.7(a) | Material Business Contracts |
| Schedule 3.8 | Material Business Licenses |
| Schedule 3.11 | Financial Statements |
| Schedule 3.13 | Litigation |
| Schedule 3.20 | Environmental Permits |
| Schedule 3.23 | Affiliated Transactions |
| Schedule 3.24 | Certificate of Service |
| Schedule 5.11(d) | Property Tax Proration |
| Schedule 5.17 | Employees |

ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "*Agreement*") dated as of April 11, 2011 ("*Execution Date*"), by and among NuStar Refining, LLC, a Delaware limited liability company ("*Purchaser*"), and Eric J. Moeller (the "*Seller*"), solely in his capacity as Chapter 11 Trustee of AGE Refining, Inc., a Texas corporation ("*Debtor*"). Capitalized terms used in this Agreement and not otherwise defined have the respective meanings given to them in Article X).

WHEREAS, the Debtor commenced a voluntary case for reorganization under chapter 11 of title 11 of the United States Code (the "*Bankruptcy Code*"), in the United States Bankruptcy Court for the Western District of Texas, San Antonio Division (the "*Bankruptcy Court*") on February 8, 2010 under Case No. 10-50501 (the "*Bankruptcy Case*") and on July 6, 2010, the Bankruptcy Court ordered the appointment of Seller as Chapter 11 Trustee for the Debtor;

WHEREAS, Purchaser desires to purchase from the Seller, and the Seller desires to sell to Purchaser, all or substantially all of the assets, properties, interests and rights owned by the Seller to conduct the operations of the Business, and in connection therewith, Purchaser has agreed to assume certain liabilities of the Seller as set forth in Section 1.2, all as more particularly described herein and upon the terms and subject to the conditions set forth herein pursuant to the Bankruptcy Code and the Approval Order (hereinafter defined) to be entered by the Bankruptcy Court;

NOW, THEREFORE, in reliance upon and in consideration of the representations, warranties and covenants contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound hereby, agree as follows:

## ARTICLE I
## PURCHASE AND SALE OF ASSETS

1.1    Purchase and Sale of Purchased Assets

(a)    Purchase and Sale. Upon the terms and subject to the conditions set forth herein, at the Closing the Seller shall sell, convey, transfer, assign, grant and deliver to Purchaser (or to such assignee or assignees of Purchaser as may be determined by Purchaser pursuant to Section 9.2), free and clear of all Encumbrances (other than Permitted Encumbrances), and Purchaser shall purchase, acquire and accept delivery from the Seller on the Closing Date, all right, title and interest of the Seller in and to all of the assets, rights and entitlements of the Seller, whether tangible or intangible, real or personal, of every kind and nature (other than the Excluded Assets) that are used in or for, or relate to, the Business, or are necessary for the continued operation of the Business consistent with prior operations, including the following (collectively, the "*Purchased Assets*"), including, without limitation, the following:

(i)    The Refinery;

(ii)    The Elmendorf Terminal;

1

(iii)    Seller's right, title and interest in and to the four approximately 450 barrel tanks and appurtenant equipment located at County Road 211, Falls City, Texas (the "*Falls City Tanks*");

(iv)    the parcels of real property owned by the Seller described in Schedule 1.1(a)(iv) (the "*Owned Real Property*"), and all of the rights arising out of the ownership thereof or appurtenant thereto, including all rights, privileges, grants, licenses, permits and easements appurtenant to the Seller's interest in the Owned Real Property, together with all buildings, structures, facilities, fixtures and other improvements thereto and therein;

(v)    all machinery, equipment, furniture, office equipment and supplies, vehicles, computer hardware, storage tanks, molds, tools, dies, spare and replacement parts, and other tangible property of any kind or nature (and interests in any of the foregoing) (a) that are listed on Schedule 1.1 (a)(v), or (b) that are owned by the Seller and used in the operation of the Business, wherever located (collectively, the "*Personal Property*");

(vi)    all items of Inventory and other non-hydrocarbon inventory (including all materials and supplies, all manufactured and processed parts, all work in process and all finished products) pertaining to the operation of the Business (a) that are listed on Schedule 1.1(a)(vi) and are not sold in the Ordinary Course of Business during the Interim Period, or (b) that are owned by the Seller on the Closing Date (the "*Assigned Inventory*");

(vii)    all Licenses to the extent transferrable pertaining to the operation of the Business possessed by the Seller and listed on Schedule 1.1(a)(vii) (each, a "*Business License*" and, collectively, the "*Business Licenses*"), setting forth any limitations on or consents required for the transfer of such Business Licenses to Purchaser;

(viii)    all Contracts to which Seller is a party as set forth on Schedule 1.1(a)(viii) and all rights thereunder (including the rights to any deposits made with respect thereto) (each, a "*Business Contract*" and, together with the Real Property Leases, the "*Business Contracts*"), which Schedule also sets forth any limitations on, or any consents which may be required for, the transfer thereof to Purchaser and Seller's good faith estimate of the aggregate dollar amount or other actions required to cure any defaults or breaches under those Contracts ("*Cure Costs*") that relate to (A) the amount of pre-petition claims Seller believes are required by the Bankruptcy Code in order to permit the assumption and assignment of such contracts by Purchaser as specified under the caption "Pre-Petition Cure Amounts", and (B) the amount of post-petition claims Seller believes are owed as of the date hereof under such Contracts as specified under the caption "Post-Petition Amounts"; to the extent required by the Bankruptcy Court under the Bankruptcy Code to permit the assumption and assignment of the Business Contracts to the Purchaser pursuant to this Agreement, the Seller agrees to pay on or before the Closing the Seller Cure Amount, with respect to such Business Contracts and which shall not be considered an addition to the Purchase Price; *provided* that Purchaser may amend Schedule 1.1(a)(viii) at any time on or prior to the Closing Date, to add to, or remove from, Schedule 1.1(a)(viii) and the definition of Purchased Assets any Contract included thereon or excluded therefrom (as the case may be) as of the date hereof (which Business Contracts shall be assumed by Seller and assigned to Purchaser, or rejected by Seller (as the case may be) in accordance with Bankruptcy Code Section 365) and the Approval Order; *provided, further*, that

2

such addition or removal shall not serve to increase or decrease or otherwise affect the amount of the Purchase Price; and provided, further, any post-petition Business Contract, to the extent identified as such on Schedule 1.1(a)(viii), may not be removed without Seller's consent, which consent shall not be unreasonably withheld;

(ix)    all marketing, sales support and promotional materials, advertising materials and production, sales and marketing files used for the operation of the Business;

(x)    all current customer lists, supplier lists, production records and credit records, or similar records of all sales of the Business, and all other books and records maintained for, or in connection with, the operation of the Business other than those designated as Excluded Assets;

(xi)    to the extent of the Seller's rights therein, (x) all Proprietary Rights related to the Business, including the trademarks, service marks, trade names or logos of the Seller, or any of the URLs or domain names associated with the foregoing and any translations, adaptations, derivations or combinations of any of the foregoing (including Seller's URL www.agerefining.com) and all goodwill associated with the foregoing (including the common law rights therein) and all other Intellectual Property, each such Proprietary Right or other Intellectual Property listed on Schedule 1.1(a)(xi); (y) all computer hardware and Software, and all versions thereof, data rights and documentation, books and records and other written and electronic materials related thereto; and (z) all rights of Seller with respect to the foregoing, remedies against infringement, misappropriation or other unauthorized use thereof and rights to protection of interests therein under the applicable Laws of all jurisdictions; provided however, any tradename or trademark including the words "AGE Refining," "Alberto Gonzalez Enterprises," or "Alberto Gonzalez Energy" or any related names, are Excluded Assets.

(xii)    all Gross Accounts Receivable and notes receivable to the extent arising from the sale of products and services of the Business outstanding as of the Closing Date (the "*Assigned Accounts Receivable*"), and any causes of action specifically pertaining to the collection of any Assigned Accounts Receivable, except to the extent expressly set forth as an Excluded Asset;

(xiii)    all Prepayments and other prepaid expenses, deposits and charges paid by the Seller prior to the Closing Date in respect of the Business and pertaining to periods after the Closing Date (the "*Assigned Prepayments*");

(xiv)    all promotional allowances and vendor rebates and similar items to the extent allocable to the operation of the Business after the Closing Date;

(xv)    to the extent Transferable by the Seller to Purchaser and not requiring payment of any fee in connection with such assignment, all telephone numbers, websites and URLs related to the Business currently in the name of the Seller and listed on Schedule 1.1(a)(xv); provided, however, that Purchaser may elect to pay the fee on behalf of Seller to facilitate the transfer;

(xvi)    to the extent Transferable by the Seller to Purchaser and not requiring payment of any fee in connection with such assignment, all currently effective

3

warranties and guaranties given by any contractor, supplier or manufacturer of any Assigned Inventory, Personal Property or improvements to the Owned Real Property, or of any work performed on any Personal Property or improvements to the Owned Real Property (the "*Warranties*"); *provided, however*, that Purchaser may elect to pay the fee on behalf of Seller to facilitate the transfer;

(xvii)   all Claims against third Persons, whether by way of counterclaim or otherwise, with respect to (A) the Business (including all incurred but not reported claims and proceeds from pending and unpaid claims made on or prior to the Closing Date under any and all of the Seller's insurance policies to the extent related to an Assumed Liability, including without limitation the Pollution Liability Policy written by Chartis Speciality Insurance Company (PLS5769188), provided Chase shall not be affirmatively removed as an additional named insured, if an additional named insured as of the Execution Date, on the existing policy until renewal under Purchaser), and (B) the ownership, use, function or value of any of the Purchased Assets or the Assumed Liabilities, but excluding Claims listed as or with respect to the Excluded Assets or the Excluded Liabilities;

(xviii)   all rights of Seller under any agreement relating to the acquisition of any of the Purchased Assets from any Third Party, including any and all rights of indemnification, hold harmless agreements, covenants not to prosecute, and any and all other claims against Third Parties relating to the Business or the Purchased Assets (except to the extent such rights relate to claims arising before the Closing Date or in litigation as of the Closing Date and claims made against Seller after the Closing Date, each of such excluded rights and claims being Excluded Assets);

(xix)   approximately 1,243.165 troy ounces of platinum (the "*Platinum*"), as described in the Bankruptcy Court's February 15, 2011 Order (Docket Number 826) and the Platinum Stipulation attached thereto;

(xx)   all proceeds and products of any and all of the foregoing Purchased Assets (other than proceeds from accounts receivable collected prior the Closing Date, proceeds from Inventory sold in the ordinary course prior to the Closing Date and any item listed in Excluded Assets).

(b)   Excluded Assets. Notwithstanding anything to the contrary herein, it is expressly understood and agreed that the Purchased Assets do not include and the Seller shall not sell, convey, transfer, assign, grant or deliver to Purchaser, and Purchaser shall not purchase, acquire or accept delivery or have any rights to purchase, acquire or accept, delivery of the following assets (the "*Excluded Assets*"):

(i)   all cash and cash instruments in bank accounts presently administered by the Debtor or Trustee;

(ii)   the articles of incorporation, minute books, stock books and other corporate records of the Seller having exclusively to do with the corporate organization and capitalization of the Seller;

(iii)   all Tax records of the Seller;

4

(iv)    prepaid Taxes, refunds of Taxes and Tax loss carry forwards including interest thereon or claims therefor, relating to the Business for any period or portion thereof ending on or prior to the Closing Date;

(v)    all Business Licenses and Warranties that are not Transferable;

(vi)    Seller's Benefits Plans, and all rights or obligations in, or any assets or liabilities associated with or allocated to, the Benefit Plans;

(vii)    all rights of the Seller under this Agreement, the Purchase Price hereunder, any agreement, certificate, instrument or other document executed and delivered by Seller or Purchaser in connection with the transactions contemplated hereby, or any side agreement between the Seller and Purchaser entered into on or after the date of this Agreement;

(viii)    any assets transferred or otherwise disposed of by the Seller in the Ordinary Course of Business prior to the Closing and not in violation of this Agreement, or with Purchaser's prior written consent so long as the value of the assets are not in excess of $5,000 for such transfers or dispositions, whether individually or in the aggregate;

(ix)    all Contracts to which the Seller is a party not set forth on Schedule 1.1(a)(viii) and all rights thereunder; *provided* that Purchaser may amend Schedule 1.1(a)(viii) at any time prior to the Closing Date to exclude from the definition of Purchased Assets any Contract not otherwise expressly excluded hereunder, subject to the provisions of Section 1.1(a)(viii);

(x)    the leases of real property described in Schedule 1.1(b)(x) (the "*Real Property Leases*"), as to which Seller is the lessee (the "*Leased Real Property*"), together with any leasehold improvements thereon owned by the Seller, and in each case all other rights, subleases, licenses, other use and occupancy rights and interests, permits, deposits and profits appurtenant or related to each such lease, and in the case of the Redfish Bay terminal lease, the Contracts with Shell Trading (US) Company set forth on Schedule 1.1(b)(x);

(xi)    such other specific assets set forth on Schedule 1.1(b)(xi) (regardless of whether such assets are located at or on any Owned Real Property on the Closing Date);

(xii)    all Claims with respect to any pending litigation, including without limitation, that certain petition brought by Seller against Glen Gonzalez et al. in Adversary No. 10-05120 (the "*Gonzalez Suit*")

(xiii)    all of Seller's right, title and interest in and to the Tierra Pipeline that is the subject of Gonzalez Suit and any right, title and interest to such pipeline that the Bankruptcy Court may determine;

(xiv)    all causes of action of the Seller under Chapter 5 of the Bankruptcy Code,

5

(xv)    all accounts and notes receivable from AGE Transportation, Inc., Tierra Transportation, Inc., and Tierra G Squared Land and Properties LLC (collectively, the "*Tierra Receivables*"), together with that certain note receivable identified in the Seller's accounting books and records as an "Advance to Shareholder" in the amount of $17,630 and any rights of the Seller under any policy of life insurance on the life of Glen Gonzalez and/or Al Gonzalez;

(xvi)    all insurance policies and all pending Claims related to, and all proceeds from, the Seller's insurance coverage for casualty or property damage and for interruption of Seller's business, including without limitation, Claims related to the July 2010 failure at the Refinery's steam turbine generator, the truck rack property and the business interruption Claims arising from the May 2010 fire at the Refinery, the February 2011 fire at the truck rack comprising a portion of the Elmendorf Terminal, and the April 2 – 3, 2011 leak in the Refinery's crude unit furnace, but excluding any such insurance policies and rights and Claims expressly set forth in Section 1.1(a)(xvii) or otherwise related to any Assumed Liability;

(xvii)    the Government Contract Clearing Receivables;

(xviii)    all quantities of JFA-5 additive located at the Refinery and/or the Elmendorf Terminal, which the parties acknowledge are owned by the United States Government.

1.2    Assumption of Liabilities

(a)    Assumption. Upon the terms and subject to the conditions set forth herein, at the Closing, upon the consummation of the transactions contemplated by this Agreement, Purchaser shall assume from the Seller (and thereafter pay, perform, discharge or otherwise satisfy in accordance with their respective terms), and the Seller shall irrevocably convey, transfer and assign to Purchaser, only the following Liabilities of the Seller and no others whatsoever (collectively, the "*Assumed Liabilities*"):

(i)    all Liabilities under the Business Contracts and Business Licenses included in the Purchased Assets to the extent such Liabilities accrue and relate to the period of time after the Closing Date (other than as a result of default by the Seller or its agents or Affiliates occurring on or prior to the Closing Date);

(ii)    all Taxes related to the operation of the Business by Purchaser attributable to periods or portions thereof beginning after the Closing Date (for the avoidance of doubt, the event creating the Liability occurs on or prior to the Closing Date as compared to when the Tax is payable by the Seller), including, without limitation, Liabilities for Taxes attributable to the ownership of the Purchased Assets from and after the Closing Date;

(iii)    the Cumulative Accounts Payable as of the Closing Date;

(iv)    all Liabilities under Environmental Law to perform Cleanup of any Environmental Condition at, on or under any of the Owned Real Property, whether the same

6

relate to, result from or arise out of any Environmental Condition that existed prior to, at or after the Effective Time.

(b)     Excluded Liabilities.    Notwithstanding any other provision of this Agreement to the contrary, Purchaser is assuming only the Assumed Liabilities and is not assuming any other liability or obligation of Seller of whatever nature, whether known or unknown, absolute, contingent, presently in existence or arising hereafter and whether or not related to the Purchased Assets or the Business, including but not limited to all liabilities and obligations for all matters arising out of any indemnification agreement, which liabilities and obligations shall be retained by and remain obligations and liabilities of Seller (collectively, the "*Excluded Liabilities*"). The Seller will remain responsible for all Excluded Liabilities, subject to Seller's rights under the Bankruptcy Code and other available defenses.

1.3    Consideration for Purchased Assets.

(a)     Consideration. The purchase price for the Purchased Assets is (i) the Base Purchase Price, plus (ii) an amount equal to the Platinum Price, plus (iii) an amount equal to the Closing Date Working Capital as determined in accordance with Section 1.3(c) (collectively, the "*Purchase Price*").

(b)     Good Faith Deposit; Escrow Amount. On or prior to the Execution Date, Purchaser duly executed and delivered to the Seller that certain Deposit Escrow Agreement dated April 1, 2011, as amended by that certain First Amendment dated April 11, 2011, by and among Purchaser, the Trustee and the Escrow Agent, in the form attached hereto as Exhibit E (the "*Escrow Agreement*") and deposited with the Escrow Agent $1,000,000 in cash (the "*Good Faith Deposit*"). At the Closing, NuStar will deposit an additional $2,000,000 with the Escrow Agent, increasing the total deposit with the Escrow Agent to $3,000,000 (the "*Escrow Amount*"). The Escrow Amount (inclusive of the Good Faith Deposit) shall be held and disbursed in accordance with this Agreement and the Escrow Agreement. The parties agree that the Escrow Amount shall be held in escrow and shall not become, or be considered, part of the bankruptcy estate of the Seller until it is released to the Seller.

(c)     Working Capital Adjustment.

