**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | **CHAPTER 11 CASE** |
| **AGE REFINING, INC.,** | § | |
| | § | **CASE NO. 10-50501** |
| **Debtor.** | § | |
| | § | |

**SECOND AMENDED DISCLOSURE STATEMENT REGARDING TRUSTEE'S
CHAPTER 11 PLAN OF REORGANIZATION FOR
AGE REFINING, INC.**

**LANGLEY & BANACK, INC.**
745 E. Mulberry, Suite 900
San Antonio, Texas 78212
(210) 736-6600 Telephone
(210) 735-6889 Telecopier

DAVID S. GRAGG
State Bar No. 08253300
STEVEN R. BROOK
State Bar No. 03042300
NATALIE F. WILSON
Hawaii Bar No. 8852
Admitted *Pro Hac Vice*
ALLEN M. DeBARD
State Bar No. 24065132

**GENERAL COUNSEL
TO THE CHAPTER 11 TRUSTEE**

# TABLE OF CONTENTS

I.      Introduction
II.     Plan Overview and Important Notice to Holders of Claims
III.    Hearings and Deadlines to Object
IV.     Information Concerning the Debtor
     A.      History of the Debtor
     B.      Factors Leading to Chapter 11 Filing
     C.      Filing of the Bankruptcy Case
     D.      Sale to NuStar
     E.      Sale to TexStar
     F.      Significant Events Occurring During the Chapter 11 Case
          1.      Financing Orders
          2.      Critical Vendor Payments
          3.      Approval of Bid Procedures
          4.      Retention of Debtor's Professionals
          5.      Appointment of the Creditors Committee & its Professionals
          6.      Appointment of Chapter 11 Trustee
          7.      Professionals Hired by the Chapter 11 Trustee
          8.      Resumption of the Sale Process, Sale and Closing
V.      Explanation of Chapter 11
     A.      Overview of Chapter 11
     B.      Plan of Reorganization
VI.     Overview of the Plan
     A.      General
     B.      Classification and Treatment Summary
          1.      Administrative Claims and Priority Tax Claims
          2.      Professional Fee Claims
          3.      Statutory Fees
          4.      Summary of Classified Claims and Interests
     C.      Executory Contracts and Unexpired Leases
     D.      Disputed Claims
     E.      Means of Implementing the Plan
     F.      Services by and Fees for Professionals
     G.      Reserved Claims
     H.      Office of the United States Trustee
     I.      Effective Date Conditions
     J.      Retention of Jurisdiction
     K.      Modification or Withdrawal of the Plan
VII.    Confirmation of the Plan
     A.      Solicitation of Votes; Voting Procedures
     B.      Requirements for Confirmation of a Plan
VIII.   Risk Factors
     A.      Confirmation Risks
     B.      Conditions Precedent
     C.      Government Regulations

D.      Transfer Restrictions

IX.     Liquidation Alternative to Confirmation and Consummation of the Plan
X.      Recommendation and Conclusion

**<u>DISCLAIMER:</u> NEITHER THIS DISCLOSURE STATEMENT NOR THE SOLICITATION OF THE ACCOMPANYING PLAN HAS BEEN APPROVED BY THE BANKRUPTCY COURT.**

**AS OF THE FILING OF THIS DISCLOSURE STATEMENT, NO HEARING ON THE APPROVAL OF THE DISCLOSURE STATEMENT OR CONFIRMATION OF THE PLAN HAS BEEN SET. THE TRUSTEE WILL PROVIDE SEPARATE NOTICE, CONSISTENT WITH APPLICABLE BANKRUPTCY RULES, OF ANY SUCH HEARINGS AND OF THE DEADLINES FIXED BY THE COURT FOR OBJECTION TO THE PLAN OR THIS DISCLOSURE STATEMENT.**

## I.      INTRODUCTION

Eric J. Moeller, the court-appointed Chapter 11 Trustee in the above-captioned bankruptcy case (the "**Trustee**"), which case is pending before the United States Bankruptcy Court for the Western District of Texas, San Antonio Division (the "**Bankruptcy Court**"), respectfully submits this *[Proposed] Second Amended Disclosure Statement Regarding the Trustee's Chapter 11 Plan of Reorganization for AGE Refining, Inc.*, (as may be amended from time to time, the "**Disclosure Statement**").   This Disclosure Statement is to be used in connection with the Trustee's proposed *Second Amended Chapter 11 Plan of Reorganization for AGE Refining, Inc.* (as may be amended from time to time, the "**Plan**").     A copy of the Plan, which has been filed contemporaneously herewith, is attached hereto as Exhibit "A."   Unless otherwise defined herein, capitalized terms used herein have the meanings ascribed to them in the Plan, in accordance with Section 1.2 of the Plan.

## II.     PLAN OVERVIEW AND IMPORTANT NOTICE TO HOLDERS OF CLAIMS

The Plan contemplates the payment of allowed claims from proceeds generated through the previously consummated and Court approved transactions: [1]    the Trustee sold substantially all of the Estate's Refining Assets located in San Antonio and Falls City to NuStar Refining, LLC on April 19, 2011, pursuant to the Bankruptcy Court's April 14, 2011 Order    (Docket No. 913); and [2] the Trustee sold substantially all of the Estate's Redfish Bay Assets  in San Patricio County (Aransas Pass/Ingleside) to  TexStar Midstream Transport, LP, pursuant to the Bankruptcy Court's Order of May 20, 2011 (Docket No. 978) and the sale also closed on May 20, 2011.

**THIS DISCLOSURE STATEMENT CONTAINS INFORMATION THAT MAY BEAR ON YOUR DECISION TO SUPPORT CONFIRMATION OF THE PLAN.   PLEASE READ THIS DISCLOSURE STATEMENT AND THE PLAN CAREFULLY AND IN THEIR ENTIRETY.**

The Trustee submits that this Disclosure Statement contains information of a kind, and in sufficient detail, adequate to enable a hypothetical, reasonable investor, typical of the Holders of Claims against and Interests in the Debtor, to make an informed judgment with respect to the Plan.

Except for the Trustee and his professionals, no person has been authorized to use or promulgate any information concerning the Debtor or the Plan, other than the information contained in the Plan.   No Holder of a Claim against or Interest in the Debtor's Estate should rely on any information relating to the Debtor or the Plan other than what is contained in the Disclosure Statement, the Exhibits hereto, the Plan, and the Exhibits thereto.  Unless otherwise indicated, the sources of all information set forth in the Plan are the Debtor, the Trustee, and the Trustee's professionals.

## III.    HEARINGS AND DEADLINES TO OBJECT

The Trustee has requested hearings on the approval of the Disclosure Statement and Confirmation of the Plan. The Disclosure Statement hearing is tentatively scheduled for [], 2011 and the Confirmation Hearing is tentatively scheduled for [], 2011. As required under the applicable Bankruptcy Rules, the Trustee will provide all parties in interest at least twenty-eight (28) days' notice of the hearing to approve this Disclosure Statement, or obtain an order allowing a shortened notice period, and will further provide separate notice of all relevant deadlines fixed by the Bankruptcy Court regarding objections and voting.

## IV.    INFORMATION CONCERNING THE DEBTOR

### A.    History of the Debtor

Albert "Al" Gonzalez formed the Debtor's predecessor in the early 1990s, when he procured his first government contract to supply jet fuel to the military and acquired the refining plant that is the site of the Debtor's Presa Street facilities, now sold to NuStar. The Debtor emerged in its current structure in the late 1990s after a fire required substantial reconstruction of its facilities. Al Gonzalez's son, Glen joined AGE in 2002 and was appointed President. In 2008, Glen obtained forty-nine percent (49%) of AGE's stock from his parents, Al and Sharon Gonzalez.

