IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE: | § | CHAPTER 11 CASE |
| | § | |
| AGE REFINING, INC. | § | CASE NO. 10-50501-LMC |
| | § | |
| Debtor. | § | |

**THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS'
APPLICATION TO VALUE THE SECURED CLAIM OF CHASE CAPITAL
CORPORATION UNDER BANKRUPTCY CODE § 506 (a) and (b)**

**THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE THIS WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING. REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.**

TO THE HONORABLE LEIF M. CLARK, UNITED STATES BANKRUPTCY JUDGE:

NOW COMES, the Official Committee of Unsecured Creditors (the "Committee") within the Chapter 11 bankruptcy proceeding styled, *Age Refining, Inc.* ("AGE"), Case No. 10-50501-LMC, in the United States Bankruptcy Court for the Western District of Texas, San Antonio Division, to file this its Application to Value the Secured Claim of Chase Capital Corporation ("Chase") under Bankruptcy Code § 506(a) and (b) (the "Valuation Motion") and would show unto the Court as follows:

## I. BACKGROUND

1.1 On February 8, 2010, (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code.

1.2 On March 3, 2010 the Court entered its Amended Final Agreed Order Authorizing Limited Use of Cash Collateral, Obtaining Credit Secured by Senior Liens, and Granting Adequate Protection to Existing Lienholders (the "DIP Financing Order") (Doc. No. 113). The DIP Financing Order authorized AGE to use cash collateral to continue operation and borrow funds under the DIP Agreement by which Chase agreed to extend letters of credit assuring post-petition crude deliveries, increases in the principal and loan amounts and extended the post-petition termination date. Under the DIP Financing Order, J. P. Morgan Chase Bank ("Chase Bank") was granted a first primary lien and Chase bear a second lien over their prepetition collateral and cash collateral to the extent proceeds under Bankruptcy Code § 552(a).[1] "Cash collateral was defined as cash including all income, product, rents of the Chase collateral on the petition date which were within Debtor's possession, custody or control. DIP Financing Order p. 9-10 ¶ 21. The Chase claim did not attach to unencumbered assets under the DIP Financing Order.

1.3 On March 17, 2010, the United States Trustee appointed the Official Committee of Unsecured Creditors (the "Committee") (Doc. 138).

1.4 On or about June 16, 2010, the Court entered an agreed order authorizing the appointment of Chapter 11 Trustee. On or about July 6, 2010, the Court entered an

---

[1] J.P. Morgan Chase Bank ("Chase Bank") having extended the Letter of Credit and post-petition financing was provided a primary lien on post-petition cash collateral; Chase Capital – owns the Chase Claim – having extended the prepetition loan in the AGE Refinery – was provided a second priority perfected lien on cash collateral. DIP Financing Oder p. 9-10 ¶ 20-21.

order appointing Eric J. Moeller, as Chapter 11 Trustee (the "Trustee").

1.5    On April 14, 2011, this Court signed its Order (a) Authorizing and Approving the Sale of Certain of the Debtor's Assets Free and Clear of all Liens, Claims and Encumbrances Outside the Ordinary Course of Business; and (b) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases and Approving Interim Distribution of Certain Sale Proceeds, (the "Refinery Sale Order") (Doc. No. 913) for and in consideration the sum of $41 Million (the "Refinery Sale Proceeds").  The Refinery Sale Order approved a sale free and clear of all-liens, claims, interests, and encumbrances with all such liens, claims, interests, encumbrances and liabilities to transfer and attach to any remaining sale proceeds.  (Refinery Sale Order p. 10 ¶ S).  Contemporaneously with closing of the Refinery Sale, Chase was paid $36,000,000 out of the $41 Million purchase price paid to AGE – to be applied to the Chase Claim.

1.6    On May 20, 2011 the Bankruptcy Court entered its Order (A) Authorizing and Approving the Sale of Certain of the Debtor's Assets Free and Clear of all Liens, Claims and Encumbrances Outside the Ordinary Course of Business; and (B) Approving the Assignment of Certain Executory Contracts and Unexpired Leases under Document No. 978 (the "Redfish Bay Sale Order") consummating a sale to TexStar for the sum of $6.5 Million (the "Redfish Bay Proceeds").  The Redfish Bay facility was not encumbered by Chase or Chase Bank's prepetition liens.

