**SIGNED this 13th day of July, 2012.**

_____
**LEIF M. CLARK
UNITED STATES BANKRUPTCY JUDGE**

_____

# United States Bankruptcy Court

Western District of Texas
San Antonio Division

| | |
|---|---|
| IN RE: | BANKR. CASE NO. |
| AGE REFINING, INC. | 10-50501 |
| *DEBTOR* | CHAPTER 11 |

**MEMORANDUM DECISION ON MOTION BY CHAPTER 11 TRUSTEE
FOR ALLOWANCE OF FEE ENHANCEMENT**

    Eric Moeller, the Chapter 11 Trustee (the "Trustee") appointed to manage Age Refining, Inc.'s (the "Debtor") operations, sell its assets, and wind down its business, filed a Motion for Allowance of Fee Enhancement (the "Motion") [Docket No. 1560] seeking a bonus of thirty (30) percent of his total compensation based on the "substantial costs savings and strategic achievements for which [Moeller] is responsible which dramatically benefitted the Estate and creditors." The Motion drew objections from the United States Trustee and Chase Capital Corporation. The court held a hearing on the Trustee's Motion on March 21, 2012, at which time the court took the matter under advisement.

1

The relevant facts provided in support of Mr. Moeller's Motion for Allowance of Fee Enhancement include the following:

Age Refining, Inc. filed for Chapter 11 protection on February 8, 2010. As of the petition date, the Debtor continued to operate as Debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. The Debtor's internal management, headed by Glen Gonzalez, continued to manage the Debtor as it began the restructuring process. The Debtor soon retained FTI Consulting, Inc. ("FTI") as Chief Restructuring Officer ("CRO") to provide financial advisory and consulting services to the Debtor. Shortly thereafter, the Debtor also hired Global Hunter Securities, LLC ("Global Hunter") to market and sell the Debtor's assets. The Debtor and its senior secured lenders Chase Capital Corporation ("Chase") and JP Morgan Chase Bank, N.A. ("JP Morgan") (together, the "Chase Entities" or "Chase") decided to market and sell the Debtor's assets. This sale was originally set to take place through an auction to be held on May 19, 2010. The Debtor proposed a schedule of deadlines for interested buyers to place stalking horse bids and regular bids and developed a process for determining the winning bidder. The Debtor also filed a Plan of Reorganization (the "First Plan") on April 6, 2010 and a Disclosure Statement on April 9, 2010.

On March 17, 2010 the court entered an agreed order authorizing the appointment of a Chapter 11 Trustee, and on July 6, 2010 the court entered an order appointing Eric J. Moeller as the Chapter 11 Trustee.

On May 5, 2010, the truck rack at the refinery was destroyed when a third-party carrier's truck caught fire. As a result of this explosion, the refinery remained idle until July 24, 2010. Two temporary truck racks were built to allow the continued shipment of product during the construction of the permanent truck rack. The first temporary truck rack was completed before the appointment of the Trustee. The second temporary truck rack was completed after the appointment of the Trustee. The Trustee participated in bringing the second truck rack online, although he admitted that much of the work had been completed prior to his arrival. The refinery resumed operations on July 24, 2010 following start-up of the second temporary truck rack. The permanent truck rack was completed during the first months of 2011, at which time the refinery began operating at full capacity. The Trustee stated that he was "deeply involved in the permanent truck-rack rebuilding process and contributed by vetting and selecting the contractor, obtaining Court approval of the contractor and overseeing much of the actual construction, ensuring its practical completion in a timely, cost-effective manner." (Mot. p. 3.)[1]

The Trustee asserted (and the evidence supported the assertion) that following the truck rack fire, and until the Trustee's appointment, the Debtor's bankruptcy case essentially went nowhere. The Trustee established that FTI all but disappeared, and the marketing and sales

---

[1] The Motion referred to throughout this decision is the Trustee's Application for Allowance of Fee Enhancement.