(i)     For the purposes of Section 1.3 hereof, and more particularly, determining the amount of the Purchase Price payable at Closing and the amount of the Closing Adjustment, Seller and Purchaser hereby acknowledge that:

1.    the amount of the Monetized Accounts Receivable shall be estimated to be $23,391,102.48;

2.    the amount of the Inventory shall be estimated to be $11,963,291.94;

3.    the amount of the Prepayments (net of Crude Prepayments) shall be estimated to be $363,114.02;

4.    the amount of the Crude Prepayments shall be estimated to be $9,740,028.17;

7

5.  the amount of the Gross Crude Accounts Payable shall be estimated to be $37,047,852.54;

6.  the amount of the Trade Accounts Payable shall be estimated to be $1,246,851.06;

(the aggregate of the amounts set out in clauses 1.3(c)(i)(1) – (4), inclusive, less the aggregate of the amounts set out in clauses 1.3(c)(i)(5) – (6), inclusive, is hereby referred to as the "*Estimated Working Capital*").

(ii)     Increase in Escrow Amount.  No later than three Business Days prior to the Closing Date, Purchaser and Seller shall jointly prepare a revised estimate in good faith of the Closing Date Working Capital ("*Closing Date Working Capital Estimate*") (x) based on the trial balances available for Gross Accounts Receivable, Prepayments and Cumulative Accounts Payable on such date and in accordance with the methodology set forth in Section 1.3(c)(iii), and (y) the value of Inventory determined in accordance with the procedures described on Schedule 1.3(c)(iii).  If the absolute value of the difference between the Closing Date Working Capital Estimate and the Estimated Working Capital is in excess of 105% of the Escrow Amount, the Escrow Amount shall be increased dollar-for-dollar by an amount equal to the absolute value of such difference.

(iii)     Preparation of Closing Adjustment Statement.  On or before the 30th day after the Closing Date, Purchaser shall calculate the Closing Date Working Capital and shall deliver to Seller a statement (the "*Closing Adjustment Statement*") setting forth the amount of the Closing Date Working Capital, together with supporting calculations and information.  Seller may provide a copy of the Closing Adjustment Statement to Chase solely for the purpose of making Chase aware of the magnitude of adjustment, if any, to the Purchase Price resulting from the Closing Date Working Capital.  In calculating the Closing Date Working Capital, the value of Inventory shall be determined in accordance with the procedures described on Schedule 1.3(c)(iii) at or immediately prior to the Effective Time and the value of the Monetized Accounts Receivable, Prepayments and Cumulative Accounts Payable shall be prepared in accordance with GAAP.  Seller shall cause its employees to give Purchaser and its advisors access at all reasonable times to the personnel, properties and books and records of the Business and Seller's working papers for the purpose of conducting the physical inventory and preparing the Closing Adjustment Statement, and Seller and its representatives and advisors may be present for and participate in such physical inventory.  Unless Seller gives notice to Purchaser on or before the 15th day after Seller's receipt of the Closing Adjustment Statement that Seller disputes the Closing Date Working Capital as specified in the Closing Adjustment Statement, the Closing Date Working Capital shall be as specified in the Closing Adjustment Statement and shall be final, binding and non-appealable by the parties.  If Seller gives notice to Purchaser on or before such 15th day that it disputes the Closing Date Working Capital specified in the Closing Adjustment Statement, Purchaser and Seller shall consult in good faith and use commercially reasonable efforts to agree upon the calculation of the Closing Date Working Capital.  If on or before the 30th day after Seller's receipt of the Closing Adjustment Statement, Purchaser and Seller have not agreed on the Closing Date Working Capital, such matters as remain in dispute shall be submitted to one of the "Big 4" nationally recognized independent accounting firms reasonably acceptable to the parties, or such other accounting firm as Purchaser and Seller shall

8

mutually agree, for final resolution, which resolution shall be binding upon Purchaser and Seller, with no rights of appeal therefrom. The fees and expenses of such accounting firm for its services in resolving such dispute shall be borne equally by Purchaser and Seller.

(iv)     Payment of Adjustments. Within three Business Days after the final determination of the Closing Date Working Capital in accordance with Section 1.3(c)(iii), (A) if the Estimated Working Capital is greater than the Closing Date Working Capital, Seller will execute a joint written instruction to the Escrow Agent as set forth below in this paragraph to pay to Purchaser the amount by which the Estimated Working Capital exceeds the Closing Date Working Capital, or (B) if the Closing Date Working Capital is greater than the Estimated Working Capital, Purchaser will pay directly to Seller the amount by which the Closing Date Working Capital exceeds the Estimated Working Capital. In the event of clause (A) above, Purchaser and Seller shall execute and deliver joint written instructions to the Escrow Agent to release to Purchaser that portion of the Escrow Amount equal to the difference between the Estimated Working Capital and the Closing Date Working Capital (collectively, the "*Closing Adjustment*"). To the extent any portion of the Escrow Amount remains after giving effect to the payment described in clause (A) above, or in the event of clause (B) above, Purchaser and Seller shall execute joint written instructions to the Escrow Agent to release such amount to Seller. If the Escrow Amount is insufficient to satisfy in full the Closing Adjustment due Purchaser, Seller shall deliver to Purchaser an amount in cash equal to the difference between the Closing Adjustment and the Escrow Amount within the time period set forth above in this paragraph. Any payment required to be made pursuant to this paragraph shall be made by wire transfer of immediately available funds to an account designated in writing by the party that is to receive payment of the Closing Adjustment.

(v)     Accounting Books, Records, Policies and Procedures. Purchaser agrees that following the Closing through the date on which payment, if any, is made by either party pursuant to Section 1.3(c)(v), Purchaser will not take any actions with respect to any accounting books, records, policies or procedures on which the Closing Adjustment is to be based that would make it impossible or impracticable to calculate the Closing Adjustment in the manner and the use of the methods required hereby.

(d)     Allocation of Purchase Price. Purchaser and Seller agree that subsequent to but in no event later than 60 days after the Effective Time they will use their best efforts to agree on an estimate of the proper allocation of the consideration paid or received in connection with the transactions contemplated hereunder for purposes of Section 1060 of the Code and IRS Form 8594. Additionally, no later than 120 days after the Effective Time, Purchaser, at its expense, will either prepare or obtain a valuation report prepared by a third party and forward either such report to Seller. Purchaser and Seller shall consider such valuation report in order to agree upon the proper allocation of the consideration paid or received in connection with the transactions contemplated hereunder for purposes of Section 1060 of the Code and IRS Form 8594. If the parties are not able to reach an agreement, each party shall make such filings as required of it under applicable tax laws applying the requirements of Section 1060 of the Code in its own discretion.

1.4     Further Assurances. At and after the Closing, and without further consideration therefor, (a) the Seller, or any post-confirmation entity vested with the rights of the Seller, shall

9

execute and deliver to Purchaser such further and reasonable instruments and certificates of conveyance and transfer as Purchaser may reasonably request to convey and transfer the Purchased Assets from the Seller to Purchaser and to put Purchaser in operational control of the Business, or for aiding, assisting, collecting and reducing to possession any of the Purchased Assets and exercising rights with respect thereto, and (b) Purchaser (including any assignee or designee) shall execute, or shall arrange the execution of, and deliver to the Seller such further reasonable instruments and certificates of assumption, novation and release as the Seller may reasonably request in order to make Purchaser responsible for all Assumed Liabilities and release the Seller therefrom to the fullest extent permitted under applicable Law.

1.5    Assignment of Business Contracts and Business Licenses. To the extent that any Business Contract (including any Real Property Leases) or Business License is not Transferable, this Agreement shall not be deemed to constitute an assignment, an attempted assignment or an undertaking to assign such Business Contract or Business License if such consent or approval is not given or if such an assignment, attempted assignment or undertaking otherwise would constitute a breach thereof or cause a loss of benefits thereunder. The Seller (and Purchaser where required) shall use their respective commercially reasonable efforts to obtain any and all such third party consents or approvals under all Business Contracts and Business Licenses; *provided, however,* that the Seller shall not be required to pay or incur any cost or expense to obtain any third party consent or approval other than (i) *de minimus* administrative costs associated with obtaining such consent, and (ii) any Cure Costs under Section 365 of the Bankruptcy Code, in either event which shall be paid prior to the Closing. If any such third party consent or approval is not obtained before the Closing, the Seller shall cooperate with Purchaser in any reasonable arrangement selected by Purchaser designed to provide for Purchaser after the Closing the benefits intended to be assigned to Purchaser under the applicable Business Contract, including enforcement at the cost and for the account of Seller of any and all rights of the Seller against the other party thereto arising out of the breach or cancellation thereof by such other party alleging that such Business Contract was improperly assigned by virtue of the consummation of the transactions contemplated by this Agreement; *provided* that Purchaser shall undertake to pay or satisfy the corresponding Liabilities for the enjoyment of such benefit to the extent that Purchaser would have been responsible therefor hereunder if such consent, waiver or approval had been obtained.

1.6    Casualty and Condemnation Loss. If, after the date of this Agreement but prior to the Closing Date, any portion of the Purchased Assets is damaged or destroyed by fire or other casualty or is taken in condemnation or under right of eminent domain, Purchaser shall nevertheless be required to close and Seller shall elect by written notice to Purchaser prior to Closing either: (a) to cause the Purchased Assets affected by any casualty to be repaired or restored, at Seller's sole cost, as promptly as reasonably practicable (which work may extend after the Closing Date; *provided however,* if such work is not completed prior to the Closing Date, then Purchaser may deduct the cost to complete such work from the Purchase Price and Purchaser shall be obligated to pay such amount to the Person completing such work); or (b) to accept an assignment of Seller's insurance proceeds and other claims against third parties with respect to the casualty or taking, *provided however,* to the extent the insurance proceeds are insufficient to repair or restore the affected Purchased Assets (such shortfall, the "***Shortfall***"), then Purchaser may deduct the Shortfall from the Purchase Price and Purchaser shall be obligated to expend such Shortfall to complete the repair or restoration of the affected Purchased

10

Assets. Notwithstanding the foregoing to the contrary, if the aggregate losses caused by such casualties and/or takings exceeds $1,000,0000 or the casualty is not commercially reasonably capable of being repaired or replaced within fifteen (15) days of the date of the first occurrence of the casualty event, Purchaser shall have the right, but not the obligation, by notice to the Seller one Business Day (unless the loss occurs so close to Closing as to make such notice impracticable) prior to Closing, to terminate this Agreement under Section 8.1(g); *provided, however,* if the aggregate losses caused by such casualties and/or takings exceeds $4,000,0000 or the casualty is not commercially reasonably capable of being repaired or replaced within forty-five (45) days of the date of the first occurrence of the casualty event, Seller shall have a reciprocal right, but not the obligation, by notice to the Purchaser one Business Day (unless the loss occurs so close to Closing as to make such notice impracticable) prior to Closing, to terminate this Agreement under Section 8.1(g).

## ARTICLE II
## THE CLOSING

2.1     Time and Place; Effective Time. The consummation of the transactions contemplated hereby shall take place at a closing (the *"Closing"*) to be held at the offices of Langley & Banack, Incorporated 745 East Mulberry, Suite 900, San Antonio, Texas 78212 at 10:00 a.m. Central Time, on April 21, 2011 (the *"Closing Date"*) and the satisfaction and fulfillment or waiver of the conditions set forth in Article VI (other than conditions to be satisfied simultaneously at the Closing). The sale, transfer, assignment, conveyance and delivery of the Purchased Assets and the assumption of the Assumed Liabilities described in the Operative Agreements will be effective as of the Effective Time.

2.2     Closing Deliveries of the Seller. At the Closing, the Seller shall deliver, or cause to be delivered, to Purchaser the following instruments, certificates and other documents in order to consummate the transactions contemplated hereby, including the transfer of the Purchased Assets to Purchaser pursuant to Section 1.1:

(a)     Instruments of Transfer and Assignment.

(i)     A special warranty deed with respect to each Owned Real Property, in proper form for recording and otherwise substantially in the form attached hereto as Exhibit A (the *"Deed"*), conveying fee simple title to all of the Owned Real Property to Purchaser, subject only to Permitted Encumbrances;

(ii)     a Bill of Sale – Purchased Assets and a Bill of Sale – Inventory, each duly executed by the Seller and substantially in the form attached hereto as Exhibits B-1 and B-2, respectively (collectively, the *"Bill of Sale"*);

(iii)     an Assignment and Assumption Agreement duly executed by the Seller, substantially in the form attached hereto as Exhibit C (the *"Assumption Agreement"*);

(iv)     copies of all instruments, certificates, documents and other filings (if applicable) necessary to release the Purchased Assets from all Encumbrances, including any

11

applicable UCC termination statements and releases of mortgages, all in a form reasonably satisfactory to counsel for Purchaser, unless released pursuant to the Approval Order;

(v)     copies of the waivers, consents and approvals if such waivers, consents and approvals are required to validly transfer and assign any Business Contract or Business License in accordance with its terms after giving effect to the relevant provisions of the Bankruptcy Code, the Bid Procedures Order and the Approval Order (the "*Required Consents*");

(vi)     an affidavit to the Title Company of the type customarily provided by Seller of real property to induce title companies to insure over certain "standard" or "preprinted" exceptions to title to the extent available, if Purchaser has elected to obtain a title insurance;

(vii)     copies of any transfer or sales Tax forms and returns required to be filed by the Seller prior to or on the Closing Date in connection with the transactions contemplated hereby;

(viii)     a certified copy of the Approval Order; such other instruments as shall be reasonably requested by Purchaser to vest in Purchaser title in and to the Purchased Assets in accordance with the provisions of this Agreement.

(b)     <u>Closing Certificates</u>.

(i)     An officer's certificate executed by an authorized officer of the Seller, which shall certify as to the satisfaction of the conditions set forth in <u>Sections 6.1(a)</u> and <u>6.1(b)</u>; and

(ii)     a certificate of the Seller certifying as to its respective non-foreign status, in compliance with the requirements of Section 1445 of the Internal Revenue Code .

(c)     <u>Other Deliveries</u>.

(i)     an executed counterpart of joint written instructions to wire the Escrow Amount to the accounts designated in writing by the Seller in accordance with this Agreement;

(ii)     payment by the Seller of all transfer Taxes (including all transfer, sales and similar Taxes) payable pursuant to <u>Section 5.8</u> in connection with the consummation of the transactions contemplated by this Agreement;

(iii)     evidence of payment of all Seller Cure Amounts; and

(iv)     such other documents related to the transactions contemplated by this Agreement that Purchaser may reasonably request.

2.3    <u>Closing Deliveries of Purchaser</u>. At the Closing, Purchaser shall make the payment and deliver, or cause to be delivered, to the Seller the following instruments, certificates

12

and other documents in order to pay for the Purchased Assets and effect the assumption of all Assumed Liabilities from the Seller pursuant to Section 2.2:

(a)    Cash Payment. At the Closing, Purchaser shall deliver to Seller by wire transfer of immediately available funds the Base Purchase Price, plus the Platinum Price, plus the Closing Date Working Capital Estimate, less the Escrow Amount, less the Property Tax Proration (the "*Cash Payment*").

(b)    Instruments of Assumption.

(i)    the Assumption Agreement, duly executed by Purchaser;

(ii)    the Assignment of Proprietary Rights, duly executed by Purchaser;

(iii)    copies of any transfer Tax forms and returns required to be filed by Purchaser prior to or on the Closing Date in connection with the transactions contemplated hereby;

(iv)    all other instruments and certificates of assumption, novation and release as the Seller may reasonably request in order to effectively make Purchaser responsible for all Assumed Liabilities and release the Seller therefrom to the fullest extent permitted under applicable Law;

(v)    copies of the waivers, consents and approvals as are required to be obtained to validly transfer and assign the Purchased Assets to Purchaser, after giving effect to the relevant provisions of the Bankruptcy Code, the Sales Procedures Order and the Approval Order;

(vi)    such other instruments as shall be reasonably requested by the Seller for the assumption of the Assumed Liabilities by Purchaser in accordance with the provisions of this Agreement;

(c)    Closing Certificates.

(i)    An officer's certificate which shall certify as to the satisfaction of the conditions set forth in Sections 6.2(a) and 6.2(b); and

(ii)    a copy of the resolutions adopted by the Board of Directors of Purchaser evidencing its authorization of the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby, certified by an officer of Purchaser.

(d)    Other Deliveries. Each party shall deliver such other documents related to the transactions contemplated by this Agreement that the other party may reasonably request.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF THE SELLER

**Subject to the information set forth in the Disclosure Schedules**, the Seller, to induce Purchaser to enter into this Agreement and to close hereunder, hereby represents and warrants to Purchaser, as of the date hereof and as of the Closing, as follows (Seller acknowledging that Purchaser has materially relied upon the representations and warranties set forth in this Article III):

3.1     Organization.

(a)     Seller. Seller (i) is a corporation duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, (ii) is duly qualified under the laws of, or is licensed to do business as a foreign company in good standing in, each jurisdiction in which such qualification or license is required to own, lease or license the Purchased Assets or to operate or carry on the Business, and (iii) except for the approval of the Bankruptcy Court, has all necessary corporate power and authority required to own, lease or license its Purchased Assets, to operate and carry on its portion of the Business. Seller has the power and authority to execute and deliver each of the Operative Agreements, to consummate the transactions contemplated by this Agreement and to perform their obligations under the Operative Agreements.

(b)     Subsidiaries and Affiliates. Seller does not have any Subsidiary and no Affiliate of the Seller is engaged in the Business or owns, leases or otherwise holds and operates any of the Purchased Assets.

3.2     Authority. Assuming the receipt of all necessary approvals of the Bankruptcy Court, Seller has all requisite corporate power and authority to enter into and deliver this Agreement and the Operative Agreements to which it is a party, to perform its obligations hereunder and thereunder, and to consummate the transactions contemplated hereby and thereby. This Agreement and the Operative Agreements have been duly executed and delivered by the Seller and constitute a legal, valid and binding obligation of Seller, each enforceable against Seller in accordance with its terms.

3.3     No Violation; Third Party Consents. Assuming the receipt of all necessary approvals of the Bankruptcy Court, the execution and delivery by the Seller of this Agreement and the Operative Agreements to which it is a party, the performance by the Seller of its obligations hereunder and thereunder and the consummation by the Seller of the transactions contemplated hereby and thereby will not conflict with or violate, constitute a default (or event which with the giving of notice or lapse of time, or both, would become a default) under, give rise to any right of termination, amendment, modification, acceleration or cancellation of any obligation or loss of any benefit under, result in the creation of any Encumbrance on any of the Purchased Assets pursuant to, or require it to obtain any consent, waiver, approval or action of, make any filing with, or give any notice to any Person as a result of or under, the terms and provisions of(a) the Certificate of Incorporation or Bylaws of the Seller, (b) any currently enforceable Contract to which the Seller is a party or by which any of the Purchased Assets are bound or (c) any Law applicable to the Seller or any of the Purchased Assets, or any

14

Governmental Order by which the Seller or any of the Purchased Assets is in any way bound or obligated, except, in the case of clauses (b) and (c) of this Section 3.3, as would not have a material adverse effect on the ability of the Seller to perform its obligations under this Agreement and the Operative Agreements to which it is a party or to consummate on a timely basis the transactions contemplated hereby or thereby.