By 2001, the Debtor had obtained procurement contracts with the Defense Logistics Agency - Energy ("**DLA-Energy**," formerly known as Defense Energy Support Center or DESC) to supply jet fuel to U.S. Air Force bases near San Antonio and Del Rio, Texas. The Debtor also began refining and supplying diesel fuel to VIA Metropolitan Transit of San Antonio, the city's local transit service. The Debtor's refining operations grew steadily over the past decade, and it was awarded significant contracts to continue supplying jet fuels to the military and commercial airlines. The Debtor also endeavored to refine and market "green" products such as biodiesel and low-emission diesel.

The Debtor qualified as a Small Business Administration ("**SBA**") entity. SBA status was important to the profitable operation of the refinery at current crack spreads. This advantage produced a committed outlet for approximately 80% of the Debtor's aggregate jet fuel capacity under military contracts at premium pricing. The Debtor's headquarters and refinery are located in Historically Underutilized Business Zones ("**HUBZone**"). The HUBZone status also assisted the Debtor in procuring military jet fuel contracts.

Prior to the sale of the Refining Assets, the Debtor refined crude oil to produce jet fuels, diesel products, solvents and other highly specialized fuels for its commercial, industrial and government customers. The Debtor has a 13,500 BPCD low sulfur crude unit (the "**Crude Unit**") and a 1,500 BPD solvent distillation unit (the "**Solvent Distillation Unit**"). The Crude Unit is currently permitted to operate and 21,000 BPCD, with an average through-put of 13,500 BPD. The Crude Unit was designed to process

6

Sweet South Texas Condensate or a blend of South Texas Condensate and South Texas Light Sweet Crude with a gravity of 40-53 APT and sulfur of less than .05% wt.  The Solvent Distillation Unit has five fractionating towers, which produce specialty fuels and solvents.  The fractionators operate in a series fashion which allows close quality control of these specialty fuels as well as customization of the solvent products.  The storage and distribution system at the refinery site includes a tank farm of 162 tanks ranging in capacity from 40 to 10,000 barrels, two additive blend systems, a tank car loading facility and two transport loading systems.  The Debtor also utilizes a tank farm in Elmendorf, Texas.  The total capacity of the Elmendorf tank farm is 208,000 barrels, which provides the Debtor with the ability to control product and crude inventory, as well as blending operations.  Because it is landlocked, the San Antonio refinery also has full rail access and loading capabilities for product distribution and crude receiving.  The majority of the Debtor's specialty jet fuels are shipped via rail car to destinations throughout the United States.

As of the Petition Date, the Debtor had government contracts to supply JP-8 (jet fuels) to three local U.S. Air Force bases.  These contracts represented approximately 17% to 19% of the Debtor's revenues for the years ended December 31, 2008 and 2007, respectively.  The Debtor also has an annual contract with the U.S. Air Force to supply TS-Kero, with one-year renewal options extending through March 31, 2012.  The contract represented approximately 3% of the Debtor's revenues for each of the years ended December 31, 2008 and 2007.

**B.    Factors Leading to Chapter 11 Filing**

As a result of its success during the past decade, the Debtor sought to expand its operations in 2007.  The costs of expansion were funded through a term loan facility provided by Chase Capital, as the administrative agent under the Chase Capital Credit Agreement.  The costs of the expansion were significantly higher than projected, and the expansion was delayed repeatedly.  As a result, the Debtor incurred a large amount of secured debt to Chase Capital.  As of the Petition Date, the total obligations due to Chase Capital were approximately $40,200,000, secured by first    liens on certain of the Debtor's fixed assets and a second lien on  working capital assets.

In July 2009, the Debtor experienced an explosion in its steam turbine generator (the "**Generator**" or "**STG**"), causing significant economic damages and delays to the Debtor's operation.  The STG was restarted on August 26, 2010.

Additional factors leading to the Debtor's bankruptcy filing include the rising prices for crude oil and the narrowing "crack spread," or profit margins, for the Debtor's refined products.  In the months leading up to the Petition Date, refining margins and crack spreads were impacted negatively by the decrease in global demand for refined products resulting from the reduction in industrial activity and the decline in consumer spending characteristic of the general decline of global and domestic economies.  Also, in the weeks preceding the Petition Date, the Debtor did not have sufficient availability under the facility terms and did not otherwise qualify for any further extensions of credit,

which were required by many of the Debtor's crude oil suppliers as a precondition to future shipments. When Chase Bank requested the Debtor (Glen Gonzalez) to provide sufficient collateral to permit further borrowings, the Debtor through Mr. Gonzalez refused. Prepetition, Chase Bank had provided a revolving credit facility to the Debtor under the terms and conditions of the Chase Bank Credit Agreement. Under that credit facility, Chase Bank extended letters of credit for the benefit of the Debtor's crude oil suppliers. Many of those letters expired by their terms in the weeks immediately preceding the bankruptcy filing. Thus, as the letters of credit expired, Debtor's crude suppliers refused to deliver new shipments of crude oil, forcing the Debtor to shut down its operations.

Finally, prior to the filing, the Debtor, through Glen Gonzalez, made a number of pre-petition transfers to himself, his family, family trusts and/or related insider companies to the financial detriment of the Debtor. These pre-petition transfers include payment of Glen Gonzalez's personal expenses, excessive compensation to Glen Gonzalez and family members or family trusts and massive distributions to Glen Gonzalez, family members or related entities on account of inflated stock value. The Debtor, through Glen Gonzalez, also used Debtor's funds to purchase and improvements to the Tierra Pipeline. Additionally, Glen Gonzalez used company money to purchase and improve real property in the name of Tierra G Squared, including the Redfish Bay Terminal. The Debtor advanced over $2.2 million for improvements at the Redfish Bay Terminal and has paid over $400,000 for the acquisition, improvements and repairs to the Tierra G Squared properties and the Tierra Pipeline.

### C.     Filing of the Bankruptcy Case

On February 8, 2010, the Debtor commenced this chapter 11 case by filing a voluntary chapter 11 petition. Contemporaneously with the filing of its chapter 11 petition, the Debtor also filed certain "first day" motions, requesting emergency relief from the Bankruptcy Court, including requests to (i) incur post-petition secured debt under an amended Chase Bank Credit Agreement (the "**DIP Agreement**"), (ii) pay certain pre-petition claims of crude suppliers and other vendors and contractors deemed by the Debtor to be critical to its ongoing operations; and (iii) retain and employ bankruptcy counsel, a restructuring officer and a technical project consultant. The Bankruptcy Court authorized the Debtor to enter into Chase Bank Credit Agreement, under which Chase Capital agreed to the Debtor's use of cash collateral and to make letters of credit available for crude suppliers. The Bankruptcy Court also authorized the Debtor to pay certain suppliers and contractors deemed to be critical to the Debtor's post-petition operations.

### D.     Sale to NuStar

The Trustee filed his motion to sell the Refining Assets on April 1, 2011. (Docket No. 879). The Court entered the Refining Sale Order on April 14, 2011, and the sale closed on April 19, 2011. The Refining Sale Order and the Trustee's decision to sell the assets to a designated purchaser, rather than conducting an auction, were the

result of an extensive review of the offers submitted by various parties interested in purchasing the Refining Assets and negotiations with NuStar. The Trustee and NuStar entered into an asset purchase agreement that provided the best possible terms and conditions for the Estate and would allow the parties to close on the Refining Asset Transaction. At the end of the process, the Trustee, using his business judgment, determined that the sale of the Refining Assets to NuStar would result in the greatest recovery to the estate and its creditors.