1.7    All DIP Financing Agreement obligations owed to Chase Bank were paid in full save and except a contingent obligation relating to two unexpired letters of credit extended by Chase Bank, leaving no remaining debt owed to Chase Bank.  The

payment of the DIP Financing obligations satisfied AGE obligations arising under the terms of the DIP Financing Agreements, thereby terminating Chase Bank's post-petition liens, encumbrances and attachments upon assets of AGE.

1.8 The prepetition obligations of Chase are referenced within the Chase Proof Claim dated March 11, 2010 (Claim Docket 50-1) where under Chase asserts a claim in the amount of $40,212,084.63, for money loaned, as a secured claim with any unsecured amount indicated as "unknown" (the "Chase Claim"). The Chase Claim is evidenced by the Second Amended and Restated Credit Security Agreement with Chase as Administrative Agent and Lender (as amended and supplemented from time to time prior to that date), the ("Chase Capital First Lien Credit Agreement"); and a certain Second Lien Credit and Security Agreement with Chase Capital Corporation as Administrative Agent and Lender (the "Chase Capital Second Lien Credit Agreement"). The outstanding balance owed on the Chase Claim on the petition date consisted of $30,062,495.48 on the first lien prepetition claim and $10,149,589.15 consisting of the second lien prepetition claim, for a total prepetition claim in the amount of $40,212,084.63. (Claim No. No. 50-1 Chase Claim)

1.9 Following Refinery Sale, Chase was paid $36 Million, applied against Chase Claim, resulting in a net remaining balance on the Chase Claim of $4,212,084.63, plus any interest, cost, fees and/or expenses to the extent authorized under § 506 (a) and (b) of the Bankruptcy Code, up to the value of collateral securing the prepetition liens of Chase.

1.10 Remaining assets constituting most of the remaining property of the AGE estate include:

    i.   <u>Cash</u>
        a.   Money Market Account $9,739,132.89 (including remaining Refinery Sale Proceeds and Redfish Bay Proceeds);
        b.   DIP Account $230,000;
        c.   Total Cash on hand other than checks and process, $9,969,132.89

    ii.   <u>Accounts Receivables</u> and other assets with good collection probability $400,000;

    iii.   <u>Insurance related collections</u> 0 to $6.6 Million (these include both asserted and unasserted claims in negotiation or litigation related to the May 2010 truck rack fire)

    iv.   <u>Gonzalez related receivables</u> other than adversary $1.7 Million (estimate)

    v.   <u>Claims against Gonzalez</u> – contingent unknown

See, Trustee Motion for Authority to Pay Pre-Petition Claim of Chase, p. 5 ¶ 14 (the "Trustee Motion")

    1.11   The Committee does not dispute that Chase asserts a secured prepetition claim to uncollected receivables and insurance proceeds – items number iii. and iv. above, to the extent of any lawful amounts due under the Chase Claim. Such claims, once established are in addition to the "valuation" sought by Committee herein.

## II.   ARGUMENTS AND AUTHORITIES

    2.1   A secured creditor's entitlement to post-petition interest is to be determined under § 506 (b) of the Bankruptcy Code. Section 506 (b) states in and of its part:

> "to the extent that an allowed secured claim is secured by property, the value of which . . . is greater than the amount of such claim, there shall be allowed to the holder of such claim interest on such claim."

11 U.S.C. § 506(b). Bankruptcy Code § 506(b) applies only from the date of filing

through the confirmation date. *Rake v. Wade*, 508 U.S. 464, 468 113 S. Ct. 2187, 2190, 124 L.Ed.2d 424 (1993).

    2.2    The creditor's entitlement to post-petition interest is predicated on the relationship between two values, that of the collateral and of the claim amount, to determine whether the creditor is oversecured and thus entitled to accrue post-petition interest. *Financial Security Assurance, Inc. v. T-H New Orleans Limited Partnership (In re T-H New Orleans Limited Partnership),* 116 F.3d. 790 at 798 (5th Cir. 1997).

    2.3    Valuations under § 506(a) and (b) are to be made in light of the purposes of the value. *In re Landing and Associates, Ltd.,* 122 B.R. 288 (Bankr. W.D. Tex. 1990). A party raising dispute of a creditors' right to interest under § 506(b) must file a motion for the Court to make such determination. *In re T-H New Orleans Limited Partnership* at 798. A creditor asserting an oversecured claim bears the ultimate burden of proof beyond a preponderance of evidence to an entitlement to post-petition interest and to an oversecured claim, to what extent, and for what period of time. *Id.* citing *In re Grabill Corporation* 121 B.R. 983, 991- 92 (Bankr. N.D. Ill. 1990).