2

process came to a halt. In the joint motion to appoint a Chapter 11 Trustee filed in March, 2010, the Chase Entities and the Committee of Unsecured Creditors alleged various breaches of fiduciary duty and other misdeeds against the Debtor's management, arguing that cause existed to appoint an independent trustee. The parties eventually reached an agreement, and the Trustee began his work at the refinery on July 6, 2010.

The Trustee asserted that he "inherited a refinery and an estate that was lacking clear direction or a practical plan of action to increase value." (Mot. p. 4.). When Cindy Campbell, the Plant Controller and a critical member of the Debtor's finance team (with an annual salary of $113,000.00), left the company, the Trustee chose not to replace her. Rather, the Trustee chose to rely on the remaining finance and administrative personnel in combination with the Trustee's own oversight and direction. The Trustee also stated that after Jeff Dorrow, the Head of Commercial Operations, left the company, the Trustee largely assumed Dorrow's duties, which allowed the estate to forego replacing Dorrow (at an annual salary of $109,000.00). The Trustee maintained that these personnel decisions alone saved the estate significant sums by reducing payroll at the expense of the Trustee's own time. The Trustee stated that he spent additional personal time working with the Debtor's remaining staff to purchase crude and sell products, which had been Dorrow's job. With his background in the petroleum industry, the Trustee was able to train the remaining, less experienced team members to be more effective, "shaving at least three dollars per barrel off of the average crude price (each $1/barrel savings was worth $5 million per year in cash flow and multiples of that in a sales price) and increasing the average sales price for refined products." (Mot. p. 5.) The Trustee noted that he also was able to convince Lisa Trefger, a key employee of the Debtor, to remain with the company and take on additional responsibilities. "Ms. Trefger was a critical element of the ultimate success of the Case, and the Trustee considers keeping Ms. Trefger on as one of his more significant tasks and accomplishments on behalf of the estate." (Mot. p. 5.)

In sum, the Trustee argued that

[t]hese commercial gains were completely independent of an additive to the market improvements that also occurred under the Trustee's watch. By assuming many of Dorrow's and others functions, the Trustee kept payroll costs down, lower than they had been under prior (or subsequent) management and simultaneously and substantially improved gross profit margins, bringing tremendous value to the estate measured in the millions of dollars (if not tens of millions). The Trustee's deep personal involvement in day to day operations management, performance improvement and commercial negotiations went above and beyond the scope of work that a trustee would normally undertake.

(Mot. p. 5.)

3

The Trustee asserted that throughout his tenure he kept operating costs at an absolute minimum and successfully performed the tasks of the previously appointed CRO and its large staff with only the Trustee's own time and effort and that of the remaining Age employees. The Trustee stated that rather than hiring employees and consultants to replace those who left, he chose to tackle many of those tasks himself, resulting in "immediate, substantial cost savings and a greater return for the benefit of all creditors." (Mot. p. 6.) The Trustee maintained that FTI left little or no valuable work product for the Trustee to use. In short, the Trustee asserted that he and the remaining Age employees, through long days and weekends of tireless effort, were able to efficiently and effectively perform the work of the CRO and its numerous employees without the aid of any useful information from FTI.