3.4     Government Consents. No consent, waiver, approval, order or authorization of, or registration, qualification, designation, declaration or filing with, any Governmental Authority is required on the part of any Seller in connection with the execution and delivery by the Seller of this Agreement and the Operative Agreements to which it is a party, the performance by the Seller of its obligations hereunder and thereunder and the consummation by the Seller of the transactions contemplated hereby and thereby, except such consents and approvals of the Bankruptcy Court and as may be required under the HSR Act.

3.5     Equipment and Tangible Property. Schedule 1.1(a)(v) contains a list of all equipment and tangible personal property (except for non-capitalized leased equipment and Assigned Inventory) of the Seller used regularly in or material to the conduct of the Business that, individually, has a book value in excess of $25,000.

3.6     Proprietary Rights. Schedule 3.6 contains a list of all Proprietary Rights and Intellectual Property included in the Purchased Assets. To the Knowledge of the Seller, the Proprietary Rights included in the Purchased Assets are all of the material Proprietary Rights necessary for the operation of the Business as currently conducted by the Seller, other than Proprietary Rights licensed from any third party under any Contract. To the Knowledge of Seller, (i) no third party has infringed upon or misappropriated any of the Proprietary Rights included in the Purchased Assets; (ii) no Person has any rights whatsoever to the Proprietary Rights included in the Purchased Assets, and (iii) Seller has not infringed upon or misappropriated any Proprietary Rights of any third party. All applications and registrations for each item of such Intellectual Property included in the Purchased Assets is valid and in full force and effect and are not subject to the payment of any unpaid Taxes or maintenance fees or the taking of any other actions by Seller to maintain their validity or effectiveness. Seller has not received written notice of any claim by any third party contesting the validity, enforceability, use or ownership of any Proprietary Rights included in the Purchased Assets that is currently outstanding.

3.7     Business Contracts.

(a)     Schedule 3.7 contains a list of all of the following currently enforceable Business Contracts of the Seller primarily related to the Business as currently conducted by the Seller (each, a *"Material Business Contract"* and, collectively, the *"Material Business Contracts"*): (i) Real Property Leases, (ii) all equipment leases, capital and operating leases or conditional sales agreements relating to any Purchased Assets, in each case involving annual payments in excess of $50,000, (iii) agreements concerning noncompetition and all other agreements restricting the ability of the Seller to engage in the Business in any location, (iv) all employment, consulting, severance, collective bargaining and other labor agreements, (v) all agreements and indentures relating to the borrowing of money or to mortgaging, pledging or otherwise placing an Encumbrance on any of the Purchased Assets other than pre-petition

15

agreements and indentures or other Encumbrances to be released pursuant to the Approval Order, (vi) all management, consulting, advertising, marketing, promotion, technical services, advisory and other contracts and other similar arrangements relating to the management or operation of the Business involving more than $25,000 annually, and (viii) agreements under which Seller is obligated to indemnify, or entitled to indemnification from, any other Person, other than any agreement that requires indemnification solely in connection with or as a result of a breach of such agreement.

(b)     Seller has delivered to Purchaser a copy of each written Material Business Contract. Subject to the assumption of the Material Business Contracts by the Seller pursuant to Section 365 of the Bankruptcy Code or in motions or other pleadings or similar items filed with the Bankruptcy Court, as of the date hereof, each Material Business Contract is in full force and effect and represents a valid, binding and enforceable obligation of Seller in accordance with the respective terms thereof and represents a valid, binding and enforceable obligation of each of the other parties thereto other than with respect to any such Material Business Contract which may expire after the date of this Agreement and prior to the Closing Date in accordance with its terms.

(c)     Upon the cure of defaults in accordance with <u>Section 1.1(a)(viii)</u> and <u>Section 1.5</u>, the Seller will have cured in all material respects the obligations required pursuant to each Business Contract and the Bankruptcy Court to have been performed by them through the Closing Date. Other than the defaults to be cured in accordance with <u>Section 1.1(a)(viii)</u> and <u>Section 1.5</u>, there has not occurred any default under any of the Business Contracts as of the date hereof on the part of Seller or any of its Affiliates or any other party to the Business Contracts, nor has Seller or any of its Affiliates received notice of default under any of the Business Contracts as of the date hereof from any other party to the Business Contracts or, except in accordance with the Bankruptcy Code, sent notice of default under any of the Business Contracts as of the date hereof to any other party to the Business Contracts. There has been no billing, collection or prepayment under a Business Contract prior to or in advance of Seller or any of its Affiliates performing their obligations pursuant to such Business Contract.

3.8     <u>Business Licenses</u>. The Seller own or possess all right, title and interest in and to all material Licenses which are necessary as of the date hereof to conduct the Business substantially as currently conducted (each, a "***Material Business License***" and, collectively, the "***Material Business Licenses***), and all such Material Business Licenses are in full force and effect. <u>Schedule 3.8</u> contains a list of all Material Business Licenses. No Material Business License will be subject to suspension, modification, limitation, revocation, cancellation or non-renewal as a result of the consummation of the transactions contemplated by this Agreement. As of the date hereof, no loss or expiration of any such Material Business License is pending or threatened, other than the expiration of any such Material Business License in accordance with the terms thereof which may be renewed in the Ordinary Course of Business.

3.9     <u>Business Employees</u>. Each employee of Seller who remains employed by the Seller immediately prior to the Closing (whether actively or inactively), and each additional employee who is hired to work primarily in the Business following the date hereof and prior to the Closing in accordance with <u>Section 5.1</u> who remains employed by the Seller immediately prior to the Closing (whether actively or inactively), is referred to herein individually as a

"*Business Employee*" and, collectively, as the "*Business Employees*." Any individual who is no longer employed by Seller or any of their Affiliates but who was previously employed by Seller and had employment duties primarily related to the Business is referred to herein as a "*Former Business Employee*" and, collectively, as the "*Former Business Employees*." Since February 8, 2010, Seller has been in compliance in all material respects with all laws, rules, regulations, and ordinances related to employment or termination of employment, employment practices, employment terms, conditions, and compensation, labor or employment relations, equal employment opportunities, and fair employment practices. As of the date hereof, (i) no Business Employees are represented by a labor organization, (ii) to the Knowledge of Seller, there are no union organizational campaigns or decertification efforts in progress with respect to the Business Employees or any questions concerning representation with respect to such Business Employees, (iv) there are no unfair labor practice charges or complaints pending, or threatened against Seller with the National Labor Relations Board, (v) there is no material workers' compensation liability, experience or matter not covered by workers' compensation insurance maintained by Seller, (vi) there is no material employment-related charge, complaint, grievance, investigation, inquiry or obligation of any kind, pending or threatened in any forum, relating to an alleged violation or breach by Seller (or their respective officers or directors) of any law, regulation or contract, and (vii) to the Knowledge of Seller, no employee or agent of Seller have committed any act or omission giving rise to material liability for any violation or breach identified in subsection (vi) above that would have a Material Adverse Effect on Seller. Prior to Closing, Seller shall timely provide any notice of the transactions contemplated hereby required by law or collective bargaining agreement, and will satisfy all bargaining obligations relating to the transactions contemplated hereby.

    3.10    Employee Plans and Other Benefit Obligations.

    (a)    The Seller has delivered to Purchaser: (i) all material documents that set forth the terms of each Employee Plan and Employee Other Benefit Obligation; (ii) all current personnel, payroll, and employment manuals and policies; (iii) all material current contracts with Third Party administrators, actuaries, investment managers, consultants, and other independent contractors that relate to any Employee Plan or Employee Other Benefit Obligation; (iv) all material reports submitted within the one year preceding the date of this Agreement by Third Party administrators, actuaries, investment managers, consultants, or other independent contractors with respect to any Employee Plan or Employee Other Benefit Obligation; (v) all material notices related to any Employee Plan and Employee Other Benefit Obligation that were given by the Seller to any Governmental Authority or any current or former employee, participant or beneficiary, pursuant to statute, within one year preceding the date of this Agreement; and (vi) all material notices related to any Employee Plan and Employee Other Benefit Obligation that were given by any Governmental Authority to Seller within one year preceding the date of this Agreement.

    (b)    With respect to all Employee Plans and Employee Other Benefit Obligations, the Seller has performed all of its material obligations thereunder and each Employee Plan and Employee Other Benefit Obligation is in material compliance with all applicable Laws. Seller does not have any obligations to any Person or Governmental Body with respect to any Employee Plans or Employee Other Benefit Obligations. All filings required by any applicable Law as to each Employee Plan and Employee Other Benefit Obligation has been

17

timely filed, and all notices and disclosures to participants required by any Governmental Body have been timely provided. Seller has the right to modify and terminate each Employee Plan and Employee Other Benefit Obligation. The consummation of the transactions contemplated by this Agreement will not result in the payment, vesting, or acceleration of any benefit or amount due under any Employee Plan and Employee Other Benefit Obligation or otherwise.

3.11    Financial Statements.

(a)    Schedule 3.11 contains copies of (i) the audited balance sheets of the Seller as at December 31, 2008 and the related audited statements of income and of cash flows of the Seller for the year then ended, and (ii) the unaudited balance sheet of the Seller as at (A) December 31, 2009, (B) December 31, 2010 and (C) February 28, 2011 and, in each case, the related statement of income and cash flows of the Seller for the twelve-month period then ended (such audited statements, including the related notes and schedules thereto and such unaudited statements, are referred to herein as the "*Financial Statements*"). The balance sheet of the Seller as at February 28, 2011 is referred to herein as the "*Balance Sheet*" and February 28, 2011 is referred to herein as the "*Balance Sheet Date*".

(b)    Except as approved by the Bankruptcy Court or except as expressly contemplated by this Agreement, since the Balance Sheet Date, (i) the Seller has conducted its respective businesses only in the Ordinary Course of Business, and (ii) there has not been any event, change, occurrence or circumstance that has had or could reasonably be expected to have a Material Adverse Effect.

3.12    Real Property.

(a)    Owned Real Property. Schedule 1.1(a)(iv) describes the Owned Real Property, which is all the real property owned by Seller and used in the Business. The Seller has good and marketable fee simple title to the Owned Real Property held by it, free and clear of all Encumbrances, except for Permitted Encumbrances and those Encumbrances which will be removed, released or otherwise rendered unenforceable at or prior to Closing. Except as set forth on Schedule 1.1(a)(iv), with respect to each Owned Real Property: (i) except for the Permitted Encumbrances, the Seller has not leased or otherwise granted to any Person the right to use or occupy such Owned Real Property or any portion thereof, which lease or grant currently is in effect; and (ii) other than the rights of Purchaser pursuant to this Agreement, there are no outstanding options, rights of first offer or rights of first refusal to purchase such Owned Real Property or any portion thereof or interest therein.

(b)    Leased Real Property. Schedule 1.1(b)(x) describes the Leased Real Property, which is all real property leased to any Seller and used in the Business. Copies of each Real Property Lease listed in Schedule 1.1(b)(x) (and all amendments, extensions, guaranties, renewals, and other agreements with respect to such Real Property Leases) have been delivered to Purchaser.

(c)    Condemnation and Eminent Domain. There is no pending or, to the Knowledge of the Seller, threatened condemnation or eminent domain proceeding or other Action with respect to any of the Owned Real Property or Leased Real Property.

18

3.13    Litigation; Governmental Orders.

(a)    Except for Actions in the Bankruptcy Court or as set forth on Schedule 3.13, as of the date hereof, there are no pending or, to the Knowledge of the Seller, threatened Actions by any Person or Governmental Authority against or relating to the Seller which relate to the Business or Purchased Assets or to which any of the Purchased Assets are subject nor have there been any such Actions pending against or affecting Seller arising out of the Purchased Assets during the two (2) years preceding the Closing (other than Actions relating to employment matters). Seller is not in violation of, or in default under, and no event has occurred which, with the lapse of time or the giving of notice, or both, would result in the violation of or default under, the terms of any judgment, decree, order, injunction or writ of any Governmental Authority relating to the Purchased Assets or the Business.

(b)    Seller is not subject to or bound by any Governmental Order other than those which would not, in any individual case, as of the date hereof, have a Material Adverse Effect.

3.14    Compliance with Laws.

(a)    In General. Seller, its operations, the Business and the Purchased Assets are materially in compliance with each Material Business License and each Law applicable to the Seller, its operations, the Business or the Purchased Assets. The Seller is in material compliance with all orders entered by the Bankruptcy Court in the Bankruptcy Case.

(b)    WARN Act. The Seller has not, within the 90 days immediately prior to the Closing Date, in whole or in part taken any action or actions which would, independently of the transactions contemplated hereby, result in a plant closing or mass layoff within the meaning of the WARN Act, or any similar state or local law, regulation or ordinance.

3.15    Insurance. The Seller, all of the Purchased Assets and the Business are covered by valid and currently effective insurance policies or binders of insurance, including, without limitation, general liability insurance, property insurance, workers' compensation insurance and business interruption insurance, issued in favor of the Seller with reputable insurance companies and in such types and amounts and covering such risks as are consistent with customary practices and standards of companies engaged in business and operations substantially similar to those of the Seller (the *Business Insurance Policies*"). Seller is not in default with respect to its obligations under any insurance policy maintained by it, and all premiums thereunder will be timely paid in full for all periods up to and including the Effective Time. Seller acknowledges that it has provided notice to its insurance carriers of all potential claims under any "claims-made" policies prior to the Closing Date.

3.16    Title to Purchased Assets. As of the date hereof, the Seller has good and marketable title to all of the Purchased Assets, free and clear of all Encumbrances, except (i) the Permitted Encumbrances with respect to the Owned Real Property, and (ii) those Encumbrances that will be removed, released or otherwise rendered unenforceable at or prior to Closing. Assuming the receipt of the Approval Order and all of the Required Consents prior to the Closing, Seller has good right, full power and lawful authority to sell, bargain, convey, transfer,

19

deliver and assign to Purchaser all its right, title and interest in, to and under each of the Purchased Assets.

3.17 <u>Taxes</u>. With respect to Taxes relating to the Business, the Seller has filed or will have filed all material Tax Returns in connection with any such Tax required to be filed by the Seller , and the Seller has or will have paid all such Taxes except as contested upon audit and except as the payment of which may be stayed as a result of the bankruptcy filing by Seller, or with respect to extensions provided by the Bankruptcy Court.

3.18 <u>Receivables</u>. Each Assigned Accounts Receivable (i) results from a bona fide sale to a customer in the Ordinary Course of Business, (ii) the amount of which was actually due on the date thereof, is not to the Knowledge of the Seller subject to any valid counterclaim or setoff and (iii) to the Knowledge of the Seller, is valid and collectable in accordance with its terms, subject to applicable reserves.

3.19 <u>Inventory</u>. The Assigned Inventory consists of all inventory of the Seller relating to the Business, including all materials and supplies, manufactured and processed parts, work in process, and finished goods owned by the Seller related to the Business, subject to the reserve for slow moving, defective and obsolete inventory set forth on the Balance Sheet included in the Financial Statements, as adjusted in accordance with past practice for operations and transactions through the Closing Date.

3.20 <u>Environmental Matters</u>. Except as set forth on <u>Schedule 3.20</u>:

(a) <u>No Environmental Liability</u>.

(i) Seller's operation of the Business has complied and is in compliance with all applicable Environmental Laws and contractual obligations (including lease provisions) concerning public health and safety, worker health and safety, Hazardous Substance and the Environment.

(ii) Seller has obtained and is in compliance with all Environmental Permits necessary for the lawful operation of the Business, the Owned Real Property and the Leased Real Property. All such Environmental Permits are listed in <u>Schedule 3.20</u> and no investigation or proceeding is pending or, to the Knowledge of Seller, threatened to modify, revoke or limit any Environmental Permit.

(iii) Seller has never received or been subject to any Environmental Claim that has not been resolved, and has not received any written or oral notice, report, or other information regarding any pending or threatened Environmental Claim.

(iv) There are no Environmental Conditions at, on, under or emanating to or from any Owned Real Property, any Leased Real Property, any formerly owned or operated property or any other property for which Seller could be liable or responsible under Environmental Laws, any lease, contract or otherwise, other than the January 11, 1995 Agreed Order with TNRCC (Matter SWR 34356).

(v) Seller has not, either expressly or by operation of law, assumed or

20

undertaken any liability or responsibility of another person or entity, (whether or not affiliated with Seller or its predecessors or Affiliates) for Cleanup, Cleanup costs of any kind or nature, any Environmental Claim or other liability, cost or responsibility under Environmental Laws.

(vi)    Neither this Agreement nor the consummation of the transaction contemplated by this Agreement will trigger or result in (a) any responsibility or obligation for investigation, Cleanup or notification to or consent of Governmental Authority or any other Person; or (b) any requirement to assign or transfer any Environmental Permit.

(vii)    There are no liens filed or recorded against any Owned Real Property arising under any Environmental Law and Seller has not received any notice that any such lien is threatened to be recorded or filed against any Owned Real Property.

(b)    Basis for Environmental Claims. Except as set forth in Schedule 3.20, the Seller has not been identified or listed as a potentially responsible party or a responsible party for Cleanup or Cleanup costs of any kind or nature under the federal Comprehensive Environmental Response, Compensation and Liability Act or any other Environmental Law, nor has the Seller received any information request from a Governmental Body under any Environmental Law, and no Relevant Property is listed or is proposed for listing on the federal National Priorities List or any other similar Law.

(c)    Seller has not received any written or oral communication from a Governmental Body, Person or any citizens' group, employee or otherwise within the past five years, alleging (i) that Seller or any Relevant Property has violated or is in violation of any Environmental Law or is liable for any Cleanup of Hazardous Substance or (ii) that Seller has any pre-existing Environmental Liability.

(d)    Seller has timely filed all material reports, obtained all material Consents and Licenses and generated and maintained, and currently generates and maintains, all material Consents, Licenses, data, documentation and records required under applicable Environmental Laws.

3.21    Warranties. The Seller has delivered to Purchaser or Purchaser's representatives correct and complete copies of all material written warranties for products and services given by the Seller related to products made in the Ordinary Course of the Business apart from the warranties of merchantability under the uniform commercial code and standard warranties included in the Seller's sales contracts. No material claim for breach of any express or implied warranty with respect to the Seller's products or services has been made or, or to the Knowledge of the Seller, is threatened. The Seller is not contemplating the recall of any products sold by it.