The Court agreed and entered the Refining Sale Order approving the sale after conducting a lengthy hearing. Only two parties filed formal objections to the Trustee's motion to sell, however, a number of parties objected orally at the sale hearing. The Court heard objections from equity holders, secured claim holders, the Creditors Committee and other parties-in-interest. At the end of the hearing, the Court held that the sale of the Refining Assets to NuStar was in the best interest of the Estate, constituted the highest and best offer for those assets and would result in the highest recovery to the estate.

The sale to NuStar generated $41,000,000 for the fixed assets, $2,220,292 for platinum, and approximately $10,901,646 for working capital.

At the closing, Chase Capital was paid $36,000,000, and Chase Bank was paid on its post-petition financing, $118,915. Immediately prior to such payment to Chase Bank, the outstanding balance of the post-petition financing was approximately $11,817,586.

### E.     Sale to TexStar

NuStar purchased the Refining Assets only and specifically excluded from its purchase all of the Debtor's rights, title and interests in and to the Redfish Bay Assets.

Once the NuStar sale excluded the Redfish Bay Assets, the Trustee and Global Hunter Securities, Inc. immediately contacted the other serious bidders for the Refining Assets as well as many AGE trading partners and other parties who could reasonably be expected to have an interest in the Redfish Bay Assets. These contacts led to discussions and ultimately negotiations with a subset of these parties regarding the purchase of the Redfish Bay Assets. The Trustee, after consultation with the Creditors Committee, determined to proceed with a more formal process in accordance with the Redfish Bay Bid Procedures Order which was approved by the Court after proper notice and a hearing. The Redfish Bay Bid Procedures Order allowed the Trustee to market the Redfish Bay Assets for a potential transaction, (i) with a negotiated sale with a designated purchaser, or (ii) through the designation of a stalking horse bidder and then holding an auction, or (iii) by holding an open auction with no stalking horse. In exercising his business judgment, the Trustee also has the option of cancelling the sale of the Redfish Bay Assets under the Redfish Bay Bid Procedures Order.

The Trustee sold the Redfish Bay Assets to TexStar, the designated purchaser for $6,500,000.00. This represented the highest and best offer under the Redfish Bay Bid

Procedures Order and offered the greatest recovery for the estate. The Court approved the sale of the Redfish Bay Assets on May 20, 2011 and the sale closed that same day.

### F. Significant Events Occurring During the Chapter 11 Case

Below is a summary of significant events that have occurred during the course of this Chapter 11 Case.

### 1. Financing Orders

On March 3, 2010, the Bankruptcy Court entered that DIP Financing Order. As of the Petition Date, the Debtor did not have the funds necessary to maintain its assets, sell or otherwise liquidate its assets, provide financial information, pay necessary employees, payroll taxes, overhead, and other expenses necessary to maximize the value of the Debtor's assets. The DIP Financing Order allowed the Debtor to use cash collateral of Chase Bank and Chase Capital and use the DIP Facility to continue operations which was necessary to avoid immediate and irreparable harm to the estate. Under the DIP Facility, the Debtor could enter into the DIP Agreement, under which Chase Capital and Chase Bank agreed to make letters of credit available for crude suppliers' post-petition deliveries.

To secure the DIP Facility, the Debtor stipulated that Chase Bank and Chase Capital each hold valid, enforceable, and allowable claims against the Debtor, as of the Petition Date, in an aggregate amount equal to at least $74,455,481 of non-contingent and contingent amounts and, to the extent applicable, unpaid principal, plus any and all other fees, cost, expenses, charges, other debts or obligations of the Debtor to Chase Bank and Chase Capital under certain pre-petition claim documents. The Debtor further stipulated that the aforementioned claims constitute allowed, legal, valid, binding, enforceable, and non-avoidable obligations of the Debtor, and shall not be subject to any offset, defense, counterclaim, avoidance, recharacterization, or subordination pursuant to the Bankruptcy Code or any other applicable law, and that the Debtor does not possess and shall not assert any claim, counterclaim, setoff, or defense of any kind, nature, or description which would in any way affect the validity, enforceability and non-avoidability of any of the claims. Finally, the Debtor stipulates that, as of the Petition Date, pursuant to the Pre-PetitionClaim Documents, Chase Bank has issued approximately $34,766,592 of commercial standby letters of credit.

Chase Bank was granted first priority claims, priming liens and the protections of good faith credit providers under Bankruptcy Code §§ 364(c)(1), (c)(2), and (c)(3), 364(d)(1), and 364(e) to secure the DIP Facility, senior to all other liens and security interests, including adequate protection and replacement liens which liens and security interests shall secure all DIP Facility amounts. These liens were automatically perfected and attach to any and all of the properties and assets of the Debtor and the Debtor's bankruptcy estate, both real and personal.

Through the DIP Financing Order, Chase Bank and Chase Capital were granted superpriority administrative claims and all other benefits and protections allowable under Bankruptcy Code §§ 507(b) and 503(b)(1), senior in right to all other administrative claims against the estate, except for the Carve-Out.

As adequate protection for the right to use the Lender's cash collateral and for extending the DIP Facility, Chase Bank and Chase Capital were granted, effective as of the Petition Date, valid and automatically perfected first priority replacement liens and security interests in and upon the Collateral and all other property of the Debtor and the Debtor's estate. In addition, any and all claims of Chase Bank funded post-petition under the Pre-Petition Claim Documents, the Letters of Credit or the DIP Facility are deemed post-petition obligations of the Debtor.  To the extent any adequate protection is insufficient to adequately protect the Lender's Interests Chase Bank and Chase Capital the DIP Financing Order granted superpriority administrative claims and all of the other benefits and protections allowable under Bankruptcy Code § 507(b).

The DIP Facility is evidenced by the Debtor in Possession Financing Amendment and Second Amendment to Amended and Restated Credit Agreement dated on or about February 16, 2010 and Financing Order.  The DIP Facility was renewed and extended by the Debtor in Possession Financing Amendment and Third Amended and Restated Credit Agreement dated as of June 30, 2010.

The Trustee renewed and extended the DIP Facility pursuant to the Trustee in Possession Financing Amendment and Fourth Amendment and Restated Credit Agreement dated September 2, 2010 (the "Fourth Amendment").  The Fourth Amendment renews and extends the DIP Facility for a period of time and reaffirmed the liens, security interests and other rights and interests granted to Chase bank and/or Chase Capital through the DIP Financing Order.

Additionally, the Trustee and Chase Bank negotiated and entered into the Overline Agreement which provided the Trustee with access to the aggregate amount of $5,000,000.00 through additional letters of credit (the "Overline Letters of Credit").

On December 7, 2010, the Court entered the Final TIP Financing Order.  Pursuant to the Final TIP Financing Order, the DIP Facility described above (now the TIP Credit Facility) was renewed and extended, allowing the Trustee to continue operating the Debtor's business.  The credit agreement with Chase Bank was itself amended through the 8th amendment extending the terms (but not increasing the amount) of the post-petition financing.