    2.4    The measuring data upon which the status of a creditor's collateral and claim are compared is determinative of a creditor's rights to accrue interest under § 506(b), and matures at that point and time when the creditor's claim becomes oversecured. *T-H New Orleans Limited Partnership* at 799. Chase's claim, to the extent if any, deemed oversecured, did not approach an oversecured status until the Refinery Sale, following payment in full of the DIP Financing obligation owed to Chase Bank. At that point, all priming liens of Chase Bank were discharged, and the refinery was sold at a premium, raising Chase collateral position – form being substantially

undersecured to one on the fringes to potential oversecured status. Prior thereto the refinery was presumed to have a substantially lower value and working capital a deficit value, following payment of operating expenses, the DIP loan obligation and administrative debt. At prior intervals within the bankruptcy process the working capital deficit exceeded $10 Million.

      2.5    An oversecured creditor is entitled to post-petition interest only "to the extent that such interest when added to the principal amount of the claim [does not] exceed the value of the collateral". *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd. (In re Timbers of Inwood Forest Assocs., Ltd.),* 793 F.2d 1380, 1387 (5th Cir.1986), *on reh'g,* 808 F.2d 363 (1987) (en banc court reinstates panel opinion), *aff'd,* 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988). See also, *Landmark Financial Services v. Hall*, 918 F.2d 1150,1155 (4th Cir. 1990).

      2.6    Valuation of the secured claim under § 506 (a)(1) is to be made:

> "in light of the purpose of the valuation and of the proposed disposition or use of such property."

*In re Pan American General Hospital, LLC*, 385 B.R. 855, 864 (Bankr. W.D. Tex. 2008). The valuation sought herein, is intended to be determinative for plan confirmation and distribution purposes, to be made in perspective to the post-petition events having occurred within the reorganization process, keeping in mind the substantial enhancement to the value of the Chase Claim, the net increase in the value of the refinery of almost Twenty Million Dollars ($20,000,000.00) and the factors contributing to the final resolution including crude suppliers, unpaid invoices, insurance and construction expenses, costs of operation and overhead and professional fees. The "disposition" of the refinery occurred almost fourteen (14) months after the petition date,

after an explosion and reconstruction of the refinery loading terminal and following Trustee's appointment, the reinstated AGE business – optimizing production and maximizing operating profits. Expenses incurred within the "disposition" process are yet to be fully paid – including unsatisfied crude suppliers and insurance costs which directly relate to the enhanced Chase collateral position. Those costs and expenses while not chargeable to Chase under Bankruptcy Code § 506(c), are to be considered in relation to the "value" of the working capital. Working capital is generally described as assets minus payables including long term debt. http://en.wikipdeia.org/wiki/working-capital .

    2.7    The Chase "refinery" collateral was sold per Court order with the sale proceeds resulting therefrom being subject to distribution under the priorities established under the Bankruptcy Code. The value of collateral securing the Chase Claim includes the refinery value which, to some extent, is resolved by the refinery sale price under prevailing case law. *T-H New Orleans Limited Partnership* at 798, *In re Pan American General Hospital, LLC*, 385 B.R. 855 (Bankr. W.D. Tex. 2008), holding that where collateral is sold the value of the collateral is based within consideration recovered by the estate in connection with the sale. The Refinery Sale Proceeds amounted to $41 Million, paid to AGE, a portion of which $36 Million having been distributed to Chase. The refinery sale also included assets not encumbered by Chase prepetition lien or the Chase Claim, consisting of:

        i. Elmendorf Tank Farm;
        ii. Rolling stock;
        iii. Adjacent real property

(the "Unencumbered Refinery Sale Assets")

The Committee believes the value of the Unencumbered Refinery Sale Assets to be at least $2 Million thereby reducing the remaining pot of Refinery Sale Proceeds subject to the Chase Claim to $39 Million, and maximizing Chase's Claim to the Refinery Sale Proceeds at $39 Million – of which $3 Million remains unpaid.