As operations at the refinery became stabilized and the market improved, the Trustee stated that he turned his attention to resuming the process of marketing and selling the Debtor's assets. The highest stalking horse bids received under the Debtor's proposed sale process to acquire all the refinery assets plus net working capital had been valued at between $15-17 million under the Debtor's First Plan. The Trustee asserted that his involvement in the sales process went above and beyond what a typical trustee and even most investment banks would normally undertake in a section 363 sale. The Trustee stated that he personally redesigned, wrote and edited the offering memorandum for the sale of the refinery assets. The Trustee stated that the offering memorandum prepared by FTI "did not demonstrate any of the potential upside a potential purchaser could realize from a purchase of the refinery or any of the leverage points that could be used to increase profitability and as such was, in the Trustee's judgment, unlikely to justify the valuations that would most benefit the creditors." (Mot. p. 7.) The Trustee's re-write of the offering memorandum included a framework outlining the potential avenues a purchaser could take to realize additional value, namely: 1) an extensive listing of economically attractive capital projects, b) a listing of improvement projects only requiring minimal capital and/or administrative, organizational, commercial or other process changes, and c) positioning the refinery as a critical logistics asset in the mix of the Eagle Ford Shale development. (Mot. p. 7.) The Trustee estimated that the capital projects list specified $40 million in annual income enhancements and that minimal capital projects could generate approximately $12.6 million. The Trustee maintained that he was "instrumental in assembling, quantifying and highlighting these value creation opportunities to the prospective purchasers." (Mot. p. 8.) The Trustee also developed an interactive spreadsheet financial model that allowed purchasers to prepare discounted cash flow forecasts in real time with recent refinery numbers, price forecasts and operating assumptions. The spreadsheet also allowed a potential purchaser to toggle each of the projects on and off to calculate the cost-benefit analysis from implementing any of the improvement initiatives.

4

Additionally, the Trustee reorganized and then continuously updated the data room to provide potential purchasers with the Debtor's most current physical and financial information. The Trustee invited potential purchasers to the refinery, conducted plant tours and held management meetings to advance the purchasers' understanding of the process and economic capacity of the refinery. All of this, argued the Trustee, went above and beyond what is ordinarily expected of a Chapter 11 Trustee, and "contributed to the highly competitive sales process which in turn delivered exceptional value to the estate." (Mot. p. 8.)

The Trustee was ultimately able to sell the refinery for $41 million. The Trustee also sold the estate net working capital for $14 million. In sum, the Trustee maintained that through his success in operating the refinery more efficiently and at a higher percentage of its capacity at lower operating costs, and through his extensive marketing and sales efforts, the estate realized an increase in value of nearly $38 million from what it stood to gain prior to the Trustee's appointment and under the Debtor's First Plan.

The Trustee stated that he encouraged and negotiated with the Chase Entities and other parties in interest to wait until just the right time to sell the refinery. He stated that "[o]nce the industry margins and crack spreads increased, the Trustee moved aggressively and efficiently to sell the refinery in order to capitalize on these market conditions before they deteriorated." (Mot. p. 9.) The Trustee noted that shortly after the sale of the refinery assets, crude discounts and crack spreads shrank, thus underscoring the Trustee's invaluable knowledge of market conditions and ability to accurately gauge the appropriate time to sell.

The Debtor's estate also owned a lease in Aransas Pass, Texas on Redfish Bay — a valuable port on the Texas Gulf Coast. Pre-petition, the Debtor had not leased this space out, despite its potential to generate cash for the company. Rather, the Debtor had permitted a third party to use the space for free. After the refinery resumed operations, the Trustee began charging lease fees for the use of the Redfish Bay terminal, thereby generating significant operating cash flows for the estate during the Debtor's bankruptcy. The Trustee ultimately sold the Redfish Bay lease and associated assets for $6.5 million. The Trustee maintained that "[a]gain, as with the refinery, the timing of this sale was exceptional, capturing the value of this logistics asset at a time when competing assets had not yet been built and the applicable crude price spreads were at historic levels." (Mot. p. 10.)

The Trustee further stated that he provided additional benefits to the estate that were unforeseen at the time of his appointment. Specifically, the Trustee rigorously documented all claims arising from the truck rack fire with the Debtor's insurance provider and ultimately negotiated a settlement with its carrier. In all, the Trustee's efforts resulted in the recovery of $7.44 million from the Debtor's insurer to resolve final claims. The Trustee also recovered

5

another $2.4 million in a settlement with the Debtor's insurer related to the stop/loss interruption of a steam turbine generator.