3.22    Brokers. All negotiations relative to this Agreement and the transactions contemplated hereby have been carried out by the Seller directly with Purchaser without the intervention of any Person on behalf of the Seller in such manner as to give rise to any valid claim by any Person against Purchaser for a finder's fee, brokerage commission or similar payment, other than Global Hunter Securities, Inc. whose fees and expenses shall be borne by the Seller.

21

3.23  Affiliated Transactions. Except as set forth on Schedule 3.23, no Insider is a party to any agreement, contract, commitment or transaction related to the Business with Seller or has any interest in the Purchased Assets.

3.24  Certificate of Service. The parties shown on the Certificate of Service attached as Schedule 3.24 constitute all parties entitled to notice of Seller's intent to sell the Purchased Assets (and assume and assign the Business Contracts) under Bankruptcy Rule 2002 and include all parties owning, claiming or asserting an Encumbrance in or to any of the Purchased Assets.

3.25  Undisclosed Liabilities. To Seller's Knowledge, Seller has no material Liability (and there is no Basis for any present or future action, suit, proceeding, hearing, investigation, charge, complaint, claim, or demand against any of them giving rise to any Liability), except for (i) Liabilities set forth on the face of the Balance Sheet (rather than in any notes thereto) and (ii) Liabilities that have arisen after February 28, 2011 in the Ordinary Course of Business (none of which results from, arises out of, relates to, is in the nature of, or was caused by any breach of Contract, breach of warranty, tort, infringement, or violation of law).

3.26  Disclosure. The representations, warranties and other statements made by Seller contained in this Agreement, the Schedules, any supplement thereto or any certificates required by Section 2.2(b) do not contain any untrue statement of a material fact or omit to state any fact necessary in order to make the statements and information contained in this Article III not materially misleading.

3.27  Trustee's Operation. Seller is operated by Eric J. Moeller, as Chapter 11 Trustee ("*Trustee*"). Accordingly, neither the Trustee nor his staff (including Lisa Trefger) shall have any personal liability arising under this Agreement and no action can ever be brought by the Purchaser against the Trustee or his staff personally for any error or omission with respect to this Article III. Further, the Purchaser shall have no resort to the Escrow Amount to recover monetary damages for any alleged breach under this Agreement, it being acknowledged that the Escrow Amount has been established solely for the purposes set forth in Section 1.3 above.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser, to induce the Seller to enter into this transaction and to close hereunder, hereby represents and warrants to the Seller as follows:

4.1  Organization. Purchaser is a limited liability company, duly organized, validly existing and in good standing under the Laws of the jurisdiction of its incorporation.

4.2  Authority. Purchaser has all requisite limited liability company power and authority to enter into and deliver this Agreement and the Operative Agreements to which it is a party, to perform its obligations hereunder and thereunder, to consummate the transactions contemplated hereby and thereby and to assume and perform the Assumed Liabilities. The execution and delivery by Purchaser of this Agreement and the Operative Agreements to which it is a party, the performance by Purchaser of its obligations hereunder and thereunder, the consummation by Purchaser of the transactions contemplated hereby and thereby and the assumption and performance of the Assumed Liabilities have been duly authorized by all

22

necessary corporate action on the part of Purchaser. This Agreement has been, and the Operative Agreements to which Purchaser is a party shall be, duly executed and delivered by Purchaser. Assuming the due authorization, execution and delivery of this Agreement and the Operative Agreements by the Seller and subject to the effectiveness of the Sales Procedures Order and the Approval Order, this Agreement constitutes, and each of the Operative Agreements to which Purchaser is a party when so executed and delivered will constitute, a legal, valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms.

4.3    No Violation; Third Party Consents. The execution and delivery by Purchaser of this Agreement and the Operative Agreements to which it is a party, the performance by Purchaser of its obligations hereunder and thereunder, the consummation by Purchaser of the transactions contemplated hereby and thereby and the assumption and performance of the Assumed Liabilities will not conflict with or violate, constitute a default (or event which with the giving of notice or lapse of time, or both, would become a default) under, give rise to any right of termination, amendment, modification, acceleration or cancellation of any obligation or loss of any benefit under, result in the creation of any Encumbrance on any of the assets or properties of Purchaser pursuant to, or require Purchaser to obtain any consent, waiver, approval or action of, make any filing with, or give any notice to any Person as a result of or under, the terms or provisions of (a) the organizational documents of Purchaser, (b) any Contract to which Purchaser is a party or is bound or obligated, except as would not have a material adverse effect on the ability of Purchaser to perform its obligations under this Agreement and the Operative Agreements to which it is a party, to assume and perform the Assumed Liabilities or to consummate on a timely basis the transactions contemplated hereby or thereby.

4.4    Governmental Consents. No consent, waiver, approval, order or authorization of, or registration, qualification, designation, declaration or filing with, any Governmental Authority is required on the part of Purchaser in connection with the execution and delivery by Purchaser of this Agreement and the Operative Agreements to which it is a party, the performance by Purchaser of its obligations hereunder and thereunder, the consummation by Purchaser of the transactions contemplated hereby and thereby and the assumption and performance of the Assumed Liabilities, except where the failure to obtain such consent, waiver, approval, order or authorization, or to make such registration, qualification, designation, declaration or filing, would not have a material adverse effect on the ability of Purchaser to perform its obligations under this Agreement and the Operative Agreements to which it is a party, to assume and perform the Assumed Liabilities or to consummate on a timely basis the transactions contemplated hereby or thereby, and otherwise as may be required under the HSR Act.

4.5    Litigation. There are no pending or, to the Knowledge of Purchaser, threatened Actions by any Person or Governmental Authority against or relating to Purchaser (or any Affiliate of Purchaser) or by which Purchaser or its assets or properties are or may be bound which, if adversely determined, would have a material adverse effect on the ability of Purchaser to perform its obligations under this Agreement and the Operative Agreements to which it is a party, to assume and perform the Assumed Liabilities or to consummate on a timely basis the transactions contemplated hereby or thereby.

4.6    Brokers. All negotiations relative to this Agreement and the transactions contemplated hereby have been carried out by Purchaser directly with the Seller without the

23

intervention of any Person on behalf of Purchaser in such manner as to give rise to any valid claim by any Person against any Seller for a finder's fee, brokerage commission or similar payment.

4.7   Financing. Purchaser has sufficient funds, or at and as of the Closing shall have sufficient funds, in an aggregate amount necessary to pay the Cash Payment and to perform the Assumed Liabilities and to consummate all of the other transactions contemplated by this Agreement and the Operative Agreements to which it is a party.

## ARTICLE V
## COVENANTS AND AGREEMENTS

5.1   Conduct of Business. Subject to any obligations of the Seller under the Bankruptcy Code and except as contemplated, permitted or required by this Agreement, at all times during the Interim Period, unless Purchaser shall otherwise consent in writing, the Seller shall use commercially reasonable efforts consistent with practices of a similarly situated debtor-in-possession to (i) conduct the Business in the ordinary course consistent with past practice of the Business, (ii) use commercially reasonable efforts to preserve intact the Business and its business organizations and relationships with employees and persons having dealings with it and not transfer or otherwise dispose of any of the Purchased Assets, except (A) Inventory sold in the Ordinary Course of Business or (B) worn, damaged or obsolete equipment disposed of or replaced consistent with prudent business practices; (iii) not, without Purchaser's prior written approval (which approval shall not be unreasonably withheld), enter into any material contract or agreement to which Seller would be a party or by which Seller would be bound or materially amend any existing material contract or agreement to which Seller is a party or by which Seller is bound and (iv) use its reasonable efforts to timely provide any notice required by applicable Law, and advise Purchaser in writing of any Material Adverse Effect that has occurred. Seller shall not engaged in any practice or taken any action that would knowingly or intentionally cause or result in any of the representations and warranties contained in Article III to become untrue.

5.2   Access and Information. Subject to the terms of the Confidentiality Agreement, at all times during the period commencing upon the execution and delivery hereof by each of the parties hereto and terminating upon the Closing or the termination of this Agreement pursuant to and in accordance with the terms of Section 8.1, the Seller shall permit Purchaser and its authorized agents and representatives to have reasonable access, upon reasonable notice and during normal business hours, to the Purchased Assets and all of Seller's relevant vendors, suppliers, distributors, third-party service providers, and employees, books, records and documents of or relating to the Business and the Purchased Assets and the Seller shall make reasonably available any senior executives active in the Business, and shall furnish to Purchaser such information and data, financial records and other documents in its possession relating to the Business and the Purchased Assets as Purchaser may reasonably request. The Seller shall permit Purchaser and its agents and representatives reasonable access to its accountants for reasonable consultation or verification of any information obtained by Purchaser during the course of any investigation conducted pursuant to this Section 5.2.

5.3   Confidentiality. Subject to Section 5.12 and the requirements of the Bankruptcy Code and the Bankruptcy Court and except as otherwise explicitly provided in this Agreement,

24

the terms of the Confidentiality Agreement are hereby incorporated herein by reference and shall continue in full force and effect from the date hereof until the Closing in accordance with the terms thereof, such that the information obtained by Purchaser, or its officers, employees, agents or representatives, during any investigation conducted pursuant to Section 5.2, in connection with the negotiation, execution and performance of this Agreement, the consummation of the transactions contemplated hereby, or otherwise, shall be governed by the terms set forth in the Confidentiality Agreement; *provided, however,* that in the event of the termination of this Agreement, the terms of the Confidentiality Agreement incorporated herein by reference shall survive for the term as provided in the Confidentiality Agreement.

5.4    Further Actions.  Upon the terms and subject to the conditions set forth in this Agreement (including the terms of Section 5.12) and subject to the requirements of the Bankruptcy Code and the Bankruptcy Court, the Seller and Purchaser shall each use their respective commercially reasonable efforts to take, or cause to be taken, all appropriate action, and to do, or cause to be done, and to assist and cooperate with the other parties hereto in doing, all things reasonably necessary, proper or advisable under applicable Laws to consummate the transactions contemplated hereby and satisfy the conditions to its obligations to close the transactions contemplated hereby, including obtaining all necessary Licenses (including the transfer or reissuance of Licenses required under Environmental Laws), actions or nonactions, Required Consents, authorizations, qualifications and other orders of any Governmental Authorities with competent jurisdiction over the transactions contemplated hereby and providing all notices of such transactions required by Law, including without limitation any necessary filings under the HSR Act, and thereafter make any required submissions with respect to this Agreement and the transactions contemplated hereby required under any applicable Law at or prior to the Closing.  Seller and Purchaser shall each bear the cost and expense of preparing their respective filings; *provided, however,* Seller and Purchaser shall each be responsible for paying one-half of the cost of any filing fee in connection with such filings.  Seller and Purchaser shall cooperate in connection with the making of all such filings, including by providing copies of all such documents to the non-filing party and its advisors prior to filing.  Seller and Purchaser shall each use commercially reasonable efforts to furnish or cause to be furnished all information required for any application or other filing to be made pursuant to any applicable Law in connection with the transactions contemplated by this Agreement.  In respect of any filing that may be required pursuant to the HSR Act, Seller and Purchaser acknowledge that the Purchase Price is "undetermined" as of the Execution Date in light of the contingent portions of the Purchase Price consisting of (i) the Closing Date Working Capital and (ii) the Platinum Price, which shall be liquidated to a known amount at or within 30 days after Closing.  In the event the Purchase Price at Closing exceeds the size-of-transaction threshold under the HSR Act (presently equal to $66 million), the parties will make all required filings within the prescribed 60-day period after Closing.  As of the Execution Date, Purchaser has prepared a good faith fair market value estimate of the Purchase Price that suggests the liquidated Purchase Price at Closing will be less than the size-of-transaction threshold.

5.5    Fulfillment of Conditions by the Seller.  Seller shall not knowingly or intentionally take or cause to be taken, or knowingly or intentionally fail to take any action that would cause the conditions to the obligations of the Seller or Purchaser to consummate the transactions contemplated hereby to not be satisfied or fulfilled at or prior to the Closing.

5.6    Fulfillment of Conditions by Purchaser. Purchaser shall not knowingly or intentionally take or cause to be taken, or knowingly or intentionally fail to take, any action that would cause the conditions to the obligations of the Seller or Purchaser to consummate the transactions contemplated hereby to fail to be satisfied or fulfilled at or prior to Closing.

5.7    Publicity. Subject to Section 5.12 and the requirements of the Bankruptcy Code and the Bankruptcy Court, the Seller, on the one hand, and Purchaser, on the other hand, shall cooperate with each other in the development and distribution of all news releases and other public disclosures relating to the transactions contemplated by this Agreement. Subject to Section 5.12 and the requirements of the Bankruptcy Code and the Bankruptcy Court, neither the Seller nor Purchaser shall issue or make, or allow to be issued or made, any press release or public announcement concerning the transactions contemplated by this Agreement without the consent of the other party hereto, except as otherwise required by applicable Law or the rules of any applicable stock exchange, but in any event only after giving the other party hereto a reasonable opportunity to comment on such release or announcement in advance, consistent with such applicable Laws, other than customary tombstone-like disclosures after the Closing.

5.8    Transaction Costs. Purchaser shall pay all transaction costs and expenses (including any legal, accounting and other professional fees and expenses) that it incurs in connection with the negotiation, execution and performance of this Agreement and the consummation of the transactions contemplated hereby. The Seller shall pay all transaction costs and expenses (including legal, accounting and other professional fees and expenses) that they incur in connection with the negotiation, execution and performance of this Agreement and the consummation of the transactions contemplated hereby. Notwithstanding the immediately preceding sentences of this Section 5.8, the Seller shall pay at Closing any and all transfer Taxes (including use, recording and real and personal property transfer Taxes) not otherwise exempt or waived by the Bankruptcy Court pursuant to Section 1146 of the Bankruptcy Code and the fees and costs of recording or filing all applicable conveyancing instruments associated with the transfer of the Purchased Assets from the Seller to Purchaser pursuant to this Agreement. In the event any party shall fail to pay any portion of the aforementioned transfer Taxes, fees and costs, such party shall indemnify and hold harmless the other party and its respective Affiliates from any and all claims, damages and costs arising therefrom. The Seller and Purchaser shall cooperate in the preparation, execution and filing of all Tax Returns regarding any transfer Taxes which become payable as a result of the transfer of the Purchased Assets from the Seller to Purchaser pursuant to this Agreement or shall cooperate to seek an available exemption from such Taxes.

5.9    Retention of and Access to Records; Employees. For a period of three years following the Closing Date, Purchaser shall preserve all books and records transferred by the Seller to Purchaser pursuant to this Agreement and Seller shall preserve for a period of three years following the Closing Date all books and records related to the Business or the Purchased Assets not transferred by Seller to Purchaser pursuant to this Agreement; provided, however, if the Bankruptcy Case, including a Chapter 7 proceeding in the event the Bankruptcy Case is converted, is closed prior to such three-year period, then the Purchaser shall have the right at any time prior to the conclusion of the Bankruptcy Case to ask for a confidential electronic copy of such records at Purchaser's expense. Upon request, at any time prior to the expiration of such three-year period, Purchaser shall provide the Seller a reasonable opportunity to obtain copies, at

26

the Seller's expense, of any of such books and records, and Seller shall provide Purchaser a reasonable opportunity to obtain copies, at the Purchaser's expense, of any of such books and records. Upon the reasonable request of the Seller, Purchaser shall deliver to the Seller such financial information relating to the Business as is reasonably requested to enable the Seller to prepare its Financial Statements and all Tax Returns of the Seller relating to periods ending on or prior to the Closing Date. Upon the reasonable request of Purchaser, Seller shall deliver to Purchaser such financial information relating to the Business as is reasonably requested (and not otherwise transferred pursuant to this Agreement) to enable Purchaser to prepare its Financial Statements and all Tax Returns of Purchaser relating to periods after the Closing Date. In addition to the foregoing, from and after the Closing, Purchaser shall afford to the Seller and its counsel, accountants and other authorized agents and representatives, during normal business hours, reasonable access to the employees, books, records and other data relating to the Purchased Assets, the Assumed Liabilities, the Transferred Employees and the Excluded Liabilities in its possession with respect to periods prior to the Closing, and the right to make copies and extracts therefrom at their expense, to the extent that such access may be reasonably required by the requesting party (a) to assist, facilitate or testify in connection with any investigation, proceeding, dispute, grievance, litigation, arbitration and final disposition of any claims which may have been or may be made against any such party or Persons or their Affiliates, including any proceeding before any arbitral, administrative, regulatory, self-regulatory, judicial, legislative or other body or agency, including, but not limited to, making employees (including Transferred Employees) available as witnesses to the extent such investigations, proceedings, disputes, grievances, litigations or arbitrations relate to such employees' employment with the Seller, services performed or required to be performed by the employees, or pertinent knowledge possessed by such employees and (b) for the preparation of Tax Returns and audits; *provided* that other than pursuant to the rules of disclosure applicable in the jurisdiction of such litigation, in no event shall Purchaser be obligated to provide any such information or access for any purpose involving a (i) proceeding, dispute, grievance or litigation before any administrative, regulatory, self-regulatory, judicial, legislative or other body or agency or (ii) any arbitration, in which the parties hereto have adversarial positions.

5.10    Insurance.

(a)    During the Interim Period, the Seller shall maintain in full force and effect all existing policies of insurance covering product liability and related risks. The Seller agrees to notify the insurers providing product liability coverage in writing promptly upon becoming aware of any claim or potential claim that is or may be covered by such insurance, including notifying all insurers providing "claims made" coverage prior to the last date for which claims may be made under such policies

(b)    Effective as of the Effective Time, Seller hereby assigns to Purchaser the right to pursue and enforce, and hereby irrevocably appoints Purchaser as its true and lawful attorney in fact with full power in the name of and on behalf of Seller for the purpose of pursuing and enforcing, any and all rights of Seller under any insurance policies of Seller to the extent assigned to Purchaser pursuant to this Agreement (but in no event as to any Excluded Asset or Claims in connection with such Excluded Asset); provided that Purchaser may not exercise such right or power unless Seller fails to promptly and expeditiously pursue and enforce, on behalf of Purchaser, its rights under its insurance policies with respect thereto. Purchaser reserves the

27

right to acquire extended reporting period coverage for any of Seller's "claims-made" policies. The power of attorney conferred upon Purchaser by Seller pursuant to this Section 5.10 is an agency coupled with an interest and all authority conferred hereby shall be irrevocable, and shall not be terminated by the dissolution or the liquidation of Seller or any other act of Seller.