The DIP Financing Order provided that parties-in-interest would have ninety days from its entry (or, in the case of a creditors committee, 75 days from committee appointment) to investigate and seek authority to assert claims or causes of action against Chase Bank or Chase Capital arising out of the prepetition loan documents, otherwise challenging their liens and claims, or pursuing any other actions against Chase Bank or Chase Capital.  Failing such action by a party-in-interest, all of the Debtor's waivers,

releases, stipulations and affirmations regarding Chase Bank's and Chase Capital's claims and interests, of any nature were to be of full force and effect and forever binding upon the bankruptcy estate and all parties-in-interest. No party-in-interest, including without limitation, the Debtor, the United States Trustee, the Chapter 11 Trustee, or the Official Committee of Unsecured Creditors, has ever timely sought such authority, instituted any such action, or sought reconsideration of or appealed any of the Financing Orders, which (except as the underlying financing agreement had been amended from time to time), remain in full force and effect.

### 2. Critical Vendor Payments

As mentioned above, the Debtor, in its first day motions, sought authorization to pay certain creditors' pre-petition debts. On February 11, 2010, the Bankruptcy Court entered the Critical Vendor Order. Under the Critical Vendor Order, the Debtor negotiated agreements with certain crude suppliers to ensure a reliable stream of crude oil on terms favorable to the Debtor and the Estate. The Debtor agreed to pay part of certain suppliers' prepetition claims during the course of the Bankruptcy Case.

### 3. Approval of Bid Procedures

On March 8, 2010, the Bankruptcy Court entered Preliminary Bid Procedures Order, authorizing the Debtor to begin soliciting potential investors or purchasers for the Debtor's assets. Under the terms of the First Bid Procedures Order, the Debtor was authorized, but not required, to hold an Auction for cash offers from new investors or purchasers. It was contemplated that any proposed transaction would be consummated pursuant to a plan of reorganization or approval of a sale under section 363 of the Bankruptcy Code.

On December 21, 2010, the Bankruptcy Court entered the Second Bid Procedures Order, as amended March 15, 2011 (Docket No. 870). Pursuant to the Second Bid Procedures Order, the Trustee was authorized to recommence the sales process, with an auction or with negotiations with one potential buyer, a designated purchaser, without proceeding to a formal auction. NuStar was the designated purchaser.

On May 12, 2011, the Court entered the Redfish Bay Bid Procedures Order, and TexStar was also a designated purchaser.

### 4. Retention of the Debtor's Professionals

The Debtor engaged various professionals to assist in the reorganization process. The Bankruptcy Court approved the employment of the following professionals to serve in their respective capacities:

- Cox Smith Matthews Incorporated, as the Debtor's bankruptcy counsel;

- Albert S. Conley of FTI Consulting, Inc., as the Debtor's Chief Restructuring Officer;
- Merrill Communications, LLC, to publish and maintain a virtual data room for potential investors or purchasers;
- Muse Stancil and Co. as technical consultants to the Debtor;
- Global Hunter Securities, LLC as the Debtor's investment banker; and
- Certain other professionals retained as necessary pursuant to separate applications.

On March 19, 2010, the Bankruptcy Court entered an Order Establishing Procedures for Interim Compensation, authorizing the Debtor to pay its professionals portions of their monthly invoices on an interim basis and subject to certain guidelines, including the approval by the U.S. Trustee and Prepetition Lenders.

The Trustee filed a Motion to Amend the Procedures for Interim Compensation to expand the scope of the Order to include the Trustee and any professionals subsequently hired by him. The Court entered an Order approving the Amended Procedures for Interim Compensation on September 8, 2010 (Docket No. 554).

### 5.     Appointment of Committee & its Professionals

On March 17, 2010, the United States Trustee appointed an Official Committee of Unsecured Creditors. (Docket No. 138). On May 5, 2010, the Bankruptcy Court entered its Order approving the employment of Martin & Drought, PC as counsel to the Creditors Committee (Docket No. 246).

### 6.     Appointment of Chapter 11 Trustee

On May 25, 2010, the Lenders and the Creditors Committee filed their Motion to Appoint a Chapter 11 Trustee (Docket No. 291). In the Motion to Appoint a Chapter 11 Trustee, the Lenders and the Creditors Committee informed the Bankruptcy Court that they had lost confidence that AGE Refining's management, and in particular, Glen Gonzalez, could continue to perform its fiduciary obligations to the Estate and its creditors. The Motion recited Glen Gonzalez's excessive compensation, mismanagement of the Debtor's business, his refusal to cooperate with professionals, advisors, and the Lenders during the bankruptcy process, and his general lack of attention to both bankruptcy and day-to-day business matters. The Debtor, Lender and Creditors Committee reached an agreement resulting in the entry of an Agreed Order Granting the Motion to Appoint a Chapter 11 Trustee on June 16, 2010 (Docket No. 350).

On July 6, 2010, the Court entered its Order Approving the Amended Application of the United States Trustee to Approve Appointment of Eric Moeller as Trustee (Docket No. 410).

### 7.     Professionals Hired by the Chapter 11 Trustee

The Trustee has hired various professionals to assist him in the bankruptcy proceedings, including, but not limited to:

- Langley & Banack, Inc., as general counsel
- Global Hunter Securities, as investment bankers
- Martin & Drought, PC, as proposed litigation counsel
- Grant Thornton, as litigation expert
- David Brock, as special counsel
- Cox Smith Matthews, as special counsel
- Travis Wolff, LLP, as accountants

### 8.  Resumption of the Sale Process, Sale and Closing

As noted above, on March 15, 2011, the Bankruptcy Court entered the (Amended) Second Bid Procedures Order, pursuant to which the Trustee   sold the Refining Assets to NuStar pursuant to sections 363 and 365 of the Bankruptcy Code on   April 19, 2011.  On May 12, 2011, the Court entered its *bid procedures for the sale of the Redfish Bay Assets* (Docket No. 968), and the sale to TexStar closed May 20, 2011.

## V.  EXPLANATION OF CHAPTER 11

### A.  Overview of Chapter 11

Chapter 11 is the principal reorganization chapter of the Bankruptcy Code. Pursuant to chapter 11, the debtor-in-possession may attempt to reorganize its business for the benefit of the debtor, its creditors, and other parties-in-interest.  However, chapter 11 may also be used as a means for liquidating the debtor's assets under a controlled process that maximizes the value of those assets in an attempt to recover the greatest possible value for the creditors and interest holders.

The commencement of a chapter 11 case creates an estate comprised of all the legal and equitable interests of the debtor in property as of the date the petition was filed. Sections 1101, 1107, and 1108 of the Bankruptcy Code provide that a debtor may continue to operate its business and remain in possession of its property as a "debtor in possession" unless the bankruptcy court orders the appointment of a trustee.  In this case, the Debtor operated as a debtor in possession until July 6, 2010, when the Bankruptcy Court appointed Eric J. Moeller to be the Chapter 11 Trustee.

The principal purpose of a chapter 11 case is to formulate a plan of reorganization (which could include liquidation).  The plan of reorganization establishes the means for satisfying claims against and interests in the debtor.

### B.  Plan of Reorganization

Although referred to as a plan of reorganization, a plan may provide for a restructuring of the debtor's business and obligations or the liquidation of the debtor's assets.  In this case, the Trustee is [1] winding down remaining claims held by the Debtor (to include insurance claims), [2] prosecuting a lawsuit against insiders, and [3] determining how the Debtor's cash should be allocated to its creditors, including the Allocation of Unencumbered Assets .

After all of the secured claims, administrative and priority claims are paid in full, the Trustee will transfer all remaining assets to the Liquidating Trustee to be administered by a Liquidating Trustee on behalf of Class 4 claim holders.