2.8 Chase also asserts a security interest in "working capital" as a result of a second lien granted to Chase, securing its prepetition indebtedness through post-petition DIP Financing Order. (See, p. 9 ¶ 20-21 DIP Financing Order). Chase's myopic contention is that all cash remaining following distribution to Chase of remaining Refinery Sale Proceeds ($9.76 Million less $5.0 Million equals $4.76 Million) constitutes AGE "working capital" subject to Chase's lien. Chase assumes entitlement to all the remaining AGE cash contending that the entirety of the remaining proceeds consist of "working capital" subject to Chase Lender's Interest. The Committee disputes Chase contention that all remaining cash (less Refinery Sale Proceeds) constitutes the "cash collateral" subject to Chase's "Lender's Interest" – and would assert:

    i. <u>No Lien on Redfish Bay Proceeds:</u> The remaining cash within AGE accounts, includes cash derived from the subsequent Redfish Bay Sale amounting to $6.5 Million – which were not subject to the Chase Claim, and is not part of the "cash collateral" of Chase under the terms of the DIP Financing Order. Following a reduction out of the cash balance of those sums attributable to the Refinery Sale – of $5 Million, the remaining sum of $4.7 Million is less than the amount received for the Redfish Bay Sale ($6.5 Million) upon which Chase has no lien. Consequently, Chase's Lender's Interest does not attach to any of those proceeds and Chase secured claim is limited to $39 Million. Without consideration of the remaining unliquidated receivables and insurance proceeds which may be subject to the Chase claim.

    ii. <u>Sale of Accounts to NuStar:</u> Most of AGE's "working capital collateral" was sold to NuStar under the Purchase Agreement dated April 11, 2011, as modified by the Side Letter Agreement, providing that NuStar "agrees to purchase from Seller the Assigned

-9-

> Inventory, Assigned Accounts Receivables and Assigned Prepayments and assume the Cumulative Accounts Payable". The amount of the sold working capital was determined under the terms of the Closing Adjustment Statement delivered to Seller within 30 days after the date of closing, setting forth Purchaser's calculations of Closing Date Working Capital, together with supporting calculations and information which "trued up" the working capital between AGE and NuStar. (See, Side Agreement, dated May 19, 2011). The gross amount of the "working capital" reflected within the AGE books and records on the Closing Date – was $4.827 Million to be adjusted by:
>
> a. current payables amounting to $1.473 Million, further;
> b. outstanding obligations to SemCrude $1.8 Million; and
>
> c. reclamation claimants $2.1 Million, for an adjustment of at least $5.373 Million of the working capital balance resulting in a working capital deficit of approximately $500,000 and contribution zero value to the "secured value" of Chase's claim.
>
> iii. <u>Working Capital deficit resulting in no value attributable to Chase Claim:</u> Alternatively, based upon data provided by Trustee within Trustee's Motion for Authority to Pay Pre-Petition Claim of Chas (Doc. No. 1077 - the "Trustee Motion") – cash on hand as of July 27, 2011 was $9.73 Million. Following a reduction of remaining Refinery Sale Proceeds of $5 Million – the balance is $4.73 Million subject to further "true up" occurring through deduction of outstanding liabilities amounting to $5.66 Million – again resulting in a working capital deficit of approximately $900,000 – and contributing zero dollars ($0.00) to the Chase Claim.

A diagram depicting the Chase Claim value analysis is attached hereto as **Exhibit "A".**

2.9 Chase retains additional security interest in unliquidated collateral consisting primarily of uncollected account receivables – the ATI receivables – and insurance collection. No value can be attributed to those items given the uncertainty of collection – provided however that upon liquidation – the Chase Claim secured value would be adjusted to reflect the net benefit of collection.

-10-

## PRAYER

WHEREFORE, PREMISES CONSIDERED, the Committee respectfully requests that upon due consideration the Court determine that the secured value of the Chase claim is currently fixed at $39 Million, subject to further adjustment pending disposition of remaining unliquidated Chase collateral, and grant such other and further relief as the Court deems just and proper.

Respectfully submitted,

**MARTIN & DROUGHT, P.C.**
Bank of America Plaza, 25th Floor
300 Convent Street
San Antonio, Texas 78205-3789
Telephone: (210) 227-7591
Telecopier: (210) 227-7924

By: /s/Michael G. Colvard
  _____
  **MICHAEL G. COLVARD**
  State Bar No. 04629200

**ATTORNEYS FOR THE UNSECURED CREDITORS COMMITTEE**

## CERTIFICATE OF SERVICE

I hereby certify that on August 3, 2011, a true and correct copy of the foregoing document was served (i) electronically by the Court's PACER system, or (ii) by first-class U.S. Mail on the parties listed on the attached Service List.

/s/ Michael G. Colvard
Michael G. Colvard