Finally, the Trustee negotiated a settlement of the adversary proceeding that he had filed against Glen Gonzalez and others (the "Gonzalez Defendants") in November, 2010. The Trustee reached a settlement with the Gonzalez Defendants in December 2011, resulting in the estate receiving a payment of $3.647 million from the Gonzalez Defendants in addition to an agreement on the part of the Gonzalez Defendants to forego a $4.1 million unsecured claim against the estate.

As a result of the Trustee's obvious success in this case, the Trustee seeks a discretionary fee enhancement of $283,838.68, to be paid from the remaining estate funds. The amount sought constitutes thirty percent (30%) of the Trustee's twenty-one (21) months of total compensation for serving as Trustee for the estate. The Trustee received $55,000 per month from the time of his appointment until November 1, 2011, at which time the Trustee voluntarily reduced his monthly compensation to $15,000 per month.

The United States Trustee (the "UST") filed an objection to the Trustee's request for a fee enhancement. The UST argued that Mr. Moeller agreed to a limitation of $55,000 per month for July 6, 2010 through October 31, 2011 and agreed to compensation of $15,000 per month beginning November 1, 2011. The UST noted that the court held a hearing on Mr. Moeller's proposed compensation on July 6, 2010 to ask two questions: 1) whether the "eye-popping" $55,000 per month figure was a typo, and 2) what the reasoning was for the $55,000 per month compensation.

The UST asserted that the Trustee's request for a fee enhancement should be denied for several reasons: The UST maintained that the fee enhancement should be denied because the Trustee agreed to monthly compensation of $55,000 through October 31, 2011 and $15,000 thereafter, and admitted that these sums were fair and reasonable in light of the work performed and expected to be performed. The UST emphasized that in October, 2011, when the Trustee sought to have his compensation reduced from $55,000 per month to $15,000 per month, the Trustee stated that "[f]rom the date of his appointment through and until October 31, 2011, this [$55,000 per month] compensation was commensurate with the time and the attention the Trustee devoted to improving operations and effectuating the sale of the Debtor's Assets." (UST Obj. p. 5.) At this time the Trustee also stated that he believed the reduced compensation of $15,000 beginning November 1, 2011 was "fair and reasonable compensation for his remaining duties." (UST Obj. p. 5.)

The UST further argued that while the Trustee was clearly successful in his efforts, he had the benefit of Age employees and other professionals retained by the Debtor and the Trustee

6

to aid the Trustee in his management and ultimate sale of the Debtor's assets. The UST maintained that after the sale of the refinery in April 2011, and the sale of the Redfish Bay assets in May, 2011, the Trustee's main duties included "negotiating for the payment of insurance proceeds, managing the litigation with former owner Glen Gonzalez, resolving the payment of Chase Capital's claim, seeking plan confirmation, and generally managing the estate assets." (UST Obj. p. 4.) For this, noted the UST, the Trustee continued to be paid $55,000 per month through October 2011. The UST maintained that the Trustee should not receive a $283,000 bonus, at the expense of general unsecured creditors, simply for doing the job he was hired to do well. The UST did not dispute that the Trustee achieved good results, she simply asserted that, for $55,000 per month, excellence should have been assumed, not rewarded as though it were unexpected. In short, the UST asserted that the Trustee, who did not have to pay overhead or pay a staff, and who received what amounted to an annual salary of $660,000 per year, should not receive a bonus simply because he did a good job and worked long hours to do it.

The UST also asserted that the Trustee's reliance on section 328 as support for his request for an enhancement was improper as trustees are employed pursuant to section 326, not section 328. The UST further argued that even if section 328 were to apply, the Trustee had not met the exacting standards required to alter the terms of a section 328 retention agreement after the fact.