5.11 _Prorations and Taxes._ Taxes and other charges with respect to the transactions contemplated by this Agreement shall be paid or prorated by the parties as follows:

(a) Except as expressly set forth in this Agreement, all income and expenses attributable to the Purchased Assets for the period prior to the Effective Time are for the account of Seller, and all income and expenses attributable to the Purchased Assets thereafter are for the account of Purchaser.

(b) Seller and Purchaser agree that all state and local sales and use Taxes or other similar Taxes relating to the sale and conveyance of the Purchased Assets shall be the liability of Seller, and shall be borne by Seller.

(c) Promptly following Closing, Purchaser shall provide Seller with an appropriate exemption certificate to establish the right to any exemption from state and local sales and use Taxes and for any exemptions from any other applicable state Tax. Purchaser shall thereafter provide Seller with any additional exemption certificates and other documentation as may be required by the Governmental Authorities for such purpose.

(d) All real property, personal property, ad valorem and other similar Taxes, including payments in-lieu-of property Taxes, as well as all rents, utilities, maintenance charges and similar expenses associated with the Business or Purchased Assets, shall be prorated between Purchaser and Seller as of the Effective Time. Amounts owing for real property and ad valorem Taxes shall be based on the appraised value and tax rates applicable to the Owned Real Property for taxable year 2010 as set forth on Schedule 5.11(d). At the Closing, Seller shall remit to Purchaser an amount equal to $183,135.05 (_"**Property Tax Proration**"_) in satisfaction of Seller's portion of such Taxes for taxable year 2011; any such Taxes in subsequent years shall be the responsibility of Purchaser. After the Closing, the party receiving each Tax or other such bill or notice applicable to the Purchased Assets for the period before or after the Closing Date (other than real property and ad valorem Taxes) shall promptly notify the other party and shall pay each such bill prior to the last day the same may be paid without penalty or interest. The party responsible or liable under this Agreement with respect to such amount shall promptly on receipt of a written request (accompanied by appropriate supporting documentation) reimburse the responsible party's share of such amount so paid as provided under this Agreement. Seller and Purchaser shall reasonably cooperate with each other after Closing with respect to any property Tax assessment or valuation (or protest in connection therewith) by any Governmental Authority with respect to the Tax periods in which the Closing Date occurs.

(e) Except as provided otherwise in this Agreement: (A) for any Tax period or portion of any Tax period on or prior to the Effective Time, Seller shall be responsible for timely filing of all income, excise, franchise, privilege, sales, use and similar Tax returns required by applicable Law to be filed, and payment of all Taxes levied or imposed, in connection with the Purchased Assets, the Business, or employees and independent contractors engaged in operating

28

or maintaining the Purchased Assets or marketing products produced by the Purchased Assets; (B) for any Tax period or portion of any Tax period after the Effective Time, Purchaser shall be responsible for the timely filing of all income, excise, franchise, privilege, sales, use and similar Tax returns required by applicable Law to be filed, and payment (subject to the provisions of Section 5.11(d)) of all such Taxes levied or imposed, in connection with the Purchased Assets, the Business, or employees and independent contractors engaged in operating or maintaining the Purchased Assets or marketing the products produced by the Purchased Assets; and (C) control of any legal or administrative proceedings concerning any such Taxes with respect to the Purchased Assets, and entitlement to any refunds or awards concerning any such Taxes with respect to the Purchased Assets, shall rest with the party responsible for payment therefor under this Section 5.11(e). If, however, any Claim for property Taxes is asserted against the Purchased Assets or the Business for any Tax period or Tax periods prior to the Effective Time, Seller shall not have the right to agree to a settlement or compromise without the prior approval of Purchaser, which approval shall not be unreasonably withheld. Purchaser shall also be afforded a reasonable opportunity (but not a duty) to participate in the defense of any such Claim for property Taxes at its own expense.

(f)     In the event of a Tax audit or an examination of Seller or Purchaser involving the Purchased Assets or the Business for any Tax period prior to the Closing Date, Purchaser and Seller shall cooperate with each other in connection with such Tax audit or examination. Purchaser and Seller shall each notify the other of the receipt of notice of any Tax audit relating to the Purchased Assets for any Tax period prior to the Closing Date and shall furnish the other with copies of any correspondence received from any Governmental Authority in connection with such Tax audit.

5.12    Bankruptcy Court Approval.

**(a)     Notwithstanding anything in this Agreement to the contrary, this Agreement and the sale of the Purchased Assets are subject to the entry by the Bankruptcy Court of the Approval Order. If an Approval Order is not entered by the Bankruptcy Court by 4:00 p.m. Central on April 14, 2011, either Purchaser or Seller may terminate this Agreement in accordance with Section 8.1(h).**

(b)     The Seller shall seek entry by the Bankruptcy Court of an order, the terms of which shall provide that the Approval Order shall be effective immediately upon entry pursuant to Rule 7062 and 9014 of the Federal Rules of Bankruptcy Procedure, and no automatic stay of execution, pursuant to Rule 62(a) of the Federal Rules of Civil Procedure, or Rule 6004(h) or 6006(d) of the Federal Rules of Bankruptcy Procedure shall apply with respect to the Approval Order, in form and substance attached hereto as Exhibit F (the "*Approval Order*") as soon as reasonably practicable, and in no event later than April 14, 2011.

(c)     Nothing in this Article V or otherwise in this Agreement shall require the Seller to maintain its existence or any specific assets following the Closing, other than as required pursuant to the terms of the Escrow Agreement.

5.13    Updating Disclosure Schedules. The Seller shall update or supplement any Disclosure Schedule delivered pursuant to this Agreement in writing delivered to Purchaser at

any time on or prior to Closing reflecting other material matters which occur subsequent to the date hereof in the Ordinary Course of Business, or correcting mistakes made or adding information missing in good faith during the Seller's preparation of such Disclosure Schedule (each such update of supplement, an "*Update*"). In the event that the Seller delivers any Update to Purchaser in accordance with the provisions of this Section 5.13, then such Update shall not be (i) deemed to be attached to this Agreement or become a part of this Agreement, or (ii) given effect for any purposes under this Agreement, unless agreed to in writing by Purchaser. In the event that an Update is accepted by Purchaser, then upon such acceptance, (i) such Update to the Disclosure Schedules shall be deemed to be attached to this Agreement and become a part of this Agreement, (ii) all references to the Disclosure Schedules in this Agreement shall refer to the Disclosure Schedules as updated by such Update, and (iii) such Update shall be given effect for all purposes under this Agreement, including, without limitation, for determining whether the conditions to Closing set forth in Section 6.1 have been satisfied. In the event Purchaser does not accept any Update pursuant to this Section 5.13, Purchaser shall notify Seller in writing of such non-acceptance within three Business Days after the delivery of such Update (but prior to Closing) and Purchaser shall have the right to terminate this Agreement pursuant to Section 8.1(f), subject to the provisions thereof and any right to cure pursuant thereto.

5.14　Notice. The Seller agrees to provide a copy of this Agreement to all relevant parties as required by Rule 6006 of the Bankruptcy Code.

5.15　Corporate Name. From and after the Effective Date, the Seller will not, directly or indirectly, use or do business under or assist any other Person in using or doing business under any name or trademark confusingly similar to any names or trademarks included in the Purchased Assets.

5.16　Data. The Seller shall reasonably cooperate with Purchaser to transfer any data related to the Business to databases of Purchaser.

5.17　Employees.

(a)　Schedule 5.17 contains a list of all employees of Seller who are employed in connection with the Business (collectively, the "*Employees*"), including employees who are receiving disability benefits or are on family, medical, administrative, military, or any other type of leave that entitles the employee to reinstatement upon completion of the leave under the applicable leave policies of Seller (collectively, "*Leave*"), and each such Employee's date of hire, position, base salary or wages, and status as active or on leave. Seller shall provide Purchaser with an updated Schedule 5.17 as necessary at any time prior to Closing to reflect any and all employment changes. Seller intends to terminate all Employees as of the Effective Time, other than those Employees identified by name and title on Schedule 5.17 whose job function primarily relates to the Leased Real Property, and Purchaser will not make any offer of employment to such named individuals without Seller's prior written consent.

(b)　Prior to or following the Closing, Purchaser, in it is sole discretion, shall have the right, but not the obligation, to extend offers of employment to certain Employees of Seller. To the extent Purchaser makes any such offer or offers, the parties understand and agree that the terms and conditions thereof shall be as agreed between Purchaser and each such

Employee, and that Purchaser shall have no obligation to assume any existing Benefit Plans or other liabilities of the Seller related to any such employee. Purchaser, in connection with its evaluation of such employees, shall be afforded, subject to Section 5.2, reasonable access through direct communications with such employees. The consummation of any offer shall be subject to compliance with Purchaser's applicable policies, procedures and requirements relating to drug testing and criminal background checks.

5.18   Title Matters Relating to Real Property.

(a)     Unless waived by Purchaser, Purchaser shall obtain for its own benefit and at its own expense, one or more standard commitments for title insurance covering the Owned Real Property (to include a current title commitment obtained by the Seller, if any, the "*Title Commitment*") and effective as of a date which is on or prior to the Closing Date. The Title Commitment shall be issued, at Purchaser's option, by (i) Fidelity National Title Insurance Company ("*Fidelity*"), 1330 Post Oak Boulevard, Suite 2330, Houston, Texas 77056, Rhonda Obaugh, Vice President and Escrow Officer, as agent, and Fidelity National Title Insurance Company or another nationally recognized title company as underwriter, or (ii) Texas Investors Title ("*Investors Title*"), 101 Main Street, Suite C, Boerne, Texas 78006, Stephen V. Vallone, President and Closer, as agent, and Stewart Title Company or another nationally recognized title company as underwriter (in either case, the "*Title Company*"); provided, however, if Fidelity is unable or unwilling to issue Title Insurance for the Owned Real Property prior to the expiration of the automatic 14-day stay of entry of the Approval Order under the Bankruptcy Code, Purchaser shall select Investors Title for the issuance of such policy. Purchaser in its sole discretion may obtain any such extended coverage or endorsements from the Title Company covering the Owned Real Property as it desires, the expense for same being solely Purchaser's, provided that Seller shall reasonably cooperate with same. Unless waived by the Purchaser, Purchaser shall purchase a title insurance policy pursuant to the Title Commitment; and Purchaser shall be responsible for paying the premium therefor.

(b)     Purchaser shall have until ten (10) days after its receipt of the Title Commitment, in final form (or if earlier, one Business Day prior to Closing) to object to any issue disclosed therein (a "*Title Objection*"), except that Purchaser may not object to any Permitted Encumbrances. Purchaser shall make any Title Objection by delivering to Seller written notice of such Title Objection. Seller will thereafter have ten (10) days after receiving Purchaser's Title Objection (or if earlier, one Business Day prior to Closing), at its expense and election, to remove or cure such Title Objections prior to Closing and following receipt of written notice from Purchaser identifying the Title Objections (the "*Title Cure Period*"). In the event the Seller elects not to, or fails to, remove or cure such Title Objections during the Title Cure Period, then Purchaser may elect to terminate this Agreement by written notice to Seller, delivered within ten (10) days after the Seller gives notice to Purchaser of inability, or election not, to cure (but in any event, one Business Day prior to Closing). If Purchaser does not exercise its termination right under this Section 5.18, or if such termination right does not accrue, then Purchaser will be deemed to have waived any uncured Title Objections and shall proceed with Closing, subject to Article VI.

5.19   Existing Letters of Credit. Prior to Closing, Purchaser shall negotiate with the beneficiaries of existing letters of credit relating to the Purchased Assets (each, an "*Existing*

31

*Letter of Credit*"). For each Existing Letter of Credit, Purchaser will either (i) issue a replacement letter of credit or (ii) pending approval by the beneficiary of an Existing Letter of Credit, issue a guaranty in an amount sufficient to satisfy such beneficiary. In the event that Purchaser is not able to issue guaranties for all Existing Letters of Credit prior to Closing, then Purchaser will issue a backup letter of credit to Chase, in form and substance reasonably acceptable to Chase, for each outstanding Existing Letter of Credit on or prior to the Closing Date. Upon the issuance of a replacement letter of credit or guaranty, Trustee shall cause the beneficiary of the related Existing Letter of Credit to fully and finally release such letter of credit.

## ARTICLE VI
## CLOSING CONDITIONS

6.1     <u>Conditions to Obligations of Purchaser</u>. The obligations of Purchaser to consummate the transactions contemplated by this Agreement are subject to the satisfaction or fulfillment at or prior to the Closing of the following conditions, any of which may be waived in whole or in part by Purchaser in writing (and these are waived by completion of Closing):

(a)     all representations and warranties of the Seller contained in this Agreement shall be true and correct in all material respects (except that any representation or warranty that is qualified by materiality or Material Adverse Effect shall be true and correct in all respects) at and as of the Closing with the same effect as though such representations and warranties were made at and as of the Closing (other than any representation or warranty that is expressly made as of a specified date, which shall be true and correct in all material respects (or in the case of any representation and warranty that is qualified by materiality or Material Adverse Effect shall be true and correct in all respects) as of such specified date only);

(b)     the Seller shall have performed and complied in all material respects with all the covenants and agreements required by this Agreement to be performed or complied with by it at or prior to the Closing;

(c)     there shall be in effect no Law or injunction issued by a court of competent jurisdiction making illegal or otherwise prohibiting or restraining the consummation of the transactions contemplated by this Agreement;

(d)     all Required Consents under all Business Contracts and all Business Licenses shall have been duly obtained, made or given, shall be in form and substance reasonably satisfactory to Purchaser, shall not be subject to the satisfaction of any condition that has not been satisfied or waived and shall be in full force and effect; without limiting the generality of the foregoing, Seller and Purchaser acknowledge and agree that a novation or comparable consent is required under the express terms of the Business Contracts between Seller, on the one hand, and the Department of Defense, the Defense Logistics Agency and its components, on the other hand (collectively, the "*DOD Contracts*"), and that any such instrument consenting to the assignment of the DOD Contracts shall have been duly obtained, made or given, shall be in form and substance reasonably satisfactory to Purchaser, shall not be subject to the satisfaction of any condition that has not been satisfied or waived and shall be in

full force and effect notwithstanding any provision under the Approval Order, the Bankruptcy Code, or any other applicable Law that sets aside the validity or enforceability of the express anti-assignment provisions in the DOD Contracts;

(e)     all terminations or expirations of waiting periods imposed (and any extension thereof) by any Governmental Authority necessary for the transactions contemplated under this Agreement, if any, shall have occurred, including any waiting period (or extension thereof) under the HSR Act, and neither the Federal Trade Commission nor the Department of Justice shall have imposed any material conditions upon Purchaser's ability to acquire, own or operate the Purchased Assets or require Purchaser to dispose of, hold separate or take any other action with respect to the Purchased Assets;

(f)     a Material Adverse Effect shall not have occurred since the date of this Agreement;

(g)     pursuant to the terms of and after the entry of the Bid Procedures Order, the Seller shall have served notice on all parties (including all parties to the Business Contracts and all Persons who would appear on any search conducted to determine those Persons asserting a lien on the assets of the Seller) to whom service of notice is required under the terms of the Bid Procedures Order;

(h)     Seller shall have filed Cure Claim Notice (as defined in the Sale Procedures Order) in accordance with the terms of the Bid Procedures Order;

(i)     Seller shall have obtained entry of the Approval Order in the form of Exhibit F no later than April 14, 2011. The Approval Order shall provide, among other things, that the assumption by the Seller and the assignment by Seller to Purchaser of all Business Contracts that are executory contracts, so long as Purchaser shall have designated to Seller prior to Closing that it wishes to have Seller so assume and assign such Business Contracts and the Seller shall have complied with all of the material provisions of the Approval Order with respect to the assumption by the Seller and the assignment to Purchaser of such Business Contracts, including paying or pro-rating for future payments, after resolution of any dispute, all Cure Costs associated therewith, which Seller Cure Amounts shall be paid out of the Purchase Price received by Seller hereunder. The Approval Order shall also provide that such Business Contracts will be transferred to, and remain in full force and effect for the benefit of, Purchaser notwithstanding any provisions in such Business Contracts (including those described in Sections 365(b)(2) and (f) of the Bankruptcy Code) that prohibit such assignment or transfer.

(j)     Seller shall deliver to Purchaser a non-foreign affidavit dated as of the Closing Date in the form attached hereto as Exhibit D and otherwise in form and substance required under the Treasury Regulations issued pursuant to Section 1445 of the Code so that Purchaser is exempt from withholding any portion of the Purchase Price thereunder;

(k)     no Governmental Order shall be in effect which restrains or enjoins the consummation of the transactions contemplated by this Agreement;

(l)     the Title Company shall be willing to issue (subject to Purchaser's payment of the premiums and other charges therefor) a policy of title insurance (the "*Title*

33

*Insurance*") on its standard form insuring the fee title to each parcel of Owned Real Property in the name of Purchaser, subject to the Permitted Encumbrances, any matters waived by the Purchaser, and other typical exclusions from coverage;

(m)     Seller shall have delivered to Purchaser all of the certificates, instruments and other documents required to be delivered by it at or prior to the Closing pursuant to Section 2.2;

(n)     Seller shall have paid all Taxes of Seller relating to the Purchased Assets to the extent and as provided for in this Agreement.