In considering a plan, the bankruptcy court must independently determine that the requirements of section 1129 of the Bankruptcy Code have been met.  Section 1129 requires, *inter alia*, that a plan meets the "best interest" and "feasibility" tests.  The best interests test requires that the value of the consideration to be distributed to the holders of claims and equity interests under a plan may not be less than the value those parties would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code.  For a plan to be deemed feasible, the bankruptcy court must find that there is a reasonable probability that the debtor will be able to meet its obligations under the plan and that the debtor will not require further financial reorganization.

The Trustee believes that the Plan satisfies the applicable requirements of section 1129(a) of the Bankruptcy Code, including the best interests and feasibility tests.  The Trustee reserves the right to modify or supplement the Plan substantially.

Classes of claims or equity interests that are not "impaired" under a plan of reorganization are conclusively presumed to have accepted the plan and thus are not entitled to vote.  Accordingly, acceptances of a plan will generally be solicited only from those persons who hold claims or equity interests in an impaired class.  A class is impaired if the legal, equitable or contractual rights attaching to the claims or equity interests of that class are modified under the plan.

## VI.  OVERVIEW OF THE PLAN

### A.  General

The Plan you are being asked to consider is attached hereto as Exhibit "A."  You should carefully review the Plan prior to the Confirmation Hearing.

The Trustee believes that the Plan provides fair treatment to and is in the best interest of all classes of Claims and Interests.  The Trustee has sold the major assets of the Estate for a total of $60,621,000.00.  These funds were applied first to pay Chase Capital $36,000,000 and to repay the TIP Facility.   The Trustee will disburse the funds generated from asset sales to pay creditors in accordance with the provisions and priorities provided in the Bankruptcy Code, the Plan and further orders of the Bankruptcy Court.

The only remaining substantial asset of the Estate is the Gonzalez Litigation.  If this litigation is resolved prior to a hearing on the Disclosure Statement or Plan, the Trustee will disclose the terms of resolution in a plan supplement.  To the extent that the Gonzalez Litigation is not resolved prior to the Effective Date, the Gonzalez Litigation will be transferred to the Liquidating Trust.  The Liquidating Trustee shall have the authority and power to administer the Gonzalez Litigation and other Trust Assets on behalf of Class 4 claim holders (including any claims for insurance reimbursement).

The Trustee believes the Plan is feasible and meets the requirements of the Bankruptcy Code.  The information contained herein was prepared from information delivered by the Trustee's professionals (and information previously compiled by the Debtor's professionals) and has been approved by the Debtor's management, including the Trustee.

Attached as Exhibit _____ is a summary of the cash on hand and the estimated amounts of claims and the estimated remaining assets of the Estate.

This summary describes certain major elements of the Plan.  The remaining sections of the Plan deal with each of these subjects in greater detail.  The actual terms of the Plan are controlling, and this summary will not change and should not be used to construe terms of the Plan.

### B.    Classification and Treatment Summary

The following is a summary of the classification and treatment of Claims and Interests under the Plan.  Reference should be made to the entire Disclosure Statement and to the Plan for a complete description of the classification and treatment of Claims and Interests.

**THIS IS ONLY A SUMMARY OF CERTAIN KEY PROVISIONS OF THE PLAN.  THE PLAN INCLUDES OTHER PROVISIONS THAT MAY AFFECT YOUR RIGHTS.  YOU ARE URGED TO READ THE PLAN IN ITS ENTIRETY.**

### 1.    Administrative Claims and Priority Tax Claims

With respect to each Allowed Administrative Claim, except as otherwise provided for in Section 10.1 of the Plan, on, or as soon as reasonably practicable after, the latest of (i) the Effective Date, (ii) the date such Administrative Claim becomes an Allowed Administrative Claim, or (iii) the date such Administrative Claim becomes payable pursuant to any agreement between the Trustee and the holder of such Administrative Claim, the holder of each such Allowed Administrative Claim shall receive in full satisfaction, settlement, release and discharge of and in exchange for such Allowed Administrative Claim, (A) Cash equal to the unpaid portion of such Allowed

Administrative Claim or (B) such different treatment as to which the Trustee and such holder shall have agreed upon in writing; *provided, however,* that Allowed Administrative Claims with respect to liabilities incurred by the Debtor in the ordinary course of business during the Chapter 11 Case shall be paid in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto.

Each holder of an Allowed Priority Tax Claim shall receive, in full satisfaction, settlement, release and discharge of and in exchange for such Allowed Priority Tax Claim as shall have been determined by the Trustee, (i) regular installments payable in Cash, over a period not exceeding five years after the Petition Date, having a total value, as of the Effective Date, equal to the Allowed amount of such Claim; (ii) such different treatment as to which the Trustee and such holder have agreed in writing; *provided* that such treatment is on more favorable terms to the Debtor (or the Liquidating Trustee after the Effective Date), than the treatment set forth in clause (i) above; or (iii) payment in full in Cash on the later of the Distribution Date or the date on which such Claim becomes an Allowed Claim. Each holder of an Allowed Priority Tax Claim shall *not* receive any Cash or other distribution on account of a penalty on, with respect to or arising in connection with such Allowed Priority Tax Claims. All penalties on, with respect to or arising in connection with any Priority Tax Claim shall be treated as Class 4 General Unsecured Claims.

The aggregate amount of Administrative Claims and Priority Tax Claims are unknown as of the filing of this Disclosure Statement.

### 2. Professionals Fee Claims

All final requests for payment of Professional Fee Claims and any Substantial Contribution Claims must be filed and served on the Chapter 11 Trustee, counsel to the Chapter 11 Trustee, counsel to Chase Capital, counsel to the Creditors Committee, the United States Trustee and other necessary parties in interest no later than sixty (60) days after the Effective Date, unless otherwise ordered by the Bankruptcy Court. Objections to such requests for payment must be filed and served on the Chapter 11 Trustee, counsel to the Chapter 11 Trustee, counsel to Chase Capital, counsel to the Creditors Committee, the United States Trustee, and other necessary parties in interest and the requesting Professional or other entity no later than twenty (20) days after the date on which applicable request for payment was served unless a longer period is allowed by order of the Bankruptcy Court.

### 3. Statutory Fees

All fees payable pursuant to section 1930 of Title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on or before the Effective Date. All such fees that arise after the Effective Date shall be paid by the Liquidating Trust. The obligation of the Liquidating Trust to pay quarterly fees to the Office of the United States Trustee pursuant to section 1930 of Title 28 of the United

States Code shall continue until such time as a particular Chapter 11 Case is closed, dismissed or converted.