The Chase Entities also filed an objection to the Trustee's request for a fee enhancement. Chase, like the UST, did not dispute the Trustee performed his job admirably. Chase did dispute, however, that the Trustee's success justified a 30% bonus. Chase maintained that the Trustee bargained for and was hired for a maximum flat fee of $55,000 per month. Chase noted that the operable language in the retention agreement provides: "subject to review for reasonableness and court approval pursuant to 11 U.S.C. § 330(a) **_and limited by_** 11 U.S.C. § 326 **_and the $55,000 per month agreed amount listed above_**." (Docket No. 405, ¶ 9) (emphasis added). Chase asserted that the "good results" bonus now requested by the Trustee could have been negotiated into the original fee agreement, but was not. Chase further noted that the Trustee himself stated in his fee applications that his fees were not "outcome-dependent." (Chase Obj. p. 2.)

Chase argued that once the refinery and Redfish Bay assets were sold (all by mid-May, 2011 and 10 months after the Trustee's appointment), the Trustee "had virtually no assets to administer except litigation assets." (Chase Obj. p. 3.) Chase asserted that the Trustee spent the remainder of his tenure negotiating a settlement with Chase regarding Chase's claimed status as an over-secured creditor, negotiating various settlements with the Debtor's insurers in connection with the truck rack fire, negotiating the Gonzalez settlement, and obtaining court approval of the Debtor's plan and disclosure statement. Chase noted that the Trustee continued to receive his $55,000 per month fee for several months after the sale of the refinery and Redfish Bay assets— until November 1, 2011, when the Trustee voluntarily reduced his fee to $15,000 per month.

7

Like the UST, Chase argued that section 328 is inapplicable to Trustees and cannot be used to support the Trustee's request for a fee enhancement here. Rather, asserted Chase, section 330(a) governs Trustees' compensation. Chase maintained that a fee enhancement was simply not warranted in this case under section 330(a). Argued Chase:

> The Trustee has earned his agreed-upon fee, nothing more. The Trustee, despite that he previously alleged that his fee was not "outcome-dependent," seeks a bonus for himself based on outcomes: the sale of the refinery, the Redfish Bay sale, the settlement of the insurance claims, the settlement of the Gonzalez Litigation, and the plan confirmation. With respect to the refinery sale, the estate benefitted (in hindsight) from the truck rack fire that delayed the sale, which fortuitously resulted in the sale occurring at a time when market conditions made the crack spreads favorable. The Trustee notes that he moved to sell the refinery "[o]nce the industry margins and crack spreads increased." In addition, the Trustee did not sell the refinery by himself; he had the help of … others. … On the insurance settlement, the Trustee had the advice and counsel of his insurance counsel …. With respect to the Gonzalez Settlement, the great majority of the work was done by the Trustee's counsel and the Creditors' Committee counsel. Moreover, Chase Capital gave up valuable rights to make the Gonzalez Settlement happen, granting a release on a $1.7 million receivable upon which Chase Capital had a lien and granting Gonzalez a release. With respect to the chapter 11 plan, the majority of the work was done by the lawyers. None of these other professionals have requested an enhancement. None of the AGE employees appear to have received any bonuses as a result of these successes. As with most things, success, however measured, resulted from a team effort combined with elements of luck. Here, we have one person (not a firm with overhead to pay), who will already receive almost a million dollars for his efforts over 19 months, seeking an additional bonus of almost $300,000.

(Chase Obj. pp. 12-13.) Chase argued that while ordinary executives might expect a 30% bonus, this was not an ordinary situation. Chase emphasized that here the company was in bankruptcy, and any enhancement in the Trustee's compensation would come directly out of the pockets of creditors.[2]

---

[2] Chase also argued against any attempt to surcharge its collateral by way of section 506(c). It is unnecessary to review those arguments here, however, because the Trustee withdrew his surcharge argument on the record at the hearing.

*Discussion*

This court has ruled in the past that there is case law support in this circuit for enhancing fee awards. *See In re El Paso Refinery, L.P.*, 257 B.R. 809, 822-828 (Bankr. W.D.Tex. 2000).[3] However, the rule is that such enhancements are the exception, not the rule. *See id.* It is not surprising that professionals have more regularly sought fee enhancements -- after all, given the case law, it's worth a try when the outcome of the case is especially positive (as it has been in this case). In fact, it is not surprising that professionals might come to think that a court's refusal to grant an enhancement award is an indirect devaluation of the quality of their work -- after all, having made the request and been denied, is not the implication that these professionals are not so special after all?