6.2     Conditions to Obligations of the Seller. The obligations of the Seller to consummate the transactions contemplated by this Agreement are subject to the satisfaction or fulfillment at or prior to the Closing of the following conditions, any of which may be waived in whole or in part by the Seller in writing (and these are waived by completion of Closing):

(a)     all representations and warranties of Purchaser contained in this Agreement shall be true and correct in all material respects (except that any representation or warranty that is qualified by materiality or Material Adverse Effect shall be true and correct in all respects) at and as of the Closing with the same effect as though such representations and warranties were made at and as of the Closing (other than any representation or warranty that is expressly made as of a specified date, which shall be true and correct in all material respects (or in the case of any representation and warranty that is qualified by materiality or Material Adverse Effect shall be true and correct in all respects) as of such specified date only);

(b)     Purchaser shall have performed and complied in all material respects with the covenants and agreements required by this Agreement to be performed or complied with at or prior to the Closing;

(c)     there shall be in effect no Law making illegal or otherwise prohibiting or restraining the consummation of the transactions contemplated by this Agreement. There shall not be pending or threatened in writing by any Governmental Authority of competent jurisdiction any proceeding (i) challenging or seeking to restrain, prohibit, alter or materially delay the sale and purchase of the Purchased Assets or any of the other transactions contemplated by this Agreement, or seeking to obtain from Purchaser or any of its Affiliates in connection with the sale and purchase of the Purchased Assets to be acquired by Purchaser any material damages, or (ii) seeking to prohibit Purchaser or any of its Affiliates from effectively controlling or operating any portion of the Business or the Purchased Assets to be acquired by Purchaser;

(d)     Purchaser shall have delivered to the Seller the Cash Payment and all of the certificates, instruments and other documents required to be delivered by Purchaser at or prior to the Closing pursuant to Section 2.3; and

(e)     the Approval Order (finding, among other things, that Seller shall have obtained all required consents) shall have been entered by the Bankruptcy Court, shall be effective immediately upon entry pursuant to Rule 7062 and 9014 of the Federal Rules of Bankruptcy Procedure, and no automatic stay of execution, pursuant to Rule 62(a) of the Federal

Rules of Civil Procedure, or Rule 6004(g) or 6006(d) of the Federal Rules of Bankruptcy Procedure, or otherwise, shall apply with respect to the Approval Order.

## ARTICLE VII
## AS IS SALE; SURVIVAL

7.1 "AS IS" SALE. PURCHASER HEREBY ACKNOWLEDGES AND AGREES THAT, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THIS AGREEMENT, THE SELLER MAKES NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO ANY MATTER RELATING TO THE PURCHASED ASSETS, THE BUSINESS, THE ASSUMED LIABILITIES OR OTHERWISE. WITHOUT IN ANY WAY LIMITING THE FOREGOING, SELLER HEREBY DISCLAIMS ANY WARRANTY, EXPRESS OR IMPLIED, OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AS TO ANY PORTION OF THE PURCHASED ASSETS, THE BUSINESS OR THE ASSUMED LIABILITIES. PURCHASER FURTHER ACKNOWLEDGES THAT PURCHASER IS KNOWLEDGEABLE IN THE PURCHASE AND OPERATION OF SIMILAR BUSINESSES AND HAS CONDUCTED AN INDEPENDENT INSPECTION AND INVESTIGATION OF THE PURCHASED ASSETS, THE BUSINESS AND THE ASSUMED LIABILITIES. ACCORDINGLY, SUBJECT TO THE OTHER PROVISIONS OF THIS AGREEEMNT, PURCHASER WILL ACCEPT THE PURCHASED ASSETS AT THE CLOSING "AS IS," "WHERE IS," AND "WITH ALL FAULTS". THIS ARTICLE IS A MATERIAL INDUCEMENT FOR THE SELLER IN NEGOTIATING THE PURCHASE PRICE.

PURCHASER HAS INSPECTED, OR WAIVED (AND UPON CLOSING SHALL BE DEEMED TO HAVE WAIVED) ITS RIGHT TO INSPECT, THE PURCHASED ASSETS FOR ALL PURPOSES AND SATISFIED ITSELF AS TO THEIR PHYSICAL AND ENVIRONMENTAL CONDITION, BOTH SURFACE AND SUBSURFACE, INCLUDING, BUT NOT LIMITED TO, CONDITIONS SPECIFICALLY RELATED TO THE PRESENCE, RELEASE, OR DISPOSAL OF HAZARDOUS MATERIALS IN, ON, OR UNDER THE PURCHASED ASSETS. EXCEPT AS OTHERWISE PROVIDED IN ARTICLE III, (I) PURCHASER IS RELYING SOLELY UPON ITS OWN INSPECTION OF THE PURCHASED ASSETS; AND (II) SELLER MAKES NO, AND HEREBY DISCLAIMS ANY, WARRANTY OR REPRESENTATION, EXPRESS, IMPLIED, STATUTORY, OR OTHERWISE, AS TO THE ACCURACY OR COMPLETENESS OF ANY DATA, REPORTS, RECORDS, PROJECTIONS, INFORMATION, OR MATERIALS NOW, HERETOFORE, OR HEREAFTER FURNISHED OR MADE AVAILABLE TO PURCHASER BY ANY PERSON IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY. ANY AND ALL SUCH DATA, RECORDS, REPORTS, PROJECTIONS, INFORMATION, AND OTHER MATERIALS (WRITTEN OR ORAL) FURNISHED BY SELLER OR ITS AGENTS OR CONTRACTORS OR OTHERWISE MADE AVAILABLE OR DISCLOSED TO PURCHASER ARE PROVIDED TO PURCHASER AS A CONVENIENCE AND SHALL NOT CREATE OR GIVE RISE TO ANY LIABILITY OF OR AGAINST SELLER OR ITS AGENTS OR CONTRACTORS, AND ANY RELIANCE ON OR USE OF THE SAME SHALL BE AT PURCHASER'S SOLE RISK TO THE MAXIMUM EXTENT PERMITTED BY LAW.

7.2    <u>Survival of Representations and Warranties</u>. The representations and warranties of each party, as well as the covenants of each party required to have been performed prior to the Closing, whether contained in this Agreement or in any exhibit, certificate, document or instrument delivered pursuant to this Agreement, shall survive the Closing for a period of eighteen (18) months following the Closing, or, as the same relate to Seller, until the earlier dissolution or winding up of Seller and closing of the Bankruptcy Case.

## ARTICLE VIII
## TERMINATION

8.1    <u>Termination</u>. This Agreement and the transactions contemplated hereby may be terminated and abandoned:

(a)    by either the Seller or Purchaser at any time prior to the Closing with the mutual written consent of the other and the prior approval of the Bankruptcy Court;

(b)    by either the Seller or Purchaser if the Closing has not occurred on or prior to 5:00 p.m., Central Time, on April 21, 2011 (the "***Termination Date***"), unless the Closing has not occurred as a result of a breach of this Agreement by the party seeking such termination;

(c)    by either the Seller or Purchaser if any Governmental Authority with jurisdiction over such matters shall have issued a final and nonappealable Governmental Order permanently restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated by this Agreement; ***provided, however,*** that neither the Seller nor Purchaser may terminate this Agreement pursuant to this <u>Section 8.1(c)</u> unless the party seeking so to terminate this Agreement has used all commercially reasonable efforts to oppose any such Governmental Order or to have such Governmental Order vacated or made inapplicable to the transactions contemplated by this Agreement;

(d)    by the Seller (provided that the Seller is not in material breach of any of the representations, warranties, covenants or other agreements contained herein), but only if Purchaser shall have breached, in any material respect, any representation or warranty or any covenant or other agreement to be performed by it contained herein, and such breach is incapable of being cured or is not cured within five days of receipt of written notice thereof from the Seller;

(e)    by the Seller pursuant to the terms of <u>Section 1.6</u>;

(f)    by Purchaser (provided that Purchaser is not in material breach of any of the representations, warranties, covenants or other agreements contained herein), but only if the Seller has breached, in any material respect, any representation or warranty or any covenant or other agreement to be performed by it contained herein, and such breach is incapable of being cured or is not cured within ten days of receipt of written notice thereof from Purchaser;

(g)    by Purchaser pursuant to the terms of <u>Section 1.6</u>;

(h)    by either Purchaser or the Seller, if the Approval Order is not entered by the Bankruptcy Court on or prior to April 14, 2011; or

36

(i)     by either Purchaser or the Seller, if the Bankruptcy Court has issued an order approving the sale of some or all of the Purchased Assets to another party or if Seller has effected an alternative transaction, with the approval of the Bankruptcy Court, including a plan of reorganization or liquidation (including a Chapter 7 liquidation), resulting in the disposition to someone other than Purchaser of some or all of the Purchased Assets (in any such case, an "*Alternative Transaction*").

8.2     Effect of Termination. If this Agreement is terminated pursuant to Section 8.1, this Agreement shall become null and void and none of the parties hereto shall have any further liability hereunder except that the provisions of Sections 5.3 and 5.8 and Articles VIII, IX and X shall remain in full force and effect.

8.3     Good Faith Deposit.

(a)     If this Agreement is terminated pursuant to Section 8.1(a), (b), (c), (e), (f), (g), (h), or (i), the Good Faith Deposit, together with all interest accrued thereon, shall be returned to Purchaser and the Seller shall not be entitled to any damages, losses, or payment from Purchaser, and Purchaser shall have no further obligation or Liability of any kind to the Seller, or any third party on account of this Agreement.

(b)     If this Agreement is terminated pursuant to Section 8.1(d), the Good Faith Deposit shall be transferred to the Seller as a termination fee and the receipt by the Seller of the Good Faith Deposit shall be the sole and exclusive remedy of the Seller (as liquidated damages) and the Seller shall not be entitled to any other amounts for damages, losses, or payment from Purchaser, and Purchaser shall have no further obligation or Liability of any kind to the Seller, any of their Affiliates, or any third party on account of this Agreement.

8.4     Notice. The party desiring to terminate this Agreement pursuant to Section 8.1 shall give notice of such termination to the other party or parties in accordance with Section 9.1.

## ARTICLE IX
## MISCELLANEOUS

9.1     Notices. All notices, requests, demands, claims and other communications that are required or may be given pursuant to this Agreement must be in writing and delivered personally against written receipt, by reputable international overnight courier, by telecopy or facsimile (if a number is shown) or by registered or certified mail, return receipt requested, postage prepaid, to the parties at the following addresses (or to the attention of such other Person or at such other address as any party may provide to the other party by notice in accordance with this Section 9.1):

if to Purchaser, to:

NuStar Refining, LLC
2330 North Loop 1604 West
San Antonio, Texas 78248
Attention: Bradley C. Barron, General Counsel
Facsimile: (210) 918-4861

37

with a copy to (which shall not constitute notice):

Andrews Kurth LLP
1717 Main St., Suite 3700
Dallas, Texas 75201
Attention: Monica S. Blacker
Facsimile: (214) 659-4844

if to the Seller, to:

AGE Refining, Inc.
7811 S. Presa
San Antonio, TX 78223
Attn: Eric J. Moeller, Trustee
Facsimile: (210) 532-7222

(but after Closing, to Eric J. Moeller, Trustee, in care of Langley & Banack, Inc. at the address below)

with a copy to (which shall not constitute notice):

Langley & Banack, Incorporated
745 E. Mulberry, Suite 900
San Antonio, TX 78212
Attn: Steven R. Brook
Facsimile: (210) 735-6889

and

Global Hunter Securities, LLC
400 Poydras St., #1510
New Orleans, LA 70130
Attn: Michael H. Schmidt and Jenna Wittig
Facsimile: (504) 212-1610

Any such notice or other communication will be deemed to have been given (i) if personally delivered, when so delivered, against written receipt, (ii) if sent by reputable international overnight courier, when so delivered with delivery confirmed by the courier service, (iii) if given by telecopier or facsimile, once such notice or other communication is transmitted to the facsimile number specified above and the appropriate answer back or telephonic confirmation is received; *provided* that such notice or other communication is promptly thereafter delivered in accordance with the provisions of clauses (i) or (ii) hereof, or (iv) if mailed by registered or certified mail, return receipt requested, postage prepaid and addressed to the intended recipient as set forth above, upon receipt by the addressee. Any notice, request, demand, claim or other communication given hereunder using any other means (including ordinary mail or electronic

mail) shall not be deemed to have been duly given unless and until such notice, request, demand, claim or other communication actually is received by the individual for whom it is intended.

9.2     Assignment. Neither this Agreement nor any of the rights, interests or obligations hereunder may be assigned or delegated by the Seller or Purchaser without the prior written consent of the other parties and any purported assignment or delegation in violation hereof shall be null and void; _provided, however,_ Purchaser may assign its rights hereunder to purchase all or any portion of the Purchased Assets (and assume any related Assumed Liabilities) to one or more of its Affiliates without Seller's consent, _provided_ that Purchaser shall provide evidence reasonably acceptable to Seller that a financially responsible party shall remain liable for such Assumed Liabilities. No assignment of any party's rights or obligations hereunder shall serve to release the assigning party from any of its obligations hereunder.

9.3     Amendments and Waiver; Exclusive Remedies. This Agreement may not be modified or amended except in writing signed by the party or parties against whom enforcement is sought. The terms of this Agreement may be waived only by a written instrument signed by the party or parties waiving compliance. No waiver of any provision of this Agreement shall be deemed or shall constitute a waiver of any other provision hereof (whether or not similar), nor shall such waiver constitute a continuing waiver unless otherwise provided. No delay on the part of any party hereto in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, power or privilege hereunder. Whenever this Agreement requires or permits consent by or on behalf of a party, such consent shall be given in writing in a manner consistent with the requirements for a waiver of compliance as set forth in this Section 9.3. The rights and remedies herein provided shall be the exclusive rights and remedies available to the parties hereto at law or in equity.

9.4     Entire Agreement. This Agreement and the related documents contained as Exhibits and Schedules hereto or expressly contemplated hereby (including the Operative Agreements, the Confidentiality Agreement) contain the entire understanding of the parties relating to the subject matter hereof and supersede all prior written or oral and all contemporaneous oral agreements and understandings relating to the subject matter hereof. The Exhibits and Schedules to this Agreement are hereby incorporated by reference into and made a part of this Agreement for all purposes.

9.5     No Third Party Beneficiary. This Agreement is made for the sole benefit of the parties hereto and their respective successors, executors and permitted assigns, and nothing contained herein, express or implied, is intended to or shall confer upon any other Person any third-party beneficiary right or any other legal or equitable rights, benefits or remedies of any nature whatsoever under or by reason of this Agreement.

9.6     Governing Law; Jurisdiction. This Agreement will be governed by and construed and interpreted in accordance with the substantive Laws of the State of Texas, without giving effect to any choice of law or conflicts of Law provision or rule that would cause the application of the Laws of a jurisdiction other than Texas. Each party irrevocably consents to the service of any and all process in any action or proceeding arising out of or relating to this Agreement by the mailing of copies of such process to each party at its address specified in Section 9.1. Until the

39

settlement of the cases of the Seller before the Bankruptcy Court, the parties hereto irrevocably
submit to the exclusive jurisdiction of the Bankruptcy Court (or any court exercising appellate
jurisdiction over the Bankruptcy Court) over any dispute arising out of or relating to this
Agreement or any other agreement or instrument contemplated hereby or entered into in
connection herewith or any of the transactions contemplated hereby or thereby.  Each party
hereby irrevocably agrees that all claims in respect of such dispute or proceedings may be heard
and determined in such courts.  The parties hereby irrevocably waive, to the fullest extent
permitted by applicable law, any objection which they may now or hereafter have to the laying
of venue of any such dispute brought in such court or any defense of inconvenient forum in
connection therewith.

    9.7   Neutral Construction. The parties hereto agree that this Agreement was negotiated
fairly between them at arms' length and that the final terms of this Agreement are the product of
the parties' negotiations. Each party represents and warrants that it has sought and received legal
counsel of its own choosing with regard to the contents of this Agreement and the rights and
obligations affected hereby. The parties hereto agree that this Agreement shall be deemed to
have been jointly and equally drafted by them, and that no provisions of this Agreement should
be construed against either party on the grounds that such party drafted or was more responsible
for drafting such provision.

    9.8   Severability. In the event that any one or more of the provisions or parts of a
provision contained in this Agreement shall for any reason be held to be invalid, illegal or
unenforceable in any respect in any jurisdiction, such invalidity, illegality or unenforceability
shall not affect any other provision or part of a provision of this Agreement or any other
jurisdiction, but this Agreement shall be reformed and construed in any such jurisdiction as if
such invalid or illegal or unenforceable provision or part of a provision had never been contained
herein and such provision or part shall be reformed so that it would be valid, legal and
enforceable to the maximum extent permitted in such jurisdiction, *provided* that any such reform
or construction does not affect the economic or legal substance of the transactions contemplated
hereby in a manner adverse to any party.

    9.9   Headings; Construction. The descriptive headings of the Articles and Sections of
this Agreement are inserted for convenience only and do not constitute a part of this Agreement.
It is understood and agreed that neither the specifications of any dollar amount in this Agreement
nor the inclusion of any specific item in the Schedules or Exhibits is intended to imply that such
amounts or higher or lower amounts, or the items so included or other items, are or are not
material, and no party shall use the fact of setting of such amounts or the fact of the inclusion of
such item in the Schedules or Exhibits in any dispute or controversy between the parties as to
whether any obligation, item or matter is or is not material for purposes hereof.

    9.10  Patriot Act; Executive Order 13224; Anti-Money Laundering Act. Purchaser
represents and warrants that (i) no Benefited Party is a Prohibited Person, and (ii) no Benefited
Party is in violation of the Executive Order, the Patriot Act, the Anti-Money Laundering Act, or
any order, rule, regulation or recommendation promulgated under or in connection with the
Executive Order, the Patriot Act or the Anti-Money Laundering Act.  This representation and
warranty shall be continuing and shall be deemed remade by Purchaser as of the Closing Date,
with the same force and effect as if made on, and as of, the Closing Date.  The Seller shall have

the right to terminate this Agreement in the event of any breach of the foregoing representation and warranty. "*Benefited Party*" means and includes any and all of the following: Purchaser; any officer, director, shareholder, partner or member of Purchaser; any direct or indirect holder of any equity interest in Purchaser; and any affiliate of Purchaser. "*Prohibited Person*" means and includes any person or entity with whom US persons or entities are prohibited or restricted from doing business pursuant to any of the following: the Executive Order and the Annex thereto; the regulations of the Office of Foreign Asset Control of the Department of the Treasury (including the Specially Designated Nationals and Blocked Persons List, as updated from time to time; and, any other statute, law, executive order, rule, regulation or other governmental action. "*Executive Order*" means Executive Order 13224 signed on September 24, 2001 and titled "Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism." "*Patriot Act*" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001. "*Anti-Money Laundering Act*" means the International Money Laundering Abatement and Financial Anti-Terrorism Act of 2001.

9.11    Extended Meanings. Words importing the singular include the plural and vice versa and words importing gender include all genders, unless the context otherwise requires.

9.12    Counterparts; Facsimile Delivery. This Agreement may be executed and delivered in one or more counterparts, each of which shall be an original, but all of which together shall constitute one and the same instrument. This Agreement may also be executed and delivered by facsimile, PDF or other electronic file with the same force and effect as if originally executed copies of this Agreement had been delivered by the parties hereto. If this Agreement is executed and delivered in counterparts or by a facsimile, PDF or other electronic file, any party may thereafter require that both parties originally execute and deliver a sufficient number of additional copies of this Agreement so that each party may have two fully executed originals of this Agreement.