### 4. Summary of Classified Claims and Interests

Unless otherwise noted, the Trustee's estimates of the number and amount of Claims or Interests in each class set forth in the table below includes all Claims or Interests asserted against the Debtor without regard to the validity or timeliness of the filing of the Claims or Interests. Thus, by including any Claim in the estimates set forth below, the Trustee is not waiving his rights to object to any Claim or Interest on or before the objection deadline established by the Plan.

| Class | Treatment |
|---|---|
| **Class 1: Other Priority Claims**<br><br>Voting: Unimpaired – deemed to accept<br><br>Trustee's Estimate of Allowed Claims: $_____<br><br>Estimated Recovery: 100% | On, or as soon as reasonably practicable after, the latest of (i) the Distribution Date, (ii) the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, or (iii) the date on which such Allowed Other Priority Claim becomes payable pursuant to any agreement between the Trustee and the holder of such Other Priority Claim, each holder of an Allowed Other Priority Claim shall receive, in full satisfaction, settlement, release and discharge of and in exchange for such Allowed Other Priority Claim, either (A) Cash on the Effective Date equal to the unpaid portion of such Allowed Other Priority Claim or (B) such different treatment as to which the Trustee and such holder shall have agreed upon in writing; *provided* that such different treatment must be on more favorable terms to the Debtor after the Effective Date, than the treatment set forth in clause (A) above. |
| **Class 2: Asset Based Credit Facility Claims of Chase Bank under the Chase Bank Credit Agreement (DIP/TIP)**<br><br>Voting: Unimpaired – deemed to accept<br><br>Trustee's Estimate of Allowed Unpaid Claims: $0.00<br><br>Estimated Recovery: 100% | Chase Bank has already been paid in full the amount under the Chase Bank Credit Agreement. .<br><br>Notwithstanding the foregoing, if any letters of credit issued under the Chase Bank Credit Agreement remain outstanding as of the Effective Date, the Debtor or the Reorganized Debtor, as applicable, with either, with the consent of such issuing bank: (i) cash collateralized such letters of credit in an amount equal to at least 105% of the undrawn amount of any such letters of credit, (ii) return any such letters of credit to the issuing bank undrawn and marked "cancelled," or (iii) provide a "back to back" letter of credit to the issuing bank in a form and issued by an institution reasonably satisfactory to such issuing bank, in an amount equal to at least 105% of the then undrawn amount of such letters of credit.<br><br>Upon resolution of the outstanding letters of credit, any replacement or other Liens created pursuant to the DIP Financing Order for the benefit of Chase |

| | |
|---|---|
| | Bank shall terminate and shall have no further force or effect  . |
| **Class 3:  Secured Term Credit Facility Claim of Chase Capital**<br><br>Voting:  Unimpaired – deemed to accept<br><br>Trustee's Estimate of Allowed Claims:  [$_____, paid $___m and $_____ after admins are paid]<br><br>Estimated Recovery:  100% | Chase Capital is secured by, inter alia, pre-petition liens on the Refining Assets and the working capital assets (including the Working Capital Adjustment from the Refining Asset Transaction).  Through the DIP Financing Order and TIP Financing Order, Chase Capital was granted valid and automatically perfected first priority replacement liens and security interests in and upon the Collateral and all other property of the Debtor and the Debtor's estate.<br><br>The Fourth Amendment reaffirmed the liens, security interests and other rights and interests granted to Chase Capital through the DIP Financing Order.<br><br>Chase Capital has been paid $36 million under the Chase Capital Credit Agreement.<br><br>Chase Capital may claim an interest in proceeds  of the Redfish Bay Assets, as adequate protection or otherwise, a claim opposed in part or in whole by the Creditors Committee. The Creditors Committee may claim an interest in the proceeds of some of the Refinery Assets that were not subject to the pre-petition liens of Chase Capital. Chase Capital may oppose the Creditors Committee's position. This process is referred to in the Plan as the Allocation of Unencumbered Assets.<br><br>A portion of Chase Capital's Claim may be treated as a Class 4 unsecured claim; that portion has not yet been determined.  Chase claims it  may be owed as much as another $7,800,000  (or more) over what they have already been paid pre confrmation. The Trustee and the Committee are reviewing those arguments and intend to either resolve such claims by compromise, or litigate Chase's position prior to Plan confirmation.<br><br>In addition,  Chase Capital  shall retain any payment received by it pursuant to the DIP Financing Order or TIP Financing Order.  Any replacement or other Liens created pursuant to the Cash Collateral Order shall terminate and shall have no further force or effect as of the date upon which Chase Capital receives Cash equal to the value of the secured portion of its Claim. |
| **Class 4:  General Unsecured Claims**<br><br>Voting:  Impaired – entitled to vote | On or as soon as reasonably practicable after the Distribution Date, each holder of an Allowed General Unsecured Claim will receive, in full satisfaction, settlement of and in exchange for such |

| | |
|---|---|
| Trustee's estimate of Allowed Claims:  $[$6m]<br><br>Estimated Recovery: _____ | Allowed Claim, its Pro Rata share of the Cash and other property transferred to the Liquidating Trust. |
| **Class 5: Convenience Class Claims**<br><br>Voting:  Impaired – entitled to vote<br><br>Trustee's Estimate of Allowed Claims:  Unknown<br><br>Estimated Recovery:  ___% | On, or as soon as reasonably practicable after the Distribution Date, each holder of an Allowed Convenience Claim shall receive, in full satisfaction, settlement, and release of, and in exchange for all such Allowed Convenience Claims, a single Cash payment equal to ___% of such Allowed Convenience Claim.  Additionally, any Creditor holding an Allowed General Unsecured Claim exceeding the Convenience Class Maximum may elect treatment under this Section by agreeing to reduce the aggregate of all Allowed General Unsecured Claims held by such Creditor to an amount that is less than or equal to the Convenience Class Maximum. |
| **Class 6:  Subordinated Claims**<br><br>Voting:  Impaired – deemed to reject<br><br>Trustee's Estimate of Allowed Claims:  $_____<br><br>Estimated Recovery:  0% | Under the Plan, Subordinated Claims will not receive or retain any property on account of such Claims.  All Subordinated Claims will be discharged as of the Effective Date. |
| **Class 7:  AGE Refining Interests**<br><br>Voting:  Impaired – deemed to reject<br><br>Estimated Recovery:  0% | Under the Plan, all AGE Refining Interests of any kind shall be cancelled as of the Effective Date and the holders thereof shall not receive or retain any property under the Plan on account of such Interests. |

### C.  Executory Contracts and Unexpired Leases

Under the Bid Procedures Orders, the Trustee was required to give all known counterparties to executory contracts and unexpired leases notice of the amounts necessary to cure any default by the Debtor in order to assume and assign such leases and contracts.  The process was intended to fix the cure amounts so as to expedite the purchaser's ability to determine which contracts should be rejected and which should be assumed and assigned.  As of the filing of this Disclosure Statement, to the best of the Trustee's knowledge, all executory contracts and unexpired leases have been assumed and assigned or rejected in conjunction with the sale of the Refining Assets to NuStar and the Redfish Bay Assets to TexStar.    All parties to executory contracts and unexpired leases received notice from the Trustee and had the opportunity to object to the Trustee's designation of the contract or lease as an executory contract or unexpired lease and object to the Trustee's cure amount.  All executory contracts have been either assigned and assumed by NuStar or TexStar or rejected by the Debtor.

On the Effective Date, and to the extent permitted by applicable law, all of the Debtor's executory contracts and unexpired leases, if any remain, will be rejected by the Reorganized Debtor

### D.  Disputed Claims

Except as otherwise explicitly provided in the Plan, including without limitation, Article 10 of the Plan, nothing shall affect the Trustee's rights and defenses, both legal and equitable, with respect to any Claims, including, but not limited to, all rights with respect to legal and equitable defenses to alleged rights of setoff or recoupment. A Disputed Claim means: (i) if a Proof of Claim bar date for such Claim has been established pursuant to a Final Order, (a) Claims as to which a Proof of Claim is not timely filed, (b) a Filed Claim as to which the time period set for the Trustee to file an objection to such Claim has not expired, or (c) a Filed Claim as to which the Debtor or the Trustee has timely filed an objection but the Claim has not been settled by the Debtor or Trustee or determined, resolved, or adjudicated by Final Order; (ii) if a Proof of Claim bar date has not been established for such Claim, a Claims as to which (a) the Trustee disputes the Debtor's liability in any manner that would have been available to him had the Chapter 11 Case not been commenced, and (b) the liability of the Debtor has not been settled by the Trustee or determined, resolved or adjudicated by final, non-appealable order of a court or other tribunal of competent jurisdiction; (iii) a Claim that has been expressly disputed in the Plan; or (iv) a Claim that has been permitted to be adjudicated by the Bankruptcy Court and has not been allowed by a Final Order. No distributions shall be made on Disputed Claims until and unless such Disputed Claim becomes an Allowed Claim.