The law in this area is not designed to meet or satisfy the expectations of professionals, however. Instead, it is crafted with a view to assuring that professionals are appropriately compensated for the work they have performed, while at the same time preventing them from being "overcompensated" or too richly rewarded. *See El Paso Refinery*, 257 B.R., at 827 (noting with regard to section 330 that "while the sense of Congress was certainly to bring professionals up to rates charged by non-bankruptcy professionals for comparable services, it is questionable whether they intended to go any further"); *see also In re Gulf Consolidated Services, Inc.*, 91 B.R. 414, 418 (Bankr. S.D.Tex. 1988) (to the same effect). In the "rare and exceptional" case, it may be necessary for the court to take a second look at the fee award to be sure that it accurately reflects the true value of the work performed in light of the results achieved. Moreover, the results achieved must be more than serendipitous. They must have a direct connection with the work performed by the professional. And they must be results well beyond what anyone might have expected. *In re El Paso Refinery, L.P.*, 257 B.R. at 835-36. That is what this court held in *El Paso Refinery* and no law since gives this court reason to depart from that standard now.

Recently, a bankruptcy court in the Southern District of Texas had occasion to apply this legal standard to a request for a fee enhancement made by debtor's counsel in the *Asarco* bankruptcy case. *See In re Asarco*, No. 05-21207, 2011 WL 2974957 (Bankr. S.D. Tex. July 20, 2011). That court had many positive things to say about the law firm, and readily acknowledged that the ultimate outcome of the case was far more positive than might have been expected at other stages of the case. Nonetheless, the court declined to award an enhanced fee for any work beyond that put into a particular piece of litigation, the outcome of which had a significant impact on the successful outcome of the entire case, and whose result could be directly attributed to the firm's work. The court found that the lodestar rate adequately compensated the firm for the

---

[3] The case extensively discussed the Fifth Circuit's approach to calculating the lodestar, as well as the cases that explained the manner in which the lodestar could be adjusted upward when the lodestar as originally calculated still fails to adequately compensate the professional, given the work performed and the results obtained. *See Shipes v. Trinity Industries*, 987 F.2d 311 (5th Cir. 1993); *Transamerican Natural Gas Corp. v. Zapata Partnershuip0, Ltd (In re Fender)*, 12 F.3d 480 (5th Cir. 1994).

9

majority of the services that it performed, even though that rate was, on average, below the rate that another firm might have charged for similar services.

In this case, the services in question are not those of an attorney or accountant, but that of a trustee. Trustee fees are capped by section 326 at a percentage of funds disbursed. In this case, the total of funds disbursed (including funds to the secured creditor) exceeds $40 million. The maximum amount that the Trustee could be paid in this case, then, is in the range of $2 million. This Trustee has already been paid in excess of $900,000, an amount that, though substantial, is still below the cap. If the fee enhancement is granted, and the Trustee is awarded the approximately $1.2 million fee he has requested, the cap will still not be exceeded.

The Trustee originally contracted for a "flat fee" to assure that he would be paid on an ongoing basis. At the time, he stated that he would not be seeking any more compensation beyond that flat fee. Now, however, as things have turned out, had the Trustee *not* made this fee arrangement, and had he instead simply filed a final report and requested a trustee's fee in the amount of the section 326 cap, the fee might have been approved (unless a creditor filed an objection). Perhaps an objection might have been filed in that event, but objections were almost certain to be filed when the Trustee filed a request for fee *enhancement*. And that is what has happened here. The Trustee's argument could thus be reduced to this simple proposition: "I would like to receive something approaching the compensation I think I would have received had I simply filed a Trustee's Final Report."[4]