9.13    WAIVER OF JURY TRIAL. EACH PARTY HERETO ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE IT HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT AND ANY OF THE AGREEMENTS DELIVERED IN CONNECTION HEREWITH OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY. EACH PARTY HERETO CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE SUCH WAIVER, (B) IT UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF SUCH WAIVER, (C) IT MAKES SUCH WAIVER VOLUNTARILY, AND (D) IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 9.13.

9.14    _Further Assurances_. In addition to the actions, documents, files, pleadings and instruments specifically required to be taken or delivered by this Agreement or the Operative Agreements, whether on or before or from time to time after the Closing, and without further consideration, each party hereto shall make commercially reasonable efforts to take such other actions, and execute and/or deliver such other documents, data, pleadings, files, information and instruments, as the other party hereto or its counsel may reasonably request in order to effectuate and perfect the transactions contemplated by this Agreement and the Operative Agreements, including without limitation, such actions as may be necessary to transfer to Purchaser and to place Purchaser in possession or control of, all of the rights, properties, assets and businesses intended to be sold, transferred, conveyed, assigned and delivered hereunder, or to assist in the collection of any and all such rights, properties and assets or to enable Purchaser to exercise and enjoy all rights and benefits of the Seller with respect thereto.

9.15    _Time of Essence_. It is understood and agreed between the parties hereto that time is of the essence of all the terms, provisions, covenants and conditions of this Agreement.

## ARTICLE X
## DEFINITIONS

10.1    _Certain Definitions_.  The following terms, when used herein, in addition to the capitalized terms defined elsewhere herein, shall have the respective meanings set forth below:

"*Accounts Receivable in Good Standing*" means Gross Accounts Receivable less Doubtful Accounts Receivable less Uncollectible Accounts Receivable.

"*Action*" means any claim, action, injunction, order, judgment, decree, ruling, charge, suit or proceeding, grievance, arbitral action, governmental inquiry, criminal prosecution, hearing or other investigation.

"*Affiliate*" means, with respect to any Person, (i) any other Person directly or indirectly Controlling, Controlled by or under common Control with, such Person, (ii) any other Person that owns or Controls 10% or more of any class of equity securities (including any equity securities issuable upon the exercise of any option or convertible security) of such Person or any of its Affiliates, or (iii) any director, partner, member, officer, manager, agent, employee or relative of such Person.

"*Agreement*" has the meaning set forth in the preamble hereto.

"*Alternative Transaction*" has the meaning set forth in Section 8.1(i).

"*Anti-Money Laundering Act*" has the meaning set forth in Section 9.10.

"*Approval Order*" has the meaning set forth in Section 5.12(b), and is in the form of Exhibit F, as the same may be amended from time to time by mutual agreement of the parties.

"*Assigned Accounts Receivable*" has the meaning set forth in Section 1.1(a)(xii).

"*Assigned Inventory*" has the meaning set forth in Section 1.1(a)(vi).

42

"*Assigned Prepayments*" has the meaning set forth in <u>Section 1.1(a)(xiii)</u>.

"*Assumed Liabilities*" has the meaning set forth in <u>Section 1.2(a)</u>.

"*Assumption Agreement*" has the meaning set forth in <u>Section 2.2(a)(iii)</u>.

"*Balance Sheet*" has the meaning set forth in <u>Section 3.11(a)</u>.

"*Balance Sheet Date*" has the meaning set forth in <u>Section 3.11(a)</u>.

"*Bankruptcy Case*" has the meaning set forth in the recitals hereto.

"*Bankruptcy Code*" has the meaning set forth in the recitals hereto.

"*Bankruptcy Court*" has the meaning set forth in the recitals hereto.

"*Base Purchase Price*" means $41,000,000.

"*Benefit Plan*" means each funded or unfunded, written or oral, employee benefit plan, contract, agreement, incentive, salary, wage or other compensation plan or arrangement, including each pension and profit sharing plan, savings plan, bonus, deferred compensation, incentive compensation, stock purchase, supplemental retirement, severance, change of control or termination payment, stock option, hospitalization, medical, life insurance, dental, disability, salary continuation, vacation, supplemental unemployment benefit, union contract, employment contract, consulting agreement, retiree health or life benefit, and each other employee benefit program, plan, policy or arrangement, maintained, contributed to, or required to be contributed to, by the Seller, in each case as provided to any and/or all employees of the Business.

"*Benefited Party*" has the meaning set forth in <u>Section 9.10</u>.

"*Bid Procedures Order*" means that certain Order (A) Approving Procedures for Soliciting Offers for Substantially All of the Debtor's Assets; (B) Approving the Form and Manner of Notice; (C) Authorizing the Debtor to Conduct an Auction to Determine the Highest and Best Offer; (D) Approving the Procedures for Determining Cure Amounts for Assumed Contracts and Leases; and (E) Granting related Relief, entered on December 21, 2010, as amended by order dated March 15, 2011, and as may be further amended by order of the Bankruptcy Court.

"*Bill of Sale*" has the meaning set forth in <u>Section 2.2(a)(ii)</u>.

"*Bodily Injury*" means the physical injury, sickness, disease, mental anguish, fear or emotional distress sustained or suffered by any person, including death resulting there from.

"*Business*" means the business conducted as of the Execution Date by Seller (as debtor in possession), including the ownership and operation of the Purchased Assets.

"*Business Contracts*" has the meaning set forth in <u>Section 1.1(a)(viii)</u>.

43

"*Business Day*" means any day other than Saturday, Sunday or any day on which banks in San Antonio, Texas are required or authorized to be closed.

"*Business Employees*" has the meaning set forth in Section 3.9.

"*Business Insurance Policies*" has the meaning set forth in Section 3.15.

"*Business Licenses*" has the meaning set forth in Section 1.1(a)(vii).

"*Cash Payment*" has the meaning set forth in Section 2.3(a).

"*Chase*" means Chase Capital Corporation and J.P. Morgan Chase Bank, N.A., as lenders to Debtor holding various Encumbrances on the Purchased Assets to be transferred at Closing to the proceeds of sale pursuant to the Approval Order.

"*Claims*" shall mean all claims, causes of action, choses in action, rights of recovery and rights of set-off of whatever kind or description against any Person arising out of or relating to the Purchased Assets, the Business or relating to the Seller.

"*Cleanup*" means all actions required to (i) identify, investigate, contain, characterize, cleanup, monitor, remove, transport, treat or otherwise remediate Hazardous Substance present in the indoor or outdoor environment, (ii) prevent, pursuant to Law, the Release of Hazardous Substance so that they do not enter the Environment, migrate, endanger or threaten to endanger public health or welfare or the Environment, (iii) perform pre-remedial studies and investigations and post remedial monitoring and care, or (iv) respond to any government directives, orders, requests for information or other documents in any way relating to cleanup, removal, treatment or remediation or potential cleanup, removal, treatment or remediation of Hazardous Substance in the Environment.

"*Closing*" has the meaning set forth in Section 2.1.

"*Closing Adjustment*" has the meaning set forth in Section 1.3(c)(iv).

"*Closing Date*" has the meaning set forth in Section 2.1.

"*Closing Date Working Capital*" means Monetized Accounts Receivable plus Inventory plus Prepayments less Cumulative Accounts Payable, calculated as of the Closing Date.

"*Closing Date Working Capital Estimate*" has the meaning set forth in Section 1.3(c)(ii).

"*Confidentiality Agreement*" means that certain Non-Disclosure Agreement, dated January 21, 2011 between the Seller and NuStar Energy L.P.

"*Contract*" means any contract, agreement, indenture, note, bond, instrument, lease, conditional sales contract, mortgage, license, franchise agreement, concession agreement, insurance policy, security interest, guaranty, binding commitment, purchase order or other agreement or arrangement, whether written or oral.

44

"*Control*" (including, with correlative meanings, the terms "controlling", "controlled by" and "under common control with") means, with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"*Crude Prepayments*" mean prepayments of all or a portion of the purchase price for crude oil made by Seller to its crude oil suppliers under a Business Contract assumed by Purchaser.

"*Cumulative Accounts Payable*" means Verified Crude Accounts Payable plus Trade Accounts Payable.

"*Cure Costs*" has the meaning set forth in Section 1.1(a)(viii).

"*Deed*" has the meaning set forth in Section 2.2(a)(i).

"*Disclosure Schedule*" means the disclosure schedule with respect to the exceptions to Seller's representations and warranties set forth in Article III and attached hereto.

"*Doubtful Accounts Receivable*" means any account receivable that in the good faith opinion of Seller and Purchaser is unlikely to be collected in the 6-month period following the Closing.

"*Effective Time*" means 12:01 a.m., San Antonio, Texas time, on the Closing Date.

"*Elmendorf Terminal*" means the property, plant and equipment located on the real property in or near San Antonio, Texas, as more particularly described in Schedule 1.1(a)(iv), including four storage tanks with an aggregate nominal capacity of approximately 205,000 barrels, truck racks, pipelines, valves, docks, rail and tank car facilities, buildings, boilers, laboratory equipment, and all other storage terminal equipment and improvements thereon and thereunder.

"*Employee Other Benefit Obligations*" means all obligations, arrangements, or customary practices of Seller, whether or not legally enforceable, to provide benefits, other than salary, wages or commissions, as compensation for services rendered, to present or former directors, employees, or agents of the Seller, other than obligations, arrangements, and practices that are Employee Plans. Employee Other Benefit Obligations include consulting agreements under which the compensation paid does not depend upon the amount of service rendered, sabbatical policies, severance payment policies, and fringe benefits within the meaning of any equivalent Law.

"*Employee Plan*" means any plan, fund, or program which was established, maintained or contributed to by the Seller, to the extent that such plan, fund, or program (A) was established, maintained or contributed to for the purpose of providing for employees of Seller or their dependents medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services, (B) provides retirement income payments, supplemental retirement income payments or severance payment

45

arrangements to employees of Seller, or (C) results in a deferral of income by employees of the Seller for periods extending to the termination of covered employment or beyond.

"*Encumbrance*" means any lien (statutory or otherwise), hypothecation, Liability, security interest, interest, mortgage, pledge, restriction, charge, instrument, preference, priority, security agreement, easement, covenant, encroachment, option, right of recovery, Tax (including foreign, federal, state and local Tax), of any kind or nature (including (i) any conditional sale or other title retention agreement and any lease having substantially the same effect as any of the foregoing, (ii) any assignment or deposit arrangement in the nature of a security device, and (iii) any leasehold interest or other right, in favor of a third party or a Seller, to use any portion of the Purchased Assets), whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, material or non-material, known or unknown.

"*Environment*" means surface or subsurface soil or strata, surface waters and sediments, navigable waters, wetlands, groundwater, sediments, drinking water supply, ambient air, plants, wildlife, animals and natural resources. The term also includes indoor air, structures and building materials to the extent regulated under Environmental Laws.

"*Environmental Claim*" means a claim or demand by, or notice from, a third party, including any Governmental Authority or citizen group, seeking a remedy or alleging liability or responsibility for or with respect to any Environmental Condition or violation of or liability under Environmental Law or Environmental Permits, whether due to negligence, strict liability or otherwise. The term includes administrative investigations, hearings and proceedings, court actions, orders, notices of violation, notice of potential responsibility, claims, actions, demands and notices by third parties for or with respect to Bodily Injury, Environmental Property Damage, Cleanup, Cleanup costs of any kind or nature and violations of Environmental Laws.

"*Environmental Condition*" means the intentional or unintentional presence, Release or threatened Release of any Hazardous Substance at or into the Environment. The term includes the presence of abandoned above or below ground containers, tanks or receptacles that contain or formerly contained Hazardous Substance and exposure or alleged exposure of the Environment, persons, or property to Hazardous Substance.

"*Environmental Law*" means any applicable Law, decree, License or ordinance in effect as of the Closing Date which pertain to, regulate or impose liability or standards of conduct concerning the Environment, Hazardous Substance and/or the health and safety of persons (including employees) or which relate to the manufacture, processing, distribution, use, sale, treatment, storage, release, threatened release, disposal, Cleanup, transportation, management, labeling, distribution, testing, exposure to or handling of Hazardous Substance.

"*Environmental Liability*" means any cost, damages, expense, liability, obligation, or other responsibility arising from or under any Environmental Law.

"*Environmental Permits*" means any permits, plans or other authorizations and plans required by or issued pursuant to Environmental Laws.

46

"*Environmental Property Damage*" means physical damage, injury to or destruction of tangible real or personal property or the Environment.

"*Escrow Agent*" means Langley & Banack, Inc.

"*Escrow Agreement*" has the meaning set forth in Section 1.3(b).

"*Escrow Amount*" has the meaning set forth in Section 1.3(b).

"*Excluded Assets*" has the meaning set forth in Section 1.1(b).

"*Excluded Liabilities*" has the meaning set forth in Section 1.2(b).

"*Financial Statements*" has the meaning set forth in Section 3.11(a).

"*Former Business Employees*" has the meaning set forth in Section 3.9.

"*Force Majeure Event*" means a disaster, act of God or act of war by or against the United States.

"*GAAP*" means United States generally accepted accounting principles, as in effect from time to time.

"*Good Faith Deposit*" has the meaning set forth in Section 1.3(b).

"*Governmental Authority*" means any government or political subdivision thereof, any governmental entity, quasi-governmental entity, administrative agency, department, commission, board, authority, division, agency or instrumentality, and any court, tribunal or judicial body, in each case whether federal, state, county, provincial, municipal, local or foreign.

"*Governmental Order*" means any Law, judgment, injunction, decree, stipulation or determination issued, promulgated or entered by or with any Governmental Authority of competent jurisdiction.

"*Government Contract Clearing Payables*" means invoices received by the Seller from Stolt Nielsen Rail Services after the Closing, or received prior to Closing and not submitted to the Defense Logistics Agency or pertinent United States Department of Defense agencies until after the Closing.

"*Government Contract Clearing Receivables*" means accounts receivable due from the Defense Logistics Agency for reimbursement of Government Contract Clearing Payables.

"*Gross Accounts Receivable*" means accounts receivable, as reflected on the balance sheet dated as of the Closing Date and prepared by Purchaser, less (i) accounts receivable arising from those Contracts set forth on Schedule 1.1(b)(x) with Shell Trading (US) Company at the Redfish Bay terminal; (ii) the Tierra Receivables; and (iii) the Government Contract Clearing Receivables.

47

"*Gross Crude Accounts Payable*" means the gross amount of post-petition accounts payable for receipts of crude oil under a Business Contract assumed by Purchaser, <u>less</u> severance taxes and <u>less</u> crude trade barrels.

"*Hazardous Substance*" means petroleum, petroleum by-products, polychlorinated biphenyls and any other chemicals, materials, substances or wastes which are currently defined, listed or regulated as "hazardous substances," "hazardous materials," "hazardous wastes," "extremely hazardous wastes," "restricted hazardous wastes," "toxic substances," "toxic pollutants," "toxic air pollutants," "hazardous air pollutants," "pollutants," or "contaminants" under any Environmental Law.

"*HSR Act*" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"*Insider*" means, any executive officer, director, Controlling stockholder, Controlling partner or Affiliate, as applicable, of any Seller or any individual related by marriage or adoption to any such individual.

"*Intellectual Property*" means any (i) patents, patent applications, patent disclosures and improvements thereto, including any equivalents, divisionals, continuations, continuations-in-part, reissues, registrations, additions and extensions thereof, (ii) trademarks, service marks, trade dress, logos, labels, advertising and package design, trade names, corporate names and domain names, the goodwill associated therewith, and any registrations and applications for registration thereof, (iii) copyrights, and any registrations and applications for registration thereof, including copyrights in any Software, and (iv) URLs and Internet web sites.

"*Interim Period*" means the period commencing upon the Execution Date and terminating upon the Closing or the termination of this Agreement pursuant to and in accordance with the terms of <u>Section 8.1</u>.

"*Internal Revenue Code*" means the Internal Revenue Code of 1986, as amended, any successor statute thereto and the rules and regulations promulgated thereunder.

"*Inventory*" means all product inventory held by Seller for sale to third parties or for use in the production of products for sale to third parties, including crude oil, intermediate feedstock, semi-finished refined products, and refined products (such as vacuum gas oil and marine diesel oil), including any recoverable hydrocarbons in tank heels.

"*Knowledge of the Seller*", "*Seller's Knowledge*" and phrases of similar import mean the conscious awareness of only the following executives of the Seller as of the date hereof and as of the Closing Date, without any duty of inquiry or investigation:  <u>Eric Moeller or Lisa Trefger,</u> provided that none of the foregoing individuals shall have any personal liability arising hereunder.

"*Knowledge of the Purchaser*", "*Purchaser's Knowledge*" and phrases of similar import mean the conscious awareness of only the following executives of Purchaser as of the date hereof and as of the Closing Date, without any duty of inquiry or investigation:  <u>Mike Hoeltzel,</u> provided that the foregoing individual shall have no personal liability arising hereunder

48

"*Law*" means any statute, law (including common law), decree, permit, License, ordinance, order, regulation, rule, code or requirement of any Governmental Authority.

"*Leased Real Property*" has the meaning set forth in Section 1.1(b)(x).

"*Liability*" means any indebtedness, obligation or other liability with respect to the Business or the Purchased Assets (whether absolute, accrued, matured, contingent, known or unknown, fixed or otherwise, or whether due or to become due), including any fine, penalty, judgment, award or settlement respecting any judicial, administrative or arbitration proceeding, damage, loss, claim or demand with respect to any Law or Governmental Order.

"*License*" means any franchise, approval, permit, order, authorization, consent, license, registration or filing, qualification, certificate, privilege, variance and any other similar right obtained from or filed with any Governmental Authority.

"*Material Adverse Effect*" means (i) any change or effect that is or would reasonably be expected to be materially adverse to the Business of the Seller (including changes in relationships with customers, employees and suppliers), assets, operations, financial condition or results of operations of the Business, taken as a whole with respect to the Seller, except for any such changes or effects resulting directly or indirectly from (a) the transactions contemplated by this Agreement, (b) the announcement or other disclosure of the transactions contemplated by this Agreement, or (c) the mere occurrence of any event of default, regardless of whether or not declared, or any event which, with the passing of time or the giving of notice or both, might become such an event of default under the Seller's current debtor-in-possession financing facility or any refinancing thereof, prior to Closing; and (ii) the occurrence of a Force Majeure Event that has had a material adverse effect on the business, assets, operations, financial condition or results of operations of the Seller's Business.