### E.     Means of Implementing the Plan

The source(s) of funding necessary for the treatment of Claims and Interest as set forth in the Plan will be from the funds generated from the sale of the Refining Assets and the Redfish Bay Assets.

Unless otherwise provided in the Plan Supplement and to the extent the Trustee has not already consummated a section 363 Sale of any remaining assets of the Estate, on or prior to the Effective Date, the Trustee shall transfer to, or vest in, the Liquidating Trust all of the Estate's assets Free and Clear of all Claims, Liens, charges, other encumbrances and Interests, except as specifically stated in the Plan and those that have already been sold under section 363 and 365 of the Bankruptcy Code. On and after the Effective Date, Liquidating Trustee will administer the trust assets, acquire and dispose of property, may retain, compensate and pay any professionals or advisors, and compromise or settle any Litigation Rights, including the Gonzalez Litigation, other causes of action, claims or interests without supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules other than restrictions expressly imposed by the Plan and the Confirmation Order.

### F.     Services by and Fees for Professionals

The Liquidating Trustee will be responsible for the payment of fees and expenses incurred by its Professionals, if any, following the Effective Date without the necessity of Bankruptcy Court approval.

### G.    Reserved Claims

Except as otherwise provided in the Plan, the Confirmation Order, or the Plan Supplement, and in accordance with section 1123(b) of the Bankruptcy Code, on the Effective Date, the Liquidating Trust shall hold all rights in the Reserved Claims that the Trustee, the Debtor or the Liquidating Trust may hold against any Person.   The Liquidating Trust shall retain and may enforce, sue on, settle, or compromise (or decline to do any of the foregoing) all such Reserved Claims including the following:

(a)    Any claims, obligations, suits, judgments, demands, debts, rights, causes of action or liabilities they may have against any employee, director or officer that is based upon an alleged breach of a confidentiality agreement, covenant not to compete or any other contractual or fiduciary obligation owed to the Debtor or the Trustee;

(b)    Any and all Claims and causes of action that are listed in the Debtor's Schedules or Statement of Financial Affairs;

(c)    Any and all Claims and causes of action that are subject to pending litigation in the Bankruptcy Court or a non-bankruptcy forum;

(d)    Any and all Claims against a Person, to the extent such Person asserts a crossclaim, a counterclaim, and/or a Claim for setoff that seeks affirmative relief against the Debtor;

(e)    All Avoidance Actions as defined in the Plan;

(f)    Any claims, counterclaims, obligations, suits, judgments, demands, debts, rights, causes of action or liabilities as may be asserted, or as have already been asserted, against an insurer, contractor, subcontractor, material supplier, laborer, supplier or any agent, employee or broker thereof, for any action arising under or elated to the STG project, including any issue of coverage, liability, warranty, workmanship or otherwise; [do we need to be more specific re:  preservation of claims?]

(g)    Any claim of wrongful offset or recoupment against a party entitled to receive distributions under the Plan; and

(h)    The Gonzalez Litigation, docketed as Adversary Proceeding No. 10-05120 (Docket No. 653), filed on November 3, 2010.

(i)    The Litigation Rights as defined in the Plan.

### H.    Office of the United States Trustee

The Liquidating Trustee shall provide the United States Trustee with financial reports on a quarterly basis in the form of affidavits of disbursements and pay all required fees until such time as a final decree is entered in this Case.

### I.  Effective Date Conditions

The following conditions precedent must be satisfied or waived on or prior to the Effective Date in accordance with Section 8.3 of the Plan:

(a)  The Confirmation Order shall have been entered in form and substance reasonably satisfactory to the Trustee and Chase Capital and shall, among other things:

(i)  provide that the Trustee and the Liquidating Trustee are authorized and directed to take all actions necessary or appropriate to consummate the Plan, including without limitation, to enter into, implement, and perform under the contracts, instruments, and other agreements or documents created in connection with the Plan;

(ii)  provide that, notwithstanding Rule 3020(e) of the Bankruptcy Rules, the Confirmation Order shall be immediately effective, subject to the terms and conditions of the Plan;

(b)  The Confirmation Order shall not then be stayed, vacated or reversed;

(c)  All material authorizations, consents, and regulatory approvals required, if any, in connection with consummation of the Plan shall have been obtained; and

(d)  All material actions, documents, and agreements necessary to implement the Plan shall have been effected or executed.

Upon the occurrence of the Effective Date, the Trustee or the Liquidating Trustee, whichever is applicable, shall file and serve a Notice of Effective Date and the Claims Bar Date in the Case.

### J.  Retention of Jurisdiction

Until this Chapter 11 case is closed, the Bankruptcy Court will retain the jurisdiction as is legally permissible under applicable law to ensure that the purpose and

intent of the Plan are carried out and to hear and determine all Claims, Interests and objections thereto that could have been brought before the entry of the Confirmation Order. The Bankruptcy Court will retain jurisdiction to hear and determine all Claims against and Interests in the Debtor and to enforce all causes of action that may exist on behalf of the Debtor, over which the Bankruptcy Court otherwise has jurisdiction.

### K.    Modification or Withdrawal of the Plan

The Trustee reserves the right to modify the Plan either before or after Confirmation to the fullest extent permitted under section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, including but not limited to modifications necessary to negotiate the resolution of an objection to the Confirmation of the Plan. The Trustee may withdraw the Plan at any time before the Confirmation Date, or thereafter prior to the Effective Date. The Plan may be amended by the Debtor before or after the Effective Date as provided in section 1127 of the Bankruptcy Code.

## VII.    CONFIRMATION OF THE PLAN

### A.    Solicitation of Votes; Voting Procedures

As set forth in Article 2 of the Plan, the following classes will be entitled to vote on the Plan: Class 4 (General Unsecured Claims), and Class 5 (Convenience Class Claims).[1] Claim holders with an Allowed Claim less than or equal to the Convenience Class Maximum will be placed in the Convenience Class (Class 5) and shall be permitted to vote on the Plan. All other Classes are either unimpaired or deemed to reject the Plan and, in either case, are not entitled to vote.

The Trustee will propose certain solicitation and voting procedures pursuant to a separate motion to be filed with the Court. Such motion and proposed procedures will provide (i) the notice of, among other things, the time for submitting ballots to accept or reject the Plan, the date, time, and place of the hearing to consider Confirmation of the Plan and related matters, and the time for filing objections to Confirmation of the Plan, and, as applicable, (ii) a ballot or ballots (and return envelope(s)) that may be used in voting to accept or to reject the Plan, or a notice of nonvoting status (the "**Solicitation Package**"). Only holders eligible to vote in favor of or against the Plan will receive ballots as part of their Solicitation Package.

### B.    Requirements for Confirmation of the Plan

At the Confirmation Hearing, the Bankruptcy Court must determine whether the Bankruptcy Code's requirements for confirmation of the Plan have been satisfied, in which event the Bankruptcy Court will enter an order confirming the Plan. As set forth in section 1129 of the Bankruptcy Code, these requirements are as follows:

---

[1] Class 5 Convenience Class Claims are impaired and entitled vote, but election by a General Unsecured Claim holder with an Allowed Claim greater that the Convenience Class Maximum to participate in Class 5 as a Convenience Claim is deemed to be an acceptance of the Plan.

1.      The plan complies with the applicable provisions of the Bankruptcy Code.

2.      The proponents of the plan complied with the applicable provisions of the Bankruptcy Code.

3.      The plan has been proposed in good faith and not by any means forbidden by law.

4.      Any payment made or promised by the debtor for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by or is subject to the approval of the Bankruptcy Court as reasonable.

5.      With respect to post-confirmation management,

  (a)

    (i)      The proponents of the plan have disclosed the identity and affiliations of any individual proposed to serve after confirmation of the plan as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor, or a successor to the debtor under the plan; and

    (ii)     the appointment to or continuance in such office of such individual is consistent with the interests of creditors and equity security holders and with public policy; and

  (b)      the proponent of the plan has disclosed the identity of any insider that will be employed or retained by the debtor and the nature of any compensation for such insider.

6.      Any governmental regulatory commission with jurisdiction, after confirmation of the plan, over the rates of the debtor has approved any rate change provided for in the plan, or such rate change is expressly conditioned on such approval.

7.      With respect to each impaired class of claims or interests:

  (a)      each holder of a claim or interest of such class has accepted the plan or will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor was

liquidated on such date under chapter 7 of the Bankruptcy Code on such date; or

(b) if section 1111(b)(2) of the Bankruptcy Code applies to the claims of such class, the holder of a claim of such class will receive or retain under the plan on account of such claim property of a value, as of the effective date of the plan, that is not less than the value of such holder's interest in the estate's interest in the property that secures such claims.

8. With respect to each class of claims or interests:

(a) such class has accepted the plan; or

(b) such class is not impaired under the plan.

9. Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that:

(a) with respect to a claim of a kind specified in section 507(a)(2) or 507(a)(3) of the Bankruptcy Code, on the Effective Date of the plan, the holder of such claim will receive on account of such claim cash equal to the allowed amount of such claim;

(b) with respect to a class of claims of a kind specified in sections 507(a)(1), 507(a)(4), 507(a)(5), 507(a)(6), or 507(a)(7), of the Bankruptcy Code, each holder of a claim of such class will receive:

(i) if such class has accepted the plan, deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

(ii) if such class has not accepted the plan, cash on the effective date of the plan, equal to the allowed amount of such claim; and

(c) with respect to a claim of a kind specified in section 507(a)(8) of the Bankruptcy Code, the holder of  claim will receive on account of such claim deferred cash payments, over a period not exceeding six years after the date of assessment of such claim, of a value, as of the effective date of the plan, equal to the allowed amount of such claim.

10.    If a class of claims is impaired under the plan, at least one class of claims that is impaired has accepted the plan, determined without including any acceptance of the plan by any insider holding a claim of such class.

11.    Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

12.    All fees payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the hearing on confirmation of the plan, have been paid or the plan provides for the payments of all such fees on the effective date of the plan.

13.    All transfers of property under the plan shall be made in accordance with any applicable provisions of non-bankruptcy law that govern the transfer of property by a corporation.

11 U.S.C. § 1129.

The Trustee believes that the Plan satisfies all of the statutory requirements of chapter 11 of the Bankruptcy Code, that the Trustee has complied with all the requirements of chapter 11, and that the Plan is proposed in good faith.

The Trustee believes that Holders of all Allowed Claims and Interests will receive payments under the Plan having a present value as of the Effective Date not less than the amounts likely to be received if the Debtor was liquidated in a case under Chapter 7 of the Bankruptcy Code.

The Trustee also believes that the feasibility requirement for confirmation of the Plan will be satisfied by the terms of the Order approving the sale of the Refining Assets of the Debtor's Assets to NuStar and the Order approving the sale of the Redfish Bay Assets. The proceeds from the sale of the Refining Assets and the proceeds from the sale of the Redfish Bay Assets will generate funds to satisfy all of the Debtor's secured obligations under the Plan. These facts and others in support of confirmation of the Plan will be provided at the Confirmation Hearing.

## VIII.    RISK FACTORS

### A.    Confirmation Risks

Any objection to confirmation of the Plan filed by a party in interest might prevent confirmation of the Plan or delay confirmation for a significant period of time.

### B.    Conditions Precedent

The following are conditions precedent to the occurrence of the Confirmation Date, each of which must be satisfied or waived in accordance with Section 8.3 of the Plan:

    (a)    an order finding that this Disclosure Statement contains adequate information pursuant to section 1125 of the Bankruptcy Code shall have been entered; and

    (b)    the proposed Confirmation Order shall be in form and substance reasonably satisfactory to the Trustee and Chase Capital.

Each of the conditions set forth in Sections 8.1 (Conditions to Confirmation) and 8.2 (Conditions to Effective Date) of the Plan, with the express exception of the conditions contained in Section 8.1(a) and Sections 8.2(a)(i), (ii), (iii) and (b), may be waived in whole or in part by the Trustee without any notice to parties in interest or the Bankruptcy Court and without a hearing; *provided, however*, that such waiver will not be effective without the consent of Chase Capital, which consent shall not be unreasonably withheld or delayed.

### C. Government Regulations

Because all of the Debtor's operating assets have been sold, the Debtor does not believe there are any material issues regarding governmental regulations.

## IX. LIQUIDATION ALTERNATIVE TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Trustee analyzed whether a Chapter 7 liquidation of the Debtor's remaining assets would be in the best interest of Holders of Claims and Interests. The Trustee's remaining material assets are Cash, some remaining insurance claims, and the Gonzalez Litigation. While the Trustee has not obtained a recent appraisal of the Debtor's remaining assets, all indications of the value of the Debtor's assets, indicate that the debt exceeds the aggregate value if such assets were liquidated. The assets, other than Cash, require a substantial learning curve to liquidate, such learning curve being possessed only the senior members of the Creditors Committee, or the Trustee. For this reason, the Trustee anticipates that a liquidation of its remaining assets through a Chapter 7 bankruptcy case would produce a substantially smaller return, for holders of General Unsecured Claims, Chapter 11 Administrative Claims and Interests in the Debtor. Thus, the Trustee believes that the consummation of the proposed Plan is in the best interests of the creditors, as it produces a better return for such creditors than a Chapter 7 liquidation.

## X. RECOMMENDATION AND CONCLUSION

The Trustee urges all Holder of Claims and Interests to support approval of this Disclosure Statement and confirmation of the Plan.

[Signature page follows]

Dated this 1st day of July, 2011.

AGE Refining, Inc.

By:   */s/ Eric J. Moeller*
       Eric J. Moeller
       Chapter 11 Trustee


**LANGLEY & BANACK, INC.**
745 E. Mulberry, Suite 900
San Antonio, Texas 78212
(210) 736-6600 Telephone
(210) 735-6889 Telecopier

By:     */s/ David S. Gragg*
       DAVID S. GRAGG
       State Bar No. 08253300
       STEVEN R. BROOK
       State Bar No. 03042300
       NATALIE F. WILSON
       Hawaii Bar No. 8852
       Admitted *Pro Hac Vice*
       ALLEN M. DeBARD
       State Bar No. 24065132

**GENERAL COUNSEL
TO THE CHAPTER 11 TRUSTEE**