The Trustee's position is certainly understandable. It is not sustainable, however. Section 326 is a cap, not an entitlement. Section 330 is the section that actually controls the fee request of the Trustee, and that section allows fees that are "reasonable and necessary." Fee enhancement allows a court to make further adjustments to be sure that a trustee or professional receives compensation that is in fact reasonable, given the circumstances of the case. *See El Paso Refinery*, *supra*. In this case, by contrast, the fees the Trustee has already received are more than reasonable as they stand. Any further enhancement would only lead to overcompensation.[5]

The fee payment arrangement originally negotiated by the Trustee gave the Trustee $55,000 per month as compensation. This court approved that amount, while expressing some

---

[4] The Trustee could well have added, "If only I'd had a crystal ball when I was first retained. Had I known then what I know now …."

[5] It is worth recalling that no evidence was put on other than the testimony of the trustee himself, who talked about what was accomplished in the case. While that evidence was valuable (and necessary), the court also needed to hear evidence to demonstrate that the current award was insufficient. A comparison to what other professionals cast in similar circumstances have been paid, by way of example, would have helped the court to determine whether, given the nature of the work done here, the compensation scheme fell inside or outside the range of reasonableness, after looking at what other professionals are paid. This sort of evidence was not presented. *See El Paso Refinery*, *supra* at 828 (noting the need for evidence that charging an additional fee or kicker above normal rates is customary in the area in which (in that case) attorneys practiced).

reservations about the monthly amount, describing it at the time as "eye popping." Still, given the qualifications of the Trustee, and the estate's need for emergency management, the amount seemed not entirely unreasonable, especially as the Trustee then expressed the sentiment that he had no intention of asking for a "bonus" or other similar enhancement at the end of his tenure. The Trustee served a true operational role, far beyond mere oversight of existing management. What is more, his guidance was sure, his hand steady. He steered the company through a difficult period, bringing the refinery back on line after a fire shut operations down for a period of time, then making the refinery marketable, all within less than a year. This is not just the work of a trustee. This is the work of a turnaround manager.

But the Trustee was compensated essentially as a turnaround manager. His monthly compensation translates to an annual salary of $660,000, a significant income for someone leading a company of this size in a city like San Antonio. No evidence was put on to suggest that this amount of compensation was anything less than reasonable in light of the nature of the services rendered. No evidence was presented of what other managers running similar sized businesses are able to command for their services – or for their results. Moreover, the Trustee continued to receive compensation of $55,000 for another five months following the conclusion of his role as operational manager of the refinery. In this period, his role did not differ significantly from that of any bankruptcy trustee, yet he continued to be compensated as though he were still operating the refinery.

The Trustee points to the excellent result with respect to the sale of the refinery, and of the tank farm lease at Redfish Bay. It is true that these results are attributable in no small part to his skillful operation of these assets. But for the sort of compensation he was receiving, that was the job he was expected to do. This is not the lottery, after all.[6]

---

[6] Regarding the Trustee's attempt to analogize his request for a bonus to a fee enhancement sought pursuant to section 328, the court agrees with the UST that section 326, not section 328, governs the retention of trustees. Section 326 provides:

> (a) In a case under chapter 7 or 11, the court may allow reasonable compensation under section 330 of this title of the trustee for the trustee's services, payable after the trustee renders such services, not to exceed 25 percent on the first $5,000 or less, 10 percent on any amount in excess of $5,000 but not in excess of $50,000, 5 percent on any amount in excess of $50,000 but not in excess of $1,000,000, and reasonable compensation not to exceed 3 percent of such moneys in excess of $1,000,000, upon all moneys disbursed or turned over in the case by the trustee to parties in interest, excluding the debtor, but including holders of secured claims.

11 U.S.C. § 326(a). Thus, a trustee's fee application is examined in accordance with the standards set out in section 330, subject to the cap outlined in section 326. Section 328 is not relevant.

11

For the reasons stated, the Trustee's Motion for Allowance of Fee Enhancement must be denied. An order reflecting the court's holding will be entered separately.

# # #