"*Material Business Contracts*" has the meaning set forth in Section 3.7(a).

"*Material Business Licenses*" has the meaning set forth in Section 3.8.

"*Monetized Accounts Receivable*" means Accounts Receivable in Good Standing plus a number equal to Doubtful Accounts Receivable multiplied by 0.70.

"*Operative Agreements*" means, collectively, (i) the Deed, (ii) the Bill of Sale, (iii) the Assumption Agreement, (iv) the Escrow Agreement and (v) the Approval Order.

"*Ordinary Course of Business*" shall mean the ordinary course of business of the Seller substantially consistent with past custom and practice.

"*Owned Real Property*" has the meaning set forth in Section 1.1(a)(iv).

"*Patriot Act*" has the meaning set forth in Section 9.10.

"*Permitted Encumbrances*" means (i) liens for Taxes, assessments, water and sewer rents and other lienable services that are apportioned as provided in this Agreement; (ii) the standard or printed exceptions contained in the form of owner's policy issued by Purchaser's title

49

insurance company for the Owned Real Property; (iii) an exception for any state of facts or other matters which would be shown by a survey of the Owned Real Property; (iv) any and all present and future laws, ordinances, restrictions, requirements, resolutions, orders, rules and regulations of any Governmental Authority, as now or hereafter existing or enforced (including those related to zoning and land use); (v) the rights of utility companies to maintain pipes, poles, cables and wires over, on and under the street, and the part(s) of the Owned Real Property next to the street or running to any improvement on the Owned Real Property; and (vi) liens against the Purchased Assets that will be released pursuant to the Approval Order.

"*Person*" means any individual, general or limited partnership, firm, corporation, limited liability company, association, trust, unincorporated organization, Governmental Authority or other entity.

"*Personal Property*" has the meaning set forth in Section 1.1(a)(v).

"*Platinum Price*" means the quoted PM platinum fix closing market price on the London Platinum and Palladium Market (LPPM) for the Platinum on the day (prior to Closing) at which the Seller acquires the Platinum from Mitsubishi International Corporation; *provided* that if such day is not a trading day on the LPPM, then the closing price on the trading day immediately preceding such day.

"*Platinum Stipulation*" means the Stipulation filed with the Bankruptcy Court's Order dated February 17, 2011, under Docket No. 826 in the Bankruptcy Case.

"*Prepayments*" means any customer deposits, prepayments and other similar amounts paid by Seller prior to the Effective Time for goods or services to be provided after the Effective Time, including Crude Prepayments.

"*Proprietary Rights*" means (i) Intellectual Property, (ii) trade secrets and confidential business information (including ideas, formulas, compositions, proprietary manufacturing processes, alloys, inventions (whether patentable or unpatentable and whether or not reduced to practice), know-how, research and development information, Software, drawings, specifications, designs, plans, proposals, technical data, bills of materials, copyrightable works, financial, marketing and business data, pricing and cost information, business and marketing plans and customer and supplier lists and information), (iii) copies and tangible embodiments thereof (in whatever form or medium), and (iv) licenses granting any rights with respect to any of the foregoing.

"*Purchase Price*" has the meaning set forth in Section 1.3(a).

"*Purchased Assets*" has the meaning set forth in Section 1.1(a).

"*Purchaser*" has the meaning set forth in the preamble hereto.

"*Real Property Leases*" has the meaning set forth in Section 1.1(b)(x).

"*Refinery*" means the 14,500 barrel per day refinery located on the real property in or near San Antonio, Texas, as more particularly described in Schedule 1.1(a)(iv), with 6,000 bpd

50

catalytic reformer, naphtha hydrotreater and distillate hydrotreaters, 1,500 bpd solvent distillation unit, and five MWH steam turbine generator, and the refined products terminal located thereon, and all storage tanks, truck racks, pipelines, equipment, machinery, boilers, pumps, buildings, terminal facilities, dock facilities, rail and tank car facilities, and all other improvements thereon and thereunder.

"*Release*" means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping or disposing of a Hazardous Substance into the environment.

"*Relevant Property*" means all sites, properties, structures, facilities, locations, Owned Real Property and Leased Real Property (i) presently or formerly owned, operated, leased or otherwise used by or on behalf of the Seller (whether or not such properties are currently owned, leased, used or operated by the Seller), (ii) at which any Hazardous Substance has been transported, disposed, treated, stored or Released by or on behalf of the Seller, or (iii) that are adjacent to any sites, facilities, properties, structures, locations, Owned Real Property or Leased Real Property presently or formerly owned, operated, leased, or otherwise used by or on behalf of the Seller.

"*Replacement Letters of Credit*" mean the stand-by letters of credit delivered at Closing (to Seller or applicable beneficiaries) in replacement of, and for the immediate release of, the existing letters of credit that Seller has posted with certain trade vendors (primarily crude vendors) to secure payment for such product, and the letter of credit posted pursuant to the Platinum Stipulation.

"*Required Consents*" has the meaning set forth in Section 2.2(a)(v).

"*Seller Cure Amount*" means, with respect to the Business Contracts, means all unpaid amounts or unsatisfied obligations that must be paid or satisfied to effectuate, pursuant to all applicable provisions of the Bankruptcy Code, the assumption by Seller and assignment to Purchaser of the Business Contracts as set forth on Schedule 1.1(a)(viii), as such amounts may be modified and/or approved by the Bankruptcy Court.

"*Seller*" has the meaning set forth in the preamble hereto.

"*Software*" means computer programs, including any and all software implementations or algorithms, module and methodologies whether in source code, object code or other form, databases and compilations, including any and all data and collections of data, descriptions, flow charts and other work product used to design, plan, organize and develop any of the foregoing and all documentation, including user manuals and training materials related to any of the foregoing, used in the Business.

"*Subsidiary*" means, with respect to any Person, any corporation, general or limited partnership, limited liability company, joint venture or other legal entity of any kind of which such Person (either alone or through or together with one or more of its other Subsidiaries) owns or controls (by contract or otherwise), directly or indirectly, more than 50% of the stock or other equity interests, the holders of which are (a) generally entitled to vote for the election of the

51

board of directors or other governing body of such legal entity or (b) generally entitled to share in the profits or capital of such legal entity.

"*Tax*" means any federal, state, county, provincial, local or foreign income, gross receipts, sales, use, ad valorem, employment, severance, transfer, gains, profits, excise, franchise, property, capital stock, premium, minimum and alternative minimum or other taxes, fees, levies, duties, assessments or charges of any kind or nature whatsoever imposed by any Governmental Authority (whether payable directly or by withholding), including but not limited to oil spill liability tax, LUST tax, Texas motor fuels tax, Texas motor fuels delivery tax, Texas severance tax, and Texas sales and use tax, together with any interest, penalties (civil or criminal), additions to or additional amounts imposed by, any Governmental Authority with respect thereto.

"*Tax Return*" means a report, return or other information required to be supplied to a Governmental Authority with respect to any Tax.

"*Termination Date*" has the meaning set forth in Section 8.1(b).

"*Third Party*" means a Person that is not a party to this Agreement.

"*Tierra Pipeline*" means the 4 inch crude and/or refined products pipeline segment extending approximately 118 miles from one mile north of I-10 (near WW White Road in San Antonio, Texas) to near Odem, Texas, together with the 6 inch crude and/or refined products pipeline segment extending approximately 18 miles from near Odem, Texas to near McBride Road in Corpus Christi, Texas.

"*Title Insurance*" has the meaning set forth in Section 6.1(l).

"*Title Company*" has the meaning set forth in Section 5.18(a).

"*Trade Accounts Payable*" means any post-petition account payable for receipts of goods and/or services (other than crude oil) under a Business Contract assumed by Purchaser, but excluding all Government Contract Clearing Payables.

"*Transferable*" means (a) a transfer of a Business License or Business Contract that is assumable and assignable under the Bankruptcy Code notwithstanding any consent requirement contained in such Business License or Business Contract and (b) in the circumstances where a consent of another Person to the transfer of an applicable Business License or Business Contract is required by such Business License or Business Contract and under the Bankruptcy Code the Bankruptcy Court cannot waive such consent requirement, a transfer in which such required consent is obtained from the required Persons.

"*Uncollectible Accounts Receivable*" means any account receivable invoice that is deemed doubtful due to any or all of the following: (i) is greater than 60 days past due date, (ii) is greater than 90 days past invoice date, (iii) was issued prior to January 1, 2011, (iv) due from a customer currently under a payment plan due to poor payment history, (v) due from a customer who has filed, or has had filed against it, any bankruptcy case, assignment for the benefit of creditors, receivership, or insolvency proceeding, (vi) deemed an uncollectible invoice by Seller,

(vii) due from a customer that has more than fifty percent (50%) of its total aging past 90 days and (viii) any invoice related to off-spec products.

"*Update*" has the meaning set forth in Section 5.13.

"*Verified Crude Accounts Payable*" means any Gross Crude Accounts Payable less any Prepayments verified by, and approved to the reasonable satisfaction of, Purchaser.

"*WARN Act*" means the Worker Adjustment and Retraining Notification Act of 1988, as amended, and any similar applicable Law.

"*Warranties*" has the meaning set forth in Section 1.1(a)(xvi).

10.2   Interpretation.   For purposes of this Agreement, except as otherwise expressly provided herein or unless the context otherwise requires: (i) words using the singular or plural number also include the plural or singular number, respectively, and the use of any gender herein shall be deemed to include the other genders, (ii) references herein to "Articles," "Sections," "subsections" and other subdivisions without reference to a document are to the specified Articles, Sections, subsections and other subdivisions of this Agreement, (iii) a reference to a subsection without further reference to a Section is a reference to such subsection as contained in the same Section in which the reference appears, and this rule shall also apply to other subdivisions within a Section or subsection, (iv) the words "herein," "hereof," "hereunder," "hereby" and other words of similar import refer to this Agreement as a whole and not to any particular provision, (v) the words "include," "includes" and "including" are deemed to be followed by the phrase "without limitation", (vi) the word "or" shall not be exclusive, (vii) all references to any period of days (other than references to a period of "Business Days") shall be deemed to be to the relevant number of calendar days, (viii) all accounting terms used and not expressly defined herein have the respective meanings given to them under GAAP and (ix) all references to "$" shall be deemed to mean U.S. dollars.

**[Signature Page to Follow]**

53

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the
Execution Date.

PURCHASER:

**NUSTAR REFINING, LLC**

By: _Michael H. Hoeltzel_
Name:  Michael H. Hoeltzel
Title:    Senior Vice President


SELLER:

**ERIC J. MOELLER, SOLELY IN HIS
CAPACITY AS CHAPTER 11 TRUSTEE
OF AGE REFINING, INC.**

By: _Eric J. Moeller_
Name:  Eric J. Moeller
Title:    Trustee

*SIGNATURE PAGE*
*ASSET PURCHASE AGREEMENT*

# EXHIBIT A

*OWNED REAL PROPERTY*

## TRACT 1 – TERMINAL PROPERTY

TRACT 1 – 8.252 acres of land in the Francisco Farias Survey No. 15, Abstract No. 2, the City of San Antonio, Bexar County, Texas conveyed from Support Terminals Services, Inc. to **AGE Refining, Inc.** in that Warranty Deed at Volume 9613 Page 1164 of the Official Public Records of Real Property of Bexar County.

## TRACT 2 – REFINERY PROPERTY

TRACT 2A – 5.86 acres of land out of Tract 2, NCB 10931, The Rudolph Keilmann Subdivision, City of San Antonio, Bexar County, Texas according to plat recorded at Volume 1625 Page 95 of the Deed and Plat Records of Bexar County, Texas. Said 5.86 acre tract being more particularly described in that Quitclaim Deed conveyed from Al Gonzalez to **AGE Refining, Inc** and recorded at Volume 6081 Page 192 of the Official Public Records of Real Property of Bexar County, Texas.

TRACT 2B – 17.314 acres of land (Tract I) and 0.301 acres (Tract II) described in that Warranty Deed conveyed from Howell Hydrocarbons & Chemicals, Inc. to **AGE Marketing Company** and recorded at Volume 5340 Page 1663 in the Official Public Records of Real Property of Bexar County, Texas.

TRACT 2C – 8.84 acres of land being Tract 5B, New City Block 10931, Rudolph Keilmann Subdivision, in the corporate limits of the City of San Antonio, Bexar County, Texas, according to the plat thereof recorded at Volume 1625, Page 95 of the Plat Records of Bexar County, Texas. Said 8.84 acres being more particularly described in that Warranty Deed conveyed from Albert Gonzalez to **AGE Refining, Inc.** and recorded at Volume 14917, Page 2088 of the Official Public Records of Real Property of Bexar County, Texas; said 8.84 acres also being known as 8.692 acres of land being more particularly described in that Warranty Deed conveyed from Doris S. Branham et al. to Albert Gonzalez, and recorded at Volume 9356 Page 2077 of the Official Public Records of Real Property of Bexar County, Texas.

*Exhibit B*

**Schedule 1.1(a)(viii)**
**Purchased Assets**
**Business Contracts**

| Name and Address | Pre-Petition Cure Amount | Post-Petition Amounts (Other than Current Payables) | Required Consents |
|---|---|---|---|
| Air Liquide Industrial U.S., L.P. 801 W. North Carrier Pkwy. Grand Prairie, TX 75050 | $6,180.86 | $0 | |
| Anadarko Petroleum Corp. 1201 Lake Robbins Dr. The Woodlands, TX 77380 (crude supply agreement) | $0 | $0 | |
| C.H. Guernsey & Company 5344 N. Crystal Springs Rd. Salina, KS 67401 | $20,642.07 | $0 | |
| Chartis (aka American International Specialty Lines Insurance Co.) 70 Pine St. New York, NY 10270 Policy No. PLS 5769188 | $0 | $0 | |
| Continental Trend Resources PO Box 1032 Enid, OK 73702 | $0 | $0 | |
| Defense Energy Support Center/DLA 8725 John J. Kingman Rd. Fort Belvoir, VA 22060 | $0 | $0 | Novation required |
| Dresser Rand 1200 W. Sam Houston Pkwy. N. Houston, TX 77043 | $0 | $0 | |
| Drilling Info, Inc. HPDI Subscriptions PO Box 5545 Austin, Texas 78763 | $1,805.07 | $0 | |
| (DTN) Telvent 519 Oak Court Panama City, FL 32404 | $0 | $0 | |
| Edith Polly Duhaine 316 New Hope & Crimona Rd. Waynesboro, VA 22980 | $0 | $0 | |

| | | | |
|---|---|---|---|
| G&K Services<br>PO Box 830483<br>San Antonio, TX 78283 | $10,082.89 | $0 | |
| Glenn Dugger<br>1915 Encino<br>Alice, TX 78332 | $0 | $0 | |
| Gulfmark Energy, Inc.<br>PO Box 844<br>Houston, TX 77001 | $0 | $0 | |
| H&H Crane Services, dba Texas Crane Services<br>203 S. Ww White Road<br>San Antonio, TX 78219 | $0 | $0 | |
| Hawk Electronics<br>9971 IH-10 West<br>San Antonio, TX 78230 | $4,6365.90 | $0 | |
| High Sierra Toilet Co., Inc.<br>7 Moss Rock<br>New Braunfels, TX 78130 | $0 | $0 | |
| HRH Partners<br>PO Box 127<br>Bruni, TX 78344 | $359.26 | $0 | |
| IKON Financial Services<br>PO Box 9115<br>Macon, GA 31208 | $1,389.09 | $0 | |
| Laguna Oil & Gas Corp.<br>667 Oak Ridge Dr.<br>Goliad, TX 77963 | $0 | $0 | |
| Legend Natural Gas II, LP<br>210 W. Grand Parkway S., Ste. 400<br>Katy, TX 77494 | $0 | $0 | |
| Merichem Company<br>5455 Old Spanish Trail<br>Houston, TX 77023 | $0 | $0 | |
| Mitsubishi International Corp.<br>6555 3rd Ave.<br>New York, NY 10019 | $0 | $0 | |
| Modular Space Corp.<br>1200 Swedesford Rd.<br>Berwyn, PA 19312 | $0 | $0 | |
| Musket Corporation<br>10601 North Pennsylvania<br>Oklahoma City, OK 73120 | $0 | $0 | |
| OGO Marketing, LLC<br>4560 Salt Flat Road<br>Luling, TX 78648 | $0 | $0 | |

| | | | |
|---|---|---|---|
| Porous Media Corp.<br>4301 W. Davis<br>Conroe, TX 77304 | $0 | $0 | |
| Roddey Engineering Services, Inc.<br>400 Texas St. Ste. 1040<br>Shreveport, LA 71101 | $0 | $0 | |
| RSC Equipment Rental<br>533 E. Houston<br>San Antonio, TX 78220 | $0 | $0 | |
| SBS Administrative Services<br>PO Box 3102<br>Universal City, TX 78148 | $0 | $0 | |
| Service Uniform Rental<br>2580 S. Raritan St.<br>Englewood, CO 80110 | $0 | $0 | |
| Shell Trading (US) Co.<br>909 Fannin, Plaza Level 1<br>Houston, TX 77010<br>(crude supply agreement CSE136279) | $0 | $0 | |
| Stolt Nielsen Rail Services<br>15602 Jacintoport Blvd.<br>Houston, TX 77015 | $0 | $0 | |
| Suemar Exploration & Production, LLC<br>1000 Frost Bank Plaza<br>Corpus Christi, TX 78246 | $0 | $0 | |
| Superior Crude Gathering, Inc.<br>PO Box 260784<br>Corpus Christi, TX 78426 | $0 | $0 | |
| TAS Environmental Services, LP<br>3929 California Pkwy. E.<br>Ft. Worth, TX 76119 | $3,735.53 | $0 | |
| Texon LP<br>11757 Katy Freeway, Ste. 1400<br>Houston, TX 77079 | $0 | $0 | |
| Truth Resources, LP<br>440 Louisiana, Ste 900<br>Houston, TX 77002 | $0 | $0 | |
| Valero Energy Corporation<br>One Valero Way<br>San Antonio, TX 78249 | $0 | $0 | |
| Vickrey & Associates<br>12940 Country Parkway<br>San Antonio, TX 78216 | $0 | $0 | |
| Vinoski & Associates<br>234 Pittsburgh Pike<br>Ruffs Dale, PA 15679 | $0 | $0 | |

| | | | |
|---|---|---|---|
| Waste Management<br>1777 NE Loop 410, Suite 1001<br>San Antonio, TX 78217 | $0 | $0